UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------

FR. FABIÁN ARIAS,

STEPHEN KELLY,

LAURA McCALLUM,

DEBBIE NATHAN,

DR. ZOEY PHILLIPS,

*Plaintiffs,*

v.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,
and TODD LYONS, in his official capacity as Acting
Director of U.S. Immigration and Customs Enforcement,
500 12th St. SW, Washington, D.C. 20536,

U.S. DEPARTMENT OF HOMELAND SECURITY, and
KRISTI NOEM, in her official capacity as Secretary of the
U.S. Department of Homeland Security,
2707 Martin Luther King Jr. Ave SE, Washington, D.C.
20528,

U.S. DEPARTMENT OF JUSTICE, and PAMELA BONDI,
in her official capacity as U.S. Attorney General,
950 Pennsylvania Ave., NW, Washington, DC 20530,

GENERAL SERVICES ADMINISTRATION, and
EDWARD FORST, in his official capacity as Administrator
of General Services,
1800 F Street NW, Washington, DC 20405,

*Defendants.*

-------------------------------------------------------------------------

1:26-cv-02130 (CM)

AMENDED COMPLAINT

INTRODUCTION

1.      This is a case about the government using force on people who disagree with them with words, inside a courthouse, and brought by New Yorkers on their own behalf. Defendants have implemented policies and practices including violent detention operations, arbitrary and degrading access rituals, targeted harassment of members of the public, and systematic interference with the ability to speak with supportive individuals. Taken together it functions to deter a person of ordinary firmness from attending, observing, or participating in judicial proceedings, and from engaging in protected speech and association in and around the courthouse. What emerges is not a series of disconnected incidents, but a coherent pattern of coercive conduct that chills speech, fractures association, and undermines access to the courts carried out in plain view as a continuous feature of this court's operations.

2.      This action challenges a pattern and practice by Defendants that directly restricts core First Amendment activity in and around federal immigration courts. Defendants have (i) locked courtrooms during proceedings that are required to be open to the public, (ii) prohibited members of the public from speaking with respondents, (iii) ejected individuals for distributing "know your rights" materials, and (iv) engaged in harassment in publicly accessible areas such that protected activity is effectively impossible, (v) engaged in conduct that would deter a person of ordinary firmness from appearing in court, conducting necessary business before the court, using the services of the clerk of the court, or participating in judicial proceedings.

3.      Plaintiffs seek declaratory and injunctive relief to halt these ongoing constitutional violations and to ensure that immigration court proceedings and their surrounding public spaces remain open to lawful expression, observation, and association.

BACKGROUND

4.     The immigration court is an administrative court within the Executive Office of Immigration Review ("EOIR"), a component of the United States Department of Justice. Immigration court hearings are generally open to the public except in limited circumstances prescribed by regulation. 8 C.F.R. § 1003.27 (2025); Executive Office for Immigration Review, *Immigration Court Practice Manual* § 4.9 (2024). Courts have long recognized that adjudicative proceedings are presumptively open to the public under the First Amendment. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980); *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984).

5.     Much of the work of the immigration courts involves adjudicating removal proceedings for individuals seeking asylum. Although removal proceedings are civil in nature, they must comport with the requirements of due process under the Fifth Amendment. *Reno v. Flores*, 507 U.S. 292, 306 (1993); *Bridges v. Wixon*, 326 U.S. 135, 154 (1945); *Yamataya v. Fisher*, 189 U.S. 86 (1903). These proceedings therefore carry the openness and transparency associated with adjudicative proceedings whose doors are open to the public. *Richmond Newspapers, Inc v. Virginia*, 448 U.S. at 580–81.

6.     Federal precedent identifies only one relevant distinction between removal proceedings and criminal prosecutions: respondents are not entitled to government-appointed counsel. Rather, proceedings consist of the respondent, usually advocating for themselves *pro se*, an EOIR Immigration Judge, and an attorney from the U.S. Department of Homeland Security. 8 U.S.C. § 1362. The latter two roles are under the control of the executive, and there is no meaningful structural oversight outside of executive agencies.

7.      The immigration courts are among the most consequential of the federal administrative courts. They decide whether an individual will be deported, often after a period of years and sometimes decades in this country. They decide whether individuals will remain with their families or be separated, whether they will be permitted to stay or compelled to leave, often to places where they face immediate and concrete danger.

8.      At the same time, the asylum process operates through an extraordinarily complex bureaucratic framework. The governing law draws from an intricate combination of federal statutes, administrative regulations, immigration precedent, international refugee law, and federal court decisions. Navigating this framework is difficult even for experienced practitioners. Respondents, the overwhelming majority of whom are unrepresented, must attempt to understand and participate in these proceedings while confronting fear, uncertainty, and sometimes continuing personal threats via social media.

