**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

FR. FABIÁN ARIAS et al.,

　　　　　　　　　　　　Plaintiffs,

　-against-

U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT et al.,

　　　　　　　　　　　　Defendants.

No. 26 Civ. 2130 (CM)

**THE GOVERNMENT'S OMNIBUS MEMORANDUM OF LAW IN**
**SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT**
**AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR**
**PRELIMINARY INJUNCTION AND CLASS CERTIFICATION**

JAY CLAYTON
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone: (212) 637-2679/2728

JEAN-DAVID BARNEA
KATHLEEN M. LEWIS
Assistant United States Attorneys
　- Of Counsel –

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................2

BACKGROUND...................................................................................................................3

      A.      The Amended Complaint..................................................................................3

      B.      Plaintiffs' Motion for Class Certification .......................................................5

      C.      Plaintiffs' Motion for Preliminary Injunction................................................6

      D.      The Federal Plaza and Broadway Immigration Courts.............................................7

      E.      Recent Changed Circumstances in the Federal Plaza and Broadway
            Immigration Courts........................................................................................10

      F.      Agency Efforts to Ensure Staff Compliance.........................................................12

DISCUSSION ...................................................................................................................13

I.      THE AMENDED COMPLAINT SHOULD BE DISMISSED .........................................13

      A.      Plaintiffs Lack Standing to Obtain Injunctive Relief...........................................13

      B.      Plaintiffs Cannot Establish a Constitutional Injury ............................................17

            1.      Plaintiffs Cannot Show that Immigration Courtroom Closures or
                 Exclusions Abrogated Any First Amendment Right ................................17

             2.      Plaintiffs Cannot Show that the Rules of Conduct in Government
                 Facilities Were Not Reasonable or Viewpoint-Neutral ............................20

II.      THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR CLASS
      CERTIFICATION ........................................................................................26

      A.      The Proposed Class Is Overbroad.........................................................27

      B.      The Proposed Class Does Not Satisfy the Typicality and Adequacy
             Requirements ...............................................................................28

      C.      Plaintiffs' Proposed Class Action Does Not Fall Within Rule 23(b) ....................30

III.      THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR A PRELIMINARY
      INJUNCTION..................................................................................................31

A.    Plaintiffs Do Not Face Irreparable Harm as They Have No Likelihood of Success on the Merits...............................................................................32

B.    The Public Interest Also Weighs Against Injunctive Relief...................................33

CONCLUSION.......................................................................................................................35

# TABLE OF AUTHORITIES

Page(s)

*Cases*

*Advocates for Human Rights v. Blanche*,
No. 26-865 (RC), 2026 WL 1162794 (D.D.C. Apr. 26, 2026)................................... 15, 16, 19

*Alpha & Omega Fin. Servs., Inc. v. Kesler*,
No. 18-4015-DDC-KGS, 2018 WL 5719992 (D. Kan. Nov. 1, 2018).................................... 32

*Am. Future Fund, Inc. v. N.Y. State Bd. of Elections*,
809 F. Supp. 3d 146 (S.D.N.Y. 2025)............................................................. 3, 4

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997).................................................................................. 25

*Ashcroft v. Iqbal*,
556 U.S. 662 (2007)................................................................................... 3

*Attenborough v. Const. & Gen. Bldg. Laborers' Loc. 79*,
238 F.R.D. 82 (S.D.N.Y. 2006) ..................................................................... 26

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000)........................................................................... 29

*Buffington v. Progressive Advanced Ins. Co.*,
342 F.R.D. 66 (S.D.N.Y. 2022) ...................................................................... 3

*Care One, LLC v. NLRB*,
166 F.4th 335 (2d Cir. 2026) .................................................................... 30, 31

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*,
504 F.3d 229 (2d Cir. 2007)......................................................................... 28

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983)............................................................................ 13, 14, 16

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)............................................................................. 14, 15

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013).................................................................................. 25

*Cornelius v. NAACP Legal Def. & Educ. Fund*,
473 U.S. 788 (1985).................................................................................. 20

*Curley v. Village of Suffern*,
  268 F.3d 65 (2d Cir. 2001)..................................................................................... 25

*E. Tex. Motor Freight Sys., Inc. v. Rodriguez*,
  431 U.S. 395 (1977).......................................................................................... 29, 30

*Espinoza v. 953 Assocs. LLC*,
  280 F.R.D. 113 (S.D.N.Y. 2011) ............................................................................ 27

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
  559 F.3d 110 (2d Cir. 2009).................................................................................... 31

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
  481 F.3d 60 (2d Cir. 2007)...................................................................................... 31

*Greer v. Spock*,
  424 U.S. 828 (1976)................................................................................................ 21

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 ........................................................................................................... 26

*Heerwagen v. Clear Channel Commc'ns*,
  435 F.3d 219 (2d Cir. 2006).................................................................................... 26

*Huminski v. Corsones*,
  396 F.3d 53 (2d Cir. 2005)...................................................................................... 21

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
  341 F.R.D. 128 (D. Md. 2022)................................................................................ 29

*Int'l Soc'y for Krishna Consciousness v. Lee*,
  505 U.S. 672 (1992)................................................................................................ 21

*J.S. ex rel. N.S. v. Attica Cent. Sch.*,
  386 F.3d 107 (2d Cir. 2004)...................................................................................... 3

*Marcavage v. City of New York*,
  689 F.3d 98 (2d Cir. 2012)...................................................................................... 14

*Marisol A. v. Giuliani*,
  126 F.3d 372 (2d Cir. 1997).................................................................................... 26

*Mazzei v. The Money Store*,
  829 F.3d 260 (2d Cir. 2016).................................................................................... 28

iv

*N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*,
    684 F.3d 286 (2d Cir. 2012)......................................................................... 17, 18

*O'Shea v. Littleton*,
    414 U.S. 488 (1974)......................................................................................... 13

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
    460 U.S. 37 (1983)........................................................................................... 20

*Press-Enterprise Co. v. Superior Ct.*,
    478 U.S. 1 (1986)....................................................................................... 18, 33

*Reporters Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*,
    593 F.2d 1030 (D.C. Cir. 1978) ...................................................................... 16

*Robinson v. Blank*,
    No. 11 Civ. 2480 (PAC) (DF), 2013 WL 2156040 (S.D.N.Y. May 20, 2013)................... 13, 15

*Salem v. Pompeo*,
    432 F. Supp. 3d 222 (E.D.N.Y. 2020) ............................................................. 32

*Schubert v. City of Rye*,
    775 F. Supp. 2d 689 (S.D.N.Y. 2011)............................................................... 25

*Seventh Regiment Armony Conservancy, Inc. v. Knight*,
    811 F. Supp. 3d 467 (S.D.N.Y. 2025)............................................................... 31

*Shain v. Ellison*,
    356 F.3d 211 (2d Cir. 2004).......................................................................... 13, 14

*USAA Cas. Ins. v. Permanent Mission of Republic of Namibia*,
    681 F.3d 103 (2d Cir. 2012).............................................................................. 3

*Walking, Inc. v. Turner*,
    378 F.3d 133 (2d Cir. 2004)........................................................... 20, 21, 22, 23

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)...................................................................... 25, 26, 27, 28

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)......................................................................................... 23

*Washpon v. Parr*,
    561 F. Supp. 2d 394 (S.D.N.Y. 2008)............................................................... 21

*Whitmore v. Arkansas,*
  495 U.S. 149 (1990).................................................................................................. 14

**Regulations**

6 C.F.R. § 139.35 ................................................................................................. 9, 22, 23

6 C.F.R. § 139.60................................................................................................... 10, 24

8 C.F.R. § 1003.27 .......................................................................................... 7, 8, 18, 19

41 C.F.R. § 102-74.415.............................................................................................. 24

**Rules**

Fed. R. Civ. P. 23(a) ................................................................................................. 26

Fed. R. Civ. P. 23(a)(4).............................................................................................. 29

Fed. R. Civ. P. 23(b) ................................................................................................. 30

Fed. R. Civ. P. 25(d) ................................................................................................... 1

Defendants U.S. Immigration and Customs Enforcement ("ICE"); Todd M. Lyons, the senior official performing the duties of the Director of ICE, in his official capacity; the U.S. Department of Homeland Security ("DHS"); Markwayne Mullin, the Secretary of Homeland Security, in his official capacity; the U.S. Department of Justice ("DOJ"); Todd Blanche, the Acting Attorney General, in his official capacity;[1] the General Services Administration ("GSA"); and Ed Forst, the Administrator for the GSA, in his official capacity (collectively, the "Government"), by their attorney, Jay Clayton, United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in support of their motion to dismiss the amended complaint ("Am. Compl.") (ECF No. 40) filed by plaintiffs Fr. Fabián Arias, Stephen Kelly, Laura McCallum, Debbie Nathan, and Dr. Zoey Phillips (together, "Plaintiffs"), and in opposition to Plaintiffs' motions for preliminary injunction ("PI Mot.") (ECF No. 32) and for class certification ("Class Cert. Mot.") (ECF No. 33).

