FR. FABIÁN ARIAS et al.,
Plaintiffs,
v.
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT et al.,
Defendants.
No. 1:26-cv-02130 (CM)

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS AND REPLY IN FURTHER SUPPORT OF PLAINTIFFS'
MOTIONS FOR PRELIMINARY INJUNCTION AND CLASS CERTIFICATION**

**PRELIMINARY STATEMENT**

1. The Government's opposition is built on a proposition that the new record will not support: that Plaintiffs are describing a handful of isolated inconveniences, already cured by reminders to staff. That proposition was doubtful on the original record. It is untenable now.

2. Plaintiffs have submitted declarations from frequent court observers, a former Immigration Judge and former Chair of the Board of Immigration Appeals, a faith leader whose organization has long participated in accompaniment, a historian of accompaniment practices, and Plaintiff Stephen Kelly's supplemental declaration describing post-May 12 events. Those materials show a stable pattern: public access to immigration court has been transformed, not by a single written rule, but by a practical regime of locked doors, no-observer commands, shifting hallway and waiting-room restrictions, suppression of quiet communication and information gathering, and visible ICE/ERO activity in the same spaces where respondents, families, clergy, journalists, lawyers, volunteers, and observers must pass.

3. The new record also supplies what Defendants said was missing. It gives dates. It gives locations. It identifies recurring spaces: 26 Federal Plaza, 290 Broadway, courtroom doors, waiting rooms, hallways, elevator banks, security lines, and the routes by which respondents enter and leave court. It identifies recurring speakers and listeners: observers, volunteers,

clergy, journalists, respondents, families, court staff, PSOs, FPS, GSA, and ICE/ERO. It identifies recurring conduct: locked courtrooms, orders that observers cannot enter, orders not to speak with respondents, restrictions on written materials and note-taking, instructions to move from one public place to another until no usable place remains, and armed or masked agents positioned in court-adjacent spaces.

4. Defendants' own declarations confirm the baseline rule that Plaintiffs seek to restore. EOIR says immigration hearings are generally open to the public. Burns Decl. ¶ 5; Taylor Decl. ¶ 6. EOIR says public waiting areas are generally accessible to observers and visitors. Burns Decl. ¶ 6; Taylor Decl. ¶ 8. EOIR says it does not prohibit members of the public from speaking with respondents or distributing informational materials in those waiting areas. Burns Decl. ¶ 6; Taylor Decl. ¶ 8. EOIR's fact sheet says that access to observe hearings necessarily entails access to EOIR space, including courtrooms, interior entrances, exits, corridors, conference rooms, and waiting areas that are in EOIR's control or part of EOIR's daily operations. Burns Decl. Ex. 2; Taylor Decl. Ex. 2. FPS likewise admits that hallway use can include waiting against a wall for access to a waiting room and holding conversations related to conducting federal government business. Welsh Decl. ¶ 17; Steichen Decl. ¶ 8.

5. The problem is that the practice on the ground has not matched those admissions. Kelly describes a recent 26 Federal Plaza incident in which a security officer told him observers could only visit a courtroom assigned by a clerk; one clerk knew nothing of that system; another clerk supplied three courtrooms because they were supposedly not doing anything important; the courtrooms were locked; and when a courtroom clerk finally opened a door, the clerk loudly announced, "NO, NO OBSERVERS!" and shut the door. Kelly Second Decl. ¶¶ 31-36. Shulman, a frequent observer, describes being removed for ordinary written note-taking, told not to speak with

people in waiting rooms, and delayed at courtroom doors until proceedings were over. Shulman Decl. ¶¶ 8-15. Glacel describes repeated admonitions not merely against recording, but against writing down information, texting, collecting contact information, using phones, sharing written materials, or speaking with respondents. Glacel Decl. ¶¶ 10-14. Breyer describes arriving with other faith and community volunteers, encountering masked ICE officers positioned at a courtroom doorway, finding the courtroom door locked, and watching people emerge from court and be taken by ICE. Breyer Decl. ¶¶ 8-11. The two photographs submitted with these papers similarly show ICE/ERO personnel stationed in court-adjacent space near an open doorway, a restroom, hallway, and elevator bank. Kelly Second Decl. Exs. A-B.

6. The Government's post-suit emails do not moot this case. They prove it. On March 25, 2026, ACIJ Burns wrote that there had been complaints that members of the public were unable to access public hearings at 26 Federal Plaza, and instructed judges that courtroom doors must remain unlocked during hearings. Burns Decl. Ex. 3. On April 29, the Court Administrator wrote, expressly referencing the pending lawsuit, that staff must keep hearings accessible unless a lawful exception applies. Burns Decl. Ex. 4. On May 11, EOIR leadership reiterated that public waiting areas are generally accessible and that EOIR does not prohibit members of the public from speaking with respondents or distributing informational materials there. Burns Decl. Ex. 1; Taylor Decl. Ex. 4. These are not the memoranda one writes when the complaint is fanciful. They are the memoranda one writes when practice has departed from rule.

7. And the challenged conduct continued after Defendants filed their May 12 declarations. On May 26, 2026, Kelly observed extensive ICE or federal law-enforcement presence at immigration-court locations at both 26 Federal Plaza and 290 Broadway, in the spaces used by respondents, families, observers, and volunteers for immigration-court business, not at an entrance

checkpoint performing ordinary screening. Kelly Second Decl. ¶¶ 42-46. That same day, another observer described a downstairs security guard again preventing people from entering and said that the "old thing" was recurring. Id. ¶ 46. Glacel describes a May 2026 incident in which ICE agents entered or approached Judge Maillano's courtroom and waiting area, causing respondents to become visibly frightened, including a Russian-speaking respondent who turned pale and said, "I won't leave. I won't leave." Glacel Decl. ¶¶ 17-30. Those facts defeat the Government's assertion that the problem is historical, speculative, or cured.

8. Plaintiffs do not seek an order authorizing disruption. They do not seek permission to block hallways, refuse lawful screening, record inside courtrooms in violation of EOIR rules, interfere with lawful arrests, or disregard genuine safety and capacity limits. They seek a narrower order: public hearings must remain open unless lawfully closed; courtroom doors cannot be locked against observers while public hearings are underway; quiet, consensual communication in public waiting areas cannot be banned because it concerns rights, churches, legal resources, or accompaniment; noncommercial informational materials cannot be suppressed through shifting oral commands; and law-enforcement presence and crowd-control rules cannot be used to intimidate, retaliate against, or selectively burden the people who observe, report on, accompany, worship with, or support respondents in public immigration-court proceedings.

