UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————— x

FR. FABIÁN ARIAS, STEPHEN KELLY, LAURA MCCALLUM, DEBBIE NATHAN, DR. ZOEY PHILLIPS,

               Plaintiffs,

    -against-

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; DAVID J. VENTURELLA, in his official capacity as the senior official performing the duties of the Director of U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Acting Attorney General; GENERAL SERVICES ADMINISTRATION; and EDWARD FORST, in his official capacity as Administrator of General Services,

               Defendants.

———————————————————————————— x

                        26-cv-2130 (CM)

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

McMahon, J.:

This case concerns public access, speech, association, retaliation, and alleged intimidation in and around two immigration courts in Lower Manhattan: (1) the New York Federal Plaza Immigration Court at 26 Federal Plaza (the "Federal Plaza Immigration Court") and (2) the New York Broadway Immigration Court at 290 Broadway (the "Broadway Immigration Court").

Plaintiffs Father Fabián Arias, Stephen Kelly, Laura McCallum, Debbie Nathan, and Dr. Zoey Phillips regularly attend, or seek to attend, immigration-court proceedings as clergy, court observers, journalists, attorneys, mental-health professionals, volunteers, and accompaniers. Dkt. No. 40, Am. Compl., at 1, ¶¶ 22–98. Defendants are U.S. Immigration and Customs Enforcement ("ICE"); David J. Venturella, in his official capacity as the senior official performing the duties of the Director of ICE; the U.S. Department of Homeland Security ("DHS"); Markwayne Mullin, in his official capacity as Secretary of Homeland Security; the U.S. Department of Justice ("DOJ"); Todd Blanche, in his official capacity as Acting Attorney General; the General Services Administration ("GSA"); and Edward Forst, in his official capacity as Administrator of GSA.

Plaintiffs allege that, beginning in or around June 2025, conditions in the New York City immigration courts changed dramatically. According to plaintiffs, courtroom doors were locked during proceedings that were presumptively open to the public; members of the public were told that observers were not permitted; observers and accompaniers were barred from waiting rooms and hallways; quiet communications with respondents were prohibited; written materials were treated as forbidden solicitation; and the regular presence of ICE or other federal law-enforcement officers in court-adjacent spaces deterred observation, accompaniment, reporting, and court participation. Dkt. No. 40, ¶¶ 1–3, 22–31, 38–44, 48–53, 66–74, 84–98, 103–18.

Plaintiffs seek preliminary relief requiring that ordinary, non-closed immigration court hearings remain accessible to public observers unless access is lawfully limited; that defendants not use building-security or access-control practices to prevent observers from reaching such hearings without a lawful basis; and that certain named plaintiffs be permitted to engage in quiet, consensual, noncommercial communication and accompaniment in EOIR-controlled public waiting areas. Dkt. No. 32, Pls.' Mot. for Prelim. Inj., ¶¶ 1–2; Dkt. No. 51, Pls.' Mem. L. Opp'n

to Defs.' Mot. to Dismiss & Reply Supp. Pls.' Mots. for Prelim. Inj. and Class Certification, ¶¶ 8–9, 81.  Plaintiffs also seek certification of a putative class covering persons engaged in protected activity within all immigration-court facilities in New York City, including functionally integrated common areas and exterior spaces.  Dkt. No. 33, ¶ 1.

The Government provides a different account, arguing that plaintiffs' papers "reference only a handful of specific incidents that reflect no discernible pattern," that immigration courts and the federal buildings in which they sit are nonpublic fora, and that the relevant federal agencies impose reasonable restrictions directed at public safety and the orderly operation of immigration courts.  Dkt. No. 44, Defs.' Mem. L. Supp. Mot. to Dismiss and Opp'n to Pls.' Mots. for Prelim. Inj. and Class Certification, at 2–3.  The Government emphasizes that immigration hearings are generally open to the public, but are not categorically so; that immigration judges may close or limit attendance at particular proceedings under applicable regulations; that court staff may respond to disruption and overcrowding; that Protective Security Officers ("PSOs") and the Federal Protective Service ("FPS") may clear hallways when congestion interferes with access or safety; and that ICE is not responsible for administering public access to immigration courtrooms or waiting areas.  Dkt. No. 44 at 7–12; Dkt. No. 46, Declaration of Assistant Chief Immigration Judge Khalilah Taylor, ¶¶ 6–10; Dkt. No. 50, Declaration of Joseph Harrington, ¶¶ 7–11.

Before the Court are plaintiffs' motion for a preliminary injunction, plaintiffs' motion for class certification, and defendants' motion to dismiss the amended complaint for lack of subject-matter jurisdiction and failure to state a claim.  For the reasons explained below, defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART; plaintiffs' motion for a preliminary injunction is GRANTED IN PART and DENIED IN PART; and plaintiffs' motion for class certification is DENIED WITHOUT PREJUDICE.

## I.    FACTUAL BACKGROUND

The factual background below is drawn from the amended complaint, the parties' evidentiary submissions, the parties' representations in their briefs, and publicly accessible government documents.  In resolving defendants' motion to dismiss for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1), the Court accepts the amended complaint's well-pleaded factual allegations as true and makes no findings of fact.  In resolving plaintiffs' motion for a preliminary injunction, and plaintiffs' motion for class certification, the Court considers the evidentiary record and makes such factual findings as are necessary to decide those motions.

### A.  EOIR, Immigration Court Proceedings, and Public Access Rules

The Executive Office for Immigration Review ("EOIR") is a component of the Department of Justice ("DOJ").  By regulation, "Within the Department of Justice, there shall be an Executive Office for Immigration Review (EOIR), headed by a Director who is appointed by the Attorney General."  8 C.F.R. § 1003.0(a).  EOIR includes, among other components, the Board of Immigration Appeals, the Office of the Chief Immigration Judge, and the Office of Policy.  *Id.* The regulations define an "immigration judge" as "an attorney whom the Attorney General appoints as an administrative judge within the Executive Office for Immigration Review, qualified to conduct specified classes of proceedings, including a hearing under section 240 of the Act."  8 C.F.R. § 1001.1(l).

EOIR's public fact sheet describes immigration court hearings as "civil administrative proceedings" involving "alien respondents whom the Department of Homeland Security (DHS) has charged with violating U.S. immigration law."  Dkt. No. 46-2, U.S. Dep't of Just., Exec. Off. for Immigr. Rev., *Observing Immigration Court Hearings*, at 1 (Feb. 2026) ("EOIR Fact Sheet"),

available at https://www.justice.gov/eoir/media/1416861/dl?inline [https://perma.cc/456V-VDLH].  In those hearings, immigration judges determine whether respondents are removable and, if so, whether they should be ordered removed or granted relief or protection, including "adjustment of status, asylum, withholding of removal, cancellation of removal, or protection under the United Nations Convention Against Torture." *Id.*

The principal public-access regulation provides: "All hearings, other than exclusion hearings, shall be open to the public."  However, unlike proceedings in a federal district or appellate court, there are certain listed exceptions to the presumption of public access.  *See* 8 C.F.R. § 1003.27.

*First,* "Depending upon physical facilities, the Immigration Judge may place reasonable limitations upon the number in attendance at any one time with priority being given to the press over the general public."  *Id.*, § 1003.27(a).

*Second,* "For the purpose of protecting witnesses, parties, or the public interest, the Immigration Judge may limit attendance or hold a closed hearing."  *Id.*, § 1003.27(b).

*Third,* in proceedings concerning an abused alien spouse, "the hearing and the Record of Proceeding shall be closed to the public unless the abused spouse agrees that the hearing and the Record of Proceeding shall be open to the public"; and in proceedings concerning an abused alien child, "the hearing and the Record of Proceeding shall be closed to the public."  *Id.*, § 1003.27(c).

*Fourth,* proceedings "shall be closed to the public if information subject to a protective order under § 1003.46, which has been filed under seal pursuant to § 1003.31(d), may be considered."  *Id.*, § 1003.27(d).

The regulations governing removal proceedings likewise provide that, "Hearings shall be open to the public," subject to the immigration judge's authority to limit attendance or hold a

closed hearing pursuant to § 1003.27 – meaning, the four exceptions discussed immediately above. 8 C.F.R. § 1240.10(b).

Other regulations impose additional confidentiality or closure rules. For example, 8 C.F.R. § 1208.6 protects from disclosure, subject to enumerated exceptions, information contained in or pertaining to applications for refugee admission, asylum, withholding of removal, protection under the Convention Against Torture, and certain fear determinations. *See* 8 C.F.R. § 1208.6(a)–(c). And for evidentiary hearings on applications for asylum or withholding of removal, the regulations provide that such hearings "will be open to the public unless the alien expressly requests that the hearing be closed pursuant to § 3.27 of this chapter," and that, "The immigration judge shall inquire whether the alien requests such closure." 8 C.F.R. § 1240.11(c)(3)(i).

EOIR's Policy Manual and Fact Sheet summarize these public-access rules. *See* Dkt. No. 46-1, U.S. Dep't of Just., Exec. Off. for Immigr. Rev., EOIR Policy Manual, pt. II, ch. 3.8 (last updated Mar. 18, 2026), available at https://www.justice.gov/eoir/policy-manual-eoir [https://perma.cc/A5TJ-G7AV]; Dkt. No. 46-2 at 1 (last updated February 2026), available at https://www.justice.gov/eoir/media/1416861/dl?inline [https://perma.cc/N7U9-4RXZ]. The Fact Sheet states that, "Immigration courts are open Monday through Friday, except federal holidays," and that, "Immigration court hearings are generally open to the public with limited exceptions, as specified by law." Dkt. No. 46-2 at 1.

The Fact Sheet provides guidance concerning public observation. It states: "Members of the general public do not need to notify the immigration court in advance of visiting," that "The immigration court publicly posts the docket information each morning," and that, "It is prohibited to take photos of the publicly posted docket." Dkt. No. 46-2 at 1. It further provides that "Access to observe immigration court hearings necessarily entails access to EOIR space," including

- 6 -

"courtrooms, interior entrances, exits, corridors, conference rooms, and the waiting areas that are in direct view or control of security, the immigration court, or are otherwise part of EOIR's daily operations." *Id.* at 2.  According to the Fact Sheet, "Visitors are not required to check in with court personnel before entering a courtroom to observe," although "the presiding Immigration Judge may ask all visitors to identify themselves at the start of the hearing." *Id.*  The Fact Sheet also states that, "Visitors should observe in person at the courtroom in which the hearing is scheduled and held" and that, "The Webex links posted on EOIR's website are for parties appearing remotely." *Id.*  When courtroom space is limited, "news media representatives have priority over the general public." *Id.*; *see* 8 C.F.R. § 1003.27(a).

Immigration court sessions are held inside federal facilities.  Those facilities are also subject to federal property-protection authority.  Congress directs that, "To the extent provided for by transfers made pursuant to the Homeland Security Act of 2002," the Secretary of Homeland Security "shall protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government . . . and the persons on the property." 40 U.S.C. § 1315(a).  The Secretary may designate Department of Homeland Security officers and agents for duty in connection with that protection, and designated officers may, while engaged in official duties, "enforce Federal laws and regulations for the protection of persons and property," "carry firearms," and make certain warrantless arrests. *Id.*, § 1315(b)(1)–(2).  The same statute authorizes the Secretary, "in consultation with the Administrator of General Services," to "prescribe regulations necessary for the protection and administration of property owned or occupied by the Federal Government and persons on the property," and requires that those regulations "be posted and remain posted in a conspicuous place on the property." *Id.*, § 1315(c)(1).  It also provides that nothing in § 1315 "shall be construed to . . . preclude or limit the authority of any Federal law

enforcement agency" or "restrict the authority of the Administrator of General Services to promulgate regulations affecting property under the Administrator's custody and control." *Id.*, § 1315(g).

### B.  The New York Immigration Court Facilities and Agency Roles

Immigration court proceedings are held in two federal buildings in Lower Manhattan: 26 Federal Plaza, also known as the Jacob K. Javits Federal Building, and 290 Broadway, also known as the Ted Weiss Federal Building.  Dkt. No. 44 at 7.   There is also a third immigration court in New York City, the New York Varick Immigration Court, located at 201 Varick Street, 5th Floor, but plaintiffs have made no specific allegations about limited access at that location.  *Id.* at 4 n.3, 5 n.4; Dkt. No. 46 ¶ 1.

The General Services Administration ("GSA") is responsible for the overall maintenance and operation of 26 Federal Plaza and 290 Broadway.  Dkt. No. 44 at 7; Dkt. No. 49 ¶¶ 4–6.  The Federal Protective Service ("FPS") is a component of the Department of Homeland Security ("DHS").  Dkt. No. 47 ¶ 1.  Pursuant to 40 U.S.C. § 1315 and an agreement with GSA, FPS is the primary law-enforcement agency for the two federal buildings.  Dkt. No. 47, ¶ 4.  FPS employs contract Protective Security Officers ("PSOs") to monitor federal buildings secured by FPS.  Dkt. No. 47 ¶ 5.  PSOs serve as "first-line onsite security"; when there is a law-enforcement or security concern, they are required to contact FPS law-enforcement officers for response.  *Id.*  FPS is responsible for enforcing the rules governing security and visitor conduct in federal buildings, which are now codified at 6 C.F.R. pt. 139.  *Id.*  These FPS regulations became effective and enforceable on November 5, 2025; before then, FPS enforced GSA regulations at 41 C.F.R. § 102-74, subpart C, which Welsh states were "nearly identical" to the FPS regulations.  Dkt. No. 47, ¶ 5 n.1.

District Commander Anton Welsh states that FPS engages in ongoing discussions with GSA about building safety and tenant needs. *Id.* Protective Security Operations Officer Clifford Steichen likewise states that FPS is the primary law-enforcement agency for the federal buildings at issue and that FPS engages in ongoing discussions with GSA about safety and tenant needs. Dkt. No. 48, ¶ 4.

Both 26 Federal Plaza and 290 Broadway are multi-tenant federal office buildings. 26 Federal Plaza has forty-one floors, and 290 Broadway has thirty-four floors. Dkt. No. 47, ¶ 4. The Federal Plaza Immigration Court is located on the 12th and 14th floors of 26 Federal Plaza. The Broadway Immigration Court occupies portions of the 13th, 15th, 20th, 22nd, and 29th floors of 290 Broadway. Dkt. No. 44 at 4 n.3; Dkt. No. 49, ¶ 8. Other federal agencies also occupy space in the buildings under occupancy agreements with GSA, although the record does not identify all of those agencies or describe whether their respective offices are open to the public. Dkt. No. 47, ¶ 7.

Responsibility for access is divided according to the space and function at issue. Each tenant agency controls access to and use of its own tenant space. *See id.*, ¶¶ 8–9. EOIR's tenant space includes its immigration courtrooms and associated waiting rooms. Within those spaces, EOIR and its immigration judges administer courtroom attendance, decorum, and the conduct of proceedings. *Id.*, ¶¶ 7–8. EOIR's control over its tenant space does not displace the building-wide security protocols. GSA manages the buildings, while FPS – assisted by contract PSOs – administers visitor screening and enforces federal-building security and conduct rules pursuant to 40 U.S.C. § 1315 and 6 C.F.R. § 139. *See* Dkt. No. 47, ¶¶ 4–5, 9. Those regulations prohibit, among other things, obstructing the use of or access to federal property, disrupting security

screening or the performance of official duties, and distributing written materials without authorization. *See* 6 C.F.R. §§ 139.35(c)–(e), 139.60; Dkt. No. 47, ¶¶ 10, 15–16.

Areas outside an agency's tenant space are administered differently. According to FPS District Commander Welsh, members of the public may use non-tenant hallways, although PSOs may be stationed on tenant floors at an agency's request to assist with security. *Id.*, ¶ 8. At building entrances and visitor-processing posts, PSOs verify visitors' authorization and identification, enforce entry requirements, issue visitor badges, and arrange escorts or visitor logs when required. *Id.*, ¶ 9. FPS and the PSOs therefore control initial entry into the buildings and enforce generally applicable security and visitor-conduct rules; EOIR controls access to and conduct within its courtrooms and associated waiting areas.

The record provides detailed information about the Broadway Immigration Court. EOIR occupies five floors in that building, in whole or in part, and operates twenty-five courtrooms. Dkt. No. 46, ¶ 5. Each floor contains "a waiting area containing seats where parties to hearings, the media, and observers to hearings can wait for the hearings to begin." *Id.* Those waiting areas are "generally accessible to immigration court observers and visitors, subject to capacity and safety limits." *Id.*, ¶ 8. EOIR "does not prohibit members of the public from speaking with respondents in these waiting areas or the distribution of informational materials in these areas," and Assistant Chief Immigration Judge Taylor states that she is "aware of no instructions to court staff to prohibit such conversations or the distribution of such materials." *Id.* Court staff may, however, address operational and security concerns, including "congestion, noise, or allowing orderly movement in common areas." *Id.*

The record contains considerably less detail about operations at the 26 Federal Plaza Immigration Court. It establishes that the court is located on the 12th and 14th floors of 26 Federal

Plaza.  Dkt. No. 44 at 4 n.3; Dkt. No. 49, ¶ 8.  A May 11, 2026 EOIR communication states that public waiting areas at Federal Plaza are "generally" accessible to observers and visitors, subject to unspecified operational and security concerns.  Dkt. No. 45-1 at 1.  A separate communication instructs Federal Plaza judges and staff to keep exterior courtroom doors open during public hearings.  Dkt. No. 45-4 at 1.  The record does not otherwise identify the number or configuration of the Federal Plaza courtrooms and waiting rooms.

ICE, through its Enforcement and Removal Operations component ("ERO"), is not responsible for managing public access to immigration court proceedings.  Dkt. No. 50, ¶¶ 6–8. ICE Officer Joseph Harrington states that FPS oversees visitor access to federal buildings such as 26 Federal Plaza and 290 Broadway, and that immigration judges employed by EOIR "control decorum inside immigration courtrooms, which includes deciding who can observe proceedings and what activities may take place in courtrooms and waiting areas."  Dkt. No. 50, ¶ 7.  He further states that ICE officers "are not responsible for immigration court security and play no role in setting security or access measures to immigration courtrooms, waiting areas, or the publicly accessible building hallways or elevator banks in the buildings housing immigration courts."  Dkt. No. 50, ¶ 8.  ICE officers do, however, conduct arrest and detention operations in hallways and other common areas adjacent to the immigration courts.  *Id.*, ¶¶ 6–10.

The record describes the hallways and elevator banks as publicly accessible areas but subject to building-security and access-control rules.  What those rules might be is not known to the Court.  The record does not state whether the elevators are programmed to restrict access to particular floors or otherwise describe the buildings' elevator-control systems.

The Government represents that, over the past year, there has been "a significant increase in the number of visitors to immigration court spaces in both 26 Federal Plaza and 290 Broadway."

Dkt. No. 44 at 10.  It also represents that ICE officers have been conducting more arrest operations in hallways outside immigration courtrooms and transporting more detained immigrants to and from hearings.  *Id.*; Dkt. No. 50, ¶ 9.  According to the Government, the hallways outside immigration courtrooms have become "substantially more crowded," building employees have complained to GSA and FPS about crowding, and PSOs have directed people in hallways to clear out when congestion interferes with building business or safety.  Dkt. No. 44, at 10–11.  The Government also points to security concerns, including an incident in June 2025 when, according to defendants, "a distressed immigrant tried to take a gun from a security officer."  *Id.* at 11.

