**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FR. FABIÁN ARIAS, et al., | No. 26-cv-2130 (CM) |
| Plaintiffs, | **OMNIBUS MOTION IN SUPPORT OF** PROPOSED PRELIMINARY INJUNCTION |
| -against- | |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al., | |
| Defendants. | |

**PLAINTIFFS' OMNIBUS MOTION IN SUPPORT OF PROPOSED PRELIMINARY INJUNCTION**

**INTRODUCTION**

Plaintiffs respectfully submit this omnibus motion in support of the attached proposed preliminary injunction (the "Proposed PI"). The motion addresses the scope and tailoring issues identified in the Court's June 22, 2026 Opinion, including the personal, geographic, and operational scope of each proposed provision; the basis for including U.S. Immigration and Customs Enforcement ("ICE") and David J. Venturella; the basis for including 201 Varick Street; and the basis for any relief that protects persons beyond the five named Plaintiffs.

The record begins with the named Plaintiffs. Father Fabián Arias, Stephen Kelly, Laura McCallum, Debbie Nathan, and Dr. Zoey Phillips attend, seek to attend, observe, report on, minister in, provide professional support in, or accompany people to New York immigration-court proceedings. Their earlier declarations describe concrete and recurring injuries. The witness statements submitted with this motion corroborate that plaintiff-specific showing and explain why narrow relief directed only to one agency, one doorway, or one day would not redress the injuries found in the Opinion. The new statements describe ICE and ICE-like federal agents enforcing or inducing rules about who may speak, wait, stand, reenter, use phones, hold

1

papers, move through hallways, remain in waiting rooms, photograph or document conduct, or reach courtroom doors. Ehrman Decl. ¶¶ 5-7, 12-22; Vasquez Statement ¶¶ 1-5, 11-13; Bender Decl. ¶¶ 6-13; Mun Statement ¶¶ 6-15; Sigman Statement ¶¶ 3-6, 10-11; Conwesser Decl. ¶¶ 1-15; Bowen Decl. ¶¶ 7-17, 24-25; Halabi Statement ¶¶ 4-6.

**I. ICE must be joined because the new statements show ICE control of court functions and ICE retaliation.**

The Court previously concluded that Plaintiffs had not sufficiently tied their access injuries to ICE because DOJ/EOIR formally controls immigration-court proceedings and waiting areas, while GSA and DHS/FPS formally manage federal-building access and security. See *Arias v. U.S. Immigr. & Customs Enf't*, No. 26 Civ. 2130 (CM), slip op. at __ (S.D.N.Y. June 22, 2026), ECF No. __. The new record cures that traceability and redressability problem in two independent ways.

First, ICE must be joined because the new statements show ICE's de facto assumption of operational control over court and facility functions formally assigned to EOIR, GSA, FPS, or contract security. Second, ICE must be joined because the retaliation theory depends on ICE's own conduct: threats, physical touching, ejections, surveillance-like monitoring, public humiliation, and intimidation directed at or predictably chilling protected observation, reporting, accompaniment, association, rights-related speech, and religious or professional support.

Article III requires injury in fact, traceability, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Traceability does not require a defendant to be the last or sole actor in the chain where the defendant's conduct has a practical, coercive, or determinative effect on others. *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997). Joinder is required where complete relief cannot be accorded in the party's absence, Fed. R. Civ. P. 19(a)(1)(A), is permissible where the claims arise from the same series of transactions and occurrences and

2

share common questions, Fed. R. Civ. P. 20(a)(2), and may be ordered at any time on just terms, Fed. R. Civ. P. 21.

**A. The new statements show ICE exercising de facto operational control over court functions.**

The named Plaintiffs' declarations already show why formal lines of authority are insufficient. Kelly describes a single courthouse environment in which immigration-court staff, building security or PSOs, federal law enforcement including ICE, and GSA/FPS actors operate together, with responsibility shifting in real time while observers, respondents, clergy, journalists, lawyers, psychologists, and volunteers are excluded or intimidated. Kelly Second Decl. ¶¶ 22-30, 61-62. Father Arias, McCallum, Nathan, and Phillips describe being deterred or excluded by rules enforced in that same overlapping environment, often without a written rule, closure order, capacity determination, or case-specific explanation. Arias Aff. ¶¶ 3-7; McCallum Aff. ¶¶ 5-10; Nathan Aff. ¶¶ 3-9; Phillips Aff. ¶¶ 3-8.

