**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FR. FABIÁN ARIAS, STEPHEN KELLY, LAURA MCCALLUM, DEBBIE NATHAN, and DR. ZOEY PHILLIPS,<br><br>    Plaintiffs,<br><br>    -against-<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; DAVID J. VENTURELLA, in his official capacity as the senior official performing the duties of the Director of U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Acting Attorney General; GENERAL SERVICES ADMINISTRATION; and EDWARD FORST, in his official capacity as Administrator of General Services,<br><br>    Defendants. | Case No.<br>**1:26-cv-02130-CM**<br><br><br>**DECLARATION OF**<br>**CHARLIE EHRMAN** |

**DECLARATION OF CHARLIE EHRMAN**

I, Charlie Ehrman, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     My legal name is Charles Ehrman, and I go by Charlie Ehrman. I am originally from New York and grew up on Long Island. I graduated from Queens College, CUNY, where I studied political science and Middle East studies, including immigration, migration, refugees, and asylum. I have worked as a journalist, but during the events described below I was not acting as a journalist; I was volunteering as a member of the public.

1

2. I observed immigration court and volunteered at 26 Federal Plaza during the summer of 2025 because I wanted to support people appearing in immigration court and because I wanted to learn more about immigration and asylum law. The observation itself, separate from any immigrant-rights support work, was greatly edifying to me. It was my first time in court, and simply sitting in master calendar hearings and hearing judges explain the asylum process and the steps in a case taught me, in a concrete way, material I had wanted to learn throughout my undergraduate studies.

3. While I was a CUNY student, I lived in Jackson Heights, Queens. In my immigrant-support volunteering at court, I often had friendly conversations with respondents after we discovered that we were neighbors. This usually happened while filling out or discussing a "butterfly" form, when we would exchange addresses and I would realize that a respondent, often from Ecuador, lived within walking distance of me. We would then talk about Jackson Heights, places to eat, Ecuadorian food or culture, and similar topics. Those conversations were heartwarming in an otherwise tense environment.

4. I have actual, personal knowledge of the matters stated below. I also took and kept contemporaneous notes of the incidents described in this declaration, including notes made during or shortly after court observations, and I consulted those notes in recounting these events. After the September 11, 2025 incident described below, I also submitted a report through the New York Immigration Coalition ("NYIC") Google form. I do not have the exact Google form submission, but I have my notes.

5. From about June 26, 2025, until mid-September 2025, I volunteered as a court observer at immigration court at 26 Federal Plaza. For roughly two and one-half months before September 10, I had full access to speak with respondents in court hallways, EOIR

waiting rooms, and courtrooms before and after hearings. My communications with respondents occurred in view of EOIR staff, building security, and sometimes ICE agents. I recognized ICE agents by ICE or other law-enforcement markings, masks, weapons, groups of agents, and repeated appearances by the same agents. I speak fluent Spanish and often communicated with respondents in Spanish.

6.  In June and July 2025, I routinely spoke openly with respondents in waiting rooms, hallways, and courtrooms. If respondents consented, I obtained information such as a name, A-number, phone number, or emergency contact so people could be contacted if detained. I also asked whether they wanted to be accompanied out of the building. I made clear that I was a volunteer and New York resident, that they did not have to provide information, and that even if they did not want to provide an A-number they could provide only an emergency contact. The small butterfly forms we used included fields such as name, A-number, and emergency contact, and explained the context of ICE detentions.

7.  I had particularly positive access in Judge Golovnin's courtroom, where there was no separate waiting room and the courtroom effectively functioned as both waiting room and courtroom before the judge entered. The clerk was present, and at times I asked the clerk whether it was all right for me to speak with respondents. The clerk said it was okay. The clerk saw me speak with respondents and hand them butterfly forms, and I did not have any issue there. That was my usual practice in June and July. My communications were usually with court employees or security guards, not ICE agents.

8.  On Wednesday, July 23, 2025, I had my first direct confrontation with an ICE agent. I was with a respondent from Ecuador who had gone to the floor 12 window in the

morning to drop off a document. He was not there for a hearing. After checking in at the window, we received an update that his case had been rescheduled for March 30, 2026. We saw ICE agents in the hallway, and he agreed that I would accompany him out.

9. As we left, ICE agents stopped us in the hallway and asked for his identification. I put my hands up in a protective manner and said words to the effect of, "He just got his court date, and we are walking out." I also tried to communicate that he did not need to show identification. A Spanish-speaking agent asked the respondent for his ID. The respondent presented it. An ICE agent I knew as Victor, who was wearing a flannel shirt with a badge around his neck, compared the ID to a stack of papers with photos and names. The agents determined that the respondent was not the person they were looking for and let us go.

10. After I accompanied the respondent to the train, I went back through security to floor 12 because I planned to continue observing. I saw Victor in the waiting-room area. To keep the interaction polite, I said words to the effect of, "Apologies, I wasn't trying to interfere. He had his court date for next year." Victor responded, "Well, I gotta do my job, you can't interfere. If I see him here, he's a suspicion, and it's the law that he has to show me his ID." Several other agents were present, gathered along the sides, corners, and doors of the floor 12 waiting-room area. I had no comparable problem again until early September.

11. At the beginning of September 2025, I had an interaction in the waiting room used for Judge Lopresti and another judge. I was sitting next to a woman when a newer ICE agent I had not seen before approached her and began asking for personal information, including her name. In Spanish, I told the woman, "You have the constitutional right to

remain silent. You don't have to speak." The agent understood Spanish and said, "Well, she didn't invoke her right." I responded, "Well, she is now." The agent walked away. Because that worked, I believed it was permitted for me to tell respondents they had the right to remain silent.

12. Also in early September, I noticed a shift. ICE agents increased their presence in EOIR waiting rooms, questioned respondents while they waited for hearings, and began saying "no soliciting" and enforcing what they characterized as EOIR rules. They singled people out for handing out papers and said volunteers could not hand anything out. After volunteers were told we could not use the small papers, I stopped bringing or handing out butterfly forms. The restriction I later faced was not about my handing out paper; I was not doing that.

13. On September 10, 2025, while walking in a hallway toward a courtroom to observe, I passed a family whom ICE agents were questioning. Based on my prior experience, I briefly told the family that they had the constitutional right to remain silent. ICE agents immediately told me that I could not speak with them, could not be in the hallway, and needed either to be in court observing or not be there. I went into the adjacent courtroom to observe.

14. When I later stepped into the hallway for a short break from observing, ICE agents again approached me and told me I had to leave the hallway, even though I had not attempted to speak to the family again or to anyone else. Press photographers were freely present in the same hallway, observing and documenting ICE activity. I consulted building security, and security told me I could not be in the hallway. I complied and returned to the

courtroom. One ICE agent briefly tried to block my path, but stepped aside when I made clear I was entering the courtroom.

15. Because of the September 10 hallway incident, I went to the clerk's window on floor 14 and asked to speak with a supervisor. The clerk agreed and, after approximately five to ten minutes, an EOIR supervisor came out. I recorded her name as Zugiel Soto. She explained what she described as the policy: no soliciting in EOIR spaces; no handout sheets or flyers unless they were official EOIR documents; and no speaking with respondents unless I had met them and made arrangements before they entered the building. She also said "Friends of the Court" was no more, that the pro bono room was closed or a thing of the past, and that this came from the government. She said maybe in three and a half years people could start to do something again, but "now this is what it is." She explained that EOIR controlled courtrooms and waiting rooms, while GSA controlled the hallways. She did not explain any role for ICE or DHS in enforcing those rules. I wrote down her explanation in my notebook and thanked her for clarifying.

16. On September 11, 2025, at about 8:45 a.m., I was volunteering as a court observer in the main EOIR waiting room and check-in area on floor 12. A respondent was waiting in line to check in at the clerk's window when two ICE agents approached him and requested personal information. I briefly told the respondent that he had the constitutional right to remain silent. The two ICE agents immediately confronted me, raised their voices, and said I could not do that and could not be in the waiting room. I requested EOIR staff and building security and told the agents that ICE did not have jurisdiction to enforce EOIR rules in an EOIR waiting room.

17. Within a few minutes, the same EOIR supervisor from September 10 arrived with a building security guard. She recognized me from the previous day. I explained that I had merely crossed paths with the respondent while ICE began questioning him. She nevertheless repeated that I could not speak with respondents unless I had met them before they entered the building. Three masked ICE agents stood around us while she spoke with me. One ICE agent told the EOIR supervisor, "he's going to keep doing this," referring to my telling respondents they had a right to remain silent. The supervisor told me either to stop speaking with respondents or to be escorted out. I agreed to be escorted out because I expected a building security guard or FPS officer to do it.

18. Instead, an ICE agent immediately placed his hand on my shoulder and directed me toward the elevators. He did not hurt me, but his hand on my shoulder communicated authority and that I should come with him. He did not remove his hand from my shoulder until we arrived in front of the elevators to wait. I complied because I was concerned that any hesitation could be treated as resistance. Two other ICE agents accompanied us. Once we arrived in front of the elevators, the lead agent removed his hand from my shoulder, and he and the two other agents transitioned to forming a barricade around me while we waited for the elevator. They stayed close enough to create a barrier around me on three sides and to prevent me from re-entering the court area, though not shoulder-to-shoulder. While waiting for the elevator, which took about a minute to arrive, the agents mocked me with comments including "good luck again tomorrow," asking whether I really did this for work or for a living, and asking, "Are you really that uneducated?" I had written that exact quote in notes I made as soon as I left the building that day to ensure accuracy in case I needed to recollect it later. They did not take me to the GSA

7

office; they only directed me to the elevator. When I asked if they would show me where the GSA office was, they indicated it was on that floor. They remained around me in that formation until the elevator arrived, and then made sure I got onto the elevator.

19. I immediately went to the GSA office on the second floor to make a complaint or obtain clarification. The GSA manager for floor 12 was in a meeting. The desk attendant gave me a business card for India Stewart, whom I called. I left a voicemail describing the incident, but I never heard back. The desk attendant said something along the lines of, "well, they're federal agents." I then left 26 Federal Plaza and went to the park next to Federal Plaza. Although I might technically have tried to go through security again, I did not do so because the EOIR supervisor had told me I needed to leave. Afterward, I submitted a report to NYIC.

20. Before September 11, I generally tried to go to court two or three times a week. The September 11 incident chilled me from returning. I felt that the ICE agents now knew my face and that my presence could draw ICE attention to respondents and make me more of a hazard to the people I was trying to support.

21. I returned only once more, on September 18, 2025. On that date, in the waiting room outside Judge Lopresti's courtroom, or what I believe was near courtroom 34, a woman volunteering with me did not have a printed butterfly form. Instead, she tore a piece of paper from her notebook and wrote the same type of information the butterfly form usually requested, such as emergency contact information. An ICE agent came into the waiting room, saw her speaking with a respondent or passing the note back and forth, grabbed the note, and said, "Hey, you can't be soliciting." A disagreement followed, and security then asked her to leave.

22. During the September 18 incident, we asked for a court supervisor. A supervisor named Blerinda came. She told us we could not do that, that the spaces were for respondents and attorneys, not observers, and that the space was limited. I also observed ICE agents reprimanding respondents for using their phones in the waiting room, even when they were not making calls. The agents said words to the effect of, "this is a no-phone" area and that respondents could not have their phones there. In the past, rules like that had been communicated by security guards, clerks, or other court staff, not ICE agents. This reinforced my view that, in September, ICE agents had begun enforcing court rules in a way I had not previously seen.

23. On September 28, 2025, I moved from the New York area to San Diego to begin graduate studies at UCSD. I am studying Latin American Studies with a focus on international migration, including immigration and asylum law, and I am studying immigration law in Mexico, specifically asylum law there. My court observation and volunteer experience at 26 Federal Plaza contributed to my decision to pursue work related to immigration law and immigrant-rights nonprofit work.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 2, 2026.


_/s/ Charlie Ehrman_
Charlie Ehrman

9