**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FR. FABIÁN ARIAS, STEPHEN KELLY, LAURA MCCALLUM, DEBBIE NATHAN, and DR. ZOEY PHILLIPS, | Case No. 1:26-cv-02130-CM |
| Plaintiffs, | |
| -against- | DECLARATION OF PENNEE BENDER |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; DAVID J. VENTURELLA, in his official capacity as the senior official performing the duties of the Director of U.S. Immigration and Customs Enforcement; U.S. DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF JUSTICE; TODD BLANCHE, in his official capacity as Acting Attorney General; GENERAL SERVICES ADMINISTRATION; and EDWARD FORST, in his official capacity as Administrator of General Services, | |
| Defendants. | |

## DECLARATION OF PENNEE BENDER

I, Pennee Bender, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. My name is Pennee Bender. I am a retired CUNY administrator and faculty member.

2. I became involved in court watching because I felt it was important for people to show up and have their presence speak their disapproval of the way immigrants were being treated in the immigration courts. I understand my presence in those courts as a way of observing, supporting people with hearings, and bearing witness to what is happening there.

3. From May 2025 through the beginning of April 2026, I went to immigration court almost every week. I stopped going in mid-April because I had knee surgery. I generally went with another PSC member. We would enter the court, speak with as many people as we could who were waiting for hearings, and ask whether they wanted someone to sit with them, accompany them into the courtroom if allowed, and walk them out of the courthouse after their hearings. We also provided people with information about their rights and, when they wanted, collected information from them using the butterfly forms. We understood that the information would only be used if they were arrested by ICE or if they wanted a follow-up phone call from a social worker after their hearing.

4. The people we spoke with were almost always appreciative that we were there and trying to help. They were usually willing to have us accompany them. Many had questions,

1

some of which we could answer and many of which we could not. On a typical day, we might walk out four, five, or six families or individuals.

5. Most of my court watching was at 26 Federal Plaza and 290 Broadway. My experiences at 26 Federal Plaza were much more tense than at 290 Broadway. At 26 Federal Plaza, the presence of ICE or other federal law enforcement agents was much larger and more intimidating. Court security officers were in uniform and were easy to distinguish from the other agents. The agents I am describing were often masked, always armed, and usually gathered in groups of two, three, or four. In some cases, they were clearly identified as ICE agents, but in other cases it was not clear which federal agency they belonged to. Based on their weapons and conduct, I understood them to be federal law enforcement.

6. At 26 Federal Plaza, these agents were frequently present in the hallways and sometimes in the waiting rooms. They would stand in groups, crowd the hallways, and require people to pass by them single file. They often questioned why we were there. They also told us we could not speak to people, could not hand out papers, could not wait in certain waiting rooms, or could not wait in certain hallways. The rules seemed arbitrary and changed from day to day. On one day, we might be told we could not wait in a waiting room and had to be either in a courtroom or outside. On another day, we might be told we could not wait in the hallway and had to be in the waiting room or courtroom. We had to find out each day what they would or would not allow us to do.

7. Agents at 26 Federal Plaza sometimes came into waiting rooms where we were speaking with people and told us we could not be there, could not speak with people, or could not give out butterfly cards. On at least one occasion, they took blank butterfly cards from us and said we could not have them in the building. We tried to keep completed cards inside pockets or bags so that they would not be confiscated. We were instructed not to be confrontational with ICE, so when agents demanded the cards or told us to stop using them, we generally tried to put the cards away rather than escalate the interaction.

8. I was personally thrown out of public areas at 26 Federal Plaza approximately three or four times. I was never thrown out of a courtroom. I was thrown out of waiting areas or hallways. Sometimes, agents blocked me from entering a courtroom and told me I had to leave the building immediately. When I was ordered to leave, I generally left. I might say that I was there as an observer and had a right to be there, but the agents would tell me they did not care and that I had to leave.

9. The court watch group I was part of met before entering the court and again afterward, and we stayed in communication with one another by Signal. Almost every week, someone in the group reported being thrown out of a waiting room or hallway. My own experience was that this happened only at 26 Federal Plaza, not at 290 Broadway.

10. The presence of ICE and other federal agents at 26 Federal Plaza appeared intentionally intimidating. The agents were masked, armed, and gathered in large groups. They lined the hallways so that immigrants and observers had to pass between them single file. They also blocked hallways and questioned people who tried to pass. I remember an incident in which I was accompanying an immigrant woman who had a hearing. We were walking down the hallway toward the courtroom at the end of the hall. Agents blocked the hallway and questioned people who tried to pass them. They would not let me pass, although they allowed the woman I was accompanying to pass. She was terrified.

2

11. The immigrant families I accompanied were visibly frightened. Some were literally shaking when we approached the agents in order to get into a courtroom. I would tell them that it was okay and that we were just going to walk through and get into the courtroom, but they were obviously terrified. The fear was present both going into and coming out of the courtroom. Once we got past the agents, into the elevators, and out of the building, there was often a visible release of tension. People seemed to have the fear drain from them only after leaving the area where the agents were present.

12. In my view, some of the agents' conduct had no reasonable explanation other than intimidation. For example, agents would block hallways and force people to pass through them while being questioned. They also stood in large groups in areas where people with hearings had to pass. At 290 Broadway, I also saw agents stop people coming out of the courtroom and say, almost jokingly, "Let me see your papers," and then say something like, "Okay, I'll let you pass." It did not seem that they intended to arrest those people or had an order to arrest them. It seemed designed to intimidate them and give them a hard time before they could get to the elevator, particularly because observers were accompanying them.

13. I believe that court watchers provide important support to immigrants appearing in immigration court. Our presence helps people understand that they are not alone, and it allows members of the public to witness what is happening in the courts. The actions of ICE and other federal agents at 26 Federal Plaza interfered with that work by preventing us from speaking with people, preventing us from distributing information, blocking access to courtrooms and public areas, and ordering us out of waiting rooms and hallways.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and recollection.

Executed on July 2, 2026.

/s/ Pennee Bender

Pennee Bender

3