**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FR. FABIÁN ARIAS et al., | No. 26 Civ. 2130 (CM) |
| Plaintiffs, | |
| v. | **AFFIDAVIT OF REV. JUAN** |
| U.S. IMMIGRATION AND CUSTOMS | **CARLOS RUIZ** |
| ENFORCEMENT et al., | |
| Defendants. | |

## AFFIDAVIT OF REV. JUAN CARLOS RUIZ

I. Background and Basis of Knowledge

1. I, Reverend Juan Carlos Ruiz, declare under penalty of perjury:

2. I am an ordained minister of the Evangelical Lutheran Church of America and a Pastor at the English Evangelical Lutheran Church of the Good Shepherd in Bay Ridge, Brooklyn. I submit this declaration based on my personal knowledge and my own experience accompanying immigrants in New York City.

3. I was born and raised in Mexico. I came to the United States in 1986, as an unaccompanied minor when I was sixteen years old and was already studying for the priesthood. After being reunited with my family, I lived for years in the uncertainty and fear that come with being outside the formal legal system. My family also experienced life "in the shadows." That experience is one reason that radical hospitality and ministry with the most vulnerable among us has become central to my vocation and the understanding of who God is.

4. My faith teaches that the church must be present with people at the margins, with people who are poor, displaced, frightened, or treated as invisible. For me, this is not political

1

branding or occasional activism. It is Christian ministry. To be a Christian pastor means learning how to be a neighbor. It means walking with people when they are afraid. It means being present when the machinery of government is bearing down on someone who may not understand the language, the law, or what will happen next.

5. My immigration ministry has included pastoral care, legal-resource referrals, pro se support, food and mutual aid, funeral and burial assistance, hospital visits, support for families separated by detention or deportation, and accompaniment to immigration court and ICE appointments. During the pandemic, my church became a hub for relief work for immigrant families and essential workers. We distributed food, helped families arrange burials and repatriation of remains, and continued to serve people who were excluded from ordinary public benefits and afraid to seek help.

6. I helped launch what became the New Sanctuary Movement nationwide and the local Sanctuary Coalition in New York City in around 2007. From the beginning, the work of sanctuary in New York was inseparable from accompaniment. We worked with immigrant families, clergy, lawyers, organizers, politicians and community members. We asked families what they needed from us. One of the first things they told us was that they needed us to go with them to immigration court.

7. Since approximately 2007, I have accompanied immigrants to immigration court and ICE-related appointments on a regular basis. For many years, I have gone at least once a week, and often more, depending on the needs of the community. This work has continued across administrations. It did not begin with this lawsuit, and it will not end with this lawsuit.

2

II. Accompaniment Ministry and Protected Activity

8.  Accompaniment is not merely sitting silently in a courtroom. It begins before the hearing, when a person is afraid and needs to know that someone will walk with them. It includes entering the building together, going through security, using the elevators, waiting in hallways and waiting rooms, sitting in the gallery when space permits, quietly answering basic questions or helping someone find resources, praying when requested, and helping the person and family understand what happened after the hearing. The work also includes leaving the building safely together when the hearing is over.

9.  In my experience, the spaces used for accompaniment include the sidewalk or entrance area where people gather before entering, the building lobby, security screening area, elevators, hallways, waiting rooms, public restrooms, courtroom galleries, and the areas where people exit after court. If an accompanier is removed from any of those spaces without a lawful reason, the accompaniment is broken at the point when the person most needs support.

10. In earlier years, clergy and trained community accompaniers were recognized as part of the normal reality of immigration court in New York. Judges and court personnel knew who sanctuary accompaniers were. Some clergy wore collars. Some lay accompaniers wore sanctuary buttons. At times, judges recognized us and allowed us to sit with the person we were accompanying. That practice developed because people facing removal proceedings needed visible support and because the court system itself functioned more fairly when people were not alone.

11. I do not disrupt hearings. I do not block doorways. I do not interfere with courtroom order. I do not tell respondents to skip court. I do not attempt to stop lawful arrests by

force. My work is pastoral, informational, and supportive. When I speak with a respondent or family member, I do so quietly, individually, and only when the person wants that support. When I provide information, it is noncommercial and intended to help people understand where they can obtain lawful help, community support, or church support.

12. Accompaniment is especially important because many people in immigration court are confused, traumatized, or frightened. Many do not speak English. Many have been exploited by dishonest lawyers or notarios. Many have paid thousands of dollars and still do not understand what papers were filed, what their next deadline is, or what a judge just said. Many do not know the difference between legal advice, pastoral support, and community information. They often need someone they trust to help them slow down, breathe, listen, ask for help, and leave the building with dignity.

III. Change in Conditions at Immigration Court

13. Beginning around Spring of 2025, I observed that the atmosphere in and around the immigration courts has become more hostile and frightening. There is a regular presence of federal law-enforcement officers in and around the court spaces. People are afraid of being seized when they come to court. Families are afraid to speak, ask questions, or remain near the courtrooms. The fear affects not only respondents but also family members, clergy, volunteers, and observers.

IV. Courtroom Exclusion and Restrictions on Speech

14. On June 25, 2026, I went to 26 Federal Plaza to accompany a family. I was wearing clerical collar and was seated in the gallery of the courtroom.

15. During that proceeding, I observed a man being told that he had only a short time to decide whether he would accept departure from the United States. He told the court that he was about to marry his U.S. citizen partner that same day and that he had a newborn child. He said he did not want to leave his child behind. The situation was urgent and frightening.

16. As the man left the courtroom, I took notes and offered support during the hearing. I did not disrupt the hearing. I did not speak loudly. I did not block anyone. I was trying to help a person and family facing an immediate crisis.

17. A court employee or clerk saw me and asked who I was. I said that I was their priest. The employee told me to get up and leave. I said that I had a right to be there. I was still ordered out. I left the courtroom and used the opportunity to speak with the family outside.

18. Being removed in that way directly interfered with my ministry. The point of my presence was to offer pastoral support at the moment when it was most needed. Once that moment passes, the harm cannot be repaired later. A person who is frightened in immigration court cannot receive the same support hours later outside the building after the hearing has ended, after a deadline has passed, or after officers have taken someone away. I have had countless of traumatizing experience for those I accompany. When the ICE agents were masked or now that they are still hanging out on the halls and wearing their vests that identifies them as part of the government there is an increasing sense of harassment and uncertainty not only for those who are complying with the law. The recent experiences of visible, arbitrary abductions sow fear and distrust and send a clear message for those present and those awaiting to continue their legal proceeding and

5

seeking, ultimately, to have a chance to live in dignity. I have been pushed, pulled, shouted at, spit and abused. Since 2007, I have noticed, that those in the highest places in political power who utter and express their views on immigration, have a direct impact on how people are treated and gives license, to those who charged to execute those "views with an unprecedented cruelty and inhumanity across those who are seeking and believe in the protections of this great nation.

19. I have also experienced and observed restrictions on speaking with people in public areas of the immigration court. These restrictions interfere with quiet, consensual pastoral communication.

20. I have observed that restrictions are often imposed without any clear written rule, closure order, capacity explanation, or specific safety justification. When the reason for excluding clergy or accompaniers is unclear, the effect is intimidation. People stop asking for help. Volunteers hesitate to speak. Clergy cannot minister. Families are left alone in spaces where they are afraid.

V. Ongoing Need to Return and Requested Access

21. My need to return to immigration court is concrete. I will continue to accompany people to immigration court because my faith and ministry require it. This is not an abstract interest in observing government. It is a continuing obligation to walk with people who are facing fear, uncertainty, and possible removal.

22. Each time I return to the immigration court, I face the real possibility of being excluded again, silenced, or ordered out while performing my religious duty. If I am excluded from the courtroom, waiting room, hallway, elevator area, or other spaces necessary to

accompaniment, the person I am accompanying is left alone at the very moment when my ministry is most needed.

23. I seek only the ability to do what I and other clergy and community accompaniers have long done: attend ordinary, non-closed immigration court hearings when space permits; accompany people through the building; speak quietly and consensually with respondents and families in public waiting areas and hallways; provide individualized, noncommercial information about church, legal, and community resources; pray when requested; and remain with people before and after hearings unless there is a lawful, specific reason to restrict my presence.

24. I understand that the court must preserve lawful hearing closures, confidentiality, capacity limits, courtroom order, building security, and legitimate law-enforcement activity. I am not asking for permission to disrupt proceedings or interfere with lawful arrests. I am asking that defendants not use vague, categorical, or selectively enforced rules to prevent clergy from providing quiet pastoral support and accompaniment.

VI. ICE Interference and Coercive Environment

25. Early on January 6, 2026, at 26 Federal Plaza, I personally observed ICE officers who were wearing vests and the words ICE were printed on them do the following: I came out of the court room with a family who had a master hearing on the 12th., floor. After the judge gave them a date for a new hearing they were dismissed. I got up and followed them out of the courtroom. There were four of us flanking the family as we were aggressively approached by one of the mask agents. I was pushed to the side, violently, with one arm, and the other hand had a stock of mug shots as he kept yelling somebody's name. At this point the kids, two of them were crying and the mom as well. We were

7

pushed and he was taken to an elevator as I kept telling them that he was not the individual, whose name they kept shouting and looking for. Their conduct affected me directly by physically moving me away and preventing to accompany him as they threatened me with arrest. I was engaged in walking and counseling the family at the time. Even the court clerk, who came out of the court room after hearing the wailing and shouts in the hallway, was annoyed with the violent way the masked agents were proceeding. I was not obstructing, disrupting, blocking an arrest, or refusing a lawful order. Because I continue to return to the same court spaces, I reasonably expect to encounter the same conduct again. This ICE-specific conduct is distinct from lawful arrest, detention, transport, or removal; it was interference with my protected pastoral accompaniment and communication.

VII. Irreparable Harm

26. Without court protection, my ministry will continue to be burdened in a way that cannot be repaired later. When a pastor is prevented from praying, comforting, explaining, or simply standing with a person in fear, the injury is immediate. It triggers the trauma and the violence that the asylum seeker, who is complying with the law, has fled and is seeking the protection of the law. The person is intentionally left alone. The family is alone. The moment is gone.

VIII. Conclusion

27. I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 4, 2026, in New York, NY.

/s/ Rev. Juan Carlos Ruiz

Reverend Juan Carlos Ruiz

8