9.      Many people who learn about the circumstances of immigration court respondents find that it deeply implicates their personal civil, moral, and religious values. As a result, over time, a distinct civic culture has developed around supporting immigration court respondents. One aspect of this is what is commonly called "accompaniment," which is the practice of attending court with a respondent to provide logistical, informational, and emotional support. The accompanying individual may be a member of a local congregation, a community volunteer, or a personal friend. On the day of a hearing, the volunteer typically travels with the respondent to the courthouse, waits with them until the case is called, and sits in the gallery during the proceeding. The latter role is particularly important as respondents frequently retain little of what occurs during their hearings. Moreover, immigration court proceedings do not provide respondents with

transcripts or accessible recordings. In this setting, the presence of a supportive observer able to take notes, understand procedural directives, and recall next steps is crucial.

10.     Another aspect is maintaining a presence in public waiting areas to share information about legal and social services, observe open proceedings, and offer compassionate support, all of which are longstanding practices in this forum. These activities reflect core First Amendment principles of speech, association, and public observation, and there is no meaningful alternative venue in which these forms of expression can occur.

11.     Apart from activities supporting respondents, access to the immigration courts is necessary for accurate reporting, study by legal practitioners and students, and for the accurate observation and data compilation undertaken by legal organizations, non-profits, advocacy organizations, and academic institutions. Defendants' actions are an impermissible attack on government accountability and public confidence in the administration of justice. *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982); *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83 (2d Cir. 2004).

12.     During the past year, the authorities responsible for operating the immigration courts in New York City have applied a vast array of policies and procedures to discourage, restrict, or entirely block public attendance. These policies and procedures are wholly contrary to law, to all applicable federal precedent, and to the immigration courts' own procedural manual. Executive Office for Immigration Review, Immigration Court Practice Manual § 4.9 (2024); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980).

13.     Government opposition to protected activities has permeated all aspects of the daily operations of the immigration courts, starting before a visitor even enters the building: security guards stationed behind barricades outside prevent individuals from approaching or entering,

even though the building houses numerous other public offices, and an individual who questions the asserted identification policy may be required to produce additional forms of identification or documentation, even though this does not reflect any written policy. This practice has resulted in visitors, respondents with scheduled hearings, and even attorneys being denied entry for failing to satisfy an entrance requirement that has no basis in any published rule. See *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969) (invalidating permit scheme granting officials unfettered discretion over expressive activity); *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 757 (1988) (holding licensing schemes allowing officials to grant or deny access to expressive channels without objective standards violate the First Amendment).

14.     When members of the public are able to gain access to the building, they are subjected to severe harassment and physical danger by security guards and federal police, and are prevented from observing public proceedings by court employees. This has become a daily occurrence. Individuals who attempt to remain to carry out their protected activities in public areas may be expelled at the discretion of security officers, federal police, or court staff for doing so. Individuals have been expelled from the building for conduct such as quietly speaking with a respondent in a public waiting room or, in one case, writing down the name of a church that provides services and showing it to an immigrant.

15.     Those who manage to remain in public areas around the immigration court despite these obstacles find that nearly every active courtroom is locked against public entry, typically with a court employee stationed inside to admit only respondents. If a member of the public does gain entry, a federal employee will question their presence and remove them before the proceedings begin. This applies equally to remote presence on Webex, and to individuals accompanying a respondent at their own request. These practices are not set forth in any public policy, depart

from decades of established practice, and are contrary to governing precedent. See *Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 581 (1980); *Press-Enterprise Co. v. Superior Court* ("Press-Enterprise I"), 464 U.S. 501, 510 (1984); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606–07 (1982); *United States v. Alcantara*, 396 F.3d 189, 196–200 (2d Cir. 2005). They do not reflect the court's published procedures, which explicitly require proceedings be open, and do not allow access to be restricted, except that if there is insufficient room in the gallery, reporters should be given preference as a matter of public policy. 8 C.F.R. § 1003.27(a); Executive Office for Immigration Review, Immigration Court Practice Manual § 4.9(b) (2024).

16.     Courts have consistently held that once the government opens a forum for expressive activity, it may not discriminate based on viewpoint. See, e.g., *United States v. Grace*, 461 U.S. 171, 177 (1983); *Widmar v. Vincent*, 454 U.S. 263, 267–69 (1981); *Good News Club v. Milford Central School*, 533 U.S. 98, 107 (2001). Mere presence in public areas around the immigration court itself constitutes an easily understood expression of support for immigrants and refugees in American society. People familiar with the variety of works done in this venue are unaware of even a single example of a member of the public being there for any reason unrelated to supporting immigrants and refugees, or for studying or reporting on their access to justice. This message is only amplified when a hostile administration attempts to prevent such presence.

17.     Were there any ambiguity about the content neutrality of the new practices individuals have encountered in the past year, these have been dispelled by the federal authorities themselves, who have repeatedly, directly, and explicitly banned and prevented the sharing of information or materials advising immigrants of their rights, or making them aware of available services. Defendants' actions to block public access effectively destroys entire channels of

communication and expressive activity. See *City of Ladue v. Gilleo*, 512 U.S. 43, 55–56 (1994); *Schneider v. State (Town of Irvington)*, 308 U.S. 147, 163 (1939); *City of Madison Joint School District v. Wisconsin Employment Relations Commission*, 429 U.S. 167, 175–76 (1976). Plaintiffs to this suit have experienced and witnessed countless examples of federal employees and contractors *explicitly* prohibiting the sharing of content that could help a refugee. Federal agents have confiscated such materials based solely on their content and have ejected people from the building explicitly for disobeying an unlawful verbal instruction from a government agent not to engage in speech about legal or social services for immigrants. The First Amendment forbids licensing or access regimes that grant officials unbridled discretion or require prior permission to engage in protected speech**.** See *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757 (1988); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969); *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 133 (1992); *Watchtower Bible & Tract Society v. Village of Stratton*, 536 U.S. 150, 165–66 (2002). Plaintiffs have all experienced this first-hand, and have documented this common practice.

18.    Visitors to the immigration courts are also subjected to inconsistent and discretionary directives, with no purpose other than show dominance in the face of any situational rationale, called "degradation rituals" in the language of sociology.  Security personnel and federal officers frequently issue rapid and repeated commands governing where individuals may stand in public waiting rooms, restrooms, hallways, and elevator areas surrounding the immigration courts. These directives are at times internally contradictory or impossible to follow. They often result in groups of individuals being crowded into narrow corridors opposite large numbers of armed federal agents preparing to carry out detention operations against immigration court respondents.

19.     Government action constitutes retaliation if it would deter a person of ordinary firmness from exercising First Amendment rights, and the physical risk to members of the public at immigration court is very real. *Index Newspapers LLC v. United States Marshals Serv.,* 977 F.3d 817 (9th Cir. 2020). Defendants' practices have resulted in multiple incidents where visitors have been severely injured by federal agents carrying out detention operations. Plaintiffs in this action were present during an incident in which an observer was knocked to the ground with sufficient force that the sound of the individual's head striking the floor was audible throughout the building. The individual was ultimately removed unconscious on a gurney. There have been at least two incidents with that degree of severity, with many more examples of unprovoked, unnecessary violent physical contact directed at observers by federal agents, including against plaintiffs to this action, including one involving Plaintiff Stephen Kelly, which did not result in similar head injuries only as a matter of chance.

PLAINTIFFS

20.     Plaintiffs in this action are representative of the clergy, legal observers, social services providers, community volunteers, and journalists that constitute the typical public presence at the immigration courts. Their experience of these courts varies from less than a year to decades, and all have experienced consistent constitutional injury in the past year connected with their First Amendment activities in this forum. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

21.     The experiences of the named plaintiffs described below offer only a snapshot; they do not and cannot capture the scale, pervasiveness, or psychological toll of the government's administration of these courts. While the full scope of the constitutional injuries attributable to immigration court authorities beginning in 2025 cannot be fully known, their consistency and overwhelming pervasiveness is well documented.

A. Father Fabián Arias

22.     Fabián Arias was born in Buenos Aires, Argentina, in 1963. He began studying for the priesthood in 1982 and completed his theological studies in 1989. He moved to New York in 2002 and was ordained as a Lutheran minister in 2004. He currently serves as a priest at St. Peter's Church on Lexington Avenue in Manhattan.

23.     Many of the individuals Father Arias serves are immigrants, and immigration-related pastoral care is a central and indispensable component of his ministry. His religious vocation requires him to accompany members of his congregation, and any others who come to him for his moral support, during moments of fear, vulnerability, or crisis, including when they are summoned before government authorities. This duty extends specifically to respondents appearing before the Immigration Courts and to their family members.

24.     Since 2004, accompaniment has been one of the most important and consistent components of Father Arias's ministry. He has accompanied thousands of individuals to immigration hearings, helped them understand court procedures, comforted them during proceedings, and assisted them afterward in understanding judicial rulings and any resulting obligations or deadlines. This accompaniment constitutes an explicit exercise of his religious faith, his speech, and his associative commitments as a priest.

25.     For nearly twenty years, Father Arias has been physically present in New York City's immigration courts two to three times per week.

26.     In his recent experience, conditions inside these courts have changed dramatically. The environment has become increasingly hostile, intimidating, and militarized. Federal agents and building security personnel now regularly patrol the hallways and waiting areas. Over the past

year he has had to accomplish his ministry under the eyes of federal officers, who typically appear in tactical or paramilitary gear, sometimes carrying military-style weapons.

27.    This display is deeply frightening to the individuals Father Arias serves. The harassment and intimidation have been carried out by federal agents and building security personnel acting in coordination. On multiple occasions, these officers have explicitly ordered Father Arias not to speak with members of his ministry, even when those individuals requested his presence or support, and even when they were standing in public hallways or waiting areas of the building.

28.    Father Arias has been forcibly removed from the building for what these officers perceive as insufficient compliance with these unwritten, ad hoc rules. This has included simply being present to comfort members of his congregation and community in public spaces inside the courthouse.

29.    On numerous occasions, he has been ordered to leave courtrooms, hallways, or the building entirely without explanation, posted rule, or lawful justification. The imposition of these restrictions is wholly unpredictable.

30.    He estimates that while performing his ministry he has been turned away from courtroom doors dozens of times, and ordered out of ordinary proceedings approximately twenty times, as of the filing of the original complaint in March of 2026, and these attacks of his ministry have continued unabated, and perhaps intensified, since.

31.    These exclusions were imposed by federal agents and building security personnel acting under federal authority. They were not based on courtroom capacity, judicial orders, or any individualized conduct on his part. No regulation or lawful basis was cited.

32.    As a direct result of these actions, Father Arias has been prevented from carrying out his religious and pastoral duties at the precise moments when they are most essential. Members of

his ministry who rely on his knowledge, guidance, and spiritual presence are left alone inside an intimidating and confusing legal process. Immigrants who depend on his accompaniment are deprived of support not because they rejected it, but because he was forcibly excluded.

33.    Father Arias's ministry serves many individuals who come from extremely rural areas of Latin America, who may not read or write, may not speak Spanish fluently, and often have no prior experience with courts or government institutions. Many are terrified simply to be present in the building.

34.    When Father Arias is excluded, they are unable to understand what is occurring in their proceedings, what the judge has ordered, or what obligations they must meet. His exclusion directly undermines their ability to participate meaningfully in their own cases.

35.    Father Arias was raised in Argentina during periods marked by authoritarian rule and state abuse. The militarized presence, arbitrary commands, and intimidation tactics now present in the immigration courts echo conditions of repression he experienced earlier in his life. The familiarity of the fear tactics causes him great personal distress.

36.    Father Arias was present on September 30, 2025, when a journalist was forcibly taken to the ground, causing his head to strike the marble floor with an impact audible throughout the building.

37.    For Father Arias to unhesitatingly carry on this work under these conditions, and then to have his ministerial duties interrupted by a wholly unlawful order from the defendants is a cruel assault on both his and the respondent's First Amendment rights. He is repeatedly forced to abandon members of his flock at their greatest moment of need.

38.    The arbitrary restrictions being imposed on Father Arias directly and substantially burden his religious exercise, his speech, and his right to associate with members of his congregation and community.

39.    Even under these conditions Father Arias continues to accompany immigrants and their families. Because the practices described above are ongoing and routinely enforced at New York City immigration court locations, he faces a credible and continuing threat of repeated exclusion, intimidation, and removal in the future.

B. Stephen Kelly

40.    Stephen Kelly is an attorney registered in the State of New York. In June of 2025, he registered to practice before the Executive Office for Immigration Review, a two-step process requiring electronic submission of personal information followed by in-person identity verification. On several occasions, court clerks refused to complete the verification, citing computer problems, including while actively using their computer. On a later visit, a clerk stated that "they weren't supposed to let in any more attorneys." After this remark, another clerk who had previously declined to process his request allowed him to complete the verification. However, as a New York attorney, he has an ethical obligation to represent clients only if he can do so competently, which requires the ability to observe the tribunal in which he may practice, particularly where the government advances novel legal theories.

41.    Like other plaintiffs, he has been denied entry without justification to virtually every courtroom he has attempted to enter when visiting the court on average once a week, for the past year. Even when accompanying a respondent at the respondent's request. Long-time practitioners in this court system have informed him that the presence of even a single observer significantly influences courtroom conduct, raising concerns about proceedings conducted without public

oversight. He continues to attend immigration court to provide support where possible, though these efforts are substantially impeded by the challenged practices.

42.     On or around June 23, 2025, while accompanying an individual to court, Mr. Kelly was present in the gallery during that individual's hearing. After the hearing concluded, Mr. Kelly, the respondent, and the respondent's priest exited the courtroom at an appropriate moment. The respondent had been represented remotely by counsel, and the proceedings were conducted in English, which neither the respondent nor the priest speaks. In the hallway outside the courtroom, Mr. Kelly spent several minutes explaining the favorable outcome of the hearing to them. At the conclusion of that conversation, the three began to proceed toward the elevator. At that point, a group of government agents, attired in military-style weapons and armor and who had been standing nearby without indicating any attention to the group, suddenly and without warning rushed them. Mr. Kelly was forcibly thrown away from the group, and the respondent was seized and dragged away in handcuffs. This conduct, occurring immediately following participation in a judicial proceeding and in a public courthouse space, would deter a person of ordinary firmness from attending court, conducting business before the court, or engaging in other activities that can only take place within the courthouse environment.

43.     Mr. Kelly was present on September 30, 2025, when a journalist was forcibly taken to the ground, causing his head to strike the marble floor with an impact audible throughout the building.

44.     Defendants' practices have directly interfered with Mr. Kelly's ability to observe immigration proceedings, to accompany respondents who have requested his presence, and to fulfill his responsibilities as an attorney. Although immigration court proceedings are presumptively open to the public, Mr. Kelly has repeatedly been excluded from courtrooms,

prevented from completing required attorney verification, and denied access to public spaces without lawful justification. These barriers have impeded his efforts to document court operations, support respondents, and assess the functioning of a tribunal before which he is authorized to practice. Because these exclusions arise from a recurring pattern of restrictions rather than isolated incidents, declaratory and injunctive relief is necessary to restore lawful public access and to prevent further interference with Mr. Kelly's ability to observe and participate in immigration court proceedings.

C. Debbie Nathan

45.     Debbie Nathan is an author and has been a journalist for forty-five years. She has worked as a staff writer for publications including *El Paso Times*, *City Limits*, and *The Appeal*, and as a freelancer for outlets including *The Nation*, *The Intercept*, *The New York Times*, *The Atlantic*, *Ms.*, *Los Angeles Times Magazine*, *New York Magazine*, and *The Guardian*. She has reported extensively on immigration and the immigration court system since the late 1980s.

46.     Through the summer of 2025, Ms. Nathan's experience in immigration courts was consistent with EOIR's written rules and practice manuals. Respondents had priority for seating, and remaining seats were made available to members of the public, including journalists. During that period, Ms. Nathan was routinely able to observe proceedings, take notes, and gather information necessary to report accurately on how immigration courts functioned.

47.     She has reported on how, since mid-summer 2025, conditions in the New York City immigration courts have changed drastically. Access restrictions have significantly impeded Ms. Nathan's ability to gather information and to perform her work as a journalist.

48.     In a representative incident, on November 14, 2025, Ms. Nathan went to the immigration courts at 26 Federal Plaza, on the fourteenth floor, to observe hearings for a story she was actively reporting. She was accompanied by a colleague who is also a writer.

49.     She initially wasn't able to find any courtroom with an open door, despite having researched the day's docket. When she eventually found one, Ms. Nathan observed approximately four people in the gallery, who appeared to be respondents. There was ample additional seating available for public observers.

50.     As Ms. Nathan and her colleague prepared to enter the courtroom, they were approached by an individual she recognized as a court employee from her previous visits to the court. The official told them they could not enter the courtroom because "it's too small" and that "the judge never allows the public in the courtroom." When Ms. Nathan replied that she had attended proceedings in that courtroom in the past, the court employee replied that the judge had permanently banned the public from her courtroom, and further that all judges in that section permanently ban public observers, except for a single Immigration Judge.

51.     Ms. Nathan questioned this explanation in light of both the EOIR Practice Manual, and a recently issued EOIR "Fact Sheet," dated November 2025, which state that court hearings are generally open to the public, subject to limited exceptions. She also reminded the official that he himself had allowed her into courtrooms earlier in the year. He responded, "Things have changed since then."

52.     Ms. Nathan was not permitted to observe any of the other courts, despite visible available seating and the absence of any posted closure orders or capacity determinations.

53.     On another occasion, when attempting to enter a courtroom, she was denied access by a court employee. When she joined the proceeding via Webex from her phone instead, she was told

by the judge that only in-person attendance was allowed. She explained that she had just been turned away from the courtroom, and the judge told her to return in person. She was briefly admitted, and then expelled during proceedings, with the judge claiming that some unspecified conduct disqualified her from attending proceedings. Ms. Nathan's behavior in the course of her reporting is always scrupulously appropriate.

54.     As a direct result of these actions, Ms. Nathan was prevented from observing proceedings she had specifically sought to cover for reporting purposes.

55.     She was unable to gather first-hand information about how multiple judges were conducting master calendar hearings, how respondents were being treated, and how proceedings were being managed.

56.     This resulted in the loss of information necessary for accurate and responsible reporting on the immigration court system.

57.     Because these access restrictions have become routine and categorical, Ms. Nathan has been forced to abandon specific reporting efforts to cover immigration court proceedings in New York. Attempting to observe hearings under these conditions has become futile, as she reasonably expects to be excluded regardless of available seating or the public nature of the proceedings.

58.     These restrictions have caused distinct and concrete professional harm, interfering with her ability to pursue stories, gather facts, and earn a living as a journalist.

59.     Ms. Nathan would continue attending immigration court proceedings if permitted to do so. Observing hearings firsthand is essential to her reporting career and to her ability to inform the public accurately about how the immigration court system operates.

60.     Based on her personal experiences and statements made by court officials, she faces a credible risk of permanent or ongoing exclusion from large portions of the New York City immigration courts.

61.     The restrictions she encountered are not isolated incidents but reflect a broader and continuing practice that has substantially curtailed public and press access.

D. Dr. Zoey Phillips

62.     Dr. Zoey Phillips is a New York-licensed psychologist working in the treatment of youth and families, with a particular focus on individuals who have experienced trauma. She regularly counsels youth, families, and adults who have personal or family histories of immigration to the United States in New York hospitals, schools, group practices, and private practice.

63.     Dr. Phillips is a Spanish-speaker, with a background in the psychological toll of court proceedings in immigrant communities. As part of this specialization she must diligently remain aware of the firsthand experience of immigration court proceedings on individuals and families. This is necessary to her ability to treat issues informed by fear, confusion, isolation, and re-traumatization that refugees experience.

64.     Dr. Phillips is a practicing Christian, who considers it an integral part of her faith and religious practice to also be present for people experiencing hardship, fear, and displacement. Being physically present, offering companionship, and providing prayer when asked are core expressions of her religious duty. These commitments have been central to her personal, professional, social, and religious life throughout her career.

65.      Consistent with these commitments, Dr. Phillips regularly volunteers to accompany individuals to their court dates, and to provide meaningful support before and after hearings. She

has been consistently stymied in this on virtually every visit she has attempted to make to Immigration Court in the past year.

66.     In a representative example, on October 21, 2025, Dr. Phillips attempted to observe an open immigration hearing. Earlier that morning, a court clerk had informed people in the waiting room that the gallery would be opened at approximately 10 a.m.

67.     When Dr. Phillips returned at approximately 9:55 a.m., the court clerk stated that observers were not permitted to enter and instructed them to return in ten to fifteen minutes. Dr. Phillips requested permission to wait in the public waiting room to ensure timely access. The clerk refused and ordered the observers to leave the almost empty waiting room.

68.     Later that morning Dr. Phillips and two others were permitted to enter. After the hearing, a respondent expressed concern about her ability to secure legal representation before her next court date. Dr. Phillips walked with her into the waiting room and spoke quietly with her in Spanish. Dr. Phillips wrote down the name and address of St. Peter's Church and the time of services on a small piece of paper. The woman expressed gratitude and asked if someone could accompany her to the lobby, which Dr. Phillips did.

69.     While Dr. Phillips was speaking quietly with the woman in the waiting room, the court clerk observed the interaction and stated, "After this, you're done." Dr. Phillips explained that she had only shared the name of a church. The clerk responded, "Yeah, whatever. After this, you're done," and raised his hand in a gesture blocking her return to the courtroom. She was not permitted to re-enter.

70.     She then entered another courtroom connected to the same waiting room, whose door was open during a recess, and sat in the gallery to wait. Other individuals, apparently attorneys, were milling around the area separating the gallery from the court. As proceedings were just about to

commence, the judge noticed her and asked if she was an attorney. When she replied in the negative, she was told she must leave "because they were about to have an individual hearing." The relevant law explicitly states that individual hearings are open to the public. 8 C.F.R. § 1003.27 (2025).

71.     Dr. Phillips had complied with all building rules and security procedures. No courtroom closure order, capacity determination, or other recognized justification was provided, despite her request. Many seats, including the seat she had previously occupied, were visibly unoccupied. No overflow or alternative access was offered.

72.     The October 21, 2025 incident was not isolated. On numerous other occasions at New York City immigration courts, court clerks and security officers have ordered Dr. Phillips to leave waiting rooms, hallways, and courtrooms, both when she was alone and when she was with others. On multiple occasions, she was told she could not wait in public waiting rooms or hallways and was given no lawful alternative that would allow her to observe hearings.

73.     On at least one occasion, despite arriving at approximately 7 a.m., Dr. Phillips was prevented by security officers from entering the building until 8:30 a.m., pursuant to a new policy that made it virtually impossible for observers to make it to a courtroom before staff had the opportunity to lock it from the inside.

74.     On other occasions, clerks explicitly told Dr. Phillips that she was not permitted to speak with or exchange information with individuals awaiting their hearings, even in public areas, and that she would have been allowed entry only if she had met those individuals outside the building.

75.     These practices make it practically impossible for Dr. Phillips to pursue her protected activities as a court observer, volunteer, mental-health professional, and person of faith.

76.     The actions described above have caused Dr. Phillips direct and personal harm. She has been prevented from observing public immigration court proceedings, excluded from public spaces without lawful justification, and barred from re-entering courtrooms after lawful exits.

77.     She has been forced to abandon individuals at moments of acute vulnerability, including people experiencing fear, confusion, and psychological distress.

78.     These exclusions interfere directly with her professional responsibilities as a psychologist specializing in trauma, her ability to understand the court environment affecting her clients, and her religious duty to provide presence, compassion, and support.

79.     Dr. Phillips' research and professional experience make her particularly aware of the ways in which human connection, companionship, and, often, faith can buffer the effects of traumatic experiences and promote resilience. Being prevented from offering this support causes both personal and professional injury. She is equally aware of the psychological impact of a government worker in a threatening environment arbitrarily curtailing such support.

80.     These practices create an ongoing and concrete barrier to Dr. Phillips's ability to carry out her professional, civic, and religious obligations. Despite immigration proceedings being presumptively open to the public under federal law, Defendants' repeated exclusion of Dr. Phillips from courtrooms, waiting areas, and other public spaces—without lawful justification—prevents her from observing proceedings, accompanying vulnerable individuals, and offering the support that her professional training and religious commitments compel her to provide. The restrictions described above are not isolated incidents but part of a broader pattern that effectively forecloses meaningful public access to immigration court proceedings in New York.

81.     Declaratory and injunctive relief is therefore necessary to restore lawful public access, to prevent further arbitrary exclusion of observers such as Dr. Phillips, and to ensure that she may

engage in her protected professional, expressive, and religious activities without unlawful interference.

E. Laura McCallum

82.    Laura McCallum is an artist and educator and has lived in Brooklyn, New York, for approximately forty-five years.

83.    Ms. McCallum has regularly volunteered as a court observer and accompanier at the federal immigration courts in New York City. Ms. McCallum attends immigration court approximately once per week. Her purpose in attending is to observe public immigration court proceedings, to provide non-legal information to individuals navigating the asylum process, and to accompany immigrants to and from their hearings so that they are not forced to face an intimidating legal process alone.

84.    From March through late May 2025, public-access conditions in New York City's immigration courts were consistent with Ms. McCallum's prior experience volunteering in courthouses. During this period, court observers were able to enter the buildings, wait in public waiting rooms, speak quietly with immigrants, distribute written information describing legal rights, accompany individuals into courtrooms when space permitted, and exit the building with them after hearings. Throughout her previous experience, court staff and security personnel did not restrict observers' movement through public hallways, did not prohibit access to waiting rooms, and did not interfere with observation of hearings.

85.    Beginning in early June 2025, access conditions changed sharply and dramatically. This change coincided with the regular presence of federal agents inside and immediately outside immigration courtrooms.

86.     Since that time, Ms. McCallum has repeatedly attempted to observe public immigration court proceedings and to accompany individuals attending hearings. She has repeatedly been prevented from doing so by federal agents and building security personnel acting under federal authority.

87.     Since June 2025, Ms. McCallum has been denied entry into public waiting rooms, prohibited from standing or walking in hallways ordinarily open to the public, separated from immigrants by security directives preventing communication, forced to wait outside court buildings in extreme weather conditions to gain entry, and barred from re-entering courtrooms after briefly leaving to use the restroom or accompany an individual.

88.     On multiple occasions at New York's Immigration Courts, Ms. McCallum has been told by federal agents or building security personnel that hallways were "private" or off-limits, despite those hallways being necessary to access public restrooms or courtrooms.

89.     Since June 2025, Ms. McCallum has personally been turned away at courtroom doors between fifteen and twenty-five times. She estimates that she has been ordered to leave courtrooms approximately fifteen times and has been prohibited from entering courtrooms at least twenty times.

90.     These exclusions were not accompanied by any courtroom closure order, capacity determination, or case-specific justification. No federal agent, security officer, or court staff member cited any regulation, court order, or lawful basis for denying access.

91.     As a direct result of these actions, Ms. McCallum has been prevented from observing hearings she intended to attend and was lawfully entitled to observe as a member of the public. She has also been prevented from monitoring how immigration conducted proceedings, how ICE

agents interacted with respondents and family members, and whether hearings were conducted in a fair, orderly, and lawful manner.

92.    On several occasions, Ms. McCallum was prohibited from distributing written materials explaining immigrants' legal rights by security personnel, who characterized this activity as "solicitation," a term whose definition in any relevant statute, code, or regulation has no application to her activities or reason for being present at immigration court. She both explained this, and demonstrated this fact with the court's own materials. She was told that the prohibition reflected new policy.

93.    She has witnessed federal agents demand identification without explanation and issue abrupt commands that frightened immigrants and volunteers.

94.    She was present on September 30, 2025, when a journalist was forcibly taken to the ground, causing his head to strike the marble floor with an impact audible throughout the building. Ms. McCallum has personal experience of friends with permanent cognitive impairment from this type of injury, and witnessing this conduct heightened Ms. McCallum's fear of retaliation and reinforced the chilling effect of the access restrictions described above.

95.    The conduct described above has directly interfered with Ms. McCallum's ability to observe public immigration court proceedings, to engage in lawful court observation, and to accompany individuals during and after hearings.

96.    These actions have denied her meaningful access to proceedings that are presumptively open to the public and have chilled her continued participation as a court observer. Because these practices are ongoing and appear to be enforced uniformly by ICE agents and building security personnel, Ms. McCallum faces a credible and continuing threat of repeated exclusion each time she attempts to observe immigration court proceedings in the future.

97.     Based on her repeated observations at two separate immigration courthouses, the restrictions she experienced are not isolated incidents but reflect a systemic practice applied generally to court observers and members of the public.

98.     The harms caused by these practices are ongoing and can be remedied only through declaratory and injunctive relief requiring defendants to cease unlawful restrictions and to restore lawful public access to immigration court proceedings.

## DEFENDANTS

99.     United States Immigration and Customs Enforcement and Todd Lyons in his official capacity.

100.    United States Department of Justice and Pamela Bondi in her official capacity.

101.    United States Department of Homeland Security and Kristi Noem in her official capacity.

102.    United States General Services Administration and Edward Forst in his official capacity.

## ALLEGATIONS

A. Locking of Public Courtrooms

103.    Immigration court proceedings are presumptively open to the public.

104.    Defendants have repeatedly locked courtroom doors during active proceedings, preventing members of the public from entering.

105.    Individuals seeking to observe proceedings have been denied access without lawful justification.

106.    These actions eliminate public observation and suppress the expressive and oversight functions associated with open judicial proceedings.

B. Prohibition on Speaking with Respondents

107. In publicly accessible areas of immigration court facilities, including hallways and waiting areas, Defendants have prevented Plaintiffs and others from speaking with respondents.

108. These prohibitions are enforced categorically, without regard to time, place, or manner considerations.

109. The barred speech includes brief, consensual conversations concerning legal rights, court procedures, and access to counsel.

C. Ejection for Sharing Know Your Rights Materials

110. Plaintiffs and similarly situated individuals distribute printed informational materials concerning legal rights and court processes.

111. Defendants have ordered individuals to cease such distribution and have ejected them from public areas when they do not comply.

112. These actions suppress protected expressive activity and target specific content related to legal rights.

D. Harassment in Public Areas

113. In areas surrounding immigration courtrooms that are open to the public, Defendants have engaged in repeated harassment, including intimidation, close monitoring, and threats of removal.

114. This conduct is sufficiently pervasive and coercive that individuals are effectively unable to remain in these areas while engaging in protected activity.

115. As a result, Plaintiffs and others have curtailed or ceased their activities.

E. Deterrence of Court Participation

116.    Defendants have engaged in conduct that would deter a person of ordinary firmness from appearing in court, conducting necessary business before the court, using the services of the clerk of the court, or otherwise participating in judicial proceedings.

117.    This conduct is sufficiently coercive and intimidating that individuals are effectively dissuaded from attending court or carrying out essential functions related to their cases.

118. As a result, Plaintiffs and others have curtailed or forgone court attendance and participation in judicial proceedings.

## NATURE OF ACTION

119.    Plaintiffs bring this action under the First Amendment and move this Court for an Order certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2).

120.    Plaintiffs seek certification of the following class: "All persons who are or will be subjected to Defendants' enforcement within the court's jurisdiction."

121.    Pursuant to Rule 23(g), Plaintiffs request appointment of Plaintiff Stephen Kelly as Class Counsel. As explained in the attached motion, since approximately April 2025, he has regularly attended Manhattan immigration courts, documenting alleged constitutional violations, interviewing affected individuals, and developing an evidentiary record sufficient to support this litigation. Despite sustained efforts to secure representation by experienced class or impact litigation counsel, no attorney or organization has agreed to take on this matter.

## JURISDICTION AND VENUE

122.    The Court has subject-matter jurisdiction under federal law, including 28 U.S.C. § 1331 *et seq.* and the Administrative Procedure Act, 5 U.S.C. 702 *et seq.*

123.    Venue is proper pursuant to 28 U.S.C § 1391 as the claims occurred in this district.

CLAIM FOR RELIEF

Count I – Violation of the First Amendment

124.    Plaintiffs incorporate by reference the foregoing paragraphs.

125.    Plaintiffs' activities, including observing court proceedings, engaging in consensual conversation, and distributing informational materials, are protected by the First Amendment.

126.    The courtroom closures, speech prohibitions, ejections, and harassment described above constitute direct restrictions on protected speech and access.

127.    These restrictions are not reasonable time, place, or manner regulations. They are not narrowly tailored to serve a significant governmental interest and do not leave open ample alternative channels for communication.

128.    Defendants' actions are not viewpoint neutral and disproportionately burden speech concerning legal rights and access to the courts.

129.    Defendants have violated the First Amendment by imposing adverse actions that chill and deter protected activity, including the rights to petition the government for redress of grievances and to access the courts. This conduct lacks adequate justification, is not narrowly tailored to any legitimate governmental interest, and has caused, and will continue to cause, irreparable harm absent injunctive relief.

130.    Defendants' conduct has caused and continues to cause irreparable injury.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request this Court:

(1)     Assume jurisdiction over this matter;

(2)     Issue a declaratory judgment that the Defendants' policies violate the First Amendment to the United States Constitution, federal common law, various acts, and public policy;

(3)     Issue preliminary and permanent injunctions enjoining Defendants, their officers, agents, employees, and all persons acting in concert with them from enforcing or maintaining policies or practices that restrict public access to immigration court proceedings except as permitted by law, or retaliating against persons who engage in protected activities;

(4)     Prohibit Defendants from engaging in retaliatory conduct that burdens, penalizes, or deters respondents from attending or participating in their own judicial proceedings, including conduct that would dissuade a person of ordinary firmness from exercising such rights;

(5)     Award the Plaintiffs attorneys' fees and costs; and

(6)     Grant any other relief the Court deems appropriate.

Respectfully submitted,

/s/ Stephen Kelly

Counsel for the Plaintiffs

Dated: April 26, 2026

32 Court Street, 904
Brooklyn, NY 11201
929-270-9905
stephen@philanthropy-law.com