For the reasons explained herein and in the accompanying declarations of Acting Assistant Chief Immigration Judge ("ACIJ") John Burns of the New York Federal Plaza Immigration Court at 26 Federal Plaza ("Burns Decl."); ACIJ Khalilah Taylor of the New York Broadway Immigration Court at 290 Broadway ("Taylor Decl."); District Commander Anton Welsh of the Federal Protective Service ("FPS"), part of DHS ("Welsh Decl."); FPS Protective Security Operations Officer Clifford Steichen ("Steichen Decl."); John Melecio, the GSA Field Office Manager for 26 Federal Plaza ("Melecio Decl."); and ICE Supervisory Detention and Deportation Officer Joseph Harrington ("Harrington Decl."), this Court should dismiss the amended complaint and deny Plaintiffs' motions.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Mr. Lyons, Secretary Mullin, and Acting Attorney General Blanche are automatically substituted for their predecessors in office.

**PRELIMINARY STATEMENT**

Plaintiffs, a group of individuals who observe proceedings in immigration court and seek to assist and support immigrant respondents, challenge what they assert are unconstitutional practices at two immigration courts in New York City. They seek to preliminarily enjoin the Government from restricting public access to immigration proceedings and the ability of members of the public to speak and distribute literature to immigrants in the areas surrounding immigration courtrooms. Plaintiffs seek certification of a putative class of individuals engaging in "protected activity" at immigration courthouses. For the reasons set forth below, their amended complaint should be dismissed and their motions should be denied.

Plaintiffs' suit suffers from two fatal flaws. Plaintiffs do not have standing to seek injunctive relief, as they cannot show a likelihood of imminent future harm absent such relief. While Plaintiffs conclusorily assert that their individual experiences reflect a widespread government policy and practice to deny public access to immigration proceedings and suppress protected speech, their papers reference only a handful of specific incidents that reflect no discernible pattern. For this reason (among others), Plaintiffs' proposed class should not be certified, as there are no common questions that can be resolved in a single case.

Plaintiffs also fail to show any constitutional violations. Although immigration proceedings are generally open to the public, regulations provide for discretionary or mandatory closure in a variety of circumstances. Plaintiffs' allegations that they were improperly excluded from immigration proceedings lack sufficient detail to ascertain whether these hearings were supposed to be open to the public. Furthermore, Plaintiffs' claim that they have been prohibited from exercising their First Amendment rights to speak with or provide written material to immigrants mischaracterizes the law. Immigration courts and the federal buildings in which they

2

are housed are nonpublic fora, meaning that government restrictions on speech in such facilities must only be reasonable and viewpoint-neutral.  The relevant federal agencies impose reasonable restrictions on visitors to ensure public safety and the orderly operation of immigration courts, and Plaintiffs' claims do not establish any pattern of over-regulation of their speech.

Nonetheless, in light of Plaintiffs' allegations, the relevant government agencies have taken steps to ensure that their employees and contractors are fully aware of the rules governing public access to immigration courts and federal buildings.  Given the clear applicable rules and the agencies' demonstrated commitment to enforce them consistently and fairly, Plaintiffs' proposed injunctive relief—even if Plaintiffs had a valid claim—would be burdensome, unworkable, and unnecessary.  Accordingly, because Plaintiffs have no likelihood of success on their claims, cannot show a risk of irreparable harm, and have not demonstrated that injunctive relief would advance the public interest, their motion for a preliminary injunction should also be denied.

## BACKGROUND

### A.      The Amended Complaint[2]

Plaintiffs are members of the public who wish to observe proceedings in immigration courts in New York City and to speak and distribute literature (such as "know your rights"

---

[2] This memorandum assumes the accuracy of the well-pleaded and non-conclusory allegations in the amended complaint only for the purposes of its motion to dismiss and opposition to class certification.  *See USAA Cas. Ins. v. Permanent Mission of Republic of Namibia*, 681 F.3d 103, 106 n.4 (2d Cir. 2012) (motion to dismiss for failure to state a claim); *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) (motion to dismiss for lack of jurisdiction); *Buffington v. Progressive Advanced Ins. Co.*, 342 F.R.D. 66, 69 n.1 (S.D.N.Y. 2022) (motion for class certification); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2007) (rejecting conclusory allegations). However, "[w]hen considering a motion for a preliminary injunction, unlike a motion to dismiss," the Court "need not accept as true the well-pleaded allegations in Plaintiff's . . . Complaint." *Am. Future Fund, Inc. v. N.Y. State Bd. of Elections*, 809 F. Supp. 3d 146, 150 n.3 (S.D.N.Y. 2025) (brackets omitted).  The statements in Plaintiffs' affidavits (ECF Nos. 34-37, 41) generally track or duplicate the allegations in the amended complaint (which are organized by plaintiff, *see* Am. Compl. ¶¶ 22-98) and the affidavits are thus not discussed or cited separately herein.

3

pamphlets) to immigrants before or after these hearings. Am. Compl. ¶¶ 2, 12.[3] They claim that officers and employees of (generally unspecified) federal agencies have interfered with their ability to engage in these acts over the past year. *Id.*

The amended complaint criticizes several aspects of the operations of immigration courts and the federal buildings in which they are housed. Plaintiffs have observed security personnel "regularly patrol[ling]" building hallways and elevator areas outside immigration courtrooms, and assert that those personnel have on certain occasions told Plaintiffs that they had to leave those areas and could not speak with or distribute pamphlets to immigrants in them. *E.g.*, *id.* ¶¶ 18, 26-27, 29, 72, 87-88, 107. The amended complaint also notes that ICE agents sometimes arrest immigrants in these areas after their hearings and that these arrests may involve the use of force. *Id.* ¶¶ 42-43.

Plaintiffs similarly claim that they have been instructed to leave waiting rooms outside immigration courtrooms and not to speak or distribute pamphlets to immigrants in those waiting rooms. *E.g.*, *id.* ¶¶ 14, 27, 66-69, 72, 87, 107. Finally, Plaintiffs cite instances when they were told they could not observe certain live immigration court hearings or could not enter courtrooms to observe hearings because the doors were locked. *E.g.*, *id.* ¶ 15, 50, 53, 70, 73, 104. One Plaintiff also cites a circumstance in which she was instructed to observe a virtual hearing in person in the courtroom rather than through the online platform. *Id.* ¶ 53.

---

[3] Counsel for Plaintiffs has clarified to the Government that the allegations pertain specifically to the New York Federal Plaza Immigration Court, located on the 12th and 14th floors of 26 Federal Plaza, and the New York Broadway Immigration Court, located on the 13th, 15th, 20th, 22nd, and 29th floors of 290 Broadway, both in Lower Manhattan. *See generally* Melecio Decl. ¶ 8. There is also a third immigration court in New York City, the Varick Immigration Court, located at 201 Varick Street, 5th Floor, *see* Taylor Decl. ¶ 1, which is not further discussed herein.

4

With few exceptions, Plaintiffs provide little detail about these incidents: they do not identify which immigration court (26 Federal Plaza or 290 Broadway) they occurred in or which courtroom, who gave the allegedly offending instructions or which of the defendant agencies they worked for, the dates of the incidents, or any other details; or for immigration court hearings, the name of the immigration judge, the date, the name of the respondent or case number of the hearing, or any other identifying information.

Plaintiffs assert that the government actions described in the complaint violate their constitutional rights, *id.* ¶ 129, and deter them from observing immigration hearings and accompanying immigrants to court, *id.* ¶ 19. Plaintiffs claim that they have First Amendment rights to observe immigration court proceedings and to speak and exchange written materials with immigrants attending such proceedings. *Id.* ¶ 125. They argue that the Government's actions interfere with their exercise of those rights. *Id.* ¶¶ 126-28. Plaintiffs claim that the Government has taken the challenged actions due to hostility to Plaintiffs' desire to assist immigrants. *Id.* ¶ 17.

### B.    Plaintiffs' Motion for Class Certification

Plaintiffs purport to bring this action on behalf of a class. *Id.* ¶ 119. The amended complaint defines the proposed class, somewhat ambiguously, as "[a]ll persons who are or will be subjected to Defendants' enforcement within the court's jurisdiction." *Id.* ¶ 120. As proposed class counsel, the Plaintiffs suggest Stephen Kelly, who is one of the named plaintiffs and claims to be an eyewitness to certain pertinent events. *Id.* ¶ 121; *see id.* ¶¶ 40-44 (Kelly's personal allegations). The amended complaint indicates that "[d]espite sustained efforts to secure representation by experienced class or impact litigation counsel, no attorney or organization has agreed to take on this matter." *Id.*

Plaintiffs have filed a short motion for class certification that defines the proposed class differently from the amended complaint: "All persons engaging in protected activity within

5

immigration court facilities and functionally integrated common areas and exterior spaces subject to Defendants' enforcement practices in New York City."[4]  Class Cert. Mot. ¶ 1.  Plaintiffs argue that this class is defined discretely because their claims are "limited to a discrete and objectively identifiable set of locations—immigration court facilities and the immediately surrounding spaces through which those facilities operate—and to persons engaged in protected activity within those spaces."  *Id.* ¶ 2.  Without citing record evidence, the motion conclusorily asserts that the proposed class satisfies the legal requirements for certification.  *Id.* ¶¶ 3-9.

### C.    Plaintiffs' Motion for Preliminary Injunction

Plaintiffs also filed a short motion for preliminary injunction.  Again, without citing any evidence—or even the allegations in their amended complaint—the motion asserts in a conclusory fashion that the Government's actions violate their First Amendment rights.  Specifically, Plaintiffs claim a First Amendment right of access to proceedings in immigration court.  PI Mot. ¶¶ 4-5.  Relying on inapposite caselaw pertaining to public forums, Plaintiffs also assert that they have a First Amendment right to engage in "speech and expressive activity" in the "public areas of [immigration] courthouses," and any restrictions on this supposed right must be reviewed under strict constitutional scrutiny.  *Id.* ¶ 6.  They further claim that they have been subject to "retaliation" because of their expressive activity.  *Id.* ¶¶ 6-8.  Without any legal argument or citation to evidence, Plaintiffs conclude that they will suffer irreparable harm absent injunctive relief, and that the balance of equities and public interest are in their favor.  *Id.* ¶¶ 10-13.

Plaintiffs' motion asks the Court to: (1) enjoin the Government from restricting public access to immigration court proceedings except as permitted by law and based on articulated,

---

[4] As discussed above, it does not appear that Plaintiffs intend to include the Varick Immigration Court in their claim (nor do any of their allegations pertain to that court), although it is in New York City.

narrowly tailored criteria; (2) require the Government to permit members of the public to enter, remain in, and observe proceedings in publicly accessible areas, including waiting rooms and hallways, (3) enjoin the Government from interfering with or prohibiting protected speech and association in such areas, including communication with individuals present for court proceedings; (4) prohibit the Government from engaging in "retaliation, intimidation, or selective enforcement directed at individuals engaged in protected activity, including participating in judicial proceedings"; and (5) require the Government to "implement clear, written, and uniform access policies consistent with constitutional requirements." *Id.* at 4-5.

### D. The Federal Plaza and Broadway Immigration Courts

The federal buildings at 26 Federal Plaza (the Jacob K. Javits Federal Building) and 290 Broadway (the Ted Weiss Federal Building), both in Lower Manhattan, each house immigration courts, among other government offices. *See* Melecio Decl. ¶¶ 4, 8. GSA is responsible for the overall maintenance and operation of these buildings. *Id.* ¶ 5. Security in the parts of the buildings that are open to the public—including the elevator banks and the hallways outside immigration courtrooms—is provided by Public Security Officers ("PSOs") contracted and supervised by FPS. *Id.* ¶ 6; Welsh Decl. ¶¶ 4-5; Steichen Decl. ¶¶ 5-6. Immigration courtrooms and associated waiting rooms, on the other hand, are controlled by the Executive Office for Immigration Review ("EOIR"), part of DOJ. *See* Taylor Decl. ¶ 8; Burns Decl. ¶ 6. ICE is not responsible for security in the buildings, but sometimes conducts operations such as arresting or detaining immigrants outside immigration courtrooms. *See* Harrington Decl. ¶¶ 7-9.

*Hearings in immigration court.* Immigration court hearings are presumptively open to the public except in certain circumstances. *See* Taylor Decl. ¶ 6; Burns Decl. ¶ 5; 8 C.F.R. § 1003.27. Certain types of immigration hearings can be closed to the public (sometimes depending on the wishes of the respondent), such as if they involve claims of asylum or withholding of removal;

victims of child or spousal abuse; information subject to a protective order; or to protect parties, witnesses, or the public interest. *See* Taylor Decl. ¶ 6; 8 C.F.R. § 1003.27. Immigration judges are encouraged, but not required, to announce on the record why particular hearings are closed. *See* Burns Decl. ¶ 14 & Ex. 3.

Immigration judges can also remove people from courtrooms if they engage in disruptive behavior, or if there is no available seating, given the need to prioritize parties and their counsel. *See* Burns Decl. ¶ 10; Taylor Decl. ¶ 10; 8 C.F.R. § 1003.27(a) ("Depending upon physical facilities, the Immigration Judge may place reasonable limitations upon the number in attendance at any one time with priority being given to the press over the general public."); EOIR Policy Manual (cited in Taylor Decl. ¶ 6), § 3.11(c) ("Disruptive behavior in the courtroom or waiting area is not tolerated."). If there are more people present than can be safely accommodated in immigration courtrooms, immigration judges and court staff prioritize the parties to hearings, including respondents and attorneys, as well as interpreters and witnesses, ahead of observers or members of the public. *See* Taylor Decl. ¶ 9. Members of the public can attend immigration hearings occurring virtually either by joining the virtual meeting or by going to the physical courtroom of the judge conducting the hearing. *See id.* ¶ 6; Burns Decl. ¶ 7.

*Waiting areas.* There are waiting areas outside immigration courtrooms in 26 Federal Plaza and 290 Broadway. *See* Taylor Decl. ¶ 5; Burns Decl. ¶ 2. These waiting areas are generally open to the public, subject to capacity constraints. *See* Taylor Decl. ¶¶ 8-9; Burns Decl. ¶ 6. As they do for courtrooms, immigration courts also prioritize access to these waiting areas for parties, witnesses, and the like, over members of the public—if there is insufficient space. *See* Taylor Decl. ¶ 9; Burns Decl. ¶ 6. EOIR does not prohibit members of the public from speaking with immigrants awaiting court hearings or distributing informational materials in these areas. *See*

8

Taylor Decl. ¶ 8; Burns Decl. ¶ 6.    EOIR has not instructed court staff to prohibit such conversations or the distribution of such materials.    *See* Taylor Decl. ¶ 8; Burns Decl. ¶ 6. Immigration court staff may, however, take action to address operational or security concerns, such as congestion, noise, or allowing orderly movement in common areas.    *See* Taylor Decl. ¶ 8; Burns Decl. ¶ 6.

*Publicly accessible hallways and elevator banks.*    The hallways outside immigration courtrooms and waiting areas and elevator banks are used by court staff and hearing participants. *See* Welsh Decl. ¶ 17.    They are not waiting areas, and can generally accommodate only around four to seven people at a time before becoming congested.    *See* Melecio Decl. ¶ 11.    The hallways are monitored by PSOs, who are responsible for the security of employees and visitors.    *See* Welsh Decl. ¶ 9; Steichen Decl. ¶ 5.    PSOs enforce FPS rules, which are publicly posted at the entrance to the building and in the hallways.    *See* Welsh Decl. ¶¶ 9-11; Steichen Decl. ¶ 5.    However, PSOs have limited authority: they can provide verbal warnings to rule violators, try to manage crowds or incidents, and detain people until FPS arrives, but only FPS can exercise law-enforcement authority (such as issuing citations) in this regard.    *See* Welsh Decl. ¶¶ 13-14; Steichen Decl. ¶ 6. PSOs do not have the authority to remove individuals from the building.    *See* Welsh Decl. ¶ 20.

Among other things, the rules applicable in the publicly accessible portions of federal buildings prohibit visitors from making loud noises, obstructing the use of the publicly accessible portions of the building, or impeding or disrupting the performance of official duties by federal employees or the ability of the general public to obtain government services.    *See* Welsh Decl. ¶ 10; 6 C.F.R. § 139.35(c)-(e).[5]    If there are too many people in these areas at a time, that can

---

[5] The relevant FPS regulations entered into effect only in November 2025; they replaced substantively identical GSA rules that were in place previously.    *See* Welsh Decl. ¶¶ 5, 10 & n.1.

create a hazard and the people may be asked to relocate. *See* Melecio Decl. ¶¶ 10-12. The rules for federal buildings also prohibit visitors from posting or distributing written materials such as pamphlets in publicly accessible spaces without GSA approval. *See* Welsh Decl. ¶¶ 15-16; 6 C.F.R. § 139.60; *see also* Melecio Decl. ¶¶ 13-16 (describing process for obtaining GSA approval to distribute written materials in publicly accessible areas of federal buildings).

The appropriate use of hallways includes activities like transiting from immigration courtrooms or waiting areas to the elevator lobby, waiting against the wall for access to the waiting room if the waiting room is at capacity, or holding a conversation related to conducting federal government business. *See* Welsh Decl. ¶ 17. However, when the hallways become too full for people to easily pass through, PSOs engage in crowd control by asking people to clear the hallways to ensure that government employees and visitors can complete their business. *Id.* Inappropriate use of the hallways includes obstructing the usual use or access to courtrooms or other spaces, such as sitting on the floor or standing in a manner that blocks the flow of traffic, distributing pamphlets and flyers without prior permission, or creating loud or unusual noise. *Id.*

### E.     Recent Changed Circumstances in the Federal Plaza and Broadway Immigration Courts

There has been a significant increase in the number of visitors to immigration court spaces in both 26 Federal Plaza and 290 Broadway in the last year. *See* Welsh Decl. ¶ 17; *see also* Burns Decl. ¶ 10. ICE officers have also been conducting more arrest operations in the hallways outside immigration courtrooms, and have been transporting more detained immigrants to and from their hearings. *See id.* ¶ 20; *see also* Harrington Decl. ¶ 9. As a result, the hallways outside immigration courtrooms have become substantially more crowded. *See* Welsh Decl. ¶ 18. Building employees have complained to GSA and FPS about the crowding, as it impacts their ability to conduct their business. *See id.*; Melecio Decl. ¶¶ 10-12. When this has happened, PSOs have directed people

10

in the hallway to clear out. *See* Welsh Decl. ¶ 18. On one occasion, the GSA building manager observed at least twenty people standing in a hallway outside an immigration court in 26 Federal Plaza, and asked FPS to relocate them. *See* Melecio Decl. ¶ 12. Additionally, there have been security threats, such as an incident in June 2025 when a distressed immigrant tried to take a gun from a security officer. *See* Burns Decl. ¶ 12. Federal officers have also directed members of the public to move or leave the floor so as not to interfere with ICE operations such as transporting detainees. *See* Welsh Decl. ¶ 20; *see also* Harrington Decl. ¶ 9.[6]

There have also been more disturbances in immigration courtrooms over the past year, which have resulted in members of the public being excluded from such courtrooms. *See* Taylor Decl. ¶ 10; Burns Decl. ¶¶ 10-11. For example, immigration judges have closed courtroom doors or removed members of the public from hearings for verbally interrupting hearings, for advising respondents not to attend future hearings, or if there are so many members of the public present that there is no room for the parties. *See* Taylor Decl. ¶¶ 9-10; Burns Decl. ¶ 10. Immigration judges have also sometimes directed their staff to remove members of the public from hallways outside the courtrooms if they were having loud press conferences, taking photographs inside the courtrooms, blocking parties from leaving the courtrooms, or attempting to physically prevent ICE or other law enforcement officers from arresting immigrants present for hearings. *See* Taylor Decl. ¶ 10; Burns Decl. ¶ 10. As a result of these disruptions, immigration judges asked court staff and building security in June 2025 for an increased security presence in and around immigration courtrooms. Burns Decl. ¶ 11. While this increased security led to some decrease in disruptions,

---

[6] An incident described in the amended complaint regarding a reporter injured during an ICE arrest of an immigrant in 26 Federal Plaza, *see* Am. Compl. ¶¶ 36, 43, 94, involved ICE agents trying to stop someone from interfering in the arrest, *see* Harrington Decl. ¶¶ 11-12.

11

there have still been numerous instances in the past year in which building visitors have disrupted or attempted to disrupt immigration hearings.  *Id.*

### F.     Agency Efforts to Ensure Staff Compliance

Nonetheless, in light of Plaintiffs' allegations, the relevant government agencies have taken steps to ensure that their staff are aware of the rules governing public access to immigration court hearings, waiting areas, and the public hallways of federal buildings.  The Assistant Chief Immigration Judges of the Federal Plaza and Broadway Immigration Courts, and the Acting Court Administrator, have held meetings and sent emails to all judges and court staff reminding them that immigration hearings are presumptively open to the public.  *See* Taylor Decl. ¶¶ 12-15 & Exs. 3-4; Burns Decl. ¶¶ 6, 12-15 & Exs. 1-4.  Through these meetings and messages, judges and staff have been reminded that immigration hearings may be closed only for particular reasons, and judges have been encouraged to make clear on the record at the beginning of each hearing whether the hearing is or is not open to the public.  *See* Burns Decl. ¶ 14 & Ex. 3.  Moreover, because many of the courtroom doors in both buildings lock automatically when closed, the ACIJs have reminded their fellow judges to ensure that doors are not locked (or are propped open) when non-closed hearings are in session.  *See* Taylor Decl. ¶ 15; Burns Decl. ¶ 15 & Ex. 3.

The ACIJs have also reiterated to immigration court staff that there is no prohibition against members of the public speaking with or distributing written materials to immigrants in the waiting areas outside immigration courtrooms.  *See* Taylor Decl. ¶¶ 13-14 & Ex. 4; Burns Decl. ¶ 6 & Ex. 1.  Immigration court staff were reminded that they may nonetheless take action to address operational or security concerns, such as congestion, noise, or allowing orderly movement in common areas.  *See* Taylor Decl. ¶¶ 13-14 & Ex. 4; Burns Decl. ¶ 6 & Ex. 1.

Additionally, the FPS officer responsible for overseeing the PSO operations in 26 Federal Plaza and 290 Broadway plans to address Plaintiffs' complaints in upcoming meetings.  *See*

Steichen Decl. ¶¶ 1-2, 9-10.   While noting that FPS has never received any complaint from Plaintiffs or other members of the public about the conduct of the PSOs outside immigration court areas in the two buildings, *see id.* ¶¶ 11-13, the FPS Protective Security Operations Officer nonetheless has committed to speak with the management of the PSO contractor about Plaintiffs' concerns, *see id.* ¶¶ 9-10.   Specifically, he plans to remind them of the rules allowing members of the public to use building hallways for appropriate purposes, such as transiting from courtrooms or waiting areas to the elevator lobby, waiting against the wall for access to the waiting room if the waiting room is at capacity, or holding a conversation related to conducting government business. *See id.* ¶ 8.   He will reiterate, however, that PSOs should continue to ensure that hallway rules designed to promote safety and avoid disruption or overcrowding are enforced.   *See id.*

<div align="center">

**DISCUSSION**

</div>

This memorandum of law includes the Government's motion to dismiss Plaintiffs' complaint for lack of standing (Part I.A) and because Plaintiffs have failed to state a claim that the Government has violated their First Amendment rights (Part I.B); an opposition to Plaintiffs' motion to certify a class (Part II); and an opposition to Plaintiffs' motion for a preliminary injunction (Part III).

## I.    THE AMENDED COMPLAINT SHOULD BE DISMISSED

Plaintiffs' amended complaint should be dismissed because they lack standing to seek injunctive relief, and because they fail to state a claim that their First Amendment rights have been violated.

### A.    Plaintiffs Lack Standing to Obtain Injunctive Relief

As an initial matter, Plaintiffs lack standing to obtain the declaratory or injunctive relief they seek, as they do not allege imminent future harm or the existence of an official policy or its equivalent.   When seeking injunctive relief, plaintiffs must show that they have "'sustained or [are]

<div align="center">13</div>

immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'"  *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983)).  "In doing so, plaintiffs generally 'cannot rely on past injury to satisfy the injury requirement but must show a likelihood that [they] . . . will be injured in the future.'"  *Robinson v. Blank*, No. 11 Civ. 2480 (PAC) (DF), 2013 WL 2156040, at *2 (S.D.N.Y. May 20, 2013) (quoting *Shain*, 356 F.3d at 215); *see also O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974) (holding that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects").

In short, "[t]o obtain *prospective* relief, such as a declaratory judgment or an injunction, a plaintiff must show, *inter alia*, 'a sufficient likelihood that he [or she] will again be wronged in a similar way."  *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) (quoting *Lyons*, 461 U.S. at 111); *see also Shain*, 356 F.3d at 215 ("[A] plaintiff seeking injunctive relief must demonstrate *both* a likelihood of future harm *and* the existence of an official policy or its equivalent." (emphasis in original)); *cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (standing requires that "threatened injury must be *certainly impending*" and not merely "*possible*" (emphasis in original)).  If Plaintiffs lack standing, the Court lacks subject matter jurisdiction to entertain their request for injunctive relief.  *See Shain*, 356 F.3d at 215 (citing *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990)).

Plaintiffs have not shown that they face a real or immediate threat of harm sufficient to support standing for prospective relief.  They allege that on various occasions they have been denied access to immigration court proceedings, and that they have been prohibited from speaking with or providing written materials to immigrants attending those proceedings.  *See, e.g.*, Am.

14

Compl. ¶¶ 27-29, 41, 50-53, 68-70, 74, 87-89, 92. But they provide insufficient factual support for their conclusion that the circumstances they have experienced reflect an established policy or are likely to recur, *see e.g.*, *id.* ¶¶ 12-13, 17-19, 40, 44, 61, 80-81, 96-98, as opposed to particular incidents and interactions between members of the public and government employees.[7] In fact, the actual governing policies—reflected in the rules cited above and in the Government's declarations—permit members of the public to observe most immigration court proceedings and to talk with and exchange written materials with immigrants participating in those hearings, so long as this behavior does not disrupt court or building operations.[8] Because Plaintiffs thus cannot show that the government conduct they allege reflects "official policy," they must alternatively show such a consistent practice that future injury is "certainly impending." *Clapper*, 568 U.S. at 409. They cannot.

A federal court in the District of Columbia recently denied a preliminary injunction in a similar case for lack of standing on this very ground. *See Advocates for Human Rights v. Blanche*, No. 26-865 (RC), 2026 WL 1162794, at *1 (D.D.C. Apr. 26, 2026). The plaintiff in that case, an advocacy organization, alleged that immigration judges in Minnesota had repeatedly closed hearings in contravention of applicable rules. *See id.* at *2-4. But, like here, the factual allegations were less clear-cut than the plaintiff's conclusions. As the court explained, the D.C. plaintiff had alleged "roughly a dozen days with purportedly closed hearings since June 2025," *id.* at *8, but

---

[7] This failure is compounded by the lack of detail in Plaintiffs' allegations such as dates, names (or descriptions) or agency affiliations of government employees including immigration judges, case names and numbers, and the like—which make it impossible for the Government or the Court to determine whether the instructions Plaintiffs allegedly received (such as directing that they be removed from immigration courtrooms) were appropriate in the circumstances.

[8] The Court can consider the applicable regulations on a motion to dismiss, especially given that Plaintiffs concede and cite at least some of the rules and their applicability, *see, e.g.*, Am. Compl. ¶¶ 4, 15.

15

"these twelve incidents, spread across almost as many months, with no violations identified in the three months preceding the motion, do not amount to a clear showing that [plaintiff] is likely to face additional unlawful closures in the immediate future." *Id.* at *9 (citations and internal quotation marks omitted). And also like here, EOIR leadership fully acknowledged that immigration hearings should generally be open to the public. *See id.* at *4.

The district court explained that although the plaintiff had "argue[d] that it has suffered a concrete injury *in the past* due to the previous closures of immigration hearings," such "[e]vidence of prior unlawful conduct . . . does not necessarily establish standing for a preliminary injunction, which requires an imminent *future* injury." *Id.* at *8 (emphases original). Noting that the alleged closures "represent a tiny fraction of the more than 47,000 immigration hearings held" at the court during the relevant period, the court observed that the plaintiff "provide[d] no indication of the proportion of closed hearings to the total hearings it sought to observe," and that "the one-off nature of some of [plaintiff's] evidence undermines its claim to imminent harm." *Id.* at *9-10. The court thus concluded that the plaintiff in that case could not establish "a 'pattern' of conduct, which courts often expect when a party seeks 'anticipatory relief.'" *Id.* at *10 (quoting *Reporters Comm. for Freedom of Press v. Am. Tel. & Tel. Co.*, 593 F.2d 1030, 1068 (D.C. Cir. 1978)).

Similarly here, Plaintiffs fail to allege that their one-off experiences "evince a pattern of conduct" threatening imminent future harm. *Id.* at *10; *see also Lyons*, 461 U.S. at 105-06, 108 (not sufficient to allege that improper conduct occurs "routinely," or that "the 'odds'" are high that plaintiff's constitutional rights will be violated again, for purposes of standing). Indeed, many of the specific incidents Plaintiffs allege are unique. For example, plaintiff Arias alleges he "has been forcibly removed from the building for what . . . officers [from an unspecified agency] perceive as insufficient compliance with . . . unwritten, ad hoc rules," Am. Compl. ¶ 28, but no other plaintiffs

allege they have been ejected from the building.  Plaintiffs who claim they were denied access to immigration proceedings recall being given different reasons for the denial—for example, plaintiff Nathan was allegedly told she could not enter a courtroom because "it's too small," and because the judge had banned the public from her courtroom, *see id.* ¶ 50, whereas plaintiff Phillips claims that she was allowed to observe part of an immigration hearing, but was told after the hearing that she could not do so in the future. *Id.* ¶¶ 67-69.  Plaintiff Phillips also alleges, unlike other plaintiffs, that she has been "prevented by security officers from entering the building . . . pursuant to a new policy that made it virtually impossible for observers to make it to a courtroom before staff had the opportunity to lock it from the inside." *Id.* ¶ 73.  When taken together, Plaintiffs' allegations do not paint a picture of a consistent pattern of conduct that threatens imminent harm, but a series of disparate incidents involving different circumstances and personnel.

Accordingly, Plaintiffs' amended complaint should be dismissed for lack of standing.

## B.    Plaintiffs Cannot Establish a Constitutional Injury

The amended complaint should also be dismissed because, even crediting Plaintiffs' allegations, they do not establish a First Amendment violation, either with respect to their attendance at immigration court proceedings or with respect to their interactions with immigrants before or after those hearings.

### 1.    *Plaintiffs Cannot Show that Immigration Courtroom Closures or Exclusions Abrogated Any First Amendment Right*

Plaintiffs first allege that they have been denied access to immigration court proceedings "without lawful justification," and that these denials have "suppress[ed] the expressive and oversight functions associated with open judicial proceedings."  Am. Compl. ¶¶ 103-06.  But Plaintiffs fail to show that there is a tradition of openness, or that public access plays a significant

17

positive role, in all immigration court hearings such that the First Amendment forbids the practices they allege.

"The First Amendment right of access is always qualified," and a government agency may, "in the interest of the fair administration of justice, impose reasonable limitations on access" to government proceedings, including administrative proceedings. *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 303 (2d Cir. 2012) (internal quotation marks omitted). When considering whether a qualified right of access attaches to a given government proceeding, the Second Circuit has cited the Supreme Court's "experience and logic" test. "First, courts should inquire into 'experience' (history) and 'consider[] whether the place and process have historically been open to the . . . public. Second, courts should consider 'logic' (functionality) and ask whether public access 'plays a significant positive role in the functioning of the particular process in question.'" *Id.* at 297 (quoting *Press-Enterprise Co. v. Superior Ct.*, 478 U.S. 1, 8 (1986) (citations omitted)).

As Plaintiffs note, an EOIR regulation dictates that immigration hearings are generally open to the public, but also prescribes circumstances in which immigration judges must or may close hearings or limit public attendance. *See, e.g.*, 8 C.F.R. §§ 1003.27 (exclusion hearings are not open to the public), 1003.27(a) ("Depending upon physical facilities, the Immigration Judge may place reasonable limitations upon the number in attendance at any one time . . . ."), 1003.27(b) ("For the purpose of protecting witnesses, parties, or the public interest, the Immigration Judge may limit attendance or hold a closed hearing"). Thus, certain immigration hearings are necessarily closed to the public. Similarly, while the regulation demonstrates that public access is generally valued, it also reflects that public access may in certain circumstances interfere with

18

immigration proceedings.  Plaintiffs do not attempt to show that the case-by-case, discretionary closures contemplated by this regulation are ahistorical or illogical.

The amended complaint also lacks the specificity and context to determine whether the particular courtroom closures they experienced were justified.  Plaintiffs assert that they have encountered locked doors or been turned away from courtrooms on many occasions, *see, e.g.*, Am. Compl. ¶¶ 29-31, 41, 49-52, 70-71, and assert that the closures were improper.  But they do not provide enough information to determine whether there was a legitimate reason for the closures. *See Advocates for Human Rights*, 2026 WL 1162794 at \*10 (observing that the plaintiff "provides little evidence from attorneys or parties inside the courtroom that could shed light as to whether these purported closures were unlawful").  Indeed, one Plaintiff asserts that she was asked to leave a courtroom because "they were about to have an individual hearing," and claims that this was improper because 8 C.F.R. § 1003.27 "explicitly states that individual hearings are open to the public."  Am. Compl. ¶ 70.  But section 1003.27 does not discuss "individual hearings" at all, nor is it clear what that language refers to.  Moreover, immigration judges may remove individual members of the public from their hearings, even if those hearings are otherwise open, if they cause disruption.  *See* EOIR Policy Manual § 3.11(c) ("Disruptive behavior in the courtroom or waiting area is not tolerated.").

Thus, even accepting Plaintiffs' allegations as true, the amended complaint lacks sufficient context to conclude that the courtrooms were closed, or that Plaintiffs were excluded from them, for illegitimate or inappropriate reasons.  Plaintiffs thus cannot make out a First Amendment violation with regard to their access to immigration court hearings.

2.      *Plaintiffs Cannot Show that the Rules of Conduct in Government Facilities Were Not Reasonable or Viewpoint-Neutral*

Plaintiffs also fail to show that their First Amendment rights were violated when they were allegedly prohibited from speaking with or sharing written materials with immigrants attending hearings.  Contrary to Plaintiffs' arguments, the areas surrounding immigration courtrooms in government buildings are nonpublic fora where the Government may impose reasonable and viewpoint-neutral restrictions on speech.  Furthermore, Plaintiffs cannot show that any restrictions on their speech were unreasonable, or that they were targeted due to their provision of assistance to immigrants.  Finally, Plaintiffs fail to plausibly allege that the restrictions on their speech were retaliation for exercising their First Amendment rights.

"The Supreme Court has recognized three types of fora across a spectrum of constitutional protection for expressive activity." *Make the Road by Walking, Inc. v. Turner*, 378 F.3d 133, 142 (2d Cir. 2004).  First, there are "traditional public fora," such as "streets and parks which have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (internal quotation marks omitted).  "Next on the spectrum is the 'designated public forum,' a place not traditionally open to assembly and debate, which the State has opened for use by the public as a place for expressive activity." *Make the Road*, 378 F.3d at 142-43 (citations and internal quotation marks omitted).  "Finally, [a] 'nonpublic forum' is public property not traditionally open to public expression or intentionally designated by the government as a place for such expression." *Id.* at 143 (internal quotation marks omitted).  "Restrictions on speech in a nonpublic forum need only be reasonable and viewpoint neutral." *Id.*  Accordingly, "the State may reserve [a nonpublic forum] for its intended purposes, communicative or otherwise, as long as the regulation on speech

20

is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46.

The hallways and waiting rooms outside immigration courtrooms in the federal buildings at issue are paradigmatic nonpublic fora. Courts "look[] to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum," *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 802 (1985), as well as to the "nature of the property and its compatibility with expressive activity," *Gen. Media*, at 278. "If these indicia show that intent to create a public forum is absent, the forum is generally nonpublic." *Make the Road*, 378 F.3d at 144.

As an initial matter, "Supreme Court and Second Circuit precedent are clear that a courthouse is a non-public forum," *Washpon v. Parr*, 561 F. Supp. 2d 394, 409 (S.D.N.Y. 2008), a designation that extends to "court lands." *Huminski v. Corsones*, 396 F.3d 53, 89 (2d Cir. 2005) ("courthouses, court lands, and parking lots" are nonpublic fora). This is also apparent from the spaces at issue themselves—hallways and waiting rooms outside immigration courtrooms are inherently transitional, interstitial spaces, and are not intended to host assemblies or accommodate expressive activity. The fact that members of the public may access and use these hallways and waiting rooms does not abrogate their nonpublic status, because visitors are not permitted to express themselves freely in them. *See Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 680 (1992) (holding that airline terminals, despite being accessible to members of the public, are not public fora because they have not "historically been made available for speech activity," and have not been "intentionally opened by their operators to such activity"); *see also Greer v. Spock*, 424 U.S. 828, 836 (1976) ("The State, no less than a private owner of property, has power

21

to preserve the property under its control for the use to which it is lawfully dedicated." (internal quotation marks omitted)).

The Second Circuit's decision in *Make the Road* is particularly instructive here. The plaintiff there, an advocacy organization, visited waiting rooms in New York City Human Resources Administration ("HRA") welfare offices to "inform claimants of their rights, help them complete application and recertification forms, translate for non-English-speaking claimants, and represent individual claimants during meetings with case workers." 378 F.3d at 137-38. Then, HRA began enforcing a policy that "[t]he Use of [its] Premises shall be limited to the transaction of official business and such other activities as may be specifically authorized by the HRA," and limited "third party access to Centers and their waiting rooms to those individuals who are part of the transaction of HRA's official business." *Id.* at 139. The plaintiff sued after it was barred from entering the HRA welfare offices because it lacked authorization under the new policy. *Id.* at 140. The court of appeals concluded that the waiting rooms "must be categorized as nonpublic forums," as HRA "unequivocally evidenced its intent to render them nonpublic by enforcing a written policy reserving them for 'official business.'" *Id.* at 146. Thus, "[l]ike waiting rooms in airport terminals, medical clinics or doctor's offices, or motor vehicle departments," these waiting rooms might play host to expressive activity, but such activity "is entirely incidental to the purpose of the welfare office waiting rooms, namely to ensure an orderly flow of claimants to the interviewers." *Id.*

This holding directs a similar conclusion in this case. FPS enforces regulations in the hallways outside immigration courtrooms that prohibit, among other things, "[i]mpeding or disrupting . . . the performance of official duties by Federal employees, or the ability of the general public to obtain services provided by the Federal Government." 6 C.F.R. § 139.35(e); *see also* Welsh Decl. ¶ 10. And EOIR has announced that "Disruptive behavior in the courtroom *or waiting*

22

*area* is not tolerated." EOIR Manual § 3.11(c) (emphasis added); *see also* Burns Decl. ¶ 7. Thus, like the HRA waiting rooms, these spaces are reserved for individuals conducting official duties, or obtaining services from the federal government, and are not intended to host expressive activity.

Additionally, like the HRA waiting rooms, the purpose of the waiting rooms and hallways outside immigration courtrooms is to "ensure an orderly flow" of immigration respondents and other participants in immigration proceedings, and any expressive activity is incidental to that purpose. *Make the Road*, 378 F.3d at 146. Plaintiffs are thus incorrect that the Government has "open[ed] [these] for[a] for expressive activity," Am. Compl. ¶ 16, and thus that any restrictions on communication must be "narrowly tailored to serve a significant governmental interest," *id.* ¶ 127, or limited to "time, place, and manner" restrictions, *id.* ¶¶ 107-08, which reflect the standards that govern public fora. *See generally Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech . . . .").

Because the areas surrounding immigration courtrooms are nonpublic, the Government may restrict speech in those areas provided its restrictions are reasonable and viewpoint-neutral. *See Make the Road*, 378 F.3d at 143. The alleged conduct here satisfies this standard. PSOs and FPS may direct visitors to move or relocate, as part of their duty to prevent "obstruct[ion of] the usual use, enjoyment, or access to Federal property," 6 C.F.R. § 139.35(d), or they may instruct visitors to cease or relocate conversations to the extent those conversations "[c]reat[e] a loud or unusual noise," or "[i]mped[e] or disrupt[] . . . the performance of official duties by Federal employees, or the ability of the general public to obtain services provided by the Federal Government," *id.* § 139.35(c), (e); *see also Make the Road*, 378 F.3d at 149-50 (explaining that the exclusion of Plaintiff and other advocacy organizations "ensured the success of HRA's

23

legitimate goals by limiting disruption in general"); *Heicklen v. DHS*, No. 10 Civ. 2239 (RJH) (JLC), 2011 WL 3841543, at *13 (S.D.N.Y. Aug. 30, 2011) ("[E]xpressive activities inside and outside a courthouse can interfere with a court's attendance to its business"), *report and recommendation adopted*, 2011 WL 4442669 (S.D.N.Y. Sept. 23, 2011). Plaintiffs have failed to allege that any federal employees restricted their speech in a manner inconsistent with these directives.

And while Plaintiffs indicate their belief that the restrictions on their speech and activities were based on its content, they allege no facts to support this conclusion. They point to no instances when one of them was instructed not to communicate with an immigrant specifically because they were attempting to offer assistance or services. Although they allege being told not to distribute "printed informational materials concerning legal rights and court processes," and hypothesize that this was due to a desire to "suppress protected activity and target specific content related to legal rights," Am Compl. ¶¶ 110-12, this contention disregards the posted rule prohibiting visitors in publicly accessible building areas from posting or distributing written materials unless "part of an authorized government activity or with the permission of [GSA]," 6 C.F.R. § 139.60; *see also* Welsh Decl. ¶ 10. GSA, in turn, licenses distribution of materials such as pamphlets upon application, subject to content-neutral standards. *See* Melecio Decl. ¶¶ 13-16 (describing permitting process under GSA rules). Courts have concluded that the rule prohibiting the distribution of non-GSA-licensed materials is content-neutral, as it "refers to all pamphlets, handbills, or flyers without regard to the speaker's view." *Heicklen*, 2011 WL 3841543, at *13 (discussing 41 C.F.R. § 102-74.415(c), the predecessor to 6 C.F.R. § 139.60) (internal quotation marks omitted). Plaintiffs have not alleged that they sought or received GSA permits to distribute the materials at issue, *see also* Melecio Decl. ¶ 13 (no one has applied for such a permit at 26

24

Federal Plaza in the past year), and thus to the extent PSOs or FPS agents instructed Plaintiffs not to distribute such materials in building hallways, this was based on a content-neutral restriction.

Finally, Plaintiffs argue that the Government has violated the prohibition against First Amendment retaliation by "engag[ing] in conduct that would deter a person of ordinary firmness from appearing in court, conducting necessary business before the court, using the services of the clerk of the court, or otherwise participating in judicial proceedings." Am. Compl. ¶ 116. But this argument presumes that Plaintiffs have a First Amendment right to engage in the activities they describe without interruption or disturbance. "[I]n order to state a claim for First Amendment retaliation, a private citizen normally must allege that: '(1) he has an interest protected by the First Amendment; (2) [the] defendants' actions were motivated by or substantially caused by his exercise of that right; and (3) [the] defendants' actions effectively chilled the exercise of his First Amendment right.'" *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 710 (S.D.N.Y. 2011) (quoting *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)). Here, Plaintiffs do not have an unfettered right to express themselves in immigration courts and surrounding areas. Immigration judges and federal building security staff are entitled to establish reasonable and viewpoint-neutral rules for visitors, which they have done here. Moreover, Plaintiffs allege no facts to support their assertion that the Government's restrictions on speech were "motivated by or substantially caused by" Plaintiffs engaging in expressive activity, rather than by a desire to minimize disruptions, maintain order, and ensure the smooth operation of immigration courts.

The Court should thus dismiss Plaintiffs' amended complaint.

## II.    THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiffs' threadbare motion for class certification should be denied, as they allege no facts to support their motion and fail to carry their burden of showing that they satisfy the prerequisites of Federal Rule of Civil Procedure 23.

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal quotation marks omitted).    The party seeking class certification bears the burden of demonstrating that it has satisfied the prerequisites of Rule 23(a) and that its lawsuit falls within one of the types of actions permitted under Rule 23(b). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).    "Rule 23 does not set forth a mere pleading standard" and thus a plaintiff "must affirmatively demonstrate [his] compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).    Consequently, a district court must conduct a "rigorous" class certification analysis, which may "entail some overlap with the merits of the plaintiff's underlying claim." *Id.* at 351.    If the court is not fully satisfied that all Rule 23 requirements are met, it cannot certify the class.

Rule 23(a) requires a party seeking to certify a class to demonstrate that:

(1) The class is so numerous that joinder is impractical [("numerosity")];

(2) There are questions of law or fact common to the class [("commonality")];

(3) The claims or defenses of the named plaintiffs are typical of claims or defenses of the class [("typicality")];

(4) The named plaintiffs will fairly and adequately protect the interest of the class [("adequacy of representation")].

26

Fed. R. Civ. P. 23(a).

While courts assume the truth of the allegations in the complaint when considering whether to certify a proposed class, "district courts are required to look past the pleadings for the limited purpose of deciding if the Rule 23 requirements have been met." *Attenborough v. Const. & Gen. Bldg. Laborers' Loc. 79*, 238 F.R.D. 82, 93 (S.D.N.Y. 2006) (citing *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 231 (2d Cir. 2006)). Accordingly, a defendant is permitted to submit evidence in opposition to a class certification motion. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258. 284 (2014).

### A.   The Proposed Class Is Overbroad

Plaintiffs' proposed class of "[a]ll persons engaging in protected activity within immigration court facilities and functionally integrated common areas and exterior spaces subject to Defendants' enforcement practices in New York City," Class Cert. Mot. ¶ 1, does not satisfy Rule 23(a)'s commonality requirement. "The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). While commonality "does not mean merely that [class members] have all suffered a violation of the same provision of law," *Wal-Mart*, 564 U.S. at 350, "[t]heir claims must depend upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Plaintiffs' proposed class is overbroad, as it does not limit the class to those who have "suffered the same injury." *Wal-Mart*, 564 U.S. at 350. Indeed, by delineating "all persons engaging in protected activity," Class Cert. Mot. ¶ 1, the proposed class would even include visitors to immigration courts and surrounding areas who have not suffered injury. Plaintiffs further fail to define "protected activity," leaving ambiguous which activities would be relevant

27

for class-defining purposes.  Moreover, given that immigration courtrooms and the surrounding areas are nonpublic fora, as discussed above, it is unclear whether the undefined activities Plaintiffs contemplate are constitutionally protected or could be restricted by reasonable and viewpoint-neutral rules.

Even assuming that "protected activities" is defined as observing immigration proceedings and speaking with or providing written materials to immigrants attending those hearings, a class composed of individuals who were thwarted in their attempts to engage in these activities would not meet Rule 23(a)'s commonality requirement.  "What matters to class certification . . . is not the raising of common questions—even in droves—but rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation."  *Wal-Mart*, 564 U.S. at 350.  Here, Plaintiffs allege multiple types of violations, which could not all be resolved with a common answer.  *See Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 127 (S.D.N.Y. 2011) ("The commonality requirement may be met when individual circumstances of class members differ, but their injuries derive from a unitary course of conduct." (internal quotation marks omitted)).  Access to immigration court proceedings, waiting areas, and public hallways in the federal buildings at issue each involve different rules and agencies, and different legal analyses. *See Wal-Mart*, 564 U.S. at 350; *see also, e.g.*, Burns Decl. ¶ 7; Melecio Decl. ¶ 5; Steichen Decl. ¶¶ 4-5.  Moreover, given the substantial variation in the circumstances that can lead to exclusion from these spaces, as evidenced by Plaintiffs' different experiences, it is hard to conceive of a sensible class (or subclasses) that would meet the commonality requirement.

## B.    The Proposed Class Does Not Satisfy the Typicality and Adequacy Requirements

Plaintiffs also fail to demonstrate that their claims are typical of those of the proposed class. "Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose

28

claims they wish to litigate by effectively limiting the class claims to those fairly encompassed by the named plaintiff's claims." *Mazzei v. The Money Store*, 829 F.3d 260, 271-72 (2d Cir. 2016) (alterations, citation, and internal quotation marks omitted).  Typicality requires that "the disputed issues of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class."  *Id.* at 272 (internal quotation marks and alterations omitted); *see also Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229, 244 (2d Cir. 2007) (typicality satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability").  The typicality requirement aims "to ensure that the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Mazzei*, 829 F.3d at 272 (internal quotation marks and alterations omitted).

Even setting aside that Plaintiffs' motion cites no declarations or other factual material to support typicality, it is apparent from the amended complaint that their claims would not be typical of those of the proposed class.  Given the substantial variation in the allegations of even the handful of named plaintiffs, Plaintiffs cannot establish that any of their experiences would be typical of other class members, who may have entirely different experiences attending and observing immigration court proceedings.

Similarly, Plaintiffs cannot show that they can "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "Determining adequacy of representation . . . requires the Court to determine: (1) whether the named plaintiffs . . . have any conflicts of interest with other class members; and (2) whether the named plaintiffs . . . will prosecute the action vigorously on behalf of the entire class."  *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 341 F.R.D.

29

128, 150 (D. Md. 2022) (internal quotation marks omitted); *accord Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). Class representatives must also "possess the same interest and suffer the same injury" as the class members, otherwise, they are "simply not eligible to represent a class of persons who did allegedly suffer injury." *E. Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403-04 (1977) (internal quotation marks and citation omitted).

Plaintiffs' counsel, who is himself a named plaintiff, foregrounds the issue of adequacy, explaining in the amended complaint that "[d]espite sustained efforts to secure representation by experienced class or impact litigation counsel, no attorney or organization has agreed to take on this matter." Am. Compl. ¶ 121. This extraordinary admission raises substantial questions about Plaintiffs' ability to prosecute their action vigorously on behalf of their sprawling proposed class, and Plaintiffs offer no basis to dispel concerns about their ability to adequately protect the interests of the proposed class. Plaintiffs also offer no facts to support their certification motion, instead asserting simply that "[a]dequacy exists where interests align and counsel is competent," Class Cert. Mot. ¶ 6—despite their seeming acknowledgement of the contrary in the amended complaint. Even setting aside the quality of legal representation, it is apparent from the amended complaint that Plaintiffs do not "possess the same interest and suffer the same injury" even among each other, much less with respect to their entire broadly defined class, as discussed above. *E. Tex. Motor Freight Sys.*, 431 U.S. at 403-04. Accordingly, Plaintiffs cannot satisfy Rule 23(a)'s typicality or adequacy requirements.

## C.    Plaintiffs' Proposed Class Action Does Not Fall Within Rule 23(b)

Plaintiffs also fail to show that their proposed class action falls within one of the permissible types of cases allowed under Rule 23(b). In their motion, Plaintiffs merely state their conclusion that their complaint qualifies as a class action under Rule 23(b)(2), in which the

defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Class Cert. Mot. ¶ 7.  But as explained above, Plaintiffs have alleged no "generally" applicable government actions.  Instead, their amended complaint includes a patchwork of one-off, unrelated actions allegedly committed by disparate federal employees and contractors for which it would be difficult to craft singular, class-wide injunctive or declaratory relief.  Thus, Plaintiffs also fail to satisfy the second prong of Rule 23, and their motion for class certification should be denied.

## III.    THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs' motion for a preliminary injunction should be denied as well.  "When, as here, a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction."  *Care One, LLC v. NLRB*, 166 F.4th 335, 343 (2d Cir. 2026) (internal quotation marks omitted).  "Because the requirements are conjunctive, a movant must satisfy all three to secure a preliminary injunction."  *Id.*

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citation omitted).  "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm."  *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted).

31

But "the mere assertion of constitutional injury is insufficient to automatically trigger a finding of irreparable harm . . . . [r]ather, the alleged constitutional deprivation must be convincingly shown." *Seventh Regiment Armory Conservancy, Inc. v. Knight*, 811 F. Supp. 3d 467, 478 (S.D.N.Y. 2025) (citations and internal quotation marks omitted). Thus, "when a constitutional violation is alleged, the two prongs of the preliminary injunction threshold merge into one: in order to show irreparable injury, plaintiff[s] must show a likelihood of success on the merits." *Id.* (internal quotation marks omitted).

### A. Plaintiffs Do Not Face Irreparable Harm as They Have No Likelihood of Success on the Merits

Plaintiffs assert they have suffered an irreparable injury because the "loss of First Amendment freedoms, even for minimal periods of time, constitutes irreparable harm," and each such deprivation is a "fresh constitutional injury." PI Mot. ¶¶ 10-11. But as discussed above in the motion to dismiss, Plaintiffs lack standing to bring this action and have no viable constitutional claim. Plaintiffs thus cannot show that their constitutional rights have been violated at all—even crediting their allegations—because the alleged government actions they challenge do not violate the First Amendment. Nor, for the reasons given above regarding Plaintiffs' lack of standing to pursue this action, can Plaintiffs show that the alleged actions were taken pursuant to an official policy or evince a pattern of conduct that is likely to recur.

Moreover, given the actual government policies at issue—which permit observation of most immigration court hearings and enable members of the public to converse and exchange written materials with immigrants attending those hearings with reasonable limits so long as they cause no disruption—there is no reason to believe that there will be widespread violations of those policies going forward. This is especially the case given that the leadership of the immigration courts at issue and the FPS officer who oversees the agency's relationship with the PSO contractor

32

have already, or imminently intend to, take steps to ensure that immigration judges who control courtroom access, the immigration court staff who monitor the waiting areas, and the PSOs who monitor the publicly accessible hallways are reminded of the applicable rules and requirements. *See* Taylor Decl. ¶¶ 12-15 & Exs. 3-4; Burns Decl. ¶¶ 6, 12-15 & Exs. 1-4; Steichen Decl. ¶¶ 9-10.

While it is impossible to ensure that no immigration court employee or PSO will ever restrict the ability of one of the Plaintiffs (or another member of the public) to engage in one of the permissible activities at issue, the risk of this occurring in the future is greatly reduced as a result of these interventions. This weighs heavily against injunctive relief—even if Plaintiffs were likely to succeed on the merits of their claim. *See, e.g.*, *Salem v. Pompeo*, 432 F. Supp. 3d 222, 235-36 (E.D.N.Y. 2020) (denying preliminary injunction in part because government agency amended allegedly improper policy); *Alpha & Omega Fin. Servs., Inc. v. Kesler*, No. 18-4015-DDC-KGS, 2018 WL 5719992, at *4 (D. Kan. Nov. 1, 2018) ("The court finds that—in large measure due to defendants' self-corrective behavior actions—little risk of future injury exists.").

### B.    The Public Interest Also Weighs Against Injunctive Relief

For similar reasons, the public interest also weighs strongly against injunctive relief in this case. While members of the public have a strong interest in exercising their First Amendment rights, there is no constitutional violation here. On the other hand, the public interest in appropriate operation of immigration courts and the federal buildings in which they are located is high. Where, at most, Plaintiffs have alleged that some government employees and contractors may have not followed applicable and undisputed rules in instructing members of the public what court hearings they may attend and what they can do outside of the courtrooms—and the government agencies at issue have already taken concrete steps to prevent this from happening in the future—there is no need for judicial intervention.

33

Plaintiffs' requested injunctive relief, *see* PI Mot. at 4-5, would also insert the Court unnecessarily into government operations. As summarized above, the defendant agencies already have policies in place governing public access to immigration court hearings and activities in government buildings—contrary to Plaintiffs' request for "clear, written, and uniform access policies consistent with constitutional requirements." *Id.* at 5. Given the agencies' stated and reiterated intent to ensure compliance with those rules by court and building-security staff, the most practical way for Plaintiffs or others to raise questions about particular incidents of alleged noncompliance is directly to the agencies themselves. *Cf.* Steichen Decl. ¶¶ 11-13 (noting that none of the Plaintiffs, or anyone else, has complained to FPS or DHS about PSO actions near the relevant immigration court areas in at least the past year). Such complaints would, unlike the allegations in the amended complaint, have to include the necessary details to enable the agencies to investigate the specific underlying circumstances of the incident in question: for example, whether a particular immigration court hearing was appropriately closed to the public, whether a particular in-court observer was being disruptive before the judge removed him or her, whether the hallway was overcrowded before the PSO asked people to clear it. In such circumstances, the agencies would be able to determine whether a specific employee or contractor acted contrary to the rules—and if so, to take necessary action. It is far from clear how the broadly worded requested injunction would aid the agencies in such determinations, and indeed it seems likely that each complaint or allegation of malfeasance could unnecessarily and unhelpfully devolve into a mini-trial before this Court.

There is thus no need for injunctive relief to ensure compliance with the agency rules at issue—and certainly no need for injunctive relief to ensure that Plaintiffs' First Amendment rights are respected, since they are not implicated by the conduct at issue.

**CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court grant its motion to dismiss the amended complaint, and deny Plaintiffs' motions for class certification and for a preliminary injunction.

Dated:    New York, New York
          May 12, 2026

<div style="margin-left:50%">

JAY CLAYTON
United States Attorney for the
Southern District of New York

By:  */s/ Jean-David Barnea*
     JEAN-DAVID BARNEA
     KATHLEEN M. LEWIS
     Assistant United States Attorneys
     86 Chambers Street, 3rd Floor
     New York, New York 10007
     Telephone: (212) 637-2679/2728
     jean-david.barnea@usdoj.gov
     kathleen.lewis@usdoj.gov
     *Attorneys for the Government*

</div>

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Civil Rule 7.1(c), the above-named counsel hereby certifies that this memorandum complies with the word-count limitation of this Court's Local Civil Rules, as expanded by this Court's order of May 1, 2026, ECF No. 42, which expanded the page limit for this filing to 35 pages. As measured by the word processing system used to prepare it, this memorandum contains 11,108 words.