9. The motion to dismiss should be denied. Plaintiffs have standing. They state First Amendment access, speech, association, and retaliation claims. The class should be certified, or narrowed and certified, because the questions and relief are common. The preliminary injunction should issue because each missed hearing, barred conversation, abandoned observation, and chilled act of accompaniment is an irreparable First Amendment injury.

4

**STANDARD OF REVIEW**

10. The Government combines a Rule 12 motion, an opposition to preliminary relief, and an opposition to class certification. Those procedural postures matter.

11. On Rule 12(b)(6), the Court accepts the amended complaint's well-pleaded factual allegations as true and draws reasonable inferences in Plaintiffs' favor. The Government cannot defeat the complaint by asking the Court to credit its declarations over Plaintiffs' allegations. On Rule 12(b)(1), the Court may consider jurisdictional evidence, but where standing overlaps with the merits - for example, whether Plaintiffs are subject to an ongoing unconstitutional access regime - the Court should not resolve disputed facts against Plaintiffs on a paper record. At the preliminary-injunction stage, the Court may consider declarations and record materials. At class certification, the Court conducts the Rule 23 inquiry on the evidentiary record, not merely the pleadings.

12. That record now includes multiple categories of proof: named-plaintiff affidavits; Kelly's second declaration; third-party observer declarations from Shulman and Glacel; historical and institutional declarations from Block, Schmidt, and Breyer; photographs of ICE/ERO presence in court-adjacent spaces; and Defendants' own declarations and emails. Taken together, those materials satisfy the applicable standard at every stage.

**I. PLAINTIFFS HAVE STANDING TO SEEK PROSPECTIVE RELIEF.**

13. The Government's standing argument depends on flattening a continuing course of conduct into disconnected past events. The record does not permit that.

14. Five named Plaintiffs regularly attend or seek to attend immigration court proceedings at 26 Federal Plaza and 290 Broadway. Father Arias has accompanied immigrants to immigration court for nearly twenty years and continues that ministry despite repeated orders not to speak with people who request his help and repeated exclusion from courtrooms, hallways, and the

5

building. Arias Aff. ¶¶ 1-7. Kelly attends approximately once per week as a public observer, attorney, organizer, and accompanier; he intends to continue; and he expects further exclusion, harassment, intimidation, speech restrictions, and physical risk absent relief. Kelly Second Decl. ¶¶ 4-6, 63-67. McCallum attends about once per week and states that the same pattern has occurred on virtually every visit since June 2025. McCallum Aff. ¶¶ 1-10. Nathan would continue reporting on immigration court if she could, but has reasonably concluded that access has become routine, categorical, and professionally damaging. Nathan Aff. ¶¶ 7-9. Phillips continues to face the same barriers when she attempts to return, interfering with her professional, religious, and volunteer obligations. Phillips Aff. ¶¶ 5-8.

15. The supplemental declarations reinforce the same point. Shulman has observed regularly, often almost every week, at 26 Federal Plaza, 290 Broadway, and Varick Street; he describes repeated yelling, removal, bans on speaking and sharing information, note-taking restrictions, and access delays that operate as denials of observation. Shulman Decl. ¶¶ 2, 6-16, 21-24. Glacel has attended roughly twice per week since July 2025 at both 26 Federal Plaza and 290 Broadway; she describes arbitrary rules that shift by day, floor, courtroom, clerk, security personnel, and ICE/ERO presence. Glacel Decl. ¶¶ 2, 6-14. Breyer describes her own recent court-observation experience and explains that ICNY has long partnered in immigration-court accompaniment at 26 Federal Plaza and 290 Broadway. Breyer Decl. ¶¶ 1-3, 8-11.

16. These are not plaintiffs who once encountered a random government officer and now speculate about a future tort. They are recurring visitors to the same two court facilities, engaging in the same First Amendment activities, facing the same practical restrictions in the same operational environment. The injury is imminent because the visits are recurring and the challenged conduct is recurring.

17. The record also shows post-May 12 injury. Defendants filed declarations on May 12, 2026 asserting that the alleged problems were isolated, governed by existing rules, and addressed by reminders. Kelly then observed extensive ICE or federal law-enforcement presence on May 26, 2026 at both 26 Federal Plaza and 290 Broadway in spaces used by respondents, families, observers, and volunteers for immigration-court business. Kelly Second Decl. ¶¶ 42-46. Glacel describes a May 2026 incident in which ICE/ERO agents moved through the hallway, entered or approached Judge Maillano's waiting room and courtroom, and frightened respondents so badly that one refused to leave and another declined to use the bathroom. Glacel Decl. ¶¶ 17-30. Those facts are enough by themselves to show that the challenged practices are current.

18. The Government's reliance on City of Los Angeles v. Lyons, 461 U.S. 95 (1983), and similar cases is misplaced. Lyons involved a plaintiff attempting to predict that he personally would again be stopped by police and again subjected to a chokehold. Plaintiffs here are not asking the Court to predict an unusual recurrence. They return to the same buildings precisely to observe and participate in public immigration-court activity. The alleged restrictions are built into that environment: locked doors, ad hoc no-observer rules, waiting-room speech restrictions, hallway dispersals, information-gathering bans, and ICE/ERO presence along the routes respondents must use.

19. Traceability and redressability are equally clear. EOIR controls courtrooms and waiting areas. Burns Decl. ¶¶ 2, 6; Taylor Decl. ¶¶ 5, 8. FPS and PSOs monitor hallways, issue warnings, conduct crowd control, and enforce federal building conduct rules. Welsh Decl. ¶¶ 5, 8, 13-17; Steichen Decl. ¶¶ 5-8. GSA manages the buildings and administers the permit theory the Government invokes to restrict written materials. Melecio Decl. ¶¶ 5, 13-16. ICE conducts arrest and detention operations in the same court-adjacent spaces and, according to the

7

Government, ICE or FPS officers may ask members of the public to move or leave a floor when they are said to interfere with such operations. Welsh Decl. ¶ 20; Harrington Decl. ¶¶ 7-11. The agencies may divide authority on paper, but the injuries occur in one integrated court environment. An order directed to the responsible agencies would redress the injuries by requiring open hearings to remain open, requiring waiting-area speech to be treated consistently with EOIR's own stated policy, and preventing safety and crowd-control authority from being used as a proxy for viewpoint discrimination or retaliation.

20. Nor do Defendants' post-suit emails moot the controversy. Voluntary cessation does not defeat jurisdiction unless the challenged conduct cannot reasonably be expected to recur. Friends of the Earth, Inc. v. Laidlaw Environmental Services, 528 U.S. 167, 189 (2000). Here, the Government offers nonbinding reminders, not a rescission of a written policy; future training plans, not completed structural reform; no discipline, no durable enforcement mechanism, no uniform public notice, and no promise binding ICE/ERO, FPS, PSOs, GSA, and EOIR together. The emails also came after complaints and after this lawsuit. Burns Decl. Exs. 1, 3, 4; Taylor Decl. Ex. 4. And the record contains post-May 12 evidence of continued intimidation and access problems. Kelly Second Decl. ¶¶ 42-46; Glacel Decl. ¶¶ 17-30. That is not mootness. It is a textbook reason for prospective relief.

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR FIRST AMENDMENT ACCESS, SPEECH, AND ASSOCIATION CLAIMS.

21. The Government tries to make this a simple nonpublic-forum case. It is not. There are at least two distinct First Amendment questions. First, whether public immigration-court hearings can be practically closed by locked doors, categorical no-observer commands, and access delays that cause observers to miss proceedings. Second, whether the Government can suppress quiet, consensual, court-related communication, religious and civic accompaniment, note-taking,

information gathering, and noncommercial informational materials in the public spaces through which immigration-court access operates. On either question, Plaintiffs state a claim and show likely success.

A. Immigration hearings are presumptively open, and access must be meaningful.

22. EOIR's own materials establish the starting point. Hearings are generally open to the public. Burns Decl. ¶ 5; Taylor Decl. ¶ 6. Members of the general public need not notify the immigration court in advance before visiting. Burns Decl. Ex. 2; Taylor Decl. Ex. 2. Visitors are not required to check in with court personnel before entering a courtroom to observe, although an Immigration Judge may ask visitors to identify themselves at the start of a hearing. Id. When space is limited, news media representatives have priority over the general public. Id.; 8 C.F.R. § 1003.27(a). These rules are incompatible with a practice in which courtroom doors are locked during public hearings, observers are told categorically that no observers are allowed, or access is delayed until proceedings are over.

23. The historical and functional record matters. Former Immigration Judge Paul Wickham Schmidt served as an Immigration Judge for thirteen years, as a Board Member and Chair of the BIA, as Deputy General Counsel and Acting General Counsel of the former INS, and as a private immigration practitioner and professor. Schmidt Decl. ¶¶ 1-8. He states that, as a matter of regulation and institutional practice, master calendar and individual calendar hearings were presumptively open to the public across administrations; public observers, journalists, advocates, legal observers, students, researchers, volunteers, family members, clergy, Congressional staff, and government officials routinely attended hearings, waited in common areas, spoke quietly with respondents and counsel, observed court operations, and moved throughout publicly accessible portions of the courthouse environment without incident. Id. ¶¶

10-15. He further explains that meaningful observation necessarily extended beyond the courtroom to adjacent publicly accessible areas where respondents, counsel, interpreters, family members, and observers coordinated attendance, exchanged information, prepared, and discussed next steps. Id. ¶¶ 13-18.

24. Block supplies the same historical perspective from the history of accompaniment. Block Decl. at 1-2. Organized accompaniment developed into a civic practice by 2006-2007, including in New York by 2007, and included support at immigration check-ins, court appearances, and related proceedings. Id. at 2-3. Accompaniment was not legal representation. It was public presence where immigration power was exercised: observing, bearing witness, helping people navigate the building and process, connecting people to resources, and making public proceedings public in practice. Id. at 2-3. Breyer confirms the same in present-day New York faith practice: accompaniment is a longstanding, non-disruptive practice through which trained volunteers and faith leaders help respondents find floors and courtrooms, understand what is happening, access referrals, sit in open hearings when space permits, and not face court alone. Breyer Decl. ¶¶ 1-5, 12-13.

25. That history matters under Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980), Globe Newspaper Co. v. Superior Court, 457 U.S. 596 (1982), and Press-Enterprise Co. v. Superior Court, 464 U.S. 501 (1984). It also matters under N.Y. Civil Liberties Union v. N.Y.C. Transit Authority, 684 F.3d 286 (2d Cir. 2012), which applies an experience-and-logic inquiry to access claims. Immigration hearings are adjudications of grave consequence. They are generally open by regulation. They have historically been observed by the public. Public observation improves transparency, professionalism, accuracy, civic confidence, journalism, legal education, and respondent comprehension. Schmidt Decl. ¶¶ 16-23. Functionally,

observation cannot be meaningful if the Government keeps the hearing nominally open while blocking the doorway, locking the door, turning away observers, or preventing the communications that allow observers, journalists, clergy, lawyers, volunteers, and respondents to identify and attend the relevant proceeding.

B. Plaintiffs' evidence shows closure in practice, not merely neutral administration.

26. The Government says Plaintiffs have not shown that particular hearings were supposed to be open. That argument is backwards. The default is openness. The Government must identify a lawful closure basis, not demand that observers identify every negative fact about a proceeding they were prevented from observing.

27. Plaintiffs' evidence is not limited to vague allegations. Nathan went to 26 Federal Plaza on November 14, 2025 to observe hearings for a story; could not find an open courtroom despite researching the docket; found a courtroom with available seats; and was told that the judge never allowed the public in and that "things have changed." Nathan Aff. ¶¶ 3-9; AC ¶¶ 48-53. Phillips was told observers could not enter despite earlier assurances the gallery would open, was ordered out of an almost empty waiting room, was later barred from returning after quietly sharing church information with a respondent, and was then excluded from another courtroom when proceedings resumed despite empty seats and no closure order. Phillips Aff. ¶¶ 3-8; AC ¶¶ 66-72. Kelly describes recent categorical exclusion at 26 Federal Plaza, with no capacity limitation, closure order, case-specific privacy reason, disruption, security concern, or written rule. Kelly Second Decl. ¶¶ 31-36. Shulman describes a pattern in which observers are told to come back in twenty or thirty minutes, only to return after the proceedings are over. Shulman Decl. ¶¶ 13-14.

28. The Government's own remedial emails corroborate the problem. Burns instructed Federal Plaza judges on March 25 that courtroom doors must remain unlocked when hearings are in session and that master calendar and adjustment hearings are generally open unless a specific exception applies. Burns Decl. Ex. 3. Fernandez reiterated on April 29, with the lawsuit expressly pending, that courtroom doors must not be locked during in-person public hearings and that Webex sessions must remain open and unlocked unless the respondent requested closure. Burns Decl. Ex. 4. Those instructions would be unnecessary if Plaintiffs were simply misunderstanding lawful closures.

C. The Government's forum argument does not defeat the speech and association claims.

29. Even if the Court treats some court-adjacent spaces as nonpublic fora, the Government still must act reasonably and without viewpoint discrimination. Cornelius v. NAACP Legal Defense & Educational Fund, 473 U.S. 788, 806 (1985); Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46 (1983). Plaintiffs do not need a traditional public forum to win. A restriction that contradicts the agency's own stated access policy, is applied through shifting oral commands, and suppresses quiet court-related support because of its subject matter is not reasonable or viewpoint neutral.

30. EOIR says it does not prohibit members of the public from speaking with respondents in waiting areas or distributing informational materials there. Burns Decl. ¶ 6; Taylor Decl. ¶ 8; Burns Decl. Ex. 1; Taylor Decl. Ex. 4. Yet Plaintiffs and third-party observers repeatedly describe being told the opposite. Shulman has been told, and heard others told, that observers could not talk to anyone in waiting rooms, could not share information, could not give flyers, could not use phones, and could not remain in hallways or waiting areas, even when conversations were quiet, voluntary, and non-disruptive. Shulman Decl. ¶¶ 3-10, 15-17. Glacel

describes a constant pattern of admonitions against recording, collecting, or preserving information in any form - not just recording audio or video, but writing information on paper, typing notes, texting information, collecting contact information or A-numbers, photographing activity in public areas, or passing written information. Glacel Decl. ¶¶ 10-14. Phillips was barred after writing down the name and address of St. Peter's Church and the time of services for a frightened respondent. Phillips Aff. ¶¶ 3-8; AC ¶¶ 68-72. McCallum was told that distributing legal-rights materials was prohibited under a "new policy." McCallum Aff. ¶¶ 5-8.

31. That is not merely a rule against disruption. It is a restriction on the very activities that make public access meaningful: talking quietly with respondents, offering nonlegal information, connecting people to resources, preserving basic facts about what happens in a public proceeding, and documenting government conduct. The Government cannot call those activities disruptive in the abstract when its own declarations admit that waiting-area speech and informational materials are generally permitted.

32. Make the Road by Walking, Inc. v. Turner, 378 F.3d 133 (2d Cir. 2004), does not save Defendants. That case concerned welfare-office waiting rooms where the agency had adopted a written policy reserving space for official business and limiting third-party access. Here, EOIR's own written policy and emails cut the other way: public observation necessarily entails access to EOIR space, and public waiting areas are generally accessible to observers. Burns Decl. Ex. 2; Taylor Decl. Ex. 2; Burns Decl. Ex. 1; Taylor Decl. Ex. 4. Moreover, Plaintiffs' communications are not unrelated advocacy in a government office; they are quiet, consensual communications with people present for the very government proceedings that Plaintiffs are there to observe. They are court-related business in the ordinary sense recognized even by FPS:

13

holding a conversation related to conducting federal government business. Steichen Decl. ¶ 8; Welsh Decl. ¶ 17.

33. Nor can the GSA permit theory dispose of the materials claim. First, EOIR's May 11 emails say informational materials are not prohibited in EOIR waiting areas. Burns Decl. Ex. 1; Taylor Decl. Ex. 4. Second, the permit form requires a sample or description of materials and uses a process that, according to Melecio, may take up to ten days and lasts thirty days. Melecio Decl. ¶¶ 13-16; Melecio Decl. Ex. A. That process cannot be used as a practical bar to time-sensitive, noncommercial, rights-related information offered to a respondent minutes before or after a public hearing. Third, Melecio states that GSA can deny proposed uses intended to influence or impede a pending judicial proceeding. Melecio Decl. ¶ 15. A licensing scheme that requires advance submission of rights-related materials and can be denied based on an asserted effect on pending proceedings raises exactly the First Amendment concerns the Government says do not exist. At a minimum, Plaintiffs have stated and supported an as-applied challenge.

D. Restrictions on note-taking and information gathering are independently unreasonable.

34. The Government frames the dispute as if Plaintiffs seek to record inside courtrooms. They do not. EOIR's fact sheet prohibits recording functions and requires devices to be used in a non-disruptive manner, but it also permits possession of personal electronic devices in EOIR space. Burns Decl. Ex. 2; Taylor Decl. Ex. 2. Shulman was removed from courtrooms for ordinary written note-taking with pen and paper. Shulman Decl. ¶¶ 11-12. Glacel states that officials have treated ordinary information preservation - handwriting notes, typing notes, texting, collecting contact information, or recording A-numbers - as prohibited or suspicious. Glacel Decl. ¶¶ 10-13. Public observation that forbids note-taking is not meaningful public observation. A journalist cannot report accurately, a lawyer cannot assess a tribunal, a scholar

cannot study, a legal observer cannot document, and an accompanier cannot help a respondent remember next steps if every act of information preservation is treated as suspect.

35. At this stage, Plaintiffs need not prove that every officer, clerk, or judge used the same words. They have shown a practice with a consistent practical result: public observers are prevented from observing, communicating, preserving information, and assisting respondents in the places where those activities must occur. That states a First Amendment claim and supports preliminary relief.

### III. PLAINTIFFS HAVE STATED AND SUPPORTED A RETALIATION CLAIM.

36. The amended complaint pleads retaliation, and the new declarations substantiate it. The protected activity is clear: attending public hearings, observing government proceedings, reporting, taking notes, accompanying respondents, offering pastoral support, sharing noncommercial information about rights and services, associating with respondents and other observers, and participating in this litigation.

37. The adverse action is also clear. A person of ordinary firmness would be deterred by being denied access to courtrooms, ordered out of public waiting areas, told not to speak with respondents, removed for note-taking, barred from sharing rights materials, pushed or shoved in court-adjacent space, subjected to shifting movement commands, or forced to pass masked and armed agents stationed near courtroom doors and elevator paths. Plaintiffs and declarants describe all of those things. Arias Aff. ¶¶ 3-7; Kelly Second Decl. ¶¶ 20-30, 37-46, 54-67; McCallum Aff. ¶¶ 4-10; Shulman Decl. ¶¶ 6-24; Glacel Decl. ¶¶ 10-34; Breyer Decl. ¶¶ 7-13.

38. Kelly's June 23, 2025 incident illustrates the point. He accompanied a respondent to court, was present in the gallery, exited after the hearing with the respondent and the respondent's priest, and spent several minutes explaining a favorable outcome because the proceeding had been

conducted in English and neither the respondent nor the priest understood English. Kelly Second Decl. ¶¶ 38-39. As the group began moving toward the elevator, agents in military-style weapons and armor rushed them; Kelly was forcibly separated, and the respondent was seized and taken away in handcuffs. Id. Kelly states that he was not obstructing the agents, blocking a corridor, or physically interfering with any arrest; he was explaining the outcome of a court proceeding. Id. ¶ 39. That is adverse action directed at the immediate exercise of court-related speech and association.

39. The September 30 incident is likewise not answered by Harrington's declaration. Harrington gives ICE's version and calls the episode interference. Harrington Decl. ¶¶ 10-11. But Kelly states that he personally observed a journalist forcibly taken to the ground and strike his head on the marble floor with significant force. Kelly Second Decl. ¶ 40. Arias, McCallum, and Nathan also describe the incident as part of the intimidating environment. Arias Aff. ¶ 6; McCallum Aff. ¶ 8; Nathan Aff. ¶¶ 7-9. At the motion-to-dismiss stage, Defendants' account cannot displace Plaintiffs' allegations. At the preliminary-injunction stage, the dispute underscores why a court order is needed: the same court-adjacent spaces are being used for public observation, respondent movement, and law-enforcement operations, and observers reasonably fear physical consequences if they remain present to witness or document what happens.

40. Glacel's May 2026 account shows the same danger is current. ICE/ERO agents were present in the hallway, moved near the waiting-room area, entered the courtroom area, and changed the atmosphere instantly. Glacel Decl. ¶¶ 17-24. A Russian-speaking respondent turned pale and said he would not leave; another respondent declined to use the bathroom because agents were nearby; when the Russian-speaking respondent later saw federal agents elsewhere in the

building, he ran out. Id. ¶¶ 25-30. This is not neutral screening at a magnetometer. It is law-enforcement presence inside the functional court environment, producing fear that interferes with court participation, public observation, accompaniment, and communication.

41. Shulman describes a similar June 2025 incident at 290 Broadway in which ICE agents followed a person leaving immigration court and pushed or shoved that person, and Shulman was also pushed. Shulman Decl. ¶ 20. Breyer describes masked ICE officers waiting at a courtroom door and observers being unable to enter; from the waiting room, she watched people emerge from court and be taken away by ICE. Breyer Decl. ¶¶ 8-11. These are not garden-variety security inconveniences. They are precisely the kind of actions that would deter ordinary people from attending court, observing hearings, accompanying respondents, or identifying themselves in declarations.

42. The chilling effect is not theoretical. Kelly states that the number of people willing to participate in observation and accompaniment has significantly decreased; that many people refuse to put their names on declarations; and that when he asks witnesses to come forward, their first response is often, "Is that safe?" Kelly Second Decl. ¶¶ 54-58, 65. He also explains that reports of federal monitoring of a private Signal group used by court observers intensified fear among volunteers, regardless of his personal knowledge of the underlying investigation, because volunteers reasonably understand even lawful observation and documentation as being treated as suspicious. Id. ¶ 56. Glacel similarly explains that the combined effect of arbitrary access rules, limits on speaking, restrictions on note-taking, and ICE presence interferes with her ability to observe, provide nonlegal information, and accompany respondents. Glacel Decl. ¶¶ 31-34. Shulman states that a reasonable person would be deterred by the risk of being yelled

at, removed, denied access, physically pushed, or treated as though ordinary observation and communication were prohibited. Shulman Decl. ¶¶ 21-24.

43. Retaliatory motive can be inferred from the pattern and target of enforcement. The restrictions are triggered by protected activities: asking to observe, speaking with respondents, offering legal-rights or church information, taking notes, accompanying people, and documenting official action. The May 11 EOIR emails admit that those activities are not categorically prohibited in waiting areas, yet declarants repeatedly describe being told they are forbidden. Burns Decl. Ex. 1; Taylor Decl. Ex. 4; Shulman Decl. ¶¶ 8-15; Glacel Decl. ¶¶ 10-14; Phillips Aff. ¶¶ 3-8. Kelly also reports that observers recently described public hostility by agents toward Father Arias and toward Plaintiffs in the lawsuit, which, at minimum, substantiates the fear and chilling effect surrounding continued participation in this case. Kelly Second Decl. ¶¶ 47-53. The Court need not resolve every factual dispute now. The record amply shows protected activity, adverse action, chilling effect, and a causal connection sufficient to state a claim and support preliminary relief.

**IV. THE CLASS SHOULD BE CERTIFIED, OR NARROWED AND CERTIFIED.**

44. Defendants argue that class certification fails because the proposed class is overbroad, factual circumstances vary, and Kelly is both a named Plaintiff and proposed class counsel. The argument mistakes both the record and the nature of Rule 23(b)(2) relief.

A. The Court may certify the proposed class or a narrowed class.

45. Plaintiffs proposed a class of persons engaging in protected activity within immigration court facilities and functionally integrated common areas and exterior spaces subject to Defendants' enforcement practices in New York City. If the Court believes that definition is too broad,

Plaintiffs respectfully request certification of a narrower Rule 23(b)(2) class, or subclasses, limited to the facilities and activities actually shown by this record:

46. All persons who, at 26 Federal Plaza or 290 Broadway, engage or intend to engage in public observation, courtwatching, journalism, religious or civic accompaniment, quiet consensual communication with respondents or their families, noncommercial provision of information, or other non-disruptive First Amendment activity in EOIR courtrooms, public waiting areas, and functionally connected interior common areas, and who are or will be subject to Defendants' access, movement, speech, information-gathering, materials-distribution, law-enforcement, or crowd-control practices.

47. That definition uses objective criteria: location, activity, and exposure to the challenged practices. It also tracks the evidence. It excludes people with no connection to the immigration-court environment and focuses the relief on the two buildings where the named Plaintiffs and supporting declarants describe recurring injuries.

B. Numerosity is satisfied.

48. Numerosity is plain. This is a fluid, recurring, future-facing civil-rights class. EOIR reports 212,995 hearings at Federal Plaza and 80,026 hearings at Broadway between May 1, 2025 and April 30, 2026. Burns Decl. ¶ 9; Taylor Decl. ¶ 11. Those numbers are not class-member counts, but they show the scale of the recurring public-facing environment. The class includes present and future observers, journalists, clergy, family members, volunteers, legal observers, social-service providers, students, lawyers, and respondents' supporters who appear at those courts to observe or accompany. Schmidt Decl. ¶¶ 13-23; Breyer Decl. ¶¶ 1-5; Block Decl. at 1-3.

49. The record now includes more than the five named Plaintiffs. Shulman observes frequently, often almost weekly. Shulman Decl. ¶ 2. Glacel attends roughly twice per week. Glacel Decl. ¶ 2. Breyer attended as part of a group of volunteers that included Ruth Messinger and another volunteer. Breyer Decl. ¶¶ 8-10. Kelly has spent hundreds of hours locating and communicating with potential declarants, organizing observers, and serving as a resource to organizations, scholars, journalists, community groups, and elected officials. Kelly Second Decl. ¶¶ 7-17. He states that some people have stopped attending or will not provide declarations because they fear retaliation or surveillance. Id. ¶¶ 54-58, 65. Numerosity does not fail because fear and underreporting make a complete list difficult. That is why Rule 23(b)(2) exists.

C. Commonality is satisfied.

50. The common questions are obvious and capable of classwide resolution. See Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011). They include:

51. Whether public immigration hearings at 26 Federal Plaza and 290 Broadway must remain meaningfully accessible unless lawfully closed;

52. whether EOIR, FPS, PSOs, GSA, and ICE may impose or enforce categorical or ad hoc no-observer rules, locked-door practices, or access delays that prevent observation of public hearings;

53. whether members of the public may engage in quiet, consensual, non-disruptive conversations with respondents and families in public waiting areas and functionally connected spaces;

54. whether noncommercial informational materials can be suppressed through oral commands, shifting permit theories, or content-sensitive enforcement;

20

55. whether ordinary note-taking and information preservation may be treated as prohibited recording or suspicious conduct;

56. whether crowd-control, hallway, and arrest-operation authority may be used in ways that intimidate or retaliate against observers, journalists, clergy, volunteers, or other supporters because they engage in protected activity; and

57. whether uniform injunctive relief is necessary to restore baseline access while preserving genuine safety rules.

58. Defendants themselves have made the case common. Their declarations identify a common set of agency roles, locations, rules, defenses, and asserted justifications. EOIR controls courtrooms and waiting areas. Burns Decl. ¶¶ 2, 6; Taylor Decl. ¶¶ 5, 8. FPS and PSOs enforce building conduct rules and manage hallways. Welsh Decl. ¶¶ 5, 8-17; Steichen Decl. ¶¶ 5-8. GSA manages building space and permit procedures. Melecio Decl. ¶¶ 5, 13-16. ICE conducts operations in the same environment and disclaims responsibility for access restrictions. Harrington Decl. ¶¶ 7-11. The common legal question is whether the resulting system can operate as it has, or whether it must be constrained by a court order.

59. Variations in who issued a particular command do not defeat commonality. They are part of the common problem. Kelly explains that hostile conduct comes from three overlapping sources - building security/PSOs, federal law enforcement including ICE, and immigration-court employees - and that responsibility shifts among agencies in real time so observers cannot know what rule is being enforced, who made it, or how to comply. Kelly Second Decl. ¶¶ 22-30, 61-62. That is exactly why systemwide relief is needed. The Government cannot defeat Rule 23 by assigning each piece of the same unconstitutional experience to a different agency.

D. Typicality is satisfied.

60. The named Plaintiffs' experiences are typical because they arise from the same course of conduct and assert the same legal theories as the class. Father Arias represents clergy and faith-based accompaniers whose ministry and association are burdened. Arias Aff. ¶¶ 1-7. Kelly represents observers, lawyers, organizers, and accompaniers who need courtroom access, public-space communication, and protection from retaliation. Kelly Aff. ¶¶ 1-34; Kelly Second Decl. ¶¶ 4-6, 63-67. McCallum represents community volunteers and court observers barred from courtrooms, waiting rooms, hallways, and legal-rights distribution. McCallum Aff. ¶¶ 1-10. Nathan represents journalists whose reporting depends on in-person access, note-taking, and observation. Nathan Aff. ¶¶ 1-9. Phillips represents professionals and religious volunteers whose ability to understand and mitigate trauma depends on observing proceedings and supporting respondents before and after hearings. Phillips Aff. ¶¶ 1-8.

61. Rule 23 does not require every class representative to experience every manifestation of the challenged practice. It requires the claims to arise from the same course of conduct and legal theory. They do. The Government's own argument proves typicality: it responds to Plaintiffs collectively by invoking the same nonpublic-forum theory, the same capacity and safety theories, the same GSA permit theory, the same ICE carve-out, the same standing argument, and the same post-suit remedial emails. Gov. Br. at 13-35. If Defendants can defend the case with common arguments, Plaintiffs can certify it with common questions.

E. Adequacy and Rule 23(g) are satisfied.

62. The named Plaintiffs have no conflict with the class. Their interests are aligned with all class members: restoring meaningful access to public immigration-court proceedings and protecting non-disruptive court-related speech, accompaniment, reporting, observation, and association.

They seek injunctive and declaratory relief, not individualized damages. No named Plaintiff seeks a remedy that would impair another observer's rights.

63. The Government's main adequacy attack is directed at Kelly's role as both named Plaintiff and proposed class counsel. The Court should reject that attack or, at most, address it through Rule 23(g) case-management tools rather than denying certification of a civil-rights class.

64. Kelly has done precisely what Rule 23(g) asks the Court to examine: he has investigated the claims, developed the factual record, researched the law, identified witnesses, and committed resources to the case. He was invited in March 2025 by Ravi Ragbir to evaluate conditions at the New York City immigration courts and has since attended approximately once per week as a public observer, court observer, attorney, organizer, and accompanier. Kelly Second Decl. ¶¶ 4-6. His work has included hundreds of hours of court observation, accompaniment, witness conversations, factual investigation, contemporaneous notes, locating and communicating with potential declarants, reviewing public reporting and video evidence, and assembling the record. Id. ¶¶ 7-9.

65. Kelly also explains why the case came to be litigated by him rather than a larger organization. He was among the first attorneys, to his knowledge, to identify the access, speech, and intimidation problems that emerged in these courts as a connected civil-rights problem rather than isolated courthouse incidents. Id. ¶ 9. He served as a resource to local and national legal organizations, civil-rights organizations, scholars, journalists, observers, community groups, and elected officials seeking to understand conditions at 26 Federal Plaza, 290 Broadway, and related spaces. Id. He researched First Amendment access, courthouse speech, retaliation, chilling, administrative-law constraints, EOIR rules, preliminary injunctions, Rule 23(b)(2),

Rule 23(g), and injunctions concerning federal law-enforcement conduct directed at observers, journalists, and legal observers. Id. ¶ 10.

66. He candidly states that he has not previously represented a certified federal class. Id. ¶ 14. Rule 23(g) does not require prior certification experience as a condition of adequacy. It asks whether counsel will fairly and adequately represent the class, considering counsel's work identifying and investigating the claims, experience, knowledge of the applicable law, and resources. Kelly's background includes litigation and adversarial regulatory work, including work as a private contractor seconded to DOJ's Civil Frauds Division, where he developed legal theories and evidentiary records for complex civil litigation affecting large groups of people. Id. ¶ 12. Before becoming a lawyer, he pursued law and justice issues connected to the Americas, served as the Law and Justice in the Americas Fellow at Boston College, and conducted academic legal research as a Clough Fellow on U.S.-Central America ties. Id. ¶ 13.

67. Kelly also attempted, for much of the past year, to recruit or hand the case off to experienced class-action, impact-litigation, civil-rights, or immigration counsel. Id. ¶¶ 14-16. He approached litigators, organizations, elected officials, coalitions of lawyers, coalitions of organizations, and organization lawyers in their individual capacities, especially after gathering the evidence base, identifying named plaintiffs, outlining the legal issues, drafting the complaint, and filing the complaint. Id. ¶ 15. The fact that those efforts did not produce substitute counsel is not a reason to leave the challenged practices without review. It is evidence of diligence and necessity.

68. The resources factor also supports adequacy. Kelly has maintained a personal Westlaw account for this matter and incurred approximately $5,380 in research fees. Id. ¶ 11. He has continued the case because the need for relief has not abated and because abandoning it after unsuccessful

recruitment efforts would leave the challenged practices without an effective vehicle for judicial review. Id. ¶ 16. He states that many members of the affected community know his continuous work and that no class member has expressed unease to him about his continuing in this role. Id.

69. If the Court has concerns about the dual role, the answer is not to deny relief to the class. The Court can appoint Kelly as class counsel subject to later supplementation, appoint co-counsel if additional counsel appears, require a further Rule 23(g) declaration, certify the class conditionally, or certify subclasses with counsel arrangements the Court approves. But the Government has not shown any actual conflict, any divergent remedial interest, or any reason to think Kelly will not prosecute the case vigorously. The present record shows the opposite.

F. Rule 23(b)(2) is satisfied.

70. This is a Rule 23(b)(2) case. Defendants have acted or refused to act on grounds generally applicable to a class of people who enter the same court environment to engage in the same protected activities and face the same categories of restrictions. The requested relief is indivisible: keep public hearings open unless lawfully closed; do not impose categorical no-observer rules; do not ban quiet waiting-area conversations and informational materials that EOIR itself says are not prohibited; regulate hallways by neutral safety rules rather than viewpoint or retaliation; and do not use ICE/FPS/PSO authority to intimidate or selectively burden protected activity.

71. No damages inquiry is required. No individual class member needs a separate money award. Future class members are not a defect; they are the reason injunctive classes exist. The class should be certified, or narrowed and certified as stated above.

**V. PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION.**

72. The preliminary-injunction standard is satisfied. Plaintiffs have shown a likelihood of success on the merits, or at least serious questions going to the merits and a balance of hardships tipping decisively in their favor. They have shown irreparable harm. And the public interest favors relief.

A. Plaintiffs are likely to succeed.

73. For the reasons already stated, Plaintiffs are likely to succeed on their access, speech, association, and retaliation claims. The Government's own evidence supplies the baseline rules: immigration hearings are generally open; public waiting areas are generally accessible; EOIR does not prohibit waiting-area speech with respondents or informational materials; access to observe hearings necessarily entails access to EOIR space; and FPS recognizes appropriate hallway use for court-related conversations and waiting against the wall when a waiting room is at capacity. Burns Decl. ¶¶ 5-7; Taylor Decl. ¶¶ 6-8; Burns Decl. Exs. 1-3; Taylor Decl. Exs. 2, 4; Welsh Decl. ¶ 17; Steichen Decl. ¶ 8.

74. Plaintiffs' evidence shows departures from those rules. Kelly, Shulman, Glacel, Breyer, Nathan, Phillips, McCallum, and Arias describe locked doors, categorical exclusion, delay tactics, no-speaking commands, no-materials commands, note-taking restrictions, information-gathering restrictions, public-space dispersals, ICE/ERO intimidation, physical pushing, and fear of return. Kelly Second Decl. ¶¶ 20-67; Shulman Decl. ¶¶ 6-24; Glacel Decl. ¶¶ 6-34; Breyer Decl. ¶¶ 6-13; Nathan Aff. ¶¶ 3-9; Phillips Aff. ¶¶ 3-8; McCallum Aff. ¶¶ 3-10; Arias Aff. ¶¶ 3-7.

75. The Government says its rules are reasonable. Plaintiffs do not challenge genuine rules against disruption, crowding, recording, obstruction, or interference with lawful arrests. They challenge the misuse of those concepts to close public hearings, suppress court-related speech,

and intimidate observers. A rule is not reasonable as applied when the Government says the conduct is allowed in writing and forbids it orally on the floor.

B. Plaintiffs face irreparable harm.

76. The loss of First Amendment freedoms, even for minimal periods of time, is irreparable injury. Elrod v. Burns, 427 U.S. 347, 373 (1976). The harm here occurs at the moment access is denied, speech is chilled, or intimidation causes a person to leave. A missed hearing cannot be recreated. A respondent who left court without support cannot be retroactively accompanied. A journalist cannot later observe what she was excluded from seeing. A priest cannot later provide presence at the moment of fear. A volunteer cannot later collect contact information if the respondent was taken or fled.

77. Kelly states exactly that: the injuries occur when access is denied, speech is chilled, communication is prevented, or physical intimidation causes a person to leave, and cannot be adequately remedied after the fact because the hearing has occurred, the respondent has left or been taken, and the opportunity for observation, support, and documentation is gone. Kelly Second Decl. ¶ 64. Glacel describes respondents too frightened to leave the courtroom, use the bathroom, or walk through the building. Glacel Decl. ¶¶ 25-30. Breyer describes feeling helpless as observers were excluded and immigrants were taken by masked officers. Breyer Decl. ¶¶ 8-11. Schmidt explains that public observation contributes to transparency, accountability, confidence, professionalism, legal education, and the accurate functioning of proceedings involving vulnerable populations. Schmidt Decl. ¶¶ 16-23. Those harms cannot be compensated later.

C. The balance of equities and public interest favor relief.

78. The Government has legitimate interests in safety, orderly movement, courtroom decorum, screening, and lawful enforcement. Plaintiffs do not dispute those interests. The requested injunction preserves them. It does not authorize disruption, hallway obstruction, recording in violation of EOIR policy, refusal to comply with lawful screening, or interference with lawful arrests.

79. But the Government has no legitimate interest in locking the public out of public hearings, using no-observer commands, delaying access until hearings end, suppressing quiet conversations, banning church and legal-rights information, treating note-taking as misconduct, or creating a courthouse environment so intimidating that respondents fear leaving a courtroom or using a bathroom.

80. The public interest in open adjudication is particularly strong here. Immigration courts adjudicate whether people may remain in the United States, remain with families, and obtain protection from danger. AC ¶¶ 4-11. Schmidt explains that public observation historically improved professionalism, preparedness, civility, accountability, and public understanding. Schmidt Decl. ¶¶ 18-23. Breyer explains that accompaniment is part of how faith communities answer fear with presence and prevent vulnerable people from being isolated. Breyer Decl. ¶¶ 11-13. Block explains that accompaniment has long served as public presence where immigration power is exercised. Block Decl. at 1-3. The public interest favors restoring that baseline while leaving neutral security in place.

D. The injunction can be precise.

81. The Government calls Plaintiffs' requested relief vague and burdensome. A precise order is available. Plaintiffs respectfully request an injunction providing that:

(a) During immigration-court hearings open to the public, EOIR must keep courtroom doors unlocked or otherwise provide meaningful public access, subject to lawful closure, capacity limits, and courtroom decorum.

(b) If a hearing is closed or attendance is limited, the basis must be lawful, case-specific, and documented on the record or in a contemporaneous administrative notation sufficient to permit review, with press priority applied when space is limited as required by 8 C.F.R. § 1003.27(a).

(c) EOIR and those acting with it may not impose categorical no-observer rules, permanent public bans, access delays designed to make observation futile, or Webex/in-person access traps that prevent meaningful observation.

(d) In public waiting areas and EOIR access spaces, members of the public may engage in quiet, consensual, non-disruptive conversations with respondents, family members, counsel, clergy, journalists, observers, and volunteers, subject to neutral capacity, noise, and safety rules.

(e) EOIR may not prohibit noncommercial informational materials in public waiting areas where EOIR admits such materials are not prohibited. Any regulation of materials in other public-access spaces must be content neutral, clearly communicated, and not applied to suppress rights-related, religious, journalistic, or immigrant-support speech.

(f) Defendants may enforce neutral security, decorum, capacity, and crowd-control rules, but may not use those rules to retaliate against, intimidate, remove, or selectively burden people because they observe hearings, report, accompany respondents, speak with respondents, share lawful information, take non-disruptive notes, or participate in this litigation.

(g) Defendants must provide written notice and training to relevant EOIR personnel, FPS, PSOs, GSA building management, and ICE/ERO personnel operating in court-adjacent spaces, so the order is implemented consistently across agencies and contractors.

(h) Nothing in the order permits any person to disrupt a hearing, block a hallway or elevator, record inside a courtroom in violation of EOIR policy, refuse lawful screening, enter closed administrative office space, or physically interfere with a lawful arrest.

82. This is not judicial management of immigration court. It is ordinary injunctive relief restoring the Constitution and Defendants' own stated rules.

**CONCLUSION**

83. The Government asks the Court to dismiss this case because, it says, the rules already protect public access and the agencies have reminded staff to follow them. Plaintiffs ask the Court to deny dismissal because those reminders were necessary, because the record shows repeated departures from those rules, because post-suit emails do not bind the multi-agency system in practice, and because the challenged conduct continued after Defendants filed their declarations.

84. The motion to dismiss should be denied. Plaintiffs' motion for class certification should be granted, or the class should be narrowed and certified. Plaintiffs' motion for a preliminary injunction should be granted.

Dated: New York, New York
May 26, 2026

Respectfully submitted,
/s/ Stephen Kelly
Stephen Kelly
Counsel for Plaintiffs
32 Court Street, 904
Brooklyn, NY 11201

(929) 270-9905
stephen@philanthropy-law.com

**CERTIFICATE OF COMPLIANCE**

I certify that this memorandum contains approximately 8,269 words, excluding the caption,

signature block, and this certificate.