The Government admits that immigration judges have closed courtroom doors or removed members of the public from hearings, but insists that this is done in response to disruption or lack of available seating.  *Id.* at 11–12; Dkt. No. 46, ¶¶ 9–10.  ACIJ Taylor states that she has been told about immigration judges removing members of the public from hearings "for verbally interrupting hearings, for advising respondents not to attend future hearings, or if there are so many members of the public present that there is no room for the respondents."  Dkt. No. 46, ¶ 10.  She also states that she has heard about judges directing staff to remove members of the public from hallways outside courtrooms if they were having loud press conferences, taking photographs inside courtrooms, blocking respondents from leaving courtrooms, or attempting to physically prevent ICE officers or other law-enforcement officers from arresting respondents.  *Id.*

### C.  Plaintiffs' Allegations Concerning Changed Conditions

Plaintiffs allege that, before June 2025, public access to the New York City immigration courts was generally consistent with EOIR's written rules and prior practice.  Dkt. No. 40, ¶¶ 46, 84; Dkt. No. 37 ¶¶ 2–4; Dkt. No. 41 ¶¶ 5–6.  Plaintiff Laura McCallum states, "Before June 2025, access to the courts was consistent with my prior experience.  Observers could enter, wait in public

areas, speak quietly with individuals, and attend hearings when space allowed." Dkt. No. 37 ¶ 2. She states, "That changed abruptly," and that since then she has "repeatedly been prevented from carrying out these activities." Dkt. No. 37, ¶ 3.

Plaintiff Stephen Kelly states that he is an attorney admitted to practice in New York. In March 2025, he was invited by immigrants' rights advocate Ravi Ragbir to evaluate conditions at the New York City immigration courts. Dkt. No. 41, ¶ 1. Since then, he has attended immigration court "on average once per week as both a member of the public and as a volunteer accompanying respondents." Dkt. No. 41, ¶ 2. At the outset of his observations, Kelly states, it was his "understanding and experience that immigration court proceedings were presumptively open to the public," and that members of the public could enter courtrooms when space permitted, wait in public areas, and engage in quiet, nondisruptive observation and communication. Dkt. No. 41, ¶ 5. According to Kelly, "Beginning in or around June 2025, these conditions changed sharply," and members of the public have since been "routinely excluded from courtrooms, prevented from remaining in public areas, and restricted from speaking with respondents." Dkt. No. 41, ¶ 6.

The amended complaint alleges that defendants have implemented "policies and practices including violent detention operations, arbitrary and degrading access rituals, targeted harassment of members of the public, and systematic interference with the ability to speak with supportive individuals." Dkt. No. 40, ¶ 1. Plaintiffs allege that defendants have "locked courtrooms during proceedings that are required to be open to the public," "prohibited members of the public from speaking with respondents," "ejected individuals for distributing 'know your rights' materials," and "engaged in harassment in publicly accessible areas such that protected activity is effectively impossible." Dkt. No. 40, ¶ 2. They further allege that the challenged conduct "functions to deter a person of ordinary firmness from attending, observing, or participating in judicial proceedings,

- 13 -

and from engaging in protected speech and association in and around the courthouse."  Dkt. No. 40, ¶ 1.

The complaint alleges that, "What emerges is not a series of disconnected incidents, but a coherent pattern of coercive conduct that chills speech, fractures association, and undermines access to the courts carried out in plain view as a continuous feature of this court's operations." *Id.*  The Government disputes that characterization and argues that plaintiffs describe "a handful of specific incidents that reflect no discernible pattern."  Dkt. No. 44 at 2; *see also* Dkt. No. 61, Defs.' Reply Supp. Mot. to Dismiss, at 4.

### D.  The Individual Plaintiffs

1.  <u>Father Fabián Arias</u>

Father Fabián Arias was born in Buenos Aires, Argentina, moved to New York in 2002, and was ordained as a Lutheran minister in 2004.  Dkt. No. 40, ¶ 22.  He currently serves as a priest at St. Peter's Church on Lexington Avenue in Manhattan.  *Id.*  He alleges that many of the individuals he serves are immigrants and that immigration-related pastoral care is "a central and indispensable component of his ministry."  Dkt. No. 40, ¶ 23.  According to the amended complaint, Father Arias's religious vocation requires him to accompany members of his congregation and others who seek his moral support during moments of fear, vulnerability, or crisis, including when they appear before immigration authorities.  *Id.*

Since 2004, accompaniment has been "one of the most important and consistent components" of Father Arias's ministry.  Dkt. No. 40, ¶ 24.  He alleges that he has accompanied thousands of individuals to immigration hearings, helped them understand court procedures, comforted them during proceedings, and assisted them afterward in understanding rulings,

obligations, and deadlines. *Id.* For nearly twenty years, Father Arias has been physically present in New York City immigration courts two to three times per week. Dkt. No. 40, ¶ 25.

Father Arias alleges that, in his recent experience, conditions inside the immigration courts have "changed dramatically" and that the environment has become "increasingly hostile, intimidating, and militarized." Dkt. No. 40, ¶ 26. He alleges that federal agents and building security personnel now regularly patrol hallways and waiting areas, often in tactical or paramilitary gear and sometimes carrying military-style weapons. *Id.* On multiple occasions, he alleges, officers have "explicitly ordered" him not to speak with people he serves, even when those individuals requested his presence or support and even when they were standing in public hallways or waiting areas. Dkt. No. 40, ¶ 27.

The amended complaint further alleges that Father Arias has been forcibly removed from the building for what officers perceived as insufficient compliance with "unwritten, *ad hoc* rules." Dkt. No. 40, ¶ 28. It alleges that he has been ordered to leave courtrooms, hallways, or the building "without explanation, posted rule, or lawful justification," and that the restrictions imposed on him are unpredictable. Dkt. No. 40, ¶ 29. Father Arias estimates that, while performing his ministry, he has been turned away from courtroom doors dozens of times and ordered out of ordinary proceedings approximately twenty times as of the filing of the original complaint in this action on March 17, 2026. Dkt. No. 40 ¶ 30.

2. Stephen Kelly

Attorney Kelly alleges that he has repeatedly observed and experienced restrictions on access, speech, and accompaniment. Dkt. No. 41, ¶¶ 5–9. In his first declaration, he states that, on the substantial majority of his visits since June 2025, he has personally experienced or directly observed members of the public being denied entry to courtrooms without explanation or lawful

justification; courtroom doors locked against public access, including when seating appeared to be available; people prevented from speaking with respondents in public waiting areas and hallways; people expelled or threatened with removal for sharing informational materials or engaging in brief, consensual conversations; and arbitrary directives concerning where members of the public may stand, sit, or remain. Dkt. No. 41, ¶ 7. He states that, on multiple occasions, he observed courtrooms with available seating where he and others were nevertheless denied entry, even though, "No capacity limitation, courtroom order, or other lawful justification was provided." Dkt. No. 41, ¶ 8. He also states that when he or others asked about observing proceedings or remaining in public areas, they were told that "no observers are allowed." Dkt. No. 41, ¶ 9. Such statements are inconsistent with EOIR regulations.

The amended complaint describes a June 23, 2025 incident involving Kelly. According to the complaint, Kelly had accompanied a respondent to court, was present in the gallery during the respondent's hearing, and left the courtroom with the respondent and the respondent's priest after a favorable outcome. Dkt. No. 40, ¶ 42. Because the hearing had been conducted in English, which neither the respondent nor the priest spoke, Kelly spent several minutes in the hallway explaining what had happened. *Id.* The complaint alleges that, as the group began moving toward the elevator, government agents "attired in military-style weapons and armor" rushed them, Kelly was "forcibly thrown away from the group," and the respondent was seized and dragged away in handcuffs. *Id.*

The complaint also alleges that Kelly was present on September 30, 2025, when a journalist was forcibly taken to the ground, causing his head to strike the marble floor. Dkt. No. 40, ¶ 43. ICE Officer Harrington gives a different account. According to Harrington, the September 30 incident occurred when ICE officers arrested an individual after an immigration hearing at 26

- 16 -

Federal Plaza, advised the individual that they were taking her to the tenth floor for screening and processing, and entered an elevator. Dkt. No. 50, ¶ 10. Harrington states that a reporter followed the officers into the elevator, interfered with the arrest, and resisted when officers asked him to leave. He further states that, "As the reporter was being escorted out of the elevator, an unknown journalist tripped on another individual and fell." *Id.* Harrington attributes the September 30 incident described by Kelly to third-party interference with ICE officers performing their duties. Dkt. No. 50, ¶ 11.

### 3. Debbie Nathan

Debbie Nathan is an author and journalist who has reported on immigration and the immigration court system since the late 1980s. Dkt. No. 40, ¶ 45. The complaint alleges that, through the summer of 2025, her experience in immigration courts was consistent with EOIR's written rules and practice manuals: respondents had priority for seating, and remaining seats were made available to members of the public, including journalists. Dkt. No. 40, ¶ 46. During that period, Nathan alleges, she was routinely able to observe proceedings, take notes, and gather information necessary for accurate reporting. *Id.*

Nathan alleges that, on November 14, 2025, she went to 26 Federal Plaza, on the fourteenth floor, to observe hearings for a story she was actively reporting. Dkt. No. 40, ¶ 48. She alleges that she initially could not find any courtroom with an open door, despite having researched the day's docket. Dkt. No. 40, ¶ 49. When she eventually found one, she observed approximately four people in the gallery, who appeared to be respondents, and ample additional seating for public observers. *Id.* As Nathan and a colleague prepared to enter, an individual she recognized as a court employee told them they could not enter because "it's too small" and because "the judge never allows the public in the courtroom." Dkt. No. 40, ¶ 50. When Nathan said she had attended

proceedings in that courtroom before, the employee allegedly told her that the judge had permanently banned the public from the courtroom and that all judges in that section permanently banned public observers except for one immigration judge. *Id.* Nathan alleges that, when she questioned the explanation in light of EOIR materials stating that hearings are generally open to the public, the employee responded: "Things have changed since then." Dkt. No. 40, ¶ 51.

Nathan was not permitted to observe any other courts that day, despite what she alleges was visible available seating and the absence of posted closure orders or capacity determinations. Dkt. No. 40, ¶ 52. Plaintiffs allege that these restrictions caused Nathan to lose information necessary for accurate reporting; that she has been forced to abandon reporting efforts because access restrictions have become routine; and that she would continue attending immigration court proceedings if permitted to do so. Dkt. No. 40, ¶¶ 54–61.

### 4.  Dr. Zoey Phillips

Dr. Zoey Phillips is a New York-licensed psychologist whose work focuses on youth, families, and trauma, including individuals with personal or family immigration histories. Dkt. No. 40, ¶ 62. She is Spanish-speaking and alleges that firsthand awareness of immigration court proceedings is necessary to her professional work with clients affected by fear, confusion, isolation, and trauma. Dkt. No. 40, ¶ 63. Phillips is also a practicing Christian, and alleges that physical presence, companionship, and prayer when asked are core expressions of her religious duty. Dkt. No. 40, ¶ 64.

The complaint describes an October 21, 2025 incident, during which Phillips alleges that she attempted to observe an open immigration hearing. Dkt. No. 40, ¶ 66. Earlier that morning, a court clerk had informed people in the waiting room that the gallery would open at approximately 10 a.m. *Id.* When Phillips returned at approximately 9:55 a.m., the clerk allegedly stated that

observers were not permitted to enter and instructed them to return in ten to fifteen minutes.  Dkt. No. 40, ¶ 67.  Phillips requested permission to wait in the public waiting room to ensure timely access, but the clerk refused and ordered observers to leave the almost empty waiting room.  *Id.*

Later that morning, after a hearing, a respondent expressed concern about finding legal representation before her next court date.  Dkt. No. 40, ¶ 68.  Phillips alleges that she walked with the respondent into the waiting room, spoke quietly with her in Spanish, and wrote down the name and address of St. Peter's Church and the time of services on a small piece of paper.  *Id.*  According to the complaint, the court clerk observed the interaction and stated, "After this, you're done." Dkt. No. 40, ¶ 69.  When Phillips explained that she had shared only the name of a church, the clerk responded, "Yeah, whatever.  After this, you're done," and blocked her from returning to the courtroom.  *Id.*  Phillips alleges that she then entered another courtroom connected to the same waiting room; when proceedings were about to resume, the judge asked whether she was an attorney, and when she said she was not, she was told she had to leave "because they were about to have an individual hearing."  Dkt. No. 40, ¶ 70.  Phillips alleges that there were many unoccupied seats, no closure order, and no capacity determination.  Dkt. No. 40, ¶ 71.  She further alleges that, on other occasions, clerks explicitly told her she was not permitted to speak with or exchange information with individuals awaiting hearings, even in public areas.  Dkt. No. 40, ¶¶ 72–74.

### 5.  Laura McCallum

Laura McCallum is an artist and educator who has lived in Brooklyn for approximately forty-five years.  Dkt. No. 40, ¶ 82.  She regularly volunteers as a court observer and accompanier at the federal immigration courts in New York City.  Dkt. No. 40, ¶ 83.  She attends approximately

once per week to observe public immigration court proceedings, provide nonlegal information to individuals navigating the asylum process, and accompany immigrants to and from hearings. *Id.*

McCallum alleges that, from March through late May 2025, public-access conditions were consistent with her prior courthouse experience. Observers could enter the buildings, wait in public waiting rooms, speak quietly with immigrants, distribute written information describing legal rights, accompany individuals into courtrooms when space permitted, and exit the building with them after hearings. Dkt. No. 40, ¶ 84. During that period, she alleges, court staff and security personnel did not restrict observers' movement through public hallways, prohibit access to waiting rooms, or interfere with observation of hearings. *Id.*

Beginning in early June 2025, however, access conditions "changed sharply and dramatically," coinciding with the regular presence of federal agents inside and immediately outside immigration courtrooms. Dkt. No. 40, ¶ 85. Since then, McCallum alleges, she has been repeatedly denied entry into public waiting rooms, prohibited from standing or walking in hallways ordinarily open to the public, separated from immigrants by security directives preventing communication, forced to wait outside court buildings in extreme weather conditions to gain entry, and barred from reentering courtrooms after briefly leaving to use the restroom or accompany an individual. Dkt. No. 40, ¶ 87. She alleges that she has been told on multiple occasions that hallways were "private" or off-limits, even though it was necessary to walk down those hallways to access public restrooms or courtrooms. Dkt. No. 40, ¶ 88. She estimates that, since June 2025, she has personally been turned away at courtroom doors between fifteen and twenty-five times, ordered to leave courtrooms approximately fifteen times, and prohibited from entering courtrooms at least twenty times. Dkt. No. 40, ¶ 89. Plaintiffs allege that these exclusions were not done

pursuant to any courtroom closure order, capacity determination, or any case-specific justification. Dkt. No. 40, ¶ 90.

McCallum also states that she has been prohibited from distributing written materials explaining legal rights and, when she attempted to explain that the activity was lawful, "was told it was prohibited under a 'new policy.'" Dkt. No. 37, ¶ 7. McCallum states that the examples she describes "are not isolated"; that "The pattern is clear and consistent"; and that, since at least June 2025, over the course of frequent visits, she has observed substantially similar conduct on virtually every visit. Dkt. No. 37, ¶ 10.

### E. Defendants' Remedial Communications and Continuing Dispute

In the days surrounding and following the commencement of this action, EOIR officials circulated several internal communications concerning observation of immigration court hearings and access to waiting areas.

On March 16, 2026, Court Administrator Rafael Fernandez sent an email to New York Federal Plaza judges and support staff attaching EOIR's fact sheet on observing immigration court hearings. Dkt. No. 45-2 at 1. The email stated, "Please see attached, regarding observation for court proceedings." *Id.* The attached Fact Sheet included the access provisions described above, including that immigration court hearings are generally open to the public, that members of the public need not notify the court in advance, and that visitors are not required to check in with court personnel before entering a courtroom to observe. Dkt. No. 45-2 at 2–3.

On April 29, 2026, Fernandez sent another email to New York Federal Plaza judges and support staff concerning "26 Fed Court Access and Public Hearings." Dkt. No. 45-4 at 1. The email stated: "Please note there is a pending lawsuit regarding public access to hearings at 26 Federal Plaza in 2025. I want to reiterate the procedures you must follow to ensure hearings remain

accessible unless a lawful exception applies." *Id.* Under "Courtroom access," the email instructed, "If you do not have the courtroom key or are unsure how to secure/unlock the courtroom door, keep the exterior door open for the duration of the hearing unless the respondent has requested a closed hearing. If you need assistance operating the door or lock, notify management and we will arrange help." *Id.* Under "Webex (remote) hearings," the email instructed, "For any hearing conducted by Webex, keep the Webex session open and unlocked unless the respondent has requested a closed hearing. An unlocked Webex permits public observation throughout the hearing." *Id.*

On May 11, 2026, Acting Assistant Chief Immigration Judge John Burns sent an email concerning public waiting areas at 26 Federal Plaza. Dkt. No. 45-1 at 1. The email stated: "We want to emphasize that public waiting areas are generally accessible to immigration court observers and visitors." *Id.* It continued, "EOIR does not prohibit members of the public speaking with respondents in these waiting areas or the distribution of informational materials in these areas." *Id.* The email added that staff "may take action to address operational or security concerns, such as congestion, noise, or allowing orderly movement in common areas." *Id.*

ACIJ Taylor describes similar efforts at the Broadway Immigration Court. She states that, on March 16, 2026, the Acting Court Administrator sent an email attaching EOIR's policy on observation of immigration court hearings to all employees at the Broadway Immigration Court. Dkt. No. 46, ¶ 13. She states that she reiterated these policies during meetings in March and April 2026 and in a May 11 email to all court personnel. Dkt. No. 46, ¶ 14. She further states that the doors to the immigration courtrooms at the Broadway Immigration Court "automatically lock when closed," that this is "not due to any EOIR policy but is instead a feature of the building's design," and that EOIR has only "a few keys" for those doors. Dkt. No. 46, ¶ 15. At an April

2026 meeting, she told immigration judges that they should prop their courtroom doors open when hearings are underway, unless a respondent has requested a closed hearing or the hearing is required to be closed by law. *Id.* She also told the immigration judges that keeping courtroom doors open would ensure that visitors and observers have access to observe immigration court hearings. *Id.*

The present record does not establish when the automatic-locking feature was installed or how Broadway courtroom doors were managed before 2025. Plaintiffs' declarations state generally that, before June 2025, observers could enter courtrooms when space permitted and attend public hearings, *see* Dkt. No. 37, ¶ 2; Dkt. No. 41, ¶ 5. The moving affidavits do not specifically address whether a visitor to 290 Broadway before March 2025 would have encountered a physically locked courtroom door. The Court therefore cannot determine from this record whether the locking mechanism itself changed or whether what changed was the manner in which EOIR personnel ensured public access notwithstanding the automatic-locking feature.

The Government argues that, in light of plaintiffs' allegations, the relevant agencies have taken steps to ensure that staff are aware of the rules governing public access to immigration court hearings, waiting areas, and the public hallways of federal buildings. Dkt. No. 44 at 12–13. It argues that EOIR leadership has reminded judges and court staff that immigration hearings are presumptively open to the public, that hearings may be closed only for particular reasons, that doors should not be locked or should be propped open when hearings that are not required to be closed are in session, and that there is no prohibition against members of the public speaking with or distributing written materials to immigrants in waiting areas outside immigration courtrooms. *Id.* at 12. For this reason, the Government insists that injunctive relief is unwarranted.

Plaintiffs argue that the remedial communications corroborate their allegations. According to plaintiffs, the emails show that EOIR leadership perceived a need to remind staff that public hearings must remain accessible unless lawfully closed, courtroom doors must not be locked during public hearings, Webex sessions must remain open and unlocked unless closure is lawful, and members of the public may speak with respondents and distribute informational materials in public waiting areas. Dkt. No. 51, ¶¶ 6, 20, 28, 30. Plaintiffs also argue that the emails do not moot the controversy because they are nonbinding reminders, came after complaints and after this lawsuit, and do not bind EOIR, ICE, FPS, PSOs, or GSA. Dkt. No. 51, ¶ 20.

### F. Procedural History

On April 26, 2026, plaintiffs moved for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure. Dkt. No. 32. Plaintiffs sought to enjoin defendants, their officers, agents, employees, and all persons acting in concert with them from enforcing policies and practices that "(1) restrict public access to immigration court proceedings and adjacent public areas, (2) prevent or burden protected speech and association, and (3) retaliate against individuals engaging in such protected activity." Dkt. No. 32, ¶ 1. Plaintiffs ask for relief requiring defendants to permit access to public proceedings and publicly accessible areas, refrain from interfering with protected speech and association, prohibit retaliation or selective enforcement directed at protected activity, and implement clear written access policies. Dkt. No. 32 at 4–5.

On the same day, plaintiffs moved for class certification. Dkt. No. 33. Plaintiffs proposed a class of "All persons engaging in protected activity within immigration court facilities and functionally integrated common areas and exterior spaces subject to Defendants' enforcement practices in New York City." Dkt. No. 33, ¶ 1.

On April 29, 2026, plaintiffs filed the amended complaint, which is the operative pleading. Dkt. No. 40. The amended complaint names five plaintiffs – Father Arias, Kelly, McCallum, Nathan, and Phillips – and asserts claims against ICE, DHS, DOJ, GSA, and official-capacity defendants. Dkt. No. 40 at 1, ¶¶ 99–102. Defendants later identified the then-current official-capacity defendants in their motion papers. Dkt. No. 43 at 1 & n.1; Dkt. No. 44 at 1 n.1. Because David J. Venturella has since replaced Todd M. Lyons as the senior official performing the duties of the Director of ICE, Venturella is automatically substituted for Lyons in that official-capacity role. *See* Fed. R. Civ. P. 25(d). The current official-capacity defendants are Venturella, Markwayne Mullin, Todd Blanche, and Edward Forst.

On May 12, 2026, defendants moved to dismiss the amended complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, and filed an omnibus memorandum opposing plaintiffs' motions for a preliminary injunction and class certification. Dkt. Nos. 43, 44. In support of their motion and opposition, defendants submitted declarations from Acting Assistant Chief Immigration Judge Burns, ACIJ Taylor, FPS District Commander Welsh, FPS Protective Security Operations Officer Steichen, GSA Field Office Manager John Melecio, and ICE Supervisory Detention and Deportation Officer Harrington, along with related exhibits. Dkt. Nos. 45–50.

On May 26, 2026, plaintiffs filed an omnibus memorandum opposing defendants' motion to dismiss and replying in further support of their motions for preliminary injunction and class certification. Dkt. No. 51. Plaintiffs also submitted supplemental declarations concerning the alleged continuation of the challenged practices, the effects of defendants' post-suit communications, and the allocation of responsibility among the agencies. Dkt. Nos. 52–57. Defendants later filed a reply in further support of their motion to dismiss. Dkt. No. 61.

## II.    DISCUSSION

### A.  Subject-Matter Jurisdiction

1.  Rule 12(b)(1) Standard

Defendants move under Rule 12(b)(1) to dismiss plaintiffs' claims for prospective declaratory and injunctive relief for lack of Article III standing.  They argue that the amended complaint alleges only past and episodic incidents and does not plausibly establish a real and immediate threat that plaintiffs will suffer similar injury in the future.  *See* Dkt. No. 44 at 13–17.

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  Because defendants present a facial challenge to the sufficiency of the complaint's standing allegations, plaintiffs are not required at this stage to prove jurisdiction by a preponderance of the evidence.  *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016).

Article III standing is an essential component of subject-matter jurisdiction.  "[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  *First,* the plaintiff must have suffered an injury in fact, meaning "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Id.*  *Second,* "there must be a causal connection between the injury and the conduct complained of." *Id.*  *Third,* "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561.  The plaintiff must establish standing "for each claim he seeks to press and for each form of relief that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (citation omitted).

"A Rule 12(b)(1) motion challenging subject matter jurisdiction may be either facial or fact-based." *Carter*, 822 F.3d at 56.  When the challenge is facial, the plaintiff "has no evidentiary

burden"; the Court asks whether the pleading alleges facts that "affirmatively and plausibly suggest" standing, accepts all material factual allegations as true, and draws all reasonable inferences in the plaintiff's favor. *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) (citation omitted). At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice," because courts "presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (citation omitted).

Because standing is jurisdictional, the Court addresses defendants' Rule 12(b)(1) arguments before turning to the sufficiency of plaintiffs' claims under Rule 12(b)(6). *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).

2. <u>Plaintiffs Adequately Allege Article III Standing Against DOJ, DHS, GSA, and Their Officials, but Not Against ICE or Venturella</u>

Standing is claim-specific and remedy-specific. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). "For each form of relief sought, a plaintiff must demonstrate standing separately." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (citation omitted). Because plaintiffs seek prospective relief, they must show a threatened future injury. "Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury." *Id.* "Although past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way." *Id.*; *see also DeShawn E. ex rel. Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998) ("A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future.").

The Supreme Court's decisions in *O'Shea* and *Lyons* apply the same principle. "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974). At the same time, "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury." *Id.* at 496. Because standing is assessed as of the commencement of the action, defendants' later remedial communications do not retroactively eliminate standing that existed when plaintiffs sued. *See Lujan*, 504 U.S. at 571 n.4 (explaining that standing is "assessed under the facts existing when the complaint is filed"). Defendants' remedial communications bear instead on mootness and on whether preliminary relief remains necessary. *Robinson v. Blank*, 2013 WL 2156040, at *3 (S.D.N.Y. May 20, 2013) ("[T]he ongoing feasibility of injunctive relief . . . is a question of mootness, not standing.").

The original complaint was filed on March 17, 2026. The standing question is therefore whether, as of that date, plaintiffs faced a real and immediate risk of again encountering the challenged access, speech, association, or retaliation practices.[1]

Plaintiffs have adequately alleged that they faced such a risk. Plaintiffs allege repeated injuries in the same two immigration-court facilities, arising from the same access environment, while engaging in recurring activities they intend to continue: observing public immigration hearings, accompanying respondents, speaking quietly with respondents and family members,

---

[1] The April 29 and May 11 communications postdated the commencement of the action and bear on mootness and the need for preliminary relief, not on whether standing existed at filing. *See Doe v. McDonald*, 128 F.4th 379, 385 (2d Cir. 2025) ("[P]ost-filing changes in circumstance cannot deprive a plaintiff of standing.").

The March 16 communication preceded filing by one day, but the Court does not rely on that communication or any other declaration evidence in resolving defendants' facial challenge. *See Whole Foods*, 858 F.3d at 736 (holding that, on a facial challenge to standing, the plaintiff has "no evidentiary burden" and the court evaluates the allegations in the complaint).

providing nonlegal information, reporting on court proceedings, and documenting court operations. Dkt. No. 40 ¶¶ 22–39, 40–44, 45–61, 62–81, and 82–98. According to the complaint, the same general restrictions have recurred since June 2025: locked courtroom doors, no-observer commands, exclusion from waiting areas and hallways, prohibitions on speaking with respondents, restrictions on written materials, and intimidating law-enforcement activity in court-adjacent spaces. *Id.*, ¶¶ 1–3, 26–31, 41–44, 48–53, 66–74, 84–98, 103–18. Plaintiffs allege that these restrictions were imposed without a closure order, capacity determination, individualized security justification, or other lawful basis. All such conduct would contravene the EOIR's own rules.

The allegations are concrete as to each named plaintiff. Father Arias alleges that immigration-related pastoral care is "a central and indispensable component of his ministry"; that his religious vocation requires him to accompany persons seeking his support when they appear before immigration authorities; that he has done so two or three times per week for nearly twenty years; and that he intends to continue despite repeated exclusion from courtrooms, hallways, and the buildings. *Id.*, ¶¶ 22–31, 38–39.

Kelly alleges that he attends immigration court approximately once per week, has repeatedly been excluded from courtrooms and public spaces, and continues to attend immigration court to observe proceedings, accompany respondents, and assess the functioning of tribunals before which he is authorized to practice. *Id.*, ¶¶ 40–44; *see also id.*, ¶ 41 (stating that Kelly "has been denied entry without justification to virtually *every* courtroom he has attempted to enter when visiting the court on average once a week, for the past year" (emphasis added)).

Nathan, a journalist, alleges that access restrictions have caused her to abandon reporting efforts, that she would continue attending immigration court proceedings if permitted to do so, and that she faces a credible risk of ongoing exclusion. She alleges that a court employee told her that

the judge – and all but one immigration judge in that section – had permanently barred public observers and that, when Nathan invoked EOIR's public-access materials, the employee responded, "Things have changed since then." *Id.*, ¶¶ 48–61.

Phillips alleges that physical presence, companionship, and prayer when requested are "core expressions of her religious duty," and that the challenged practices – which include her being removed from the waiting room and told "After this, you're done" when she tried to provide information to an alien – impose an "ongoing and concrete barrier" to her professional, civic, and religious activities. *Id.*, ¶¶ 62–81. She alleges, among other things, that a court clerk ordered observers from an almost empty waiting room and later blocked her from returning to a courtroom after she quietly gave a respondent the name, address, and service times of a church. *Id.*, ¶¶ 67–69; *see also id.*, ¶ 64 ("Dr. Phillips is a practicing Christian, who considers it an integral part of her faith and religious practice to also be present for people experiencing hardship, fear, and displacement.").

McCallum alleges that she attends immigration court approximately once per week, has repeatedly attempted to observe proceedings and accompany respondents, and has repeatedly been prevented from doing so. She further alleges that security personnel prohibited her from distributing written materials explaining immigrants' legal rights, characterized the activity as "solicitation," and told her that the prohibition reflected a "new policy." *Id.*, ¶¶ 82–98.

These allegations distinguish this case from *Nicosia*. There, the plaintiff had purchased a weight-loss product from Amazon in the past, but Amazon no longer sold the product and the plaintiff "failed to allege that he intends to use Amazon in the future to buy any products, let alone food or drug products generally or weight loss products in particular." 834 F.3d at 239. Here, by contrast, each plaintiff alleges a concrete and recurring reason to return to the same two facilities

to engage in the same activities that allegedly exposed that plaintiff to exclusion or restriction. Plaintiffs further allege that the challenged conditions, all of which violate EOIR rules, remained ongoing when this action commenced.

The allegations also differ materially from those in *Lyons*. In *DeShawn E.*, the Second Circuit distinguished *Lyons* because the challenged interrogation methods were "officially endorsed policies," giving rise to "a likelihood of recurring injury." 156 F.3d at 345. The court emphasized that the challenged practice was "authorized by a written memorandum of understanding," and therefore the City had "ordered or authorized" the challenged conduct in a way *Lyons* had not shown. *Id.* Plaintiffs here allege recurring restrictions in two federal immigration-court facilities involving immigration-court employees, security personnel, and other federal personnel. Dkt. No. 40 ¶¶ 1–3, 103–18. Whether plaintiffs can prove that these restrictions reflect an official policy, an informal practice, or a pattern of enforcement is a merits question. At the pleading stage, the allegations, viewed in the light most favorable to Plaintiffs, support a plausible inference of likely recurrence – especially as the Plaintiffs allege that several of them were specifically told that there were "new policies" in effect and that "things have changed" with respect to public access.

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) supports the same conclusion. A plaintiff alleging future injury may establish standing by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest," where the intended conduct is arguably proscribed and there is a credible threat of enforcement. *Susan B. Anthony List*, 573 U.S. at 159 (citation omitted). Plaintiffs allege an intent to continue conduct affected with First Amendment interests – public observation, reporting, quiet communication, accompaniment, religious ministry, and noncommercial informational support. They also allege that those activities

have repeatedly resulted in exclusion, orders to stop speaking, restrictions on written materials, and threats of removal. Dkt. No. 40, ¶¶ 22–31, 38–44, 45–61, 62–81, 82–98. These allegations are sufficient at the pleading stage.

The Government's reliance on *Advocates for Human Rights v. Blanche*, 2026 WL 1162794 (D.D.C. Apr. 29, 2026), does not require dismissal of the claims against the remaining defendants. *Advocates* also concerned alleged restrictions on public observation of immigration court proceedings. There, an organization that had operated a volunteer court-observation program at the Fort Snelling Immigration Court in Minnesota sought a preliminary injunction requiring immigration judges, before closing a hearing, to state the basis for closure on the record and afford the public and press an opportunity to object. *Id.* at *1–4. The court concluded that the organization had not made the clear evidentiary showing of imminent future injury required for preliminary relief. Its evidence identified approximately twelve days involving possible closures over nearly a year, no adequately supported unlawful closure during the three months preceding its motion, and no purportedly unlawful closure in 2026. *Id.* at *8–10. Several incidents also involved technical problems, possible confidentiality concerns, disputed remote-access restrictions, or other circumstances that did not clearly establish an unlawful closure. *Id.* at *8–13.

This case is before the Court on a different question and a different procedural record. The named plaintiffs allege that, during the months preceding the commencement of this action, they personally and repeatedly encountered substantially similar restrictions at the same two facilities; that they regularly attend or seek to attend proceedings there; and that they intend to continue doing so. Dkt. No. 40, ¶¶ 22–98. Father Arias alleges a continuing religious obligation to return to immigration court, while Phillips alleges continuing religious and professional obligations that call

for her presence there. *Id.*, ¶¶ 22–39, 62–81. These well-pleaded allegations must be accepted as true on defendants' facial Rule 12(b)(1) motion. *Advocates* arose at the preliminary-injunction stage, not on a facial motion to dismiss. It applied the more demanding evidentiary standard governing preliminary relief, not the pleading standard applicable here, and did not hold that allegations of repeated personal injury and concrete plans to return are insufficient to establish standing at the pleading stage. It is also not controlling authority in this Circuit.

Traceability and redressability must be considered separately as to each defendant. The amended complaint plausibly attributes courtroom exclusions and restrictions imposed within EOIR-controlled waiting areas by immigration-court employees to DOJ and its personnel. *See id.*, ¶¶ 14–15, 40–74, 103–09. It attributes building-entry, hallway, waiting-area, and access-control restrictions to federal security and building personnel and seeks relief against DHS, GSA, and their responsible officials. *See id.*, ¶¶ 12–18, 22–39, 82–98, 107–18. Accepting those allegations as true and drawing reasonable inferences in plaintiffs' favor, the complaint plausibly alleges injuries caused by those defendants that could be redressed through appropriately tailored prospective relief.

Defendants do not separately develop a Rule 12(b)(1) argument directed specifically at ICE or Venturella. But standing must exist as to every defendant, and the Court "has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Institute*, 555 U.S. 488, 499 (2009). The Court must therefore determine whether the amended complaint plausibly alleges an injury fairly traceable to ICE or Venturella that would likely be redressed by prospective relief against them.

The complaint repeatedly refers collectively to "federal agents," "federal police," "security personnel," or "Defendants," without identifying which agency employed the person who

allegedly imposed a particular restriction.  *See, e.g.*, *id.*, ¶¶ 14, 17–19, 26–31, 85–95, 103–18.  It alleges generally that the challenged practices "appear to be enforced uniformly by ICE agents and building security personnel," *id.*, ¶ 96, but that conclusion is not supported by a specific allegation that an identified ICE officer prohibited a named plaintiff from observing a hearing, speaking with a respondent, distributing information, or remaining in a public area outside the course of an arrest, detention, transport, or other enforcement operation.

The complaint's specific allegations that could plausibly involve ICE arise in connection with enforcement operations.  Kelly alleges that agents pushed him away from a respondent while seizing and handcuffing the respondent after a hearing.  *Id.*, ¶ 42.  He and other plaintiffs also allege that they witnessed a journalist being injured during another arrest operation.  *Id.*, ¶¶ 19, 36, 43, 94.  These allegations do not identify an instance in which ICE personnel, apart from carrying out or securing an enforcement operation, prohibited a named plaintiff from observing an open hearing, engaging in quiet communication, providing pastoral support, distributing information, or remaining in a publicly accessible area.  They likewise do not plausibly allege that any named plaintiff faces a real and immediate threat of such ICE-specific conduct in the future.  Plaintiffs do not have the right to interfere with lawful arrests that are being carried out by authorized officials (a category that includes, in the case of immigration arrests, ICE agents) – even to provide pastoral support or engage in otherwise protected communication.

Plaintiffs' alleged fear or intimidation arising from the visible presence of ICE officers and from witnessing arrest operations does not, without additional facts, establish a threatened injury that could be redressed by an injunction directed at ICE.  The Court cannot enjoin lawful enforcement activity merely because its occurrence makes observers or accompaniers uncomfortable or deters them from attending court.

For this reason, the claims against ICE and Venturella are DISMISSED without prejudice for lack of Article III standing.  Defendants' facial Rule 12(b)(1) motion is otherwise DENIED. Plaintiffs may file an amended complaint by July 20, 2026, if they can allege facts showing a real and immediate threatened injury to a named plaintiff that is fairly traceable to ICE or Venturella and redressable by relief against them.  Any amended claim must distinguish allegedly unconstitutional interference with protected activity from ICE's lawful authority to conduct arrest, detention, transportation, and removal operations.

In resolving Article III standing, the Court does not rely on the declarations submitted in connection with plaintiffs' motion for a preliminary injunction.  Whether the evidentiary record establishes the responsibilities of the remaining defendants, whether post-filing developments have mooted any surviving claim, and whether plaintiffs have made the separate, record-based showing required for preliminary relief are issues addressed below.

### 3.  Defendants' Remedial Communications Do Not Moot the Case

Defendants' remedial communications do not moot plaintiffs' surviving claims.

Voluntary cessation of challenged conduct "does not deprive the tribunal of power to hear and determine the case." *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953).  The reason is that "The defendant is free to return to his old ways." *Id.*  A defendant claiming mootness through voluntary compliance bears the "formidable burden" of making it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 190 (2000).

Defendants have not met that burden.  The March 16, April 29, and May 11, 2026 communications are reminders of governing access rules.  They are not formal regulations, binding rescissions of informal policy, consent decrees, or enforceable commitments that resolve the

alleged multi-agency problem.  Dkt. No. 45-2 at 1–3; Dkt. No. 45-4 at 1; Dkt. No. 45-1 at 1; Dkt. No. 46, ¶¶ 13–15.  The March 16 email was circulated one day before this action was filed, after the access disputes described in the complaint had arisen, making defendants aware of the very real possibility of a lawsuit.  The April 29 email, sent after this lawsuit was filed, expressly refers to "a pending lawsuit regarding public access to hearings at 26 Federal Plaza in 2025" and reiterates procedures intended to ensure that hearings remain accessible unless a lawful exception applies.  Dkt. No. 45-4 at 1.  The May 11 email states that public waiting areas are generally accessible and that EOIR rules do not prohibit members of the public from speaking with respondents or distributing informational materials in those waiting areas, while preserving authority to address congestion, noise, and orderly movement.  Dkt. No. 45-1 at 1.

Although these communications bear on the need for preliminary relief, they do not eliminate the controversy.  *W.T. Grant* instructs courts to consider "the bona fides of the [defendant's] expressed intent to comply," "the effectiveness of the discontinuance," and "the character of the past violations."  345 U.S. at 633.  The Second Circuit has applied those factors when assessing whether injunctive relief remains appropriate after a defendant claims to have stopped the challenged conduct.  *See E.E.O.C. v. KarenKim, Inc.*, 698 F.3d 92, 100 (2d Cir. 2012) ("[T]he court's power to grant injunctive relief survives discontinuance of the illegal conduct." (citing *W.T. Grant*, 345 U.S. at 633)).  It has also recognized the relevance of whether past violations were "isolated" or "widespread."  *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1215 (2d Cir. 1993).

The communications show that EOIR leadership directed court personnel to comply with the governing rules, but they do not establish that the alleged practices have been fully and permanently discontinued.  They do not bind every agency, officer, contractor, or security

employee whose conduct may affect access to the two courts; they establish no monitoring or enforcement mechanism; and they leave the relevant officials free to alter or withdraw the guidance. Nor do they constitute an admission that any prior restriction was unlawful or a binding commitment not to impose similar restrictions in the future.

The reminders are welcome, but they must be considered against plaintiffs' allegations that court and security personnel previously stated that "things have changed" and that a "new policy" prohibited activities such as providing informational materials to respondents. The recent communications reiterate the governing access and waiting-area rules, but they do not identify, formally rescind, or otherwise disavow any contrary policy or practice that may have prompted those statements. On the present record, the Court therefore cannot conclude that the reminders have eliminated the alleged restrictions or made their recurrence unreasonable to expect.

The evidence also raises a substantial question about the effectiveness of the initial corrective measure. Kelly states that, on April 17, 2026 – *after* the March 16 reminder was circulated and after this action was filed – he attempted to observe proceedings at 26 Federal Plaza and was told, "NO, NO OBSERVERS!" Dkt. No. 56, ¶¶ 31–36. This incident shows that the March 16 reminder did not immediately eliminate the alleged categorical exclusion.

The supplemental declarations also describe continuing inconsistencies in courtroom access and waiting-area practices. *See* Dkt. No. 54, ¶¶ 6–14; Dkt. No. 57, ¶¶ 9–16. These declarants do not identify a specific unlawful courtroom closure occurring after May 11 – which is two months after the commencement of this lawsuit. But the absence of a documented closure during the brief interval between that email and the completion of briefing does not make it absolutely clear that the challenged conduct cannot reasonably be expected to recur – particularly where plaintiffs regularly return to the same courts and the communications remain informal and

revocable.  *See New York Pub. Int. Rsch. Grp. v. Whitman*, 321 F.3d 316, 327 (2d Cir. 2003) (explaining that voluntary compliance moots a case only when recurrence is "absolutely clear" not reasonably to be expected (quoting *Friends of the Earth*, 528 U.S. at 190)).  Plaintiffs' surviving claims are thus not moot under the voluntary-cessation doctrine.

The same conclusion follows, in the alternative, under the exception for conduct capable of repetition yet evading review.  To the extent defendants characterize each challenged denial or restriction as a discrete event that ended when a hearing concluded, a courtroom door was later opened, or an observer left the building, the expiration of that particular incident does not necessarily moot the controversy.  A dispute remains live where "(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again." *United States v. Juv. Male*, 564 U.S. 932, 938 (2011) (internal quotation marks omitted); *see also In re Grand Jury Proceeding*, 971 F.3d 40, 53–54 (2d Cir. 2020).

Both requirements are satisfied as to the discrete access and communication restrictions alleged here.  A particular immigration hearing may conclude within hours; an observer may be excluded only for the day; a waiting-area restriction may cease when the respondent is called into court; and an opportunity to observe, report, accompany, counsel, or provide information ordinarily expires before judicial review can be obtained.  Once that moment passes, the particular injury cannot be undone.

The named plaintiffs are not one-time visitors who happened upon an isolated denial of access.  They allege and, for purposes of preliminary relief, have submitted evidence of ongoing court observation, reporting, religious accompaniment, and support work at the same two immigration courts.  Their regular return to those facilities creates a reasonable expectation that

the same plaintiffs may again encounter substantially similar restrictions, even though each individual incident is too brief to be fully litigated before it ends.

Plaintiffs' surviving claims are therefore not moot under either voluntary-cessation principles or, to the extent the challenged conduct is treated as a series of discrete and short-lived incidents, the capable-of-repetition-yet-evading-review doctrine.

## B. Defendants' Motion to Dismiss for Failure to State a Claim

### 1. Rule 12(b)(6) Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility," the Supreme Court has explained, "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plausibility is not probability, but it requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability," it "stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (citation modified).

The plausibility inquiry is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The Court first identifies allegations that are no more than legal conclusions and therefore not entitled to the assumption of truth. *Id.* It then considers the well-pleaded factual allegations to determine whether they "plausibly give rise to an entitlement to relief." *Id.* If the complaint fails to "nudge[]" the plaintiff's claims "across the line from conceivable to plausible," it "must be dismissed." *Twombly*, 550 U.S. at 570.

In deciding a Rule 12(b)(6) motion, the Court generally considers "the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). The Court may also consider documents that are integral to the complaint and matters of which judicial notice may properly be taken. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002).

### 2.   Plaintiffs State a Narrow First Amendment Access Claim

Plaintiffs' access claim requires the Court to identify the relevant First Amendment interest with care. Plaintiffs do not have an unqualified constitutional right to enter every space in a federal building, to attend every immigration proceeding regardless of lawful closure rules, or to disregard security, capacity, decorum, and confidentiality limitations. Congress possesses broad authority over immigration, and the Executive has corresponding authority to administer and enforce the immigration laws. Those powers, however, remain "subject to important constitutional limitations." *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001). This case concerns one such limitation, namely the First Amendment's qualified protection of public access to certain governmental adjudications. The question is whether that protection extends to ordinary, non-closed immigration court hearings conducted before immigration judges.

The Court concludes that it does.

### a.   The Experience-and-Logic Test

The First Amendment right of access is grounded in the Amendment's structural role in democratic government. As Justice Brennan explained in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 587 (1980), the First Amendment "embodies more than a commitment to free expression and communicative interchange for their own sakes"; it "has a structural role to play in

securing and fostering our republican system of self-government." The Supreme Court later endorsed that account in *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596, 604 (1982) (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)), explaining that "Underlying the First Amendment right of access to criminal trials is the common understanding that 'a major purpose of that Amendment was to protect the free discussion of governmental affairs.'" "By offering such protection," the Court continued, "the First Amendment serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government." *Id.*

The press occupies a special place in that constitutional structure. One draft of the First Amendment described the press as "one of the great bulwarks of liberty." *New York Times Co. v. United States*, 403 U.S. 713, 716 (1971) (Black, J., concurring). "In the First Amendment the Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy." *Id.* at 717. The ability of the press – and of the public itself – to observe government proceedings is a necessary corollary of that structural role. Freedom to report and discuss governmental affairs is diminished if the Government conceals the proceedings in which its power is exercised.

Public access is protected because some government proceedings cannot properly perform their public function in secrecy. Openness "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press-Enter. Co. v. Superior Ct. of Cal., Riverside Cnty.*, 464 U.S. 501, 508 (1984) ("*Press-Enterprise I*"). "People in an open society do not demand infallibility from their institutions," the Supreme Court has said, "but it is difficult for them to accept what they are prohibited from observing." *Richmond*

*Newspapers*, 448 U.S. at 572.  And "public monitoring is an essential feature of democratic control." *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995).

The value of access therefore lies in the public's ability to witness government power being exercised while it is being exercised.  "Popular attendance at trials, in sum, substantially furthers the particular public purposes of that critical judicial proceeding." *Richmond Newspapers*, 448 U.S. at 597 (Brennan, J., concurring in the judgment).  A later transcript is no complete substitute. "As any experienced appellate judge can attest, the 'cold' record is a very imperfect reproduction of events that transpire in the courtroom." *Id.* at 597 n.22.  Indeed, when publicity serves as a check on official power, "Recordation . . . would be found to operate rather as a cloa[k] than chec[k]; as cloa[k] in reality, as chec[k] only in appearance." *Id.* (quoting *In re Oliver*, 333 U.S. 257, 271 (1948)).  The same intuition has particular force in a live adjudication in which demeanor, interpretation, confusion, fear, restraint, dignity, and the conduct of officials may matter as much as the words transcribed.

The two-part "experience and logic" test derives from *Richmond Newspapers* and was articulated in its now-familiar form in *Press-Enterprise Co. v. Superior Court of California for Riverside County*, 478 U.S. 1 (1986) ("*Press-Enterprise II*").  Courts ask, first, "whether the place and process have historically been open to the press and general public," and second, "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II*, 478 U.S. at 8.  These are the "experience" and "logic" inquiries. They are related, "for history and experience shape the functioning of governmental processes," but they are analytically distinct. *Id.* at 9.

Where the experience-and-logic test is satisfied, the right of access is qualified, not absolute.  "[T]he presumption of openness may be overcome only by an overriding interest based

on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.  The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered."  *Press-Enterprise I*, 464 U.S. at 510.

The Second Circuit has applied these principles beyond the criminal trial context.  In *New York Civil Liberties Union v. New York City Transit Authority*, 684 F.3d 286, 290 (2d Cir. 2012), the Court held that the public had a qualified First Amendment right of access to Transit Adjudication Bureau hearings.  The Court rejected the proposition that the right of access turns on whether the proceeding is housed in the judicial branch: "The public's right of access to an adjudicatory proceeding does not depend on which branch of government houses that proceeding." *Id.*  Instead, the inquiry focuses on function.  "[T]he First Amendment question cannot be resolved solely on the label we give the event, *i.e.*, 'trial' or otherwise, particularly where the [proceeding] functions much like a full-scale trial."  *Id.* at 299 (quoting *Press-Enterprise II*, 478 U.S. at 7).

This point is especially important given the number of adjudicative functions that are carried out by administrative agencies.  "Formalized administrative adjudications were all but unheard of in the late 18th century and early 19th century."  *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 755 (2002).  But "changes in the organization of government do not exempt new institutions from the purview of old rules."  *New York C.L. Union*, 684 F.3d at 300.  Thus, when an administrative body performs adjudicatory work comparable to the work of the judicial branch, the First Amendment analysis asks what the proceeding does, not merely in which branch the Government has chosen to place it.  *Cf. Butz v. Economou*, 438 U.S. 478, 512–13 (1978) (holding that judicial immunity "stems from the characteristics of the judicial process rather than its location" within one or another branch of government).

The Sixth Circuit has squarely held that the First Amendment confers a qualified right of access to deportation hearings. *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 695, 705 (6th Cir. 2002). *Detroit Free Press* arose from the September 21, 2001 directive issued by Chief Immigration Judge Michael Creppy, which required immigration judges to close deportation proceedings designated "special interest" because of their asserted connection to the Government's investigation of the September 11 attacks. *Id.* at 683–84.

The Third Circuit considered the same directive in *North Jersey Media Group, Inc. v. Ashcroft*, 308 F.3d 198 (3d Cir. 2002). The two courts therefore both addressed the constitutionality of the Creppy Directive's categorical closure of "special interest" deportation proceedings. *Compare Detroit Free Press*, 303 F.3d at 683–84, *with North Jersey*, 308 F.3d at 199–200. The Sixth Circuit held that deportation hearings carry a qualified right of access notwithstanding the extraordinary national-security setting in which the directive operated. *Detroit Free Press*, 303 F.3d at 705. The Third Circuit reached a different result, but expressly confined its judgment to "the extremely narrow class of deportation cases" designated by the Attorney General as presenting significant national-security concerns. *North Jersey*, 308 F.3d at 224. The decisions thus reached different results concerning the same directive, but *North Jersey* did not purport to decide whether the public possesses a right of access to ordinary, non-closed removal proceedings.

In this Circuit, *New York Civil Liberties Union* supplies the controlling law. An administrative adjudication is not beyond the First Amendment right-of-access framework simply because it is administrative. "[T]he adjudicatory work of administrative agencies can be sufficiently like that of the courts to warrant requiring the agencies to follow principles that apply to courts." *New York C.L. Union*, 684 F.3d at 300. In other words, whether a particular

administrative proceeding carries a qualified right of access depends on application of the experience-and-logic test to the history, structure, and function of that proceeding.

This case differs from *North Jersey* in important respects. *North Jersey* involved the Creppy Directive, which required closure of "special interest" deportation proceedings involving individuals whom the Attorney General had determined might have connections to, or information concerning, the September 11 attacks. 308 F.3d at 199–200. The directive required those hearings to be closed to the press and public, including family members and friends, and restricted disclosure of the record. *Id.* *North Jersey*'s "logic" analysis turned heavily on an unrebutted national-security submission from the FBI explaining the asserted danger that public access could reveal investigative tactics, expose gaps in the Government's knowledge, identify sources or potential witnesses, or permit terrorist networks to assemble seemingly innocuous information into an informative "mosaic." *Id.* at 216–21.

The Third Circuit expressly stated that it did "not decide that there is no right to attend administrative proceedings, or even that there is no right to attend any immigration proceeding," and confined its judgment to "the extremely narrow class of deportation cases" determined by the Attorney General to present significant national-security concerns. *Id.* at 224. No comparable concern is asserted here.

That *Detroit Free Press* involved the same Creppy Directive reinforces the force of its reasoning here. The Sixth Circuit recognized a qualified right of access even though the Government invoked the exceptional national-security concerns arising from the September 11 investigation. This case presents the more straightforward question of whether the right attaches to ordinary removal hearings that EOIR's own regulations designate as presumptively open and as

to which the Government identifies no terrorism investigation, classified information, intelligence source, investigative method, or comparable national-security interest.

Because no comparable national-security interest is asserted here, *North Jersey* – a *sui generis* case on its facts – is not a precedent that carries any weight here. This case involves ordinary immigration court hearings that EOIR's own regulations and public guidance treat as presumptively open. The Government does not defend a formal national-security closure directive or contend that access to these hearings would expose classified information, investigative methods, intelligence sources, or an ongoing terrorism investigation. To the contrary, defendants themselves repeatedly invoke EOIR's public-access rules and remedial communications as evidence that public hearings should remain open unless a lawful exception applies. *North Jersey*'s holding is therefore materially distinguishable, while *Detroit Free Press*'s conclusion that public access serves as a check on Executive adjudication bears directly on the ordinary proceedings at issue here.

b. Experience

The experience inquiry asks whether the "place and process" have historically been open. *Press-Enterprise II*, 478 U.S. at 8. The inquiry is not confined to the precise institutional label attached to the forum. It looks to "the experience in that *type* or *kind* of hearing throughout the United States." *El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 150 (1993) (citation omitted) (emphasis omitted).

Immigration courts are not Article III courts. EOIR is a component of the Department of Justice, and immigration judges are administrative judges appointed by the Attorney General. *See* 8 C.F.R. §§ 1003.0(a), 1001.1(l) ("An immigration judge shall be subject to such supervision and shall perform such duties as the Attorney General shall prescribe[.]"). EOIR describes

- 46 -

immigration court hearings as "civil administrative proceedings."  Dkt. No. 46-2 at 1.  Moreover, removal proceedings are civil, not criminal; they are conducted inside the Executive Branch, not by Article III judges; there is no jury; and Congress and the Executive retain substantial authority over immigration policy.  *See, e.g.*, *Landon v. Plasencia*, 459 U.S. 21, 34 (1982).  For this reason, the Court does not simply import, wholesale, the law governing criminal trials.

But those distinctions do not end the inquiry, because the First Amendment access analysis turns on the character and function of the proceeding.  Removal proceedings have many of the same attributes that have historically justified public access to adjudicatory proceedings.  They are trial-type administrative adjudications.   An immigration judge has authority to determine removability, issue orders of removal, adjudicate applications for relief or protection, and take other action consistent with law and regulation.  8 C.F.R. § 1240.1(a).  The immigration judge assigned to conduct the hearing must withdraw if disqualified, and if a new immigration judge is assigned, that judge must become familiar with the record and state on the record that he or she has done so.  *Id.*, § 1240.1(b).  The immigration judge "shall receive and consider material and relevant evidence, rule upon objections, and otherwise regulate the course of the hearing."  *Id.*, § 1240.1(c).

The proceedings are also adversarial in form.  DHS counsel appears on behalf of the Government and presents evidence material to deportability, inadmissibility, and other issues requiring disposition by the immigration judge.  *Id.*, § 1240.2(a).  DHS counsel's duties include "the presentation of evidence and the interrogation, examination, and cross-examination of the respondent or other witnesses."  *Id.*  The respondent may be represented at the hearing by an attorney or other qualified representative.  *Id.*, § 1240.3.  Interpreters must be sworn to interpret

and translate accurately, unless they are federal employees.  *Id.*, § 1240.5.  Witness testimony is given under oath or affirmation, and depositions may be ordered.  *Id.*, § 1240.7(b)–(c).

The proceedings are governed by legal burdens of proof.  A respondent charged with deportability may be found removable only if the Government proves deportability "by clear and convincing evidence."  *Id.*, § 1240.8(a).  Other categories of respondents bear specified burdens to show admissibility, lawful presence, or eligibility for relief.  *Id.*, § 1240.8(b)–(d).  The hearing produces a formal record.  Testimony, exhibits, applications, proffers, requests, the immigration judge's decision, written orders, motions, appeals, briefs, and other papers all constitute the record in the case.  *Id.*, § 1240.9.

The hearing itself proceeds in a court-like order.  At the opening of a removal proceeding, the immigration judge must advise the respondent of the right to representation at no expense to the Government, the availability of pro bono legal services, and appeal rights; must advise the respondent of the opportunity to examine and object to the evidence, present evidence, and cross-examine government witnesses; must place the respondent under oath; must read the factual allegations and charges in the notice to appear and explain them in nontechnical language; and must enter the notice to appear as an exhibit in the record.  *Id.*, § 1240.10(a)(1)–(7).  The respondent must plead to the notice to appear by admitting or denying the factual allegations and removability charges.  *Id.*, § 1240.10(c).  If removability is not resolved on the pleadings, the immigration judge receives evidence on unresolved issues.  *Id.*, § 1240.10(d).  Additional or substituted charges must be lodged by DHS in writing and served on the respondent, and the immigration judge must read and explain those additional charges.  *Id.*, § 1240.10(e).

Applications for relief likewise proceed through an adjudicatory framework.  If a respondent expresses fear of persecution or harm upon return, the immigration judge must advise

the respondent of the ability to apply for asylum or withholding of removal, make application forms available, advise the respondent of the privilege of counsel at no expense to the Government, and provide a pro bono list. *Id.*, § 1240.11(c)(1). Applications for asylum and withholding of removal are decided by the immigration judge under governing standards "after an evidentiary hearing to resolve factual issues in dispute." *Id.*, § 1240.11(c)(3). During that hearing, the respondent "shall be examined under oath" and "may present evidence and witnesses," while DHS counsel may call witnesses and present evidence for the record. *Id.*, § 1240.11(c)(3)(iii)–(iv). An adverse decision on asylum or withholding must state why relief was denied. *Id.*, § 1240.11(c)(4).

Finally, the proceeding culminates in an adjudicatory decision and order. The decision may be oral or written, must include a finding as to inadmissibility or deportability, must contain reasons for granting or denying requested relief, and must conclude with an order. *Id.*, § 1240.12(a). The order must direct removal, termination, or another appropriate disposition. *Id.*, § 1240.12(c). A written decision must be served on the respondent and DHS counsel, and an oral decision must be stated by the immigration judge in the presence of the respondent and DHS counsel, if any. *Id.*, § 1240.13(a)–(b). If removal is ordered, the immigration judge must advise the respondent of the decision, the consequences of failing to depart, and appeal procedures unless appeal is waived. *Id.*, § 1240.13(d).

These features make a removal hearing a court-like adjudication of legal rights and obligations. The Supreme Court has repeatedly recognized that administrative adjudication can be functionally comparable to judicial adjudication. In *Butz v. Economou*, 438 U.S. 478, 512–13 (1978), the Court held that "adjudication within a federal administrative agency shares enough of the characteristics of the judicial process" to justify treating agency adjudicators like judges for judicial immunity purposes. The Court emphasized that administrative law judges may exercise

powers comparable to those of trial judges, including the power to rule on evidence, regulate hearings, and make or recommend decisions, and that agency adjudications may include "many of the same safeguards as are available in the judicial process." *Id.* at 513. If those similarities can justify borrowing from judicial-immunity doctrine, they also support the more modest proposition urged here that a trial-type administrative adjudication may be analyzed under the First Amendment access framework.

*Federal Maritime Commission v. South Carolina State Ports Authority*, 535 U.S. 743, 756–57 (2002) applied the same functional mode of analysis in a different constitutional setting. There, the Court looked to the "precise nature" of the agency proceeding and agreed that an adjudication before the Federal Maritime Commission "walks, talks, and squawks very much like a lawsuit." *Id.* at 757 (quoting *South Carolina State Ports Auth. v. Fed. Mar. Comm'n*, 243 F.3d 165, 174 (4th Cir. 2001)). The doctrine there was sovereign immunity, not First Amendment public access. But the lesson is the same. Our Constitution's reach does not stop at the door of an agency. When an administrative proceeding is structured as an adjudication, proceeds through adversarial presentation, produces a record, and culminates in a decision and order, its placement in the Executive Branch does not eliminate its adjudicatory character.

*Detroit Free Press* is persuasive on this point. The Sixth Circuit emphasized that deportation proceedings, in particular, "bear a strong resemblance to judicial trials" because they begin with a charging document; the Government bears a burden of proof; the respondent may contest removability, present defenses, and seek relief; the respondent may be represented by counsel; the respondent may be present, examine evidence, present evidence, and cross-examine witnesses; and the proceeding is presided over by an immigration judge. 303 F.3d at 698–99. The

regulations discussed above confirm the strong resemblance between judicial trials and deportation proceedings. *See* 8 C.F.R. §§ 1240.8–.10, 1240.12.

DOJ and EOIR have themselves long recognized both the adjudicatory character of these proceedings and the ordinary rule of public access. Their regulations do not, standing alone, establish that the First Amendment requires openness; an agency cannot create or eliminate a constitutional right by regulation. *See United States v. Caceres*, 440 U.S. 741, 749–55 (1979) (distinguishing agency regulations from independently applicable constitutional requirements). Nor could agency rulemaking abrogate a right otherwise secured by the Constitution. *See Miranda v. Arizona*, 384 U.S. 436, 491 (1966) ("Where rights secured by the Constitution are involved, there can be no rule-making or legislation which would abrogate them."). But the regulations are powerful evidence under the experience inquiry. They embody the Department's longstanding institutional judgment that public access is the usual rule for deportation and removal adjudications, while closure is the exception and must rest on one of a limited set of identified grounds.

The history of public access to immigration adjudication is also concrete. The relevant distinction is between exclusion proceedings and deportation proceedings. Congress repeatedly required exclusion proceedings – proceedings concerning whether an *arriving* alien would be admitted – to be closed to the public. In the Immigration Act of 1903, Congress provided that "boards of special inquiry" would determine whether a detained arriving alien "shall be allowed to land or be deported," and then directed that "All hearings before boards shall be separate and apart from the public." Act of Mar. 3, 1903, ch. 1012, § 25, 32 Stat. 1213, 1220. The 1952 Immigration and Nationality Act carried forward the same rule for exclusion inquiries. "At such inquiry, which shall be kept separate and apart from the public," the alien could have one friend

or relative present under conditions prescribed by the Attorney General. Immigration and Nationality Act of 1952, ch. 477, § 236(a), 66 Stat. 163, 200.

The 1952 Act did not impose a comparable closure requirement on deportation proceedings. This contrast is significant. When Congress "includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983); *see also Lindh v. Murphy*, 521 U.S. 320, 330 (1997) (explaining that negative implications are strongest when differently treated provisions were considered together). Congress thus demonstrated in the same statute that it knew how to mandate closure of an immigration proceeding. Having expressly closed exclusion hearings, Congress could readily have required deportation hearings to be closed – or expressly committed that decision to the Attorney General's general discretion – but did neither. *See Detroit Free Press*, 303 F.3d at 701–02. The historical closure rule attached only to exclusion/admissibility inquiries at the threshold of initial entry. Deportation proceedings – the predecessor to removal proceedings for persons charged with being removable from within the United States – developed differently.

Since at least 1964, federal immigration regulations have made deportation hearings presumptively open. *Accord Detroit Free Press*, 303 F.3d at 701. Former 8 C.F.R. § 242.16(a), for example, provided that "Deportation hearings shall be open to the public," while allowing the immigration judge, in a specific case and for the purpose of protecting witnesses, respondents, or the public interest, to exclude the general public or particular individuals. 8 C.F.R. § 242.16(a) (1997). The rule also permitted reasonable attendance limits depending on physical facilities, with priority to the press over the general public. *Id.*

The present regulations continue the same rule.  The general EOIR regulation provides that "All hearings, other than exclusion hearings, *shall be open to the public*" unless specified exceptions apply.  8 C.F.R. § 1003.27 (emphasis added).  And the removal-hearing regulation provides that "Removal hearings *shall be open to the public*, except that the immigration judge may, in his or her discretion, close proceedings as provided in § 1003.27 of this chapter."  8 C.F.R. § 1240.10(b) (emphasis added).

These provisions do more than show that DOJ presently favors openness as a matter of policy.  They confirm that, for approximately six decades, the Department has treated access as the default rule governing ordinary deportation and removal adjudications and has confined closure to identified circumstances involving capacity, witness or party protection, the public interest, abuse-related proceedings, protected information, and other specified concerns.  The constitutional inquiry remains the Court's responsibility.  *See Marbury v. Madison*, 1 Cranch 137, 177, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").  But DOJ's own rules are compelling evidence that ordinary removal proceedings fall within the usual tradition of accessible adjudication rather than a tradition of categorical executive secrecy.

The Second Circuit, in *New York Civil Liberties Union*, instructs that the test is functional and that a proceeding is not categorically outside the First Amendment access framework simply because it is housed in an administrative agency or lacks a precise Founding-era analogue.  *See* 684 F.3d at 299–302.  This approach comports with *Globe Newspaper*'s instruction that the First Amendment reflects "broad principles" written against "a background of shared values and practices," 457 U.S. at 604, and with *Mills*'s recognition that "there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of

governmental affairs," 384 U.S. at 218.  It also comports with *Press-Enterprise II*, which relied on post-Bill of Rights history in assessing access to preliminary hearings.  *See* 478 U.S. at 10–12.

The First Amendment would be a poor guardian of democratic accountability if it protected only those institutions that existed in their modern form in 1791.  The Supreme Court has recognized that the Framers "could not have anticipated the vast growth of the administrative state," and that "formalized administrative adjudications were all but unheard of in the late 18th century and early 19th century." *Fed. Mar. Comm'n*, 535 U.S. at 755.  It would therefore make little sense to demand a Founding-era tradition of access to the modern administrative tribunal as such.

At the same time, history cannot be ignored altogether.  There must be a tradition of at least some duration; otherwise "nothing would separate the judicial task of constitutional interpretation from the political task of enacting laws currently deemed essential." *In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325, 1332 (D.C. Cir. 1985) (Scalia, J.).  That requirement is satisfied here.  Congress expressly required exclusion proceedings to be closed, but imposed no comparable rule on deportation proceedings.  And since at least 1964, the agency charged with administering the Nation's immigration tribunals has treated deportation – and later removal – hearings as presumptively open, subject only to defined exceptions.  The current EOIR regulations preserve that longstanding rule.  Six decades of presumptive openness constitute a sustained institutional practice and demonstrate that public access is compatible with the orderly adjudication of removal cases.

The experience prong thus supports a qualified right of access to ordinary, non-closed immigration court hearings.  The scope of that right follows the tradition from which it arises.  It does not extend to hearings lawfully closed under applicable regulations, information protected by

confidentiality requirements, or attendance exceeding reasonable capacity and security limits.  But when EOIR's own rules designate a hearing as presumptively open, historical experience weighs decisively in favor of public access.

### c.  Logic

The logic inquiry asks whether public access "plays a significant positive role in the functioning of the particular process in question."  *Press-Enterprise II*, 478 U.S. at 8.  It does here.

Immigration adjudication is among the most consequential exercises of federal power over individuals.  Immigration judges determine whether respondents are removable and whether they may obtain relief or protection, including adjustment of status, asylum, withholding of removal, cancellation of removal, and protection under the Convention Against Torture.  Dkt. No. 46-2 at 1.  Those decisions determine whether a person can remain in the United States, is separated from family and community, or is removed to a country where he claims he may face persecution or torture.  The public has a profound interest in understanding how that power is exercised.

The Supreme Court's immigration due-process cases reinforce the importance of fair and regular adjudicatory proceedings.  More than a century ago, the Court held that executive officers could not arbitrarily deport a noncitizen who had entered the country, even unlawfully, without affording an opportunity to be heard on the matters affecting the person's liberty.  *See Yamataya v. Fisher*, 189 U.S. 86, 100–01 (1903).  The Court's decision in *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) likewise recognized that "aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law."  The Court later explained in *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) that "a continuously present resident alien is entitled to a fair hearing when threatened with deportation."  And, in *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001),

the Court reaffirmed that, once a noncitizen enters the country, the Due Process Clause applies "whether their presence here is lawful, unlawful, temporary, or permanent."

For respondents placed in proceedings under 8 U.S.C. § 1229a, the removal hearing is the adjudicatory mechanism through which the Government determines removability and provides the procedures required by statute and the Constitution. Public observation is not itself compelled by the due-process holdings just cited. But it enables the public to assess whether these consequential proceedings conform to established standards of fairness and operate as adjudications governed by law, rather than as exercises of unobserved executive will. "[I]nformed public opinion is the most potent of all restraints upon misgovernment[.]" *Grosjean v. Am. Press Co.*, 297 U.S. 233, 250 (1936).

Again, *Detroit Free Press* is instructive. There, the Sixth Circuit reasoned that public access "acts as a check on the actions of the Executive by assuring us that proceedings are conducted fairly and properly," and that this check is especially important in immigration, where Executive power is at its height. 303 F.3d at 704. The court also emphasized that openness helps ensure that the Government "does its job properly" and that mistakes can be identified and corrected. *Id.* These observations have force here, which involves ordinary removal hearings rather than the extraordinary special-interest proceedings and national-security concerns at issue in *Detroit Free Press* and *North Jersey*. Removal proceedings are not minor administrative events. They are the forum in which the Government seeks authority to remove people from the country and in which respondents seek permission or protection to remain. *See, e.g.*, 8 U.S.C. § 1229a(a)(3) (stating that federal removal proceedings are "*the sole and exclusive procedure* for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States" (emphasis added)).

- 56 -

Public access also promotes fairness and the appearance of fairness.  The Supreme Court has emphasized that openness reassures the public that "standards of fairness are being observed," that "established procedures are being followed," and that "deviations will become known." *Press-Enterprise I*, 464 U.S. at 508.  This logic applies with special force where proceedings are conducted before an administrative judge, without a jury, inside federal buildings where most members of the public will never otherwise see how immigration law is applied.  As *Press-Enterprise II* observed in the criminal context, the absence of a jury can make public access "even more significant."  478 U.S. at 13.  Immigration proceedings likewise depend on public confidence in the integrity of adjudicators, counsel, interpreters, government attorneys, security personnel, and the procedures that structure the hearing.

The adjudicatory character of these proceedings reinforces the logic of openness.  Removal hearings require the immigration judge to advise the respondent of the right to counsel, advise the respondent of available pro bono legal services, advise the respondent of appeal rights, advise the respondent of the opportunity to examine and object to evidence, present evidence, and cross-examine government witnesses, place the respondent under oath, read the factual allegations and charges, and receive pleadings and evidence.  8 C.F.R. § 1240.10(a), (c), (d).  Testimony is under oath or affirmation.  8 C.F.R. § 1003.34.  The decision must include a finding as to inadmissibility or deportability, reasons for granting or denying relief, and an order.  8 C.F.R. § 1240.12.  These features make public access valuable for the same reasons it is valuable in other adjudicatory settings.  Public access to removal proceedings checks arbitrariness, promotes accuracy and regularity, and enables the public to evaluate whether law is being administered as law.

Later access to hearing transcripts is not an adequate substitute for public attendance.  In live adjudication, the public observes not only words but the atmosphere, including who is present,

who may speak, whether parties appear to understand, whether interpreters are used, whether proceedings are orderly, whether respondents are treated with dignity, and whether government power is exercised in a manner consistent with law. A written record cannot fully capture that reality. As another court in this District recently put it, "documentary access is not a substitute for concurrent access," because "some information, concerning demeanor, non-verbal responses, and the like, is necessarily lost in the translation of a live proceeding to a cold transcript." *Civil Rights Corps v. LaSalle*, 741 F. Supp. 3d 112, 159 (S.D.N.Y. 2024) (quoting *ABC, Inc. v. Stewart*, 360 F.3d 90, 99 (2d Cir. 2004)).

Public access also enables reporting, religious and civic accompaniment, and informed public debate about the administration of immigration law. The First Amendment protects discussion of governmental affairs so that citizens may participate meaningfully in self-government. *Globe Newspaper*, 457 U.S. at 604. James Madison expressed the same principle in enduring terms:

> A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives.

Letter from James Madison to W.T. Barry (Aug. 4, 1822), in 9 *The Writings of James Madison* 103, 103 (Gaillard Hunt ed., 1910).

Immigration enforcement and adjudication are matters of intense public concern. The public cannot meaningfully evaluate whether the immigration system is fair, lawful, efficient, humane, or consistent with national commitments without access to the proceedings in which the Government exercises that power.

Openness, however, is not absolute. Immigration proceedings may involve abused spouses and children, asylum applicants, confidential information, witness-safety issues, capacity limits,

and building-security needs. The governing regulations already account for these interests by requiring or authorizing closure, limited attendance, or protection of confidential information in specified circumstances. *See* 8 C.F.R. §§ 1003.27(a)–(d), 1003.31(d), 1003.46, 1208.6(a)–(b), 1240.10(b), 1240.11(c)(3)(i). These provisions permit restrictions when the circumstances of a particular proceeding warrant them. They do not authorize standing rules under which the public is categorically excluded from hearings that are presumptively open.

The allegations illustrate the distinction. Nathan alleges that, despite ample available seating, a court employee told her that "*the judge never allows the public in the courtroom.*" Dkt. No. 40, ¶¶ 49–50 (emphasis added). The employee allegedly added that the judge had permanently banned the public and that every judge in that section except one did the same. *Id.*, ¶ 50. When Nathan referred to EOIR materials stating that hearings are generally open, the employee allegedly responded, "Things have changed since then." *Id.*, ¶ 51. If true, these allegations describe a categorical practice, not a particularized application of the regulatory exceptions.

The logic prong therefore supports a qualified First Amendment right of access to ordinary, non-closed immigration court hearings.

The right recognized here is a qualified right to observe ordinary, non-closed immigration court hearings that are presumptively open under governing regulations and have not been lawfully closed or limited pursuant to 8 C.F.R. §§ 1003.27(a)–(d), 1003.31(d), 1003.46, 1208.6, 1240.10(b), or 1240.11(c)(3)(i). Once the qualified right attaches, the Government may restrict access only on a lawful ground and through a restriction appropriately tailored to the interest that justifies it. A discretionary closure of an otherwise open hearing must rest on a particularized interest recognized by law – such as protection of a witness or party, confidentiality, courtroom order, or the public

interest – and must be supported by findings sufficient to permit review of the closure's basis and scope. *See Press-Enterprise I*, 464 U.S. at 510.

On that understanding, plaintiffs state a First Amendment access claim. They allege that defendants excluded observers from hearings presumptively open under governing regulations; kept courtroom doors locked; announced categorical "no observers" rules; and prevented public attendance without a closure order, capacity determination, or other case-specific justification. Taken as true, those allegations plausibly describe the closure of presumptively open adjudicatory proceedings without a lawful basis.

Defendants' motion to dismiss is therefore DENIED insofar as plaintiffs assert a First Amendment access claim against DOJ and Acting Attorney General Blanche based on conduct attributable to EOIR personnel, and against DHS and Secretary Mullin, through FPS and PSO access-control functions, and GSA and Administrator Forst, insofar as building-security or access-control practices allegedly prevent the public from reaching ordinary, non-closed immigration court hearings without a lawful basis.

Because ICE and Venturella have been dismissed for lack of Article III standing, the Court need not separately address the sufficiency of the access claim against them under Rule 12(b)(6).

### 3.   Plaintiffs Also State Speech and Association Claims

Plaintiffs also allege that defendants interfered with their own speech and association – including pastoral counseling, religious accompaniment, newsgathering, note-taking, and the provision of legal-rights, community-resource, and church-related information. Resolution of those claims requires the Court to determine whether the restrictions imposed in and around the immigration courts were permissible regulations of activity on government property or instead were unreasonable or viewpoint discriminatory.

a.    The Relevant Interior Spaces Are Nonpublic Fora

The answer to the threshold forum question is straightforward.    The immigration courtrooms, EOIR-controlled waiting areas, and general interior common areas of 26 Federal Plaza and 290 Broadway are nonpublic fora for purposes of independent expressive activity.    The Government may preserve those spaces for the uses to which they are dedicated and impose restrictions that are reasonable in light of those uses and viewpoint neutral.    *See Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 808–09 (1985).    Even a facially reasonable restriction is invalid if it is "in reality a facade for viewpoint-based discrimination."    *Cornelius*, 473 U.S. at 811.    That a government-controlled space is accessible to members of the public for a particular purpose does not, by itself, transform the space into a public forum for unrestricted expression.    *See id.* at 802; *Perry*, 460 U.S. at 47.

The immigration courtrooms themselves are nonpublic fora for independent expression. *See Huminski v. Corsones*, 396 F.3d 53, 91 (2d Cir. 2005); *Berner v. Delahanty*, 129 F.3d 20, 26 (1st Cir. 1997) ("A courthouse—and, especially, a courtroom—is a nonpublic forum.").    They exist for adjudication, and immigration judges must be able to maintain order, decorum, neutrality, and the appearance of neutrality.    Members of the public possess the qualified right to observe ordinary, non-closed proceedings recognized above, but that right does not convert the courtroom into a forum for conversation, demonstrations, literature distribution, recording, or other independent expressive activity.    As the Second Circuit explained, "[t]he function of a courthouse and its courtrooms is principally to facilitate the smooth operation of a government's judicial functions."    *Huminski*, 396 F.3d at 91.    This conclusion, however, does not resolve plaintiffs' separate allegation that officials prevented pastoral counseling and religious accompaniment in waiting areas outside the courtroom.

EOIR-controlled waiting areas and directly associated interior spaces are also nonpublic fora. They exist to facilitate immigration-court business and the orderly movement and congregation of respondents, counsel, witnesses, interpreters, court personnel, observers, family members, and other visitors awaiting proceedings. Courthouse interiors and related waiting spaces generally are not traditional or designated public fora. *See Huminski*, 396 F.3d at 90–92; *Washpon v. Parr*, 561 F. Supp. 2d 394, 408–09 (S.D.N.Y. 2008).

*Make the Road by Walking, Inc. v. Turner*, 378 F.3d 133 (2d Cir. 2004), provides the closest analogy. There, the Second Circuit held that welfare-office waiting rooms were nonpublic fora because the agency had not opened them for general public discourse and because they existed to facilitate claimants' business with the agency. *Id.* at 144–47. The agency could reasonably limit access to persons conducting "official business." *Id.* at 139, 147–50. The court nevertheless reaffirmed that an ostensibly neutral rule would be unconstitutional if used as a facade for viewpoint discrimination. *Id.* at 150.

The general interior spaces of the federal buildings – including security checkpoints, lobbies, elevator banks, and hallways outside EOIR's direct control – are likewise nonpublic fora. Those spaces exist to provide secure and orderly access to federal offices and federal business, not to host general expressive activity. Defendants may therefore impose reasonable, viewpoint-neutral rules concerning screening, crowd control, traffic flow, photography, building access, and orderly movement. *See United States v. Kokinda*, 497 U.S. 720, 727–30 (1990); *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 680–85 (1992); *Gen. Media Commc'ns, Inc. v. Cohen*, 131 F.3d 273, 278–83 (2d Cir. 1997). Their authority to regulate those spaces, however, does not include selective enforcement against speakers because they are journalists, ministers, court watchers, immigrants'-rights advocates, or accompaniers of persons in removal proceedings.

The amended complaint also refers generally to "exterior spaces," but it does not plead facts sufficient to permit a forum analysis as to any particular exterior location. Although a public sidewalk ordinarily is a traditional public forum, *see United States v. Grace*, 461 U.S. 171, 177–80 (1983), the amended complaint does not identify a particular public sidewalk or other traditional public forum in which a named plaintiff was prevented from speaking, associating, or distributing information. The pleading's generalized references to "exterior spaces" do not distinguish municipal sidewalks from federal plazas, entrances, setbacks, driveways, or security-controlled areas – properties that may serve different functions and carry different forum classifications. Nor does the amended complaint identify which named plaintiff engaged in what protected activity at a particular exterior location, which defendant restricted that activity, or what restriction was imposed.

Defendants' motion to dismiss is therefore GRANTED WITHOUT PREJUDICE insofar as plaintiffs assert speech or association claims arising from unidentified exterior spaces. Because the deficiency may be curable through more specific factual allegations, plaintiffs are granted leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *Foman v. Davis*, 371 U.S. 178, 182 (1962). Within the same thirty-day period allowed for amendment of the claims against ICE and Venturella, plaintiffs may replead an exterior-space claim if they can allege, consistently with Rule 11: (1) the specific exterior location at issue and facts bearing on its function and forum classification; (2) the named plaintiff who engaged or intends to engage in protected activity there; (3) the nature of that activity; (4) the defendant or personnel responsible for the challenged restriction; (5) the restriction imposed and facts supporting its alleged unreasonableness or viewpoint-discriminatory character; and, because plaintiffs seek prospective relief, (6) a real and immediate threat that the named plaintiff will encounter the challenged restriction again.

b.  Plaintiffs Plausibly Allege Unreasonable and Viewpoint-Discriminatory
Restrictions in Nonpublic Fora

Applying the rules governing nonpublic fora, plaintiffs plausibly allege claims arising from

restrictions imposed in EOIR-controlled waiting areas and from the selective enforcement of

building-security and access-control rules.

The amended complaint alleges that DOJ and EOIR personnel categorically or selectively

prohibited quiet, consensual, noncommercial communication and accompaniment in waiting areas

otherwise open to persons conducting immigration-court business.  Plaintiffs allege that officials

prohibited members of the public from speaking with respondents, ejected or threatened persons

for providing informational materials, separated accompaniers from the persons whom they sought

to assist, and made court-related speech and association effectively impossible.  Dkt. No. 40, ¶¶ 1–

3, 22–31, 38–44, 66–74, 82–98.

The allegations concerning religious expression are particularly serious.  Father Arias

alleges that pastoral care for immigrants is "a central and indispensable component of his ministry"

and that his faith requires him to accompany persons appearing before immigration authorities,

offer them comfort, and ensure that they do not confront the process alone.  *Id.*, ¶¶ 22–25.  He

alleges that officials repeatedly ordered him not to speak with persons who requested his assistance

and removed him from courtrooms, waiting areas, hallways, and the building while he was

carrying out that ministry.  *Id.*, ¶¶ 26–31.  The alleged prohibition prevented a minister from

providing religious counsel, comfort, and succor to willing persons at a moment when, according

to his faith, he was obligated to be present with them.  Although he has not specifically asserted a

free exercise claim, he plainly asserts interference with protected religious speech.

Phillips alleges a similarly direct restriction on religious expression.  She alleges that, after

she quietly spoke in Spanish with a respondent and wrote down the name, address, and service

times of St. Peter's Church, a court clerk told her, "After this, you're done." *Id.*, ¶¶ 66–69. When Phillips explained that she had provided only church information, the clerk allegedly replied, "Yeah, whatever. After this, you're done," and prevented her from returning to the courtroom. *Id.*, ¶ 69. Phillips further alleges that officials repeatedly prohibited her from speaking or exchanging information with persons awaiting hearings even in public waiting areas. *Id.*, ¶¶ 72–74.

The religious character of this expression does not place it outside the protection of the Speech Clause. Viewpoint discrimination is "an egregious form of content discrimination," and the Government may not restrict expression because "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 829 (1995). Religion supplies "a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Id.* at 831. If EOIR permits visitors to offer quiet secular emotional support, community-resource information, or reassurance to persons awaiting hearings, it may not prohibit otherwise comparable pastoral counseling, requested prayer, or church-related information merely because those communications proceed from a religious perspective. *See id.* at 829–31; *Good News Club v. Milford Central School*, 533 U.S. 98, 107–12 (2001).

Taken together, the allegations plausibly describe a categorical restriction on quiet, consensual, court-related communication – including religious, legal-rights, civic, and accompaniment-related speech – without an identified justification. Such a restriction may be unreasonable in light of the purposes of the waiting areas even if applied across viewpoints. To the extent officials permit communication on a subject while selectively suppressing a religious, immigrants'-rights, legal-rights, or other disfavored perspective on that subject, plaintiffs also

plausibly allege viewpoint discrimination.  *See Cornelius*, 473 U.S. at 811–12; *Rosenberger*, 515 U.S. at 829–31.

Plaintiffs also plausibly allege that DHS, FPS, PSOs, or GSA selectively enforced otherwise lawful building-security and access-control rules because of plaintiffs' observation, reporting, religious ministry, accompaniment, or support of immigration respondents.

Defendants' motion to dismiss is, therefore, DENIED insofar as plaintiffs allege that DOJ or EOIR categorically or selectively prohibited quiet, consensual, noncommercial communication and accompaniment in EOIR-controlled waiting areas, including pastoral counseling, religious counsel or comfort, requested prayer, and the individualized exchange of legal-rights, community-resource, or church-related information.  It is also DENIED insofar as plaintiffs allege that DHS, FPS, PSOs, or GSA selectively enforced building-security or access-control rules because of plaintiffs' protected observation, reporting, religious ministry, accompaniment, or support of immigration respondents.

### 4.  Plaintiffs State a First Amendment Retaliation Claim

The First Amendment forbids official reprisal for protected expression.  As the Supreme Court has explained, official retaliation for speech "offends the Constitution" because it "threatens to inhibit exercise of the protected right."  *Hartman v. Moore*, 547 U.S. 250, 256 (2006).  In the Second Circuit, a First Amendment retaliation claim requires allegations that "(1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected speech and the adverse action."  *Walker v. Senecal*, 130 F.4th 291, 298 (2d Cir. 2025) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)).

At the pleading stage, plaintiffs need not plead retaliatory intent with evidence that proves such intent. They need only allege facts that support a reasonable inference of retaliatory intent. *Posr v. Ct. Officer Shield No. 207*, 180 F.3d 409, 418 (2d Cir. 1999) ("[T]he plaintiff's pleading need not clearly establish that the defendant harbored retaliatory intent. It is sufficient to allege facts which could reasonably support an inference to that effect."). Causation may be pleaded through circumstantial allegations, temporal proximity, or statements linking the challenged action to the protected activity. *See Stajic v. City of New York*, 214 F. Supp. 3d 230, 235–37 (S.D.N.Y. 2016). The question is not whether plaintiffs will ultimately prove retaliation; it is whether the complaint plausibly alleges that protected court-related activity prompted the challenged restrictions. It does.

As explained in the preceding section, plaintiffs plausibly allege protected speech and association. The Court does not repeat that analysis here. The relevant activities include observation of presumptively open hearings, reporting and newsgathering, quiet communication with respondents, accompaniment, individualized provision of noncommercial information, and religious expression and ministry. The retaliation inquiry asks a different question: whether plaintiffs plausibly allege that officials took adverse action against them because they engaged in those activities.

Plaintiffs adequately allege adverse action. An action is adverse if it would deter a similarly situated person of ordinary firmness from exercising First Amendment rights. *See Walker*, 130 F.4th at 298–99. The complaint alleges repeated exclusion from courtrooms and waiting areas, orders not to speak with respondents, threats of removal, denial of reentry, restrictions on written information, and expulsion from areas otherwise open to persons conducting immigration-court business. These alleged actions involve more than inconvenience and would plausibly deter a

reasonable journalist, minister, court watcher, volunteer, or accompanier from continuing the protected activity.

The complaint also contains sufficient factual allegations of causation. Several alleged incidents link the adverse response directly and immediately to the protected activity that preceded it.

Father Arias alleges that officials "explicitly ordered" him not to speak with persons whom he was serving while he was engaged in pastoral ministry and accompaniment. Dkt. No. 40, ¶¶ 28–30. He further alleges that officials removed him from courtrooms, waiting areas, hallways, and the building while he was attempting to provide religious counsel and support. *Id.* These allegations plausibly connect eviction from the premises – the adverse action – to the exercise of his ministry. He alleges that officials prevented him from practicing his faith by offering requested comfort and religious succor to persons awaiting immigration proceedings.

The constitutional importance of that alleged activity warrants emphasis. The Supreme Court has made clear that religious exercise does not lose constitutional protection merely because the Government invokes weighty administrative or public interests. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020) (per curiam) ("Even in a pandemic, the Constitution cannot be put away and forgotten.").

Phillips alleges an equally direct causal link. After a respondent expressed concern about obtaining legal representation, Phillips accompanied her into a waiting area, spoke quietly with her in Spanish, and wrote down the name and address of St. Peter's Church and its service times. Dkt. No. 40, ¶ 68. A court clerk allegedly observed the interaction and immediately told Phillips, "After this, you're done." *Id.*, ¶ 69. When Phillips explained that she had provided only church

- 68 -

information, the clerk allegedly responded, "Yeah, whatever. After this, you're done," and prevented her from returning to the courtroom.  *Id.*

McCallum alleges a comparable connection between her protected activity and the restriction imposed.  She alleges that security personnel stopped her from distributing written information concerning immigrants' legal rights, characterized the activity as prohibited "solicitation," and told her that the prohibition reflected a "new policy."  *Id.*, ¶¶ 90–92.  Kelly likewise alleges that brief conversations with respondents and the provision of informational materials resulted in threats of removal and exclusion.  *Id.*, ¶¶ 38–44.

Taken together, the allegations cross the line from possible to plausible.  Plaintiffs identify protected activity, materially adverse responses, and words, timing, and circumstances supporting an inference that the responses were prompted by the protected activity.  Whether defendants instead acted because of actual congestion, disruption, security concerns, or neutral forum-management rules presents a factual issue that cannot be resolved against plaintiffs on a motion to dismiss.

Defendants' motion is therefore DENIED insofar as Father Arias, Kelly, McCallum, and Phillips assert that the remaining defendants retaliated against them for protected observation, communication, accompaniment, provision of noncommercial information, or religious expression.

### C. Preliminary Injunction

1. Preliminary Injunction Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."  *Univ.*

*of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  Because preliminary relief is issued before final adjudication, the movant bears a substantial burden.  A plaintiff seeking a preliminary injunction must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.  The threatened harm must be likely, not merely possible, and relief remains a matter of equitable discretion even when the plaintiff is likely to succeed. *Id.* at 22, 32.

Because plaintiffs seek to restrain governmental action taken pursuant to statutory and regulatory authority, they must demonstrate a likelihood of success on the merits.  *See Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006); *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).

The injunction that would be entered here is prohibitory.  A prohibitory injunction preserves "the last actual, peaceable uncontested status which preceded the pending controversy," while a mandatory injunction alters that status by commanding materially new conduct. *N. Am. Soccer League*, 883 F.3d at 36–37.  Before the alleged change in practice beginning in June 2025, the governing regulations provided – and plaintiffs' declarations state that the courts operated on the understanding – that ordinary removal hearings were presumptively open to public observers unless lawfully closed. *See* 8 C.F.R. §§ 1003.27, 1240.10(b); Dkt. No. 37, ¶¶ 1–3; Dkt. No. 41, ¶¶ 5–6.  Therefore, the injunction sought by plaintiffs simply prohibits defendants from excluding the public from non-closed hearings without a lawful basis, thereby preserves the status quo established by the regulations and the prior practice described in the record.  The heightened standard applicable to mandatory injunctions therefore does not apply. *See New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).

The preliminary-injunction inquiry is conducted on a provisional evidentiary record. The Supreme Court has recognized that preliminary relief is often decided through "procedures that are less formal and evidence that is less complete than in a trial on the merits." *Camenisch*, 451 U.S. at 395. Accordingly, the Court may consider declarations, affidavits, and hearsay evidence in determining whether preliminary relief is warranted. *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010). *Mullins* holds that "hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction" and that, "The admissibility of hearsay under the Federal Rules of Evidence goes to weight, not preclusion, at the preliminary injunction stage." *Id.* The Court therefore considers the parties' declarations and gives each statement the weight warranted by its specificity, source, and indicia of reliability.

Because plaintiffs seek prospective preliminary relief, they must also establish standing to seek such relief. Plaintiffs must show a real and immediate threat of future injury that is fairly traceable to defendants and likely to be redressed by the requested order. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101–05 (1983); *Shain v. Ellison*, 356 F.3d 211, 215–16 (2d Cir. 2004). At this stage, plaintiffs may not rely on allegations alone; they must support standing with evidence commensurate with evidence required at the summary-judgment stage. *See Murthy v. Missouri*, 603 U.S. 43, 58 (2024); *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 119 (2d Cir. 2025).

Where plaintiffs allege ongoing violations of First Amendment rights, irreparable harm follows from the threatened loss of those rights. "It is well settled that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mastrovincenzo*, 435 F.3d at 89 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also New Hope Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 181 (2d Cir. 2020). When the Government is a

party, the balance-of-equities and public-interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

2.  Plaintiffs Have Standing on the Preliminary-Injunction Record to Seek Relief

As discussed, the preliminary-injunction standing inquiry is narrower and more demanding than the facial standing inquiry under Rule 12(b)(1). *See Do No Harm*, 126 F.4th at 119 ("When a preliminary injunction is sought, a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment." (citation and alterations omitted)). Plaintiffs may not rely on the complaint alone; they must make a record-based showing that they are likely to suffer future injury fairly traceable to defendants and likely to be redressed by the particular preliminary relief they seek. *Id.*

All five named plaintiffs have made the required showing as to access to ordinary, non-closed immigration court hearings at 26 Federal Plaza and 290 Broadway – that is, hearings that have not been lawfully closed or subjected to an attendance limitation under the governing regulations. Father Arias, Kelly, McCallum, and Phillips have also made the required showing as to categorical restrictions on quiet, consensual, noncommercial communication and accompaniment in EOIR-controlled public waiting areas.

Father Arias has attended immigration court multiple times each week for nearly twenty years as part of a continuing pastoral ministry. Dkt. No. 34, ¶¶ 1–2. He describes repeated exclusion from courtrooms and repeated orders not to speak with persons requesting his assistance. *Id.*, ¶¶ 4–5. Most important for standing, he states that he continues the ministry because of his religious obligation and faces the prospect of renewed exclusion each time he returns. *Id.*, ¶ 7. His religious commitment is relevant here because it makes his future presence at the same facilities concrete and predictable.

Father Arias further states that he has repeatedly been prevented from performing that ministry.  On multiple occasions, he has been ordered not to speak with people who requested his help, even in public areas; forced to leave courtrooms, hallways, and the building without an explanation or identified legal justification; blocked from courtroom doors dozens of times; and removed from proceedings on numerous occasions.  *Id.*, ¶ 4.  According to Father Arias, these restrictions have prevented him from carrying out his ministry "precisely at the moments when it is most needed" and have left the persons who rely on him for pastoral guidance and support alone in an intimidating system.  *Id.*, ¶ 5.

His future injury is not speculative.  Father Arias continues to attend immigration court because his faith requires him to do so.  He states that, despite the challenged restrictions, "I continue this work," and that each time he enters the courthouse he faces "the real possibility of being excluded again, silenced, or expelled simply for fulfilling my religious duty."  *Id.*, ¶ 7.  The combination of his nearly twenty-year practice, his multiple weekly visits, his repeated personal exclusions, and the continuing religious obligation that requires his return establishes a real and immediate threat of recurrence.

Dr. Phillips makes a similar showing.  She is a psychologist whose work requires firsthand understanding of immigration court and who also describes herself as "a person of faith."  Dkt. No. 36, ¶ 1.  She states that part of her "religious and professional commitment is to be present with people in moments of fear and uncertainty" and that she volunteers to accompany individuals to court and offer support before and after their hearings.  *Id.*

Phillips describes a specific occasion on which she attempted to observe a hearing after being told that the gallery would open.  When she returned at the appointed time, she was told that observers were not permitted and was ordered from the waiting room.  *Id.*, ¶ 3.  After she was later

admitted, she quietly spoke with a respondent and gave her information about a church; she was then told that she could not return. *Id.* When she attempted to observe another legally open hearing, she was ordered to leave despite available empty seats. *Id.*, ¶ 4. She states that these incidents are not isolated: during frequent visits since June 2025, she has encountered substantially similar conduct "in almost every instance," has repeatedly been ordered from waiting rooms, hallways, and courtrooms, and has been told that she may not speak with individuals even in public areas and may do so only outside the building. *Id.*, ¶ 5.

Phillips also makes clear that she intends to continue the activities that exposed her to the challenged restrictions. She states that the restrictions interfere directly with her work as a psychologist, her commitments as a volunteer, and her "obligations as a person of faith"; that "[e]ach time I attempt to return, I face the same barriers"; and that the restrictions have made it nearly impossible to fulfill her "professional and religious responsibilities." *Id.*, ¶¶ 7–8. These sworn statements establish a likely future injury both to her ability to observe open hearings and to her quiet, consensual provision of support and religious information.

Kelly's declarations independently establish a recurring access and communication injury. He has attended immigration court approximately once per week since March 2025 as a public observer, attorney, organizer, and volunteer accompanier. Dkt. No. 56, ¶¶ 4–6. He intends to continue attending proceedings at both 26 Federal Plaza and 290 Broadway. *Id.* In his first declaration, Kelly states that, on the "substantial majority" of his visits since June 2025, he personally experienced or directly observed members of the public being denied entry without explanation, courtroom doors locked despite apparently available seating, individuals prevented from speaking with respondents in waiting areas and hallways, and persons threatened with removal for sharing informational materials or engaging in brief, consensual conversations. Dkt.

No. 41, ¶¶ 7–10.  He states that these practices are continuing and likely to recur each time he attends immigration court.  *Id.*, ¶¶ 21, 33.

Kelly also offers evidence that an exclusion occurred after the commencement of this action and after EOIR's initial reminder to personnel concerning its public-access rules.  On April 17, 2026 – one month after the complaint was filed and after EOIR's March 16 reminder email – Kelly attempted to observe proceedings at 26 Federal Plaza.  After being directed between floors in search of an accessible courtroom, he was told, "NO, NO OBSERVERS!"  Dkt. No. 56, ¶ 34.  According to his declaration, no one identified a closure order, capacity limitation, confidentiality concern, disruption, or security justification for the exclusion.  *Id.*, ¶¶ 31–36.  The incident occurred only nine days before plaintiffs filed their preliminary-injunction motion and constitutes recent, firsthand evidence that a categorical exclusion recurred notwithstanding EOIR's initial remedial effort.

McCallum likewise establishes both forms of injury.  She attends immigration court approximately once per week as a volunteer observer and accompanier to observe proceedings, provide information, and ensure that individuals do not face the process alone.  Dkt. No. 37, ¶ 1.  Before June 2025, she states, observers could enter the courts, wait in public areas, speak quietly with individuals, and attend hearings when space allowed.  *Id.*, ¶ 2.  Since then, she has repeatedly been denied access to waiting rooms, prevented from standing in hallways, separated from persons she was assisting, and barred from reentering courtrooms.  *Id.*, ¶¶ 3–5.  She estimates that she has been turned away from courtroom doors between fifteen and twenty-five times and ordered from courtrooms on numerous occasions, without an explanation, court order, or identified capacity limitation.  *Id.*, ¶ 6.  She has also been prohibited from distributing written materials explaining legal rights and was told that doing so violated a "new policy."  *Id.*, ¶ 7.  McCallum states that the

conduct is not isolated, that she has observed substantially similar restrictions on "virtually every visit." *Id.*, ¶ 10.

Nathan's declaration establishes standing to seek access relief, although it does not establish the same recurring waiting-area communication injury. Nathan has worked as a journalist for more than forty-five years and has covered immigration and the immigration courts since the late 1980s. Dkt. No. 35, ¶ 1. Her work depends on observing proceedings directly, taking notes, and reporting accurately on what occurs inside the courts. *Id.* She describes being denied entry to multiple courtrooms on November 14, 2025, despite visible empty seats and the absence of posted closure orders; when she questioned one exclusion, she was told that "things have changed." *Id.*, ¶¶ 4–5. On another occasion, she was denied entry in person, instructed to attend in person after attempting to join remotely, briefly admitted, and then expelled during the proceeding for unspecified reasons. *Id.*, ¶ 6.

Nathan states that these incidents reflect a consistent pattern that she has experienced or witnessed on "virtually every visit" since June 2025. *Id.*, ¶ 7. She has abandoned specific reporting efforts because access became so unreliable, has suffered concrete professional harm, and would continue covering the courts if she could, but expects to be excluded based on her prior experiences. *Id.*, ¶¶ 7–9. This evidence establishes a real and immediate threat to her ability to observe and gather firsthand information from ordinary, non-closed hearings.

The nonparty declarations corroborate the named plaintiffs' accounts. Glacel states that she attends immigration court approximately twice per week at both facilities and describes access and communication restrictions as arbitrary and inconsistent, including limits on observers despite apparently available seating and repeated commands to stop speaking with respondents or gathering information. Dkt. No. 54, ¶¶ 2, 6–11. Schulman, another frequent observer, describes

calm, voluntary, noncommercial conversations with respondents and states that personnel have repeatedly instructed observers that they could not speak with anyone in waiting rooms, share information, provide flyers, use phones, or remain in particular waiting areas or hallways. Dkt. No. 57, ¶¶ 2–9. These declarations reinforce the conclusion that the injuries described by Arias, Kelly, McCallum, Nathan, and Phillips are not idiosyncratic events.

Kelly also reports that another observer told him that a security guard was again preventing entry and that the "old thing" was recurring. Dkt. No. 56, ¶ 46. *Mullins* permits the Court to consider that hearsay statement at the preliminary-injunction stage. 626 F.3d at 52. Because Kelly did not personally observe that incident and supplies limited detail, the Court gives it only limited corroborative weight and does not rely on it independently. The firsthand declarations are sufficient without it.

*Advocates for Human Rights v. Blanche*, 2026 WL 1162794 (D.D.C. Apr. 29, 2026), a nonbinding district-court decision, does not warrant denial of preliminary relief here. As discussed earlier in this Opinion, *see supra* Section II(A)(2), this case also concerned claimed restrictions on public observation of immigration court proceedings. An organizational plaintiff that operated a volunteer observation program primarily at the Fort Snelling Immigration Court sought a universal preliminary injunction requiring immigration judges, before closing a hearing, to state the basis for closure on the record and afford the public and press an opportunity to object. *Id.* at *1–4. The court concluded that the organization had not made a clear evidentiary showing that additional unlawful closures were imminent. *Id.* at *8–13. The record and requested relief here differ in several material respects.

*First,* plaintiffs here do not seek nationwide relief. They have confined their request to two identified immigration courts that they regularly visit and to the injuries established by the named

- 77 -

plaintiffs.  They seek access only to ordinary hearings that have not been lawfully closed or subjected to an attendance limitation under the governing regulations.  They also seek narrow relief permitting Father Arias, Kelly, McCallum, and Phillips to engage in quiet, consensual, noncommercial communication and accompaniment in EOIR-controlled public waiting areas, subject to legitimate security, capacity, confidentiality, noise, congestion, decorum, and operational requirements.  *Advocates* did not involve a comparable request for speech or accompaniment relief.

*Second,* plaintiffs' evidence is materially stronger as to both the recency and frequency of the challenged conduct.  In *Advocates*, the organization identified roughly twelve days involving purported courtroom closures over nearly a year, but no sufficiently supported unlawful closure during the three months preceding its motion and no identified unlawful closure in 2026.  *Id.* at *8–10.  The organization also acknowledged that the restrictions had "temporarily abated somewhat" after its January 9, 2026 letter.  *Id.* at *10.

Plaintiff AHR's submissions were not geographically limited to Minnesota.  It submitted declarations describing restrictions in California, New York, and Louisiana, and its counsel also referred at argument to practices in Virginia.  *Id.* at *3–4, 10.  But AHR acknowledged that it suffered no injury from practices in those other states, and the court found no evidence of a national policy or other connection making those practices predictive of imminent harm at Fort Snelling.  *Id.* at 10.  The relevant standing evidence therefore remained the evidence concerning AHR's volunteers at Fort Snelling.

Here, by contrast, Kelly describes an unequivocal in-person denial of access on April 17, 2026 – after the commencement of this action and after EOIR circulated the first reminder concerning its public-access rules.  Dkt. No. 56, ¶¶ 31–36.  Plaintiffs also provide the comparative

evidence of frequency that was missing in *Advocates*. The organization there did not identify what proportion of its volunteers' attempted observations resulted in exclusion, leaving the court unable to determine whether the cited incidents reflected a meaningful likelihood of future injury or isolated events among more than 47,000 hearings. *Advocates*, 2026 WL 1162794, at *9. Here, Kelly states that the restrictions occurred on the "substantial majority" of his approximately weekly visits; McCallum states that she encountered substantially similar conduct on "virtually every visit"; Nathan states the same regarding her frequent reporting visits; and Phillips states that she encountered substantially similar barriers "in almost every instance." Dkt. No. 41, ¶ 7; Dkt. No. 37, ¶ 10; Dkt. No. 35, ¶ 7; Dkt. No. 36, ¶ 5.

*Third,* the future exposure here rests on the sworn commitments of five individual plaintiffs, not on an inference about whether unidentified organizational volunteers will encounter another closure. Father Arias's ministry requires his continued presence multiple times each week; Phillips's religious, professional, and volunteer obligations call her back to the same courts; Kelly and McCallum continue their regular observation and accompaniment; and Nathan would resume regular reporting but for the challenged restrictions. Their future encounters with the same facilities are therefore concrete and predictable. Arias's and Phillips's religious obligations are especially probative of recurrence because those continuing obligations make their future return to the same facilities particularly concrete. Their presence follows from an ongoing commitment to accompany persons facing fear, uncertainty, and possible removal, rather than from an abstract desire to observe governmental activity.

*Fourth,* the incidents supporting relief here are more consistent in character, and the relief sought is more closely matched to them. In *Advocates*, the evidence included technical difficulties with remote access, possible confidentiality-based closures, restrictions on entering or leaving

- 79 -

while hearings were underway, inaccurate signage, and possible misstatements by individual personnel. 2026 WL 1162794, at *8–13. Some of those restrictions may have reflected lawful courtroom-management or confidentiality concerns; several incidents were not shown to constitute complete closures; and AHR did not develop an argument that many of the limitations were unlawful. *Id.* at *11–12.

Here, the access claim rests on repeated in-person exclusion from ordinary hearings through locked doors, categorical no-observer instructions, refusals of entry despite apparently available seating, and denials for which no closure order, capacity determination, confidentiality concern, disruption, or security justification was identified. The communication claim rests on repeated restrictions directed at quiet, consensual, noncommercial interaction with willing respondents, including pastoral counseling, accompaniment, emotional support, and the individualized provision of court-related or religious information.

*Finally, Advocates* treated future harm as speculative in part because injury depended on an immigration judge's first exercising discretion to close a future hearing and then exercising that discretion unlawfully. *Id.* at *12–13. The court emphasized that the requested prediction depended on future, case-specific discretionary decisions by multiple immigration judges, any one of which might be lawful. *Id.* The record here does not require the Court to predict abstractly how lawful closure discretion will be exercised. The named plaintiffs describe recurring categorical or unexplained exclusions and communication restrictions already imposed without an identified invocation of lawful closure, capacity, security, congestion, noise, or disruption authority. The proposed injunction preserves those lawful grounds and prohibits only the specific forms of exclusion and communication restriction for which no such ground exists.

The evidence therefore establishes a substantial likelihood that all five named plaintiffs will again encounter denial of access to ordinary, non-closed hearings absent preliminary relief. It further establishes a substantial likelihood that Father Arias, Kelly, McCallum, and Phillips will again encounter categorical restrictions on quiet, consensual communication or accompaniment in EOIR-controlled public waiting areas.

These injuries are traceable to the defendants against whom relief is sought and redressable by a properly limited order. DOJ and Acting Attorney General Blanche are responsible for EOIR, whose personnel administer attendance in immigration courtrooms and control conduct within EOIR tenant space, including associated waiting areas. Dkt. No. 46, ¶¶ 4–8; Dkt. No. 47, ¶¶ 7–8. Relief against DOJ and Blanche would redress both the courtroom-access injury and the communication-and-accompaniment injury in EOIR-controlled waiting areas. DHS, through FPS and contract PSOs, administers federal-building entry, screening, hallway security, and access-control functions; GSA manages the buildings. Dkt. No. 47, ¶¶ 4–9; Dkt. No. 48, ¶¶ 4–8; Dkt. No. 49, ¶¶ 4–6. Relief against DHS, Secretary Mullin, GSA, and Administrator Forst would redress the risk that building-entry or access-control practices prevent the named plaintiffs from reaching ordinary, non-closed hearings. The communication-and-accompaniment relief rests on DOJ's and EOIR's authority over EOIR-controlled waiting areas, not on DHS's or GSA's general building-management functions.

All five named plaintiffs have therefore established preliminary-injunction standing to seek prohibitory relief preserving access to ordinary, non-closed immigration court hearings. Father Arias, Kelly, McCallum, and Phillips have additionally established standing to seek narrow relief from categorical restrictions on quiet, consensual, noncommercial communication and

accompaniment in EOIR-controlled public waiting areas, subject to legitimate security, capacity, congestion, noise, decorum, and operational requirements.

### 3. Likelihood of Success on the Merits

Subject to the preliminary-injunction standing limitations discussed above, plaintiffs have shown a likelihood of success on two First Amendment theories: (1) access to ordinary, non-closed immigration court hearings, and (2) protection against categorical restrictions on quiet, consensual communication and accompaniment in EOIR-controlled public waiting areas.

### a. Access to Ordinary, Non-Closed Hearings

For the reasons discussed in Section II(B)(2), ordinary, non-closed immigration court hearings fall within the qualified First Amendment right of public access. The experience and logic inquiries both support that conclusion. Removal hearings are trial-type adjudications; the governing regulations make them presumptively open; and public observation promotes fairness, regularity, accountability, and public confidence.

Defendants' regulations and public guidance confirm that immigration hearings are generally open, that members of the public need not give advance notice before visiting, that observers need not check in with court personnel before entering a courtroom, and that access may be limited only when a lawful exception applies. Dkt. No. 46-2 at 1–2.

The record summarized in Section II(C)(2) shows that those proceedings have nevertheless, at times, been rendered inaccessible because of locked courtroom doors, categorical no-observer instructions, exclusion despite apparently available seating, and denials of entry for which no closure order, capacity limitation, confidentiality concern, disruption, or security justification was identified. *See* Dkt. No. 34, ¶¶ 2, 4–7; Dkt. No. 35, ¶¶ 3–9; Dkt. No. 36, ¶¶ 3–5; Dkt. No. 37, ¶¶ 3–7, 10; Dkt. No. 41, ¶¶ 7–10.

The recent April 17 incident is particularly probative.  After EOIR circulated its March 16 public-access guidance – and after this action was filed on March 17 – Kelly attempted to observe proceedings at 26 Federal Plaza and was told, "NO, NO OBSERVERS!"  Dkt. No. 56, ¶ 34.  According to his declaration, no one identified a closure order, capacity limitation, confidentiality concern, disruption, or security justification for the exclusion.  *Id.*, ¶¶ 31–36.  This recent, firsthand account supports the conclusion that categorical exclusion recurred notwithstanding EOIR's initial remedial effort.

Defendants identify legitimate reasons why access to a particular hearing may be limited, including lawful closure, confidentiality, physical capacity, disruption, and security.  Their submissions, however, describe the generally applicable rules and the circumstances in which exclusion may be lawful.  They do not show that the specific exclusions described by plaintiffs rested on a lawful closure order, an actual capacity limitation, a confidentiality requirement, a disruption determination, or a genuine security concern.  The existence of authority to close or limit access to a hearing does not establish that any particular exclusion was lawfully imposed.  On the present record, the challenged exclusions were not accompanied by an identified order or other particularized justification under the governing regulations.  All five named plaintiffs have therefore shown a likelihood of success on the narrow access theory.

   b.   Quiet, Consensual Communication and Accompaniment

Father Arias, Kelly, McCallum, and Phillips have also shown a likelihood of success on a separate theory concerning communication and accompaniment in EOIR-controlled public waiting areas.

Those waiting areas are nonpublic fora.  The Government may preserve them for their intended purposes and impose reasonable, viewpoint-neutral rules addressing congestion, noise,

disruption, safety, and orderly movement.  *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806, 808–09 (1985).  But even a facially reasonable restriction is invalid if it is "in reality a facade for viewpoint-based discrimination."  *Id.* at 811.

Assistant Chief Immigration Judge Taylor states that the public waiting areas are generally accessible to observers and visitors, subject to capacity and safety limits.  Dkt. No. 46, ¶ 8.  She further states that EOIR "does not prohibit members of the public from speaking with respondents in these waiting areas or the distribution of informational materials in these areas," and that she knows of no instruction directing court staff to impose such a prohibition.  *Id.*

But plaintiffs have sworn that they were prohibited from speaking with respondents and from distributing materials pursuant to some "new policy."  Kelly describes prohibitions on brief conversations and informational exchanges; McCallum describes being separated from persons she sought to assist and prohibited from providing written legal-rights information; and Phillips states that she was told she could not return after quietly speaking with a respondent and giving her information about a church.  Dkt. No. 41, ¶¶ 7, 10; Dkt. No. 37, ¶¶ 5, 7; Dkt. No. 36, ¶¶ 3, 5.  Taylor's declaration establishes EOIR's stated policy, but it does not refute plaintiffs' firsthand accounts or provide an incident-specific operational or security justification for the restrictions they describe.

Father Arias's evidence illustrates the practical effect of the alleged communication restriction.  He is a Lutheran pastor who describes accompaniment of immigrants as "a calling from God to walk alongside His people and care for them."  Dkt. No. 34, ¶ 1.  His ministry requires him to appear with persons summoned before immigration authorities, "to offer comfort," help them understand what is occurring, and ensure that they do not face the process alone.  *Id.*  He states that officials have repeatedly ordered him not to speak with people requesting his pastoral

assistance, including in public areas, thereby preventing him from carrying out his ministry "precisely at the moments when it is most needed." *Id.*, ¶¶ 4–5.

Phillips describes a related injury. After quietly speaking with a respondent and giving her information about a church, Phillips was told that she could not return to the courtroom. Dkt. No. 36, ¶ 3. She further states that personnel have repeatedly told her that she may not speak with persons in public areas and must instead communicate with them outside the building. *Id.*, ¶ 5. Phillips identifies accompaniment and support as part of both her professional work and her obligations "as a person of faith." *Id.*, ¶¶ 1, 7–8.

Offering emotional support, helping respondents navigate immigration court, providing information about legal rights and available community resources, explaining the observation or accompaniment process, and reassuring persons facing a frightening proceeding are all subjects on which EOIR permits at least some quiet, individualized communication. Plaintiffs approach those subjects from different perspectives. Father Arias and Phillips sometimes speak from a religious perspective; Kelly and McCallum provide legal-rights, civic, and accompaniment-related information; and other observers or volunteers may offer secular emotional or community support. The Government may impose reasonable, viewpoint-neutral restrictions on the time, place, and manner of those communications. But if it permits quiet communication on those subjects, it may not selectively suppress otherwise comparable speech because it expresses a religious, legal-rights, immigrants'-rights, or other disfavored perspective. As *Rosenberger* explains, it is the exclusion of the "prohibited perspective, not the general subject matter," that constitutes viewpoint discrimination. 515 U.S. at 831.

On the present record, a demonstrated blanket prohibition on quiet, consensual, noncommercial communication and accompaniment is neither justified by the purposes of the

waiting areas nor consistent with EOIR's stated policy. Father Arias, Kelly, McCallum, and Phillips have therefore shown a likelihood of success on their First Amendment Speech Clause claim that defendants may not impose an unreasonable categorical prohibition on quiet, consensual, noncommercial communication and accompaniment in EOIR-controlled public waiting areas or selectively restrict such communication because of the viewpoint expressed.[2]

### 4. Irreparable Harm

The loss of First Amendment freedoms, "for even minimal periods of time," constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The record establishes two related forms of irreparable harm: (1) denial of access to ordinary, non-closed immigration court hearings and, as to Father Arias, Kelly, McCallum, and Phillips, (2) categorical interference with quiet, consensual communication and accompaniment in EOIR-controlled public waiting areas.

The access injury cannot be remedied after the fact. A missed public hearing cannot later be observed as it occurred. A journalist cannot fully recover the firsthand information she was prevented from gathering. A court observer cannot later witness the demeanor, tone, interpretation, confusion, courtroom atmosphere, and official conduct that were perceptible only while the hearing was underway. Nor can money damages restore the public oversight that was absent when the Government exercised adjudicatory power. All five named plaintiffs have therefore shown irreparable harm from the likely denial of access to ordinary, non-closed immigration court hearings.

---

[2] Plaintiffs have not pleaded or separately briefed a claim under the Free Exercise Clause. The Court therefore does not decide whether the alleged restrictions independently violate that Clause. *See Margolin v. Nat'l Ass'n of Immigr. Judges*, 146 S. Ct. 1285, 1288–89 (2026) (reiterating that courts rely on the parties to "frame the issues for decision" and ordinarily decide "only the questions presented" (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020))).

The speech and association injury is equally time-sensitive. When an observer or accompanier is prohibited, without an actual security justification, from engaging in quiet, consensual communication with a respondent, the lost interaction cannot be recreated after the hearing has concluded or the respondent's moment of need has passed. Information concerning the proceeding may be useful only before the respondent enters the courtroom. Emotional support may be most important while the respondent is waiting for the case to be called. An opportunity to accompany a frightened person through an unfamiliar adjudicatory process, once denied, cannot later be restored by damages.

The injury is especially acute where the prohibited communication is religious. Father Arias's ministry requires him to provide pastoral comfort and support to immigrants at precisely the time they confront fear, uncertainty, and possible removal. Requested prayer, pastoral counseling, and religious accompaniment offered at that moment likely cannot meaningfully be postponed until after the proceeding or relocated outside the building without changing the nature and value of the ministry itself. The religious character of the expression bears directly on the nature of the harm. In an analogous case arising under the Religious Freedom Restoration Act, the Second Circuit recognized that "the denial of the plaintiff's right to the free exercise of his religious beliefs is a harm that cannot be adequately compensated monetarily." *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). The Supreme Court likewise has treated even brief deprivations of religious exercise as irreparable. *See Tandon*, 593 U.S. at 64; *Roman Cath. Diocese of Brooklyn*, 592 U.S. at 19. These decisions reinforce the conclusion that the loss of a time-sensitive opportunity to engage in protected religious expression cannot be repaired through a later monetary award.

Father Arias, Kelly, McCallum, and Phillips have therefore demonstrated irreparable harm from the likely recurrence of categorical restrictions on quiet, consensual, noncommercial communication and accompaniment in EOIR-controlled public waiting areas.

5.    Balance of Equities and Public Interest

Because defendants are federal agencies and federal officers sued in their official capacities, the balance of equities and the public interest merge. *See Nken*, 556 U.S. at 435.  Both favor narrow relief.

The public has a substantial interest in the lawful and orderly operation of immigration courts, the safety of respondents, court personnel, law-enforcement officers, and visitors, and the protection of confidential information.  *See Legal Aid Soc. v. Crosson*, 784 F. Supp. 1127, 1131 (S.D.N.Y. 1992) ("[T]he governmental interest in safeguarding courthouses is paramount."); *Harriston v. Mead*, 2008 WL 4507608, at *5 (E.D.N.Y. Sept. 30, 2008) ("[W]hile [the openness of our courts] should be cherished, it must be balanced by reasonable precautions.").   The injunction the Court will enter, by separate order, will preserve lawful closures, capacity limits, courtroom-decorum rules, recording restrictions, confidentiality protections, reasonable crowd-control measures, ordinary building-security screening, and lawful arrest and detention operations.

But the public also has a profound interest in the transparent operation of adjudicatory proceedings that the Government's own rules make presumptively open.  *See Richmond Newspapers*, 448 U.S. at 572–73; *New York C.L. Union*, 684 F.3d at 303–05.  No legitimate public interest is served by making ordinary, non-closed hearings – hearings that by EOIR rule are presumptively accessible to the public – inaccessible through locked doors, categorical no-observer rules, unexplained exclusions, or access practices that eliminate public observation in practice.  *See Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020) ("No public

interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal.").

The equities likewise favor the narrow relief authorized by the Court. Plaintiffs face the loss of First Amendment access to proceedings that cannot later be remedied. Father Arias, Kelly, McCallum, and Phillips also face the loss of time-sensitive speech, accompaniment, and, for Arias and Phillips, religious expression that cannot be recreated after the respondent's hearing has concluded or the moment of need has passed. Defendants, by contrast, remain free to close or limit attendance at particular hearings when authorized to do so by controlling regulation; to enforce confidentiality rules; to impose reasonable capacity, safety, and decorum limits; to control access to nonpublic spaces; to prohibit recording where recording is lawfully restricted; and to conduct lawful security, arrest, detention, and transport operations.

6. Scope of Preliminary Relief

Plaintiffs' motion for a preliminary injunction is GRANTED IN PART and DENIED IN PART.

The motion is GRANTED insofar as plaintiffs seek conduct-based relief restraining: (1) the categorical or otherwise unjustified exclusion of observers from ordinary, non-closed immigration court hearings at 26 Federal Plaza and 290 Broadway; (2) building-entry or access-control practices by DHS, FPS, or GSA that prevent observers from reaching such hearings without a lawful justification; and (3) categorical or unreasonable restrictions by DOJ or EOIR on quiet, consensual, noncommercial communication and accompaniment in EOIR-controlled public waiting areas.

The motion is DENIED insofar as plaintiffs seek preliminary relief against ICE or Venturella. The present record does not establish that ICE administers courtroom access, EOIR

waiting-room rules, federal-building security, or the communication restrictions for which preliminary relief has been shown to be warranted.  The motion is also DENIED insofar as plaintiffs seek relief restraining lawful hearing closures, confidentiality protections, capacity restrictions, neutral courtroom-order or building-security rules, lawful restrictions on materials distribution, or lawful arrest, detention, transport, removal, or related enforcement operations.

The Court has determined the categories of conduct for which preliminary relief is warranted but has not yet settled the precise reach of the injunction.  These matters are reserved for the separate order described in Section III.

### D.  Class Certification

Plaintiffs move to certify a class consisting of:

> All persons engaging in protected activity within immigration court facilities and functionally integrated common areas and exterior spaces subject to Defendants' enforcement practices in New York City.

Dkt. No. 33, ¶ 1.  The motion is premature and is DENIED WITHOUT PREJUDICE to renewal on a more developed record.

The proposed class is exceptionally broad.  It is not limited to the two immigration courts meaningfully addressed in the present record; it encompasses courtrooms, waiting areas, hallways, exterior spaces, and other locations controlled by different agencies and governed by different legal standards; and it turns on the undefined phrase "protected activity."  It also combines distinct theories involving access to hearings, speech and association, accompaniment, distribution of informational materials, retaliation, building-security practices, and law-enforcement operations. The proposed definition does not permit the Court to determine with sufficient precision who belongs to the class, which conduct is challenged on a classwide basis, or what common injunction would be appropriate.

Although a court is not invariably bound by the class definition proposed in the complaint and may certify an appropriately narrowed class, *see Robidoux v. Celani*, 987 F.2d 931, 937 (2d Cir. 1993), the Court will not formulate and certify a materially different class on plaintiffs' behalf. Rule 23 requires plaintiffs to define the proposed class and establish each prerequisite to certification through evidence sufficient to permit the required "rigorous analysis." *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011).

The present record is particularly inadequate as to numerosity. Plaintiffs cite evidence that EOIR conducted 212,995 hearings at Federal Plaza and 80,026 hearings at Broadway between May 1, 2025 and April 30, 2026. Dkt. No. 51, ¶ 48. But the number of hearings is not the number of proposed class members. The record identifies five named plaintiffs and several nonparty declarants who attend or seek to attend immigration court, but it does not establish how many distinct persons fall within any properly defined class or why joinder of those persons would be impracticable.

Rule 23(a)(1) does not require an exact census, but it does require evidence from which the Court may reasonably estimate the size of the proposed class and determine that joinder would be impracticable. *See Robidoux*, 987 F.2d at 935–36. In this Circuit, numerosity generally is presumed for a class larger than forty members. *See Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014). But the inquiry also turns on other relevant circumstances, including judicial economy, the geographic dispersion of class members, their financial resources, their ability to bring individual suits, and whether prospective relief is sought. *See Robidoux*, 987 F.2d at 936. The present motion does not supply that evidence.

The record is also insufficiently developed concerning the precise common question and the existence of a classwide policy or practice. Any renewed motion must distinguish categorical

or generally applicable restrictions from lawful, case-specific decisions involving closure, capacity, confidentiality, disruption, or security.  It must identify the particular conduct alleged to affect the proposed class in common, the defendant or defendants responsible for that conduct, and the question capable of generating a common answer "apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350.

A renewed motion must also establish typicality and adequacy as to each proposed representative. It must identify the persons proposed to represent the class and submit evidence showing that each proposed representative:

1. is a member of the class as defined;
2. possesses Article III standing to seek the particular classwide relief requested;
3. has personally encountered, or faces a real and immediate risk of encountering, the classwide practice being challenged;
4. asserts a claim arising from the same course of conduct and legal theory as the claims of absent members;
5. understands and is willing to undertake the responsibilities of class representation; and
6. has no interest antagonistic to the proposed class.

The proposed appointment of Stephen Kelly as both a class representative and class counsel presents an additional problem.  Rule 23 assigns separate obligations to these roles.  A class representative must fairly and adequately protect the interests of absent members under Rule 23(a)(4), while class counsel must independently "fairly and adequately represent the interests of the class" under Rule 23(g)(4).

Moreover, a person proceeding *pro se* may not represent the interests of third parties.  *See Iannaccone v. Law*, 142 F.3d 553, 558 (2d Cir. 1998); *Rodriguez v. Eastman Kodak Co.*, 88 F. App'x 470, 471 (2d Cir. 2004) (summary order) ("[A] pro se class representative cannot adequately represent the interests of other class members.").  A court in this District has accordingly held that "a *pro se* plaintiff may not bring an action in which he will serve as both

class representative and class counsel." *Jaffe v. Capital One Bank*, 2010 WL 691639, at \*10 (S.D.N.Y. Mar. 1, 2010).

Whatever Kelly's qualifications as an attorney, the present motion does not establish that he can simultaneously discharge the distinct fiduciary responsibilities of a named class representative and counsel for absent class members. The Court therefore will not appoint him to both roles on the present record. This conclusion does not call into question Kelly's work investigating and litigating the action. It reflects the distinct responsibilities of the proposed representative and class counsel.

Any renewed motion must propose independent class counsel and provide the information required by Rule 23(g)(1)(A), including counsel's work investigating the claims, experience handling class actions and other complex litigation, knowledge of the applicable law, and resources available to represent the class. The Court must be able to find at the time of certification that appointed counsel will fairly and adequately represent absent class members. *See* Fed. R. Civ. P. 23(c)(1)(B), 23(g).

Finally, any renewed motion seeking certification under Rule 23(b)(2) must demonstrate that the identified defendants have acted or refused to act on grounds generally applicable to the proposed class and that the requested injunctive or declaratory relief would operate indivisibly for the benefit of every class member. *See Wal-Mart*, 564 U.S. at 360. The motion must identify a single, sufficiently specific injunction that could lawfully remedy the alleged classwide injury without requiring individualized determinations as to closure, capacity, confidentiality, security, disruption, forum classification, or the particular defendant responsible for the conduct.

If plaintiffs seek certification of materially different claims – such as access to hearings and restrictions on waiting-room communication – they must explain whether separate classes or

subclasses are required and establish every applicable Rule 23 requirement for each proposed class or subclass.

Plaintiffs' motion for class certification, Dkt. No. 33, is therefore DENIED WITHOUT PREJUDICE on the present record.  Plaintiffs may renew the motion upon a developed evidentiary showing that addresses the deficiencies identified above, but they are not required to do so and may continue to prosecute their individual claims.  Any renewed motion must include plaintiffs' own proposed class definition – or separate definitions for any proposed subclasses – and must demonstrate separately that each proposed class or subclass satisfies every applicable requirement of Rules 23(a) and 23(b).  The Court will not formulate a materially different class definition on plaintiffs' behalf.

The denial of the present class-certification motion does not determine the precise form or permissible scope of the preliminary injunction.  Those issues will be addressed after the parties submit proposed language and briefing concerning the appropriate conduct-based relief.

### III.    Submission of Proposed Preliminary Injunction

For the reasons stated in the Court's preliminary-injunction analysis, plaintiffs' motion for a preliminary injunction, Dkt. No. 32, is GRANTED IN PART and DENIED IN PART.  The Court will enter the preliminary injunction by separate order after receiving proposed language from the parties.  The Court does not intend to draft the injunction in the first instance.

On or before July 2, 2026, plaintiffs must file:

1. a proposed preliminary injunction that conforms strictly to the holdings and limitations set forth in this Opinion; and
2. a memorandum, not to exceed twenty pages, explaining the legal and factual basis for the proposed scope of each provision.

Plaintiffs should frame the proposed injunction in terms of the conduct to be restrained, rather than merely identifying particular persons against whom defendants may not engage in that

conduct.  The Court does not direct plaintiffs to limit their proposed conduct-based relief to the five named plaintiffs solely because the present class-certification motion has been denied without prejudice.  Plaintiffs must, however, explain why the personal, geographic, and operational scope of each proposed provision is authorized and appropriately tailored to the injuries and constitutional violations established in this Opinion.  To the extent plaintiffs seek relief extending beyond what is necessary to protect the named plaintiffs directly, they must identify the legal basis for that relief, including whether they seek provisional classwide relief pending a renewed motion for certification.

The proposed injunction must comply with Federal Rule of Civil Procedure 65(d) by stating its terms specifically and describing in reasonable detail the acts restrained or required.  It must, at a minimum:

1. identify the defendants and other persons to be bound in accordance with Rule 65(d)(2);
2. distinguish among conduct attributable to DOJ and EOIR, the building-security and access-control functions attributable to DHS and FPS, and the building-management functions attributable to GSA;
3. exclude ICE and Venturella from direct relief, except to the extent that persons with actual notice act in active concert or participation with an enjoined party within the meaning of Rule 65(d)(2);
4. define the ordinary, non-closed immigration court hearings to which the access provisions apply;
5. identify with specificity the categorical courtroom-access and waiting-area communication restrictions to be enjoined;
6. preserve lawful hearing closures, attendance limitations, confidentiality protections, courtroom-order measures, building-security requirements, and restrictions responding to actual capacity, congestion, noise, obstruction, disruption, or safety concerns;
7. make clear that the injunction does not restrain lawful arrest, detention, transport, removal, or other legitimate law-enforcement activity; and
8. distinguish quiet, consensual, noncommercial communication and individualized exchanges of information from the distribution of pamphlets, handbills, flyers, or similar materials governed by otherwise lawful and viewpoint-neutral requirements, including 6 C.F.R. § 139.60.

On or before July 9, 2026, defendants may file objections to plaintiffs' proposed injunction and must submit, with any such objections, a complete alternative proposed injunction. Defendants must identify each disputed provision, state the legal or factual basis for the objection, and propose replacement language. Defendants may address whether any proposed provision exceeds the relief authorized by this Opinion or the permissible reach of preliminary equitable relief.

The parties' submissions must concern the form, scope, and administrability of the injunction and its conformity with this Opinion. They may not reargue the Court's underlying merits determinations. No reply may be filed unless requested by the Court.

The Court will thereafter enter a separate order setting forth the final terms of the preliminary injunction. The Court has broad discretion to fashion injunctive relief "to reach an *appropriate* result protective of the interests of both parties." *Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 272 (2d Cir. 2011) (emphasis in original).

### Conclusion

For the foregoing reasons, defendants' motion to dismiss, Dkt. No. 43, is GRANTED IN PART and DENIED IN PART. The claims against ICE and Defendant David J. Venturella are DISMISSED WITHOUT PREJUDICE for lack of Article III standing. Plaintiffs' First Amendment access, speech and association, and retaliation claims survive only to the extent specified in Section II(B). The motion is otherwise GRANTED. Any dismissal for lack of subject-matter jurisdiction is without prejudice.

Plaintiffs are granted leave to file a second amended complaint on or before July 22, 2026, limited to curing: (1) the defendant-specific standing deficiencies concerning ICE and Venturella

identified in Section II(A)(2); and (2) the pleading deficiencies concerning claims arising from unidentified exterior spaces identified in Section II(B)(3).

Plaintiffs' motion for a preliminary injunction, Dkt. No. 32, is GRANTED IN PART and DENIED IN PART for the reasons stated in Section II(C). The precise terms and scope of the preliminary injunction are reserved for a separate order. Plaintiffs must submit their proposed injunction and supporting memorandum by July 2, 2026. Defendants can submit any objections and a complete alternative proposed injunction by July 9, 2026.

Plaintiffs' motion for class certification, Dkt. No. 33, is DENIED WITHOUT PREJUDICE on the present record. Plaintiffs may renew the motion on a developed evidentiary record addressing the deficiencies identified in Section II(D). Any renewed motion must include plaintiffs' proposed class definition – or proposed definitions for any subclasses – and must establish each applicable requirement of Rules 23(a) and 23(b).

The Clerk of Court is respectfully directed to terminate the motions at Docket Numbers 33 and 43. The motion at Docket Number 32 remains pending until the Court enters the separate preliminary-injunction order.

This constitutes the Opinion and Order of the Court. It is a written decision.

Dated: June 22, 2026
    New York, New York

_____
U.S.D.J.