Ehrman supplies a concrete example of ICE exercising operational authority inside EOIR space. For approximately two and one-half months, he openly spoke with respondents in court hallways, EOIR waiting rooms, and courtrooms before and after hearings, in view of EOIR staff, building security, and sometimes ICE agents. Ehrman Decl. ¶¶ 5-7. Ehrman expressly objected that ICE had no jurisdiction to enforce EOIR waiting-room rules, but ICE remained in place and physically removed him from the court area. Id. ¶¶ 16-18.

Vasquez describes the same functional displacement of courthouse administration. She states that observers were repeatedly ordered from waiting rooms, told not to speak with people, and told not to distribute know-your-rights materials; that some orders came from ICE agents and some from security; and that security told her ICE supervisors decided who could be in a hallway or courtroom while security enforced those decisions. Vasquez Statement ¶¶ 1, 11. She

also states that an ICE agent accused her of taking photographs, yelled at her to leave, and called a guard over to enforce the order. Id. ¶ 2. This directly addresses traceability: ICE was not merely present while other entities controlled access; ICE allegedly made or induced the access and visitor-conduct decisions.

Bender and Mun provide additional corroboration. Bender states that ICE agents at 26 Federal Plaza told observers they could not speak with people, could not hand out papers, could not wait in particular waiting rooms or hallways, and had to leave public areas; that agents entered waiting rooms and stopped volunteers from speaking with people or using butterfly cards; and that agents confiscated blank cards, blocked courtroom entry, and ordered observers out of public spaces. Bender Decl. ¶¶ 6-8, 13. Mun states that volunteers initially could enter but later were told by security that DHS ordered them out of waiting rooms and hallways; she also describes ICE agents hovering over volunteers and immigrants, challenging volunteers moving through hallways, and participating in an atmosphere where volunteers were prevented from distributing cards, information, coloring books, or toys. Mun Statement ¶¶ 6-11.

Other new statements show ICE or ICE-like agents enforcing visitor-conduct and courtroom-adjacent rules. Conwesser describes a federal employee identified in reporting as ICE screaming at Father Arias in a waiting room and accusing him of taking a photograph in front of frightened respondents. Conwesser Decl. ¶ 3. Ehrman states that ICE agents reprimanded respondents for using phones in a waiting room and announced that the area was a "no-phone" area, even though such rules previously came from security guards, clerks, or other court staff. Ehrman Decl. ¶ 22. Bowen describes a respondent who refused to leave a courtroom because ICE officers were waiting outside; the immigration judge told ICE they could not enter; ICE said

4

the man had to come out; and, after a back-and-forth, the courtroom was cleared and the man was detained. Bowen Decl. ¶¶ 13-17.

Those accounts describe operational control over access, speech, materials, hallway movement, waiting-room conduct, phone and photography rules, courtroom-adjacent movement, and ejection decisions. Because ICE is alleged to direct, induce, or enforce the very restrictions Plaintiffs challenge, complete relief cannot be afforded by an injunction that binds only EOIR, GSA, FPS, or contract security. See Fed. R. Civ. P. 19(a)(1)(A); Lujan, 504 U.S. at 560-61; Bennett, 520 U.S. at 168-69.

**B. The new statements also show ICE's role in retaliation and chilling effects on court attendance and observation.**

The retaliation claim independently requires relief capable of reaching ICE. Retaliatory conduct is actionable where it chills protected activity or causes other concrete harm. *Zherka v. Amicone*, 634 F.3d 642, 645-46 (2d Cir. 2011).

The named Plaintiffs already describe chilled speech, observation, reporting, ministry, and accompaniment. Ehrman's September 11 incident is direct retaliation evidence. He told a respondent that the respondent had a constitutional right to remain silent. ICE agents immediately confronted him, raised their voices, said he could not do that and could not remain in the waiting room, because and ICE agent told the EOIR supervisor that Ehrman was "going to keep doing this." Ehrman Decl. ¶¶ 16-18. An ICE agent then placed a hand on Ehrman's shoulder, directed him to the elevators, joined two other agents in forming a barrier around him, mocked him, and ensured that he got onto the elevator. Id. ¶ 18. Ehrman states that the incident chilled him from returning because ICE agents knew his face and his presence could draw ICE attention to respondents. Id. ¶¶ 19-20.

Vasquez describes retaliation and viewpoint hostility in a different form. After she returned to a waiting room by accompanying Representative Dan Goldman's entourage, the same ICE agent allegedly threw her out again and said, "Go get your fucking little congressman Goldman to help you." Vasquez Statement ¶¶ 12-13. That statement ties later exclusion and hostility to prior protected association and observation. Sigman likewise describes an armed masked man yelling that anyone who stayed in the hall would be arrested and referring to "these fucking advocates," causing her and her co-volunteer to leave the respondent they had come to accompany. Sigman Statement ¶¶ 10-11.

Other witnesses describe intimidation for its own sake and its chilling effect on court attendance. Halabi states that ICE agents repeatedly sat in 290 Broadway waiting rooms among respondents for 20 to 40 minutes, put their feet up, joked around, and left without taking anyone; he also saw agents review posted docket lists in front of terrified respondents and then leave, with the apparent point being intimidation. Halabi Statement ¶¶ 4-6. Bender states that agents blocked hallways, forced immigrants and observers to pass single file, questioned people trying to pass, and sometimes stopped people leaving court with comments like "Let me see your papers" before letting them pass. Bender Decl. ¶¶ 10-13. Bowen states that respondents had to walk a "gauntlet" past ICE officers, one woman vomited from fear, another collapsed in Bowen's arms, and the agents' face coverings, lack of visible badges, non-uniform clothing, clustering outside courtrooms, and numbers created an intimidating atmosphere. Bowen Decl. ¶¶ 7-11, 24-25.

Because this retaliation and intimidation is alleged to be ICE conduct itself, Rule 65(d)(2) cannot solve the problem unless ICE is either joined or clearly bound when acting in active concert with enjoined parties. An injunction ordinarily binds parties, their officers and agents,

and persons with actual notice who act in active concert or participation with them. Fed. R. Civ. P. 65(d)(2). Complete relief therefore requires joinder of ICE and Venturella, or at minimum an order making clear that ICE/ERO personnel with actual notice are bound when they enforce, induce, assist, or carry out the restrained access-control, waiting-area, hallway, ejection, intimidation, or retaliation practices in concert with EOIR, DHS/FPS, GSA, PSOs, or building security.

**II. The Proposed PI is authorized and appropriately tailored provision by provision.**

Rule 65 requires specificity and tailoring, not underinclusive relief that leaves the injury unredressed. The Proposed PI identifies the covered proceedings, spaces, activities, actors, prohibited conduct, preserved government authority, notice requirements, and duration. Fed. R. Civ. P. 65(d)(1)-(2). It is no broader than necessary because each provision is tied to the access, speech, association, religion, newsgathering, accompaniment, and retaliation injuries found in the Opinion. See Arias, No. 26 Civ. 2130 (CM), slip op. at __.

The personal scope of the Proposed PI is primarily direct relief for the five named Plaintiffs. The named Plaintiffs cannot meaningfully observe a public hearing, report on immigration court, minister to a respondent, accompany a frightened person, exchange emergency-contact information, or provide professional or religious support if Defendants may continue to exclude all observers, block all accessways, prohibit all quiet communication, or retaliate against any person who receives or assists their support. A remedy written only as a list of five exempt names would be ineffective: it would not reopen a closed public hearing, would not permit a respondent to speak with Father Arias or Dr. Phillips, would not allow Nathan to observe alongside other members of the press or public, and would not prevent Defendants from chilling the witness, family member, respondent, or volunteer whose interaction is necessary to

7

the named Plaintiffs' own protected activity. Arias Aff. ¶¶ 1-7; Kelly Second Decl. ¶¶ 61-67; McCallum Aff. ¶¶ 1-10; Nathan Aff. ¶¶ 1-9; Phillips Aff. ¶¶ 1-8.

To the extent any provision protects persons beyond what the Court deems necessary to protect the named Plaintiffs directly, Plaintiffs seek that relief on two legal bases. First, the relief is permissible as complete relief for the named Plaintiffs because the challenged access and communication practices are public-facing, indivisible, and operationally systemic. See Califano, 442 U.S. at 702; Madsen, 512 U.S. at 765. Second, in the alternative, Plaintiffs expressly seek provisional classwide relief under Rule 23(b)(2), pending renewed class certification, for the proposed class of persons seeking to observe, report on, accompany, support, or engage in quiet court-related communication in the New York immigration courts. Fed. R. Civ. P. 23(b)(2); see *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011).

**A. Provision 1: definitions.**

Provision 1 defines "Immigration Courts," "ordinary, non-closed hearing," "Accessways," and "Protected Activities." Proposed PI ¶ 1. The personal scope is tied to the people whose interactions make the named Plaintiffs' rights real: public observers, journalists, clergy, accompaniers, respondents, family members, attorneys, volunteers, and other willing participants in the same public court environment. Father Arias cannot provide pastoral support without a willing person to receive it; Nathan cannot report on a public court without access as a member of the public and press; Phillips cannot provide trauma-informed support or requested prayer without a respondent to speak with; McCallum and Kelly cannot accompany someone if the order protects only their bodies and not the interaction. Arias Aff. ¶¶ 1-7; Kelly Second Decl. ¶¶ 63-67; McCallum Aff. ¶¶ 1-10; Nathan Aff. ¶¶ 1-9; Phillips Aff. ¶¶ 1-8.

The geographic scope is limited to the three New York immigration-court facilities where the record shows the challenged practices occur and where Plaintiffs' protected activities must occur when respondents are scheduled there: 26 Federal Plaza, 290 Broadway, and 201 Varick Street. Kelly and the named Plaintiffs' earlier declarations establish recurring injury at 26 Federal Plaza and 290 Broadway. Kelly Second Decl. ¶¶ 4-6, 20-30, 61-67; McCallum Aff. ¶¶ 1-10; Nathan Aff. ¶¶ 3-9; Phillips Aff. ¶¶ 3-8. Conwesser states that she accompanies people at all three locations and has accompanied six individuals to Varick Street facilities approximately ten times in the past year. Conwesser Decl. ¶¶ 1-2. Sigman states that she accompanies respondents at the three New York City immigration courts and describes a June 2025 Varick Street incident involving armed agents, materials restrictions, court security, and courtroom-adjacent blocking. Sigman Statement ¶¶ 3, 5-6.

The operational scope is limited to public courtrooms, EOIR-controlled public waiting areas, and access routes necessary to reach or leave ordinary, non-closed hearings. It does not cover judges' chambers, staff-only corridors, secure offices, holding areas, detention areas, or other nonpublic spaces. That limitation fits the injuries: McCallum describes denial of waiting-room, hallway, restroom-route, reentry, and courtroom-door access; Kelly describes courtrooms, waiting rooms, hallways, elevator banks, entrances, and security checkpoints; and the new witnesses describe intimidation and restrictions in the same functional access spaces. Kelly Second Decl. ¶¶ 4-6, 20-30, 61-67; McCallum Aff. ¶¶ 1-10; Bowen Decl. ¶¶ 8-11; Bender Decl. ¶¶ 6-13; Ehrman Decl. ¶¶ 12-22; Mun Statement ¶¶ 6-11.

The definition of "ordinary, non-closed hearing" is tailored by reference to lawful closure, attendance limitation, confidentiality, capacity, disruption, security, and decorum determinations. Proposed PI ¶ 1(b); 8 C.F.R. §§ 1003.27, 1240.10(b), 1240.11(c)(3)(i) (2026).

The definition of "Protected Activities" is likewise limited to non-obstructive, non-disruptive, consensual, noncommercial court-related activity and expressly excludes conduct that interferes with lawful security, arrest, detention, transport, or emergency operations. Proposed PI ¶ 1(d).

**B. Provision 2: persons bound.**

Provision 2 binds Defendants and the persons Rule 65 permits an injunction to bind: parties, their officers, agents, servants, employees, attorneys, successors, contractors, and persons who receive actual notice and act in active concert or participation with them. Proposed PI ¶ 2; Fed. R. Civ. P. 65(d)(2). The personal scope is authorized because the record shows that the challenged restrictions are enforced by a recurring operational system, not a single official. Kelly describes the overlapping roles of EOIR, security/PSOs, federal law enforcement including ICE, FPS, and GSA; Ehrman describes ICE agents, an EOIR supervisor, and security together producing his exclusion; and Vasquez states that security told her ICE supervisors decided who could be in hallways or courtrooms while security enforced those decisions. Kelly Second Decl. ¶¶ 22-30, 61-62; Ehrman Decl. ¶¶ 16-18; Vasquez Statement ¶ 11.

The geographic scope of the persons-bound provision follows the facilities defined in Provision 1. It reaches only personnel assigned to, regularly operating in, or acting with Defendants in the Immigration Courts and Accessways. It does not impose nationwide constraints on ICE, DHS, GSA, DOJ, or any contractor outside the covered New York court facilities. The operational scope is similarly tailored: it reaches access-control, hallway, waiting-area, courtroom-exclusion, ejection, and retaliation practices restrained by the Proposed PI, not unrelated agency operations.

As to ICE specifically, Provision 2 should bind ICE directly if the Court grants joinder. If the Court does not join ICE before entering provisional relief, the same provision should bind

ICE/ERO personnel with actual notice when they act in active concert or participation with enjoined parties. That distinction preserves Rule 65(d)(2) and Alemite while preventing evasion of the order by shifting enforcement of a prohibited no-speaking, no-observer, hallway-clearing, or retaliatory ejection practice from EOIR or security to ICE. Fed. R. Civ. P. 65(d)(2); Alemite, 42 F.2d at 832-33.

## C. Provision 3: access to ordinary, non-closed hearings.

Proposed PI ¶ 3. The personal scope is authorized because each named Plaintiff's injury includes denial of access to public hearings or interference with observation connected to those hearings. Father Arias's ministry includes being physically present in immigration court with those he serves; Kelly attends as a public observer, attorney, organizer, and accompanier; McCallum has repeatedly been turned away at courtroom doors and barred from reentry; Nathan's journalism depends on in-person observation; and Phillips was blocked from reentry after a quiet waiting-room interaction. Arias Aff. ¶¶ 1-7; Kelly Second Decl. ¶¶ 4-6, 20-30, 63-67; McCallum Aff. ¶¶ 1-10; Nathan Aff. ¶¶ 1-9; Phillips Aff. ¶¶ 3-8.

The new witnesses corroborate that public access restrictions affect more than isolated plaintiffs. Bender states that agents blocked courtroom entry and ordered observers out of public areas. Bender Decl. ¶¶ 6-13. Ehrman describes being told he had to be in court observing or not be in the hallway, and later being escorted out after protected speech. Ehrman Decl. ¶¶ 13-18. Sigman describes armed agents and security forcing volunteers away from respondents near courtrooms at 26 Federal Plaza and 201 Varick Street. Sigman Statement ¶¶ 5-6, 10-11. Bowen describes ICE waiting outside a courtroom and the courtroom ultimately being cleared before a respondent was detained. Bowen Decl. ¶¶ 13-17.

The geographic scope is tailored to the Immigration Courts as defined: 26 Federal Plaza, 290 Broadway, and 201 Varick Street. The operational scope is narrower still: it applies only to ordinary, non-closed immigration-court hearings and only to practical access in real time. It does not require admission to closed hearings, overflow admission where actual capacity is reached, entry into nonpublic spaces, or disregard of confidentiality or courtroom-order rules. 8 C.F.R. §§ 1003.27, 1240.10(b), 1240.11(c)(3)(i) (2026).

To the extent Provision 3 protects observers other than the named Plaintiffs, that breadth is necessary to protect named Plaintiffs directly because a public-access violation cannot be cured by admitting five people while maintaining a categorical no-public rule against everyone else. In the alternative, Provision 3 is requested as provisional Rule 23(b)(2) relief pending renewed class certification because the access remedy is indivisible: ordinary, non-closed hearings are either meaningfully open to the public or they are not. Fed. R. Civ. P. 23(b)(2); Wal-Mart, 564 U.S. at 360.

**D. Provision 4: accessways and building-entry practices.**

Provision 4 prohibits Defendants from using building entrances, screening queues, hallways, elevator banks, corridors, lobbies, courtroom entrances and exits, waiting-room entrances and exits, and other access routes to prevent or materially burden public access, protected communication, or observation. Proposed PI ¶ 4. The personal scope is tied directly to the named Plaintiffs' injuries. Kelly describes the relevant spaces as courtrooms, waiting rooms, hallways, elevator banks, building entrances, and security checkpoints; McCallum describes being denied waiting-room access, hallway movement, restroom-route access, and reentry after brief departures; Father Arias's ministry and Phillips's support depend on being able to reach the person requesting help; Nathan's reporting is impossible if accessways are used to make public

12

hearings practically inaccessible. Arias Aff. ¶¶ 1-7; Kelly Second Decl. ¶¶ 4-6, 20-30, 61-67; McCallum Aff. ¶¶ 1-10; Nathan Aff. ¶¶ 3-9; Phillips Aff. ¶¶ 3-8.

The witness statements show why accessways need separate treatment. Bender states that agents lined hallways, forced people to pass single file, blocked hallways, questioned people trying to pass, and prevented her from accompanying a respondent while allowing the respondent through. Bender Decl. ¶¶ 10-13. Conwesser Decl. ¶¶ 5-15. Sigman describes narrow corridors, blocked doorways, and armed agents yelling that anyone who stayed in the hall would be arrested. Sigman Statement ¶¶ 4-6, 10-11. Mun states that volunteers were challenged even when walking to the restroom. Mun Statement ¶¶ 6-11.

The geographic scope is limited to the accessways at the covered Immigration Courts. The operational scope is not a general building-management injunction. It restrains use of accessways as staging, holding, exclusion, intimidation, or crowd-control zones only when that use prevents public observation of ordinary, non-closed hearings, prohibits Protected Activities, or creates a de facto closure without a lawful, particularized, non-pretextual safety, security, emergency, arrest, detention, transport, or court-operational need. Proposed PI ¶ 4(b). That carveout preserves legitimate law-enforcement and safety authority while preventing the precise accessway practices that injure Plaintiffs.

To the extent Provision 4 benefits nonparties moving through the same accessways, the relief is necessary to protect the named Plaintiffs because accessways are indivisible physical routes. In the alternative, Provision 4 is sought as provisional Rule 23(b)(2) relief pending renewed class certification.

**E. Provision 5: protected activities in EOIR-controlled public waiting areas.**

Provision 5 prohibits categorical, unreasonable, or viewpoint-discriminatory bans on quiet, consensual, noncommercial communication and accompaniment in EOIR-controlled

public waiting areas. Proposed PI ¶ 5. The personal scope is tied to the named Plaintiffs' core activities. Father Arias's religious ministry includes pastoral support, requested prayer, and quiet conversation. Arias Aff. ¶¶ 1-7. Phillips's professional and religious obligations include trauma-informed presence, Spanish-language support, and sharing church information when requested. Phillips Aff. ¶¶ 1-8. McCallum and Kelly provide nonlegal information, accompaniment, and emergency-contact support when requested. Kelly Second Decl. ¶¶ 4-6, 63-67; McCallum Aff. ¶¶ 1-10. Nathan's newsgathering depends on observing how these public court spaces operate. Nathan Aff. ¶¶ 1-9.

The new witness statements confirm that waiting-area restrictions target the same activity. Ehrman states that he spoke with respondents in waiting rooms, made clear that he was a volunteer and New York resident, told respondents that providing information was optional, and used butterfly forms only to collect information such as names, A-numbers, phone numbers, or emergency contacts if respondents consented. Ehrman Decl. ¶¶ 5-7. Bender states that observers used butterfly forms only when people wanted to provide information and understood that the information would be used if the person was arrested by ICE or wanted follow-up from a social worker. Bender Decl. ¶¶ 3-4. Mun describes volunteers being barred from waiting rooms and told not to pass cards, information, coloring books, or toys. Mun Statement ¶¶ 6-9. Vasquez describes being told not to talk to people, not to distribute know-your-rights material, and being warned by a guard that she needed to stop talking in a waiting room. Vasquez Statement ¶¶ 1, 5.

The operational scope is carefully limited. Provision 5 protects quiet, consensual, noncommercial communication and requested accompaniment. It does not authorize harassment, coercion, noise, disruption, obstruction, communication with unwilling persons, legal solicitation prohibited by lawful rule, or interference with court operations. Proposed PI ¶¶ 5(d), 8. It also

14

does not prevent lawful, viewpoint-neutral enforcement of a valid federal-property rule governing general pamphlets, handbills, flyers, free samples, posting, littering, or permit requirements. See 6 C.F.R. § 139.60 (2026).

The distinction between individualized communication and general pamphleteering is crucial. Phillips was blocked after writing down church information for a respondent who requested assistance. Phillips Aff. ¶¶ 3-8. Ehrman and Bender describe individualized butterfly-card exchanges for emergency-contact and follow-up purposes. Ehrman Decl. ¶¶ 5-7; Bender Decl. ¶¶ 3-4. Yet witnesses describe those exchanges being treated as forbidden "solicitation" or paper distribution. Bender Decl. ¶¶ 6-8; Ehrman Decl. ¶¶ 12, 21-22; Mun Statement ¶¶ 8-9; Vasquez Statement ¶¶ 1, 4-5. Provision 5 prohibits that categorical and viewpoint-based collapse of protected, one-to-one communication into prohibited solicitation.

To the extent Provision 5 protects nonparty respondents, family members, or other willing recipients, that scope is necessary to protect the named Plaintiffs directly: the right to speak, minister, report, accompany, and provide support cannot be vindicated if the willing listener or person being accompanied remains subject to a categorical gag or access rule. In the alternative, Provision 5 is sought as provisional classwide relief under Rule 23(b)(2) pending renewed certification.

## F. Provision 6: no retaliation, intimidation, or selective enforcement based on Protected Activities.

Provision 6 prohibits removal, exclusion, threats, intimidation, punishment, physical separation, and selective burdening because a person engaged in, is engaging in, or is perceived as engaging in Protected Activities. Proposed PI ¶ 6. The personal scope is authorized by the named Plaintiffs' continuing injuries and future intent to return. Kelly expects further exclusion, harassment, intimidation, speech restrictions, and physical risk absent relief. Kelly Second Decl.

15

¶¶ 4-6, 63-67. Father Arias has been ordered not to speak with people requesting ministry. Arias Aff. ¶¶ 1-7. McCallum has been barred from courtrooms, waiting rooms, hallways, reentry, and legal-rights materials distribution. McCallum Aff. ¶¶ 1-10. Nathan's reporting is chilled by access denials. Nathan Aff. ¶¶ 1-9. Phillips was blocked after quiet church-related communication. Phillips Aff. ¶¶ 3-8.

The new witness statements identify ICE's role in retaliation and intimidation. Ehrman was confronted, surrounded, touched, escorted to the elevators, mocked, and chilled from returning after telling a respondent about the right to remain silent. Ehrman Decl. ¶¶ 16-20.

To the extent Provision 6 protects persons beyond the named Plaintiffs, it is necessary because retaliation against the respondent, accompanier, listener, journalist, clergy member, or nearby witness directly chills the named Plaintiffs' own protected activity. Kelly states that intimidation reduces participation and makes witnesses and observers less willing to come forward. Kelly Second Decl. ¶¶ 65-67. In the alternative, Plaintiffs seek Provision 6 as provisional Rule 23(b)(2) relief pending renewed class certification.

**G. Provision 7: no de facto full closure of presumptively open hearings.**

Provision 7 prohibits Defendants from fully excluding the public from presumptively open hearings by locking all practical entrances, denying all observers, instructing staff categorically to refuse observers, refusing any practical means of real-time entry, or using accessways and security practices to make ordinary, non-closed hearings inaccessible in practice. Proposed PI ¶ 7. The personal scope is authorized because the named Plaintiffs' injuries include both formal denials and practical denials, while the new witness statements show that de facto closure can occur through combined accessway, waiting-room, and intimidation practices rather than a written closure order.

The geographic and operational scope is tailored to ordinary, non-closed hearings at the covered facilities. Provision 7 does not forbid lawful closure, attendance limitation, confidentiality protection, actual capacity limitation, disruption response, or safety response. It prohibits only practices that accomplish in practical terms what Defendants may not do categorically: convert public hearings into inaccessible proceedings without a lawful closure or attendance limitation. 8 C.F.R. §§ 1003.27, 1240.10(b) (2026).

To the extent Provision 7 protects the public generally, the relief is necessary to protect the named Plaintiffs because a public hearing cannot be made public only for five named individuals while everyone else remains categorically excluded.

**H. Provision 8: preserved government authority and neutral rules.**

Provision 8 is the principal tailoring provision. It confirms that the Proposed PI does not require admission to lawfully closed or attendance-limited hearings; does not prevent enforcement of lawful confidentiality protections, capacity limits, courtroom-decorum rules, recording restrictions, device restrictions, safety rules, ordinary screening, neutral crowd-control measures, or emergency measures; does not grant access to nonpublic spaces; does not authorize obstruction, harassment, threats, coercion, disruption, unlawful solicitation, or communication with unwilling persons; does not prohibit lawful arrest, detention, transport, removal, or related enforcement operations based on independent lawful grounds; and does not limit an immigration judge's lawful authority to regulate proceedings. Proposed PI ¶ 8.

The geographic and operational scope is coextensive with the rest of the order because the carveouts must travel with the prohibitions. Provision 8 makes clear across all covered facilities and spaces that Defendants may enforce lawful closures, capacity limits, confidentiality, decorum, screening, neutral safety rules, and federal-property rules. It also

17

confirms that 6 C.F.R. § 139.60 (2026) and other valid, viewpoint-neutral materials rules may be applied to general posting and distribution, so long as they are not used pretextually to bar individualized, consensual, noncommercial communication or emergency-contact exchanges.

**I. Provision 9: implementation, notice, and record preservation.**

Provision 9 requires distribution of the order, written instructions, certification of compliance, and preservation of records sufficient to identify incidents in which a member of the public is denied entry to, removed from, or prevented from reaching an ordinary, non-closed hearing. Proposed PI ¶ 9. The personal scope is authorized because the named Plaintiffs' injuries recur precisely when front-line personnel do not know, do not follow, or selectively enforce the governing rules without adequate explanation. Arias Aff. ¶¶ 3-7; Nathan Aff. ¶¶ 3-9; Phillips Aff. ¶¶ 3-8.

The new witnesses confirm why notice must reach all operational actors. Ehrman's removal involved ICE agents, an EOIR supervisor, and security. Ehrman Decl. ¶¶ 16-18. Vasquez states that orders came sometimes from ICE and sometimes from security, and that security said ICE supervisors decided access while security enforced. Vasquez Statement ¶¶ 1, 11. Bender and Mun describe rules that changed by day, location, and personnel. Bender Decl. ¶¶ 6-13; Mun Statement ¶¶ 6-11. Without notice to EOIR staff, DHS/FPS personnel, GSA personnel, PSOs, ICE/ERO personnel, and others operating in the access spaces, the same unconstitutional practices can recur through a different uniform or job title.

To the extent Provision 9 benefits nonparties by improving compliance generally, it is still necessary to protect the named Plaintiffs directly. An order that reaches only the five named Plaintiffs but is not communicated to the personnel who control doors, hallways, waiting rooms,

18

elevators, and ejections would be ineffective. In the alternative, Provision 9 is requested as provisional classwide implementation relief under Rule 23(b)(2), pending renewed certification.

**J. Provision 10: duration and jurisdiction.**

Provision 10 provides that the order remains in effect until further order of the Court and that the Court retains jurisdiction to interpret, enforce, modify, or dissolve it. Proposed PI ¶ 10. The personal scope is authorized because the named Plaintiffs intend to continue attending or seeking access to the covered courts, and the record shows continuing recurrence rather than a single completed incident. Kelly Second Decl. ¶¶ 4-6, 63-67; McCallum Aff. ¶¶ 1-10; Nathan Aff. ¶¶ 7-9; Phillips Aff. ¶¶ 6-8; Arias Aff. ¶¶ 1-7.

The new witness statements support continuing relief. Bowen estimates at least 50 courthouse visits and intends to continue. Bowen Decl. ¶¶ 3-4. Bender went almost weekly from May 2025 until surgery and describes repeated ejections and restrictions. Bender Decl. ¶¶ 3, 6-13. Vasquez has gone most Fridays since May 2025 and describes recurring orders not to talk, not to distribute materials, and to leave. Vasquez Statement ¶¶ 1-5. Mun, Sigman, Conwesser, Halabi, and Ehrman describe repeated patterns over months rather than isolated episodes. Mun Statement ¶¶ 3, 6-15; Sigman Statement ¶¶ 3-11; Conwesser Decl. ¶¶ 1-15; Halabi Statement ¶¶ 1, 4-6; Ehrman Decl. ¶¶ 5-23.

The geographic and operational scope is no broader than the order itself. Duration until further order is appropriate because the challenged practices are ongoing and likely to recur, but the Court retains jurisdiction to narrow, clarify, enforce, or dissolve the order if conditions change, if class certification is denied, if ICE is not joined, or if any provision proves unnecessary. That structure is appropriately tailored under Rule 65 and equitable principles. Fed. R. Civ. P. 65(d); Califano, 442 U.S. at 702; Madsen, 512 U.S. at 765.

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the motion; permit joinder of ICE and Venturella or, at minimum, bind ICE/ERO personnel with actual notice when they act in active concert or participation with enjoined parties; include 201 Varick Street within the geographic scope; and enter the Proposed PI or substantially similar relief. The requested order is tailored to restore meaningful access to ordinary, non-closed immigration-court hearings; protect quiet, consensual, noncommercial court-related communication, accompaniment, reporting, ministry, professional support, and observation; prevent retaliation and intimidation based on protected activity; preserve lawful closures, genuine security rules, and legitimate law-enforcement authority; and, to the extent the Court views any provision as extending beyond direct relief for the named Plaintiffs, provide provisional Rule 23(b)(2) relief pending renewed class certification.

Dated: July 2, 2026
New York, New York

Respectfully submitted,

/s/ Stephen Kelly

Stephen Kelly
Counsel for Plaintiffs

32 Court Street, 904
Brooklyn, NY 11201

stephen@philanthropy-law.com
929-270-9905