| | |
|---|---|
| **UNITED STATES DISTRICT COURT**<br>**SOUTHERN DISTRICT OF NEW YORK** | **1:26-cv-02130 (CM)** |
| FR. FABIÁN ARIAS, *et al.*<br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS<br>ENFORCEMENT, *et al.,*<br>Defendants. | **SECOND AMENDED**<br>**COMPLAINT** |

## SECOND AMENDED COMPLAINT

### INTRODUCTION

Plaintiffs submit this proposed Second Amended Complaint pursuant to the Court's June 22 and July 20, 2026 Orders. It cures the pleading deficiencies identified by the Court, incorporates factual allegations concerning subsequently issued agency guidance, and, pursuant to Federal Rule of Civil Procedure 15 and Local Civil Rule 15.1, seeks to add Reverend Juan Carlos Ruiz as a named plaintiff. (Dkt. No. 62 at 96–97; Dkt. No. 86 at 2–3, 7–8.)

For ease of use, a redlined version showing all changes from the prior Amended Complaint is appended below as Appendix A.

### PLAINTIFFS HAVE ARTICLE III STANDING TO SEEK RELIEF AGAINST ICE

The Court dismissed the claims against U.S. Immigration and Customs Enforcement ("ICE") and its senior official without prejudice for a narrow, defendant-specific pleading deficiency. The Amended Complaint referred collectively to federal agents, federal police, security personnel, and Defendants, but did not allege a specific instance in which an identified ICE officer, apart from carrying out or securing an arrest, detention, transport, or other enforcement operation, prohibited a named plaintiff from observing a hearing, communicating with a respondent, distributing information, or remaining in a publicly accessible area. The Court expressly

- 1 -

authorized amendment if Plaintiffs could allege a real and immediate threatened injury to a named plaintiff that is fairly traceable to ICE and redressable by prospective relief against ICE, while distinguishing unconstitutional interference with protected activity from lawful enforcement operations. Order at 33–35, ECF No. 62; see Am. Compl. ¶¶ 14, 17–19, 26–31, 40–44, 82–98, 103–18, 124–30, ECF No. 40.

The expanded allegations cure that precise deficiency. Named Plaintiff Laura McCallum identifies ICE agents as participants in repeated restrictions on her observation, movement, communication, and accompaniment, and she alleges a concrete intention to return to the same facilities. Named Plaintiff Stephen Kelly alleges that agents conducting an immigration seizure physically terminated his quiet explanation of a completed hearing even though he was neither obstructing nor interfering; the nature of the operation, ICE's own description of ERO's functions, and the surrounding record support the reasonable inference that the agents were ICE or ERO personnel. Reverend Juan Carlos Ruiz, if properly joined through an operative pleading, provides an additional and unusually explicit ICE-specific incident: officers wearing ICE-marked vests violently displaced him, threatened him with arrest, and prevented ongoing pastoral counseling while he was not obstructing any arrest. McCallum Decl. ¶¶ 1–10; Kelly Second Decl. ¶¶ 4–6, 37–41, 63–67, ECF No. 56; Ruiz Aff. ¶¶ 21–26; Harrington Decl. ¶¶ 1, 6–10, ECF No. 50; see Am. Compl. ¶¶ 1–3, 9–19, 40–44, 82–98, 107–18, 124–30.

The remaining declarations do not substitute nonparties' injuries for named-plaintiff standing. They corroborate who imposed the challenged restrictions, how ICE and ERO personnel are identified in the court environment, whether the conduct is recurring rather than accidental, whether the challenged actions were collateral to rather than necessary for lawful enforcement, and whether the conduct would deter a person of ordinary firmness from protected activity. That corroborating evidence directly answers the Court's concerns about agency attribution, recurrence,

and the distinction between lawful enforcement and unconstitutional interference. See Order at 33–35, 66–69; Am. Compl. ¶¶ 1–3, 12–19, 96, 107–18, 124–30.

### I. THE GOVERNING ARTICLE III STANDARD IS SATISFIED.

Article III requires injury in fact, fair traceability, and likely redressability. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992). Because Defendants' jurisdictional objection is facial, Plaintiffs bear no evidentiary burden at the pleading stage; the Court accepts all material allegations as true, draws reasonable inferences in Plaintiffs' favor, and asks only whether the pleading affirmatively and plausibly suggests standing. Carter v. HealthPort Technologies, LLC, 822 F.3d 47, 56–57 (2d Cir. 2016); John v. Whole Foods Market Group, Inc., 858 F.3d 732, 736 (2d Cir. 2017). General factual allegations may suffice because courts presume that they embrace the specific facts necessary to support the claim. Lujan, 504 U.S. at 561; Order at 26–27.

For prospective relief, a plaintiff must allege a real and immediate threat of similar future injury, not merely a completed past wrong. City of Los Angeles v. Lyons, 461 U.S. 95, 102, 105–06 (1983); Nicosia v. Amazon.com, Inc., 834 F.3d 220, 239 (2d Cir. 2016). Repeated past injuries are nevertheless evidence of likely recurrence, particularly where the plaintiff regularly returns to the same place, performs the same activity, and confronts the same asserted practice. O'Shea v. Littleton, 414 U.S. 488, 495–96 (1974); Order at 27–33. Standing must exist for each claim and form of relief and must be established against each defendant. Davis v. Federal Election Commission, 554 U.S. 724, 734 (2008); Summers v. Earth Island Institute, 555 U.S. 488, 499 (2009).

The retaliation theory supplies an independently cognizable injury. Official reprisal for protected expression violates the First Amendment because it threatens to inhibit exercise of the protected right. Hartman v. Moore, 547 U.S. 250, 256 (2006). A plaintiff plausibly pleads retaliation by alleging protected activity, adverse action that would deter a similarly situated person

of ordinary firmness, and a causal connection between the two. Walker v. Senecal, 130 F.4th 291, 298–99 (2d Cir. 2025). Retaliatory intent may be inferred from temporal proximity, statements linking the official response to protected activity, or other circumstantial facts; it need not be proved in the pleading. Posr v. Court Officer Shield No. 207, 180 F.3d 409, 418 (2d Cir. 1999); Order at 66–69.

## II. THE RECORD IDENTIFIES ICE AND ERO PERSONNEL WITH SUFFICIENT SPECIFICITY.

The absence of a visible personal name or badge number does not make the responsible agency unknowable. ICE's own supervisory declarant states that Enforcement and Removal Operations ("ERO") is an ICE component, that ERO deportation officers make immigration arrests, and that the New York City Field Office is located at 26 Federal Plaza. Harrington Decl. ¶¶ 1–2, 6, ECF No. 50. Thus, a witness who personally observes "ERO" markings has identified ICE, not an indeterminate federal entity. Glacel personally observed officers with ICE badges or ERO markings in the relevant court spaces, including the ERO-marked personnel who entered a courtroom and engaged in the simulated-rifle display described below. Glacel Decl. ¶¶ 10–18, ECF No. 54; see Am. Compl. ¶¶ 12–19, 26, 96, 113–18, 124–30.

Other declarants identify ICE through express vest or agency markings, repeated observation in the same court environment, the officers' own words and conduct, or a careful limitation to "ICE or other federal law-enforcement" personnel when agency identity was less certain. Ruiz saw the word "ICE" printed on the officers' vests. Ruiz Aff. ¶ 25. Bowen repeatedly observed ICE personnel outside immigration courtrooms and was personally pushed by an ICE officer. Bowen Decl. ¶¶ 5–9, 19–25, ECF No. 66. Conwesser distinguished ERO-marked agents from other plainclothes personnel. Conwesser Decl. ¶¶ 5–7, ECF No. 67. Sigman described police-style uniforms and apparent ICE markings, while expressly presenting that identification as

- 4 -

apparent rather than certain. Sigman Decl. ¶¶ 4–6, ECF No. 69. Bender likewise identified ICE or other federal law-enforcement agents and did not overstate which category applied to every encounter. Bender Decl. ¶¶ 5–13, ECF No. 68; see Am. Compl. ¶¶ 14, 17–19, 26, 85–96, 113–18.

The practical difficulty of recording individual names is itself documented. Agents frequently wear masks, tactical clothing, sunglasses, or other gear that obscures identity, and they do not consistently provide names or badge numbers when challenged. Kelly Second Decl. ¶ 41, ECF No. 56; Bowen Decl. ¶¶ 5–9, 24–25; Schulman Decl. ¶¶ 8–15, ECF No. 57. At the pleading stage, Plaintiffs need not identify every individual officer by name where the allegations identify the agency, describe the actor, date, location, protected activity, and challenged act with sufficient specificity to render ICE causation plausible. Carter, 822 F.3d at 56–57; Whole Foods, 858 F.3d at 736; see Am. Compl. ¶¶ 12–19, 96, 103–18.

## III. NAMED PLAINTIFFS ALLEGE CONCRETE, RECURRING, ICE-SPECIFIC INJURIES.

### A. McCallum alleges repeated interference by ICE and a concrete intent to return.

McCallum attends immigration court approximately once per week to observe proceedings, provide nonlegal information, and accompany respondents, and she intends to continue. She states that, beginning in June 2025, she was repeatedly prevented from observing and accompanying by ICE agents and building-security personnel acting under federal authority. The restrictions included exclusion from public waiting rooms, prohibitions on standing or walking in public hallways, directives separating observers from immigrants and preventing communication, unequal restrictions on phone use, and denial of courtroom reentry. On multiple occasions, ICE agents or security personnel told her that necessary hallways were private or off limits. McCallum Decl. ¶¶ 1–7; see Am. Compl. ¶¶ 82–93, 95–98.

McCallum was turned away at courtroom doors between approximately fifteen and twenty-five times and removed from courtrooms approximately fifteen times, without a cited closure order, capacity determination, or case-specific safety basis. She also personally observed ICE agents stationed at courtroom thresholds, demanding identification without explanation, issuing abrupt commands, pushing a volunteer, and forcefully grabbing a journalist in an elevator, causing another person to fall and strike the floor. Those experiences heightened her fear of retaliation and chilled her continued observation. She alleges that the practices remain ongoing and that declaratory and injunctive relief would allow her to resume observation and accompaniment without ICE interference. McCallum Decl. ¶¶ 8–10; see Am. Compl. ¶¶ 84–98, 103–18, 124–30.

These allegations satisfy injury, imminence, traceability, and redressability as to McCallum. Her injuries are personal rather than ideological; they recur in the same two facilities during the same weekly activity; she expressly identifies ICE among the personnel imposing the restrictions; and an injunction directed to ICE would prevent ICE personnel from repeating their portion of that conduct. Lujan, 504 U.S. at 560–61; Nicosia, 834 F.3d at 239; see Am. Compl. ¶¶ 82–98, 125–30.

**B. Kelly alleges physical termination of protected communication during an ICE-type enforcement operation.**

Kelly attends the immigration courts approximately once per week as an observer, attorney, organizer, and accompanier and intends to continue. Kelly Second Decl. ¶¶ 4–6, ECF No. 56; Am. Compl. ¶¶ 40–44. On June 23, 2025, after a completed hearing with a favorable result, Kelly spent several minutes in the hallway explaining that result to a respondent and priest who did not understand English. When the group began walking toward the elevator, military-equipped government agents suddenly rushed them, forcibly separated Kelly, seized the respondent, and removed him in handcuffs. Kelly states that he was not blocking the corridor, obstructing the

agents, or interfering with an arrest; he was explaining the completed proceeding. Kelly Second Decl. ¶¶ 37–39; Am. Compl. ¶ 42.

The agency inference is plausible and specific. The agents were carrying out a post-hearing immigration seizure at 26 Federal Plaza. ICE's own supervisory declarant identifies ERO as ICE's immigration-arrest component, states that ICE's New York City Field Office is located at 26 Federal Plaza, and acknowledges that ICE officers conduct post-hearing arrests and use the elevators for processing. Harrington Decl. ¶¶ 1–2, 6, 9–10. Taken together with the pleaded allegation and the Court's obligation to draw reasonable inferences in Plaintiffs' favor, those facts plausibly attribute the separation to ICE or ERO personnel. Whole Foods, 858 F.3d at 736; see Am. Compl. ¶¶ 19, 36, 42–44, 94, 113–18.

The constitutional injury is not the fact that ICE arrested or transported another person. It is the unnecessary physical termination of Kelly's protected explanation and association when he was not obstructing the operation. An injunction requiring ICE personnel to refrain from physically separating or silencing a nonobstructive speaker except where reasonably necessary to carry out a lawful operation would directly redress that injury while leaving arrest, detention, transport, and removal authority intact. Order at 34–35, 95; see Am. Compl. ¶¶ 17–19, 42–44, 113–18, 125–30.

**C. Arias alleges repeated injury and a continuing obligation to return; the additional record supplies the ICE attribution.**

Father Arias has accompanied immigrants to immigration court multiple times each week for nearly twenty years because accompaniment is a religious duty. He has repeatedly been ordered not to speak with persons requesting his help, removed from courtrooms, hallways, and the building, and subjected to a militarized federal-law-enforcement environment that directly impairs his ministry and causes personal distress. He continues to return and faces the real possibility of

being excluded, silenced, or expelled again. Arias Aff. ¶¶ 1–7; see Am. Compl. ¶¶ 22–39, 107–18, 124–30.

Arias's affidavit uses the broader term "federal agents" and should not be overstated as independently identifying every actor as ICE. But Conwesser separately observed a federal employee identified in contemporaneous reporting as ICE scream at Arias in a packed waiting area over alleged photography while several agents occupied the waiting room and hall. Conwesser Decl. ¶ 3, ECF No. 67. Kelly also records reported hostility directed toward Arias and alleged public comments about Plaintiffs, expressly labeling that information as reported rather than personally observed. Kelly Second Decl. ¶¶ 47–51. These facts corroborate ICE-specific targeting, but Arias's standing need not depend on the reported incidents because McCallum and Kelly independently allege ICE-traceable injury. See Am. Compl. ¶¶ 22–39, 113–18, 125–30.

**D. Ruiz, if joined through an operative pleading, independently alleges direct ICE interference.**

The Court has not yet made Ruiz a party; it denied the prior joinder motion without prejudice because Plaintiffs did not attach clean and redlined proposed pleadings as required by Local Civil Rule 15.1. July 20 Order at 2–3, ECF No. 86. Accordingly, Plaintiffs do not rely on Ruiz as a substitute for the standing of existing named plaintiffs. If properly joined, however, Ruiz independently satisfies every element of ICE-specific prospective standing.

Ruiz has accompanied immigrants to immigration court and ICE appointments regularly since approximately 2007 and will continue because his faith and ministry require it. Accompaniment includes walking through the building, waiting, quiet counseling, prayer, explanation, and leaving safely after court. Ruiz Aff. ¶¶ 5–12, 21–24. On January 6, 2026, officers wearing vests printed with the word "ICE" approached a family Ruiz was counseling after a master-calendar hearing. A masked agent violently pushed Ruiz aside while holding mugshots and

yelling a name; the children and mother cried; the officers moved the group toward an elevator and threatened Ruiz with arrest. Ruiz states that he was walking and counseling, was not obstructing or blocking any arrest, and was prevented from continuing accompaniment. Because he continues to return, he reasonably expects the same conduct again. Ruiz Aff. ¶¶ 21–26; see Am. Compl. ¶¶ 1–3, 9–19, 107–18, 124–30.

Ruiz's allegations track exactly the distinction required by the Court: the requested relief would not prohibit ICE from making a lawful arrest, but would prohibit ICE personnel from using unnecessary force or threats to terminate quiet pastoral communication and accompaniment by a nonobstructive minister. Order at 34–35, 95; Ruiz Aff. ¶¶ 24–26; see Am. Compl. ¶¶ 17–19, 113–18, 125–30.

## IV. ICE EXERCISES DE FACTO OPERATIONAL CONTROL OVER COURT-ACCESS RESTRICTIONS

Defendants' own declarations state that EOIR controls its courtrooms and waiting rooms, GSA manages the buildings, and FPS and its contract security officers enforce federal-building access and visitor-conduct rules. *See* Welsh Decl. ¶¶ 4–5, 7–8, 12–16 (ECF No. 47); Steichen Decl. ¶¶ 4–8 (ECF No. 48). ICE separately disclaims any role in regulating access, security, speech, written materials, hallways, waiting rooms, or elevator banks. Harrington Decl. ¶¶ 7–8 (ECF No. 50).

The record shows otherwise in practice. ICE agents began announcing and enforcing purported "EOIR rules," including restrictions on speaking with respondents, distributing papers, using phones, and remaining in waiting rooms or hallways. Ehrman Decl. ¶¶ 12–14, 21–22 (ECF No. 65). Although an EOIR supervisor confirmed that EOIR controlled courtrooms and waiting rooms and GSA controlled hallways, ICE agents physically removed Ehrman from an EOIR

waiting room, blocked his return, and ensured that he entered an elevator; GSA personnel thereafter provided no meaningful intervention. *Id.* ¶¶ 15–19.

ICE agents likewise issued speech and access restrictions to Vasquez, summoned security to enforce their commands, and personally expelled her. Vasquez Decl. ¶¶ 2–4 (ECF No. 71). Security personnel told Vasquez that ICE supervisors decided who could remain in hallways or courtrooms and that security enforced those decisions. *Id.* ¶ 12. Other witnesses similarly describe ICE or ICE-associated agents confiscating materials, excluding observers from waiting rooms and hallways, obstructing courtroom access, threatening arrest, and physically removing or separating accompaniers. *See* Bender Decl. ¶¶ 5–10, 13 (ECF No. 68); Sigman Decl. ¶¶ 5–6, 10–11 (ECF No. 69); Kelly Decl. ¶¶ 12, 19–20 (ECF No. 41).

ICE also entered an immigration courtroom and scanned respondents until an EOIR clerk ordered the agents out, and in another incident pressed an immigration judge to surrender a respondent who remained inside the courtroom. Glacel Decl. ¶¶ 17–23 (ECF No. 54); Bowen Decl. ¶¶ 13–17 (ECF No. 66).

The record therefore supports the inference that, although EOIR, GSA, and FPS retain nominal authority, ICE repeatedly exercises the immediate operational power that determines whether observers may speak, distribute information, remain in court-adjacent spaces, accompany respondents, or continue observing proceedings. *See, e.g.,* Ehrman Decl. ¶¶ 12–22 (ECF No. 65); Vasquez Decl. ¶¶ 2–4, 12–14 (ECF No. 71); Bender Decl. ¶¶ 5–10, 13 (ECF No. 68).

## IV. THE DECLARATIONS DOCUMENT DIRECT ICE INTERFERENCE WITH SPEECH, INFORMATION-SHARING, ACCOMPANIMENT, AND MOVEMENT.

### A. ICE agents prohibited rights advice and individualized information-sharing.

Ehrman's declaration provides the clearest direct evidence. ICE agents began announcing "no soliciting," singled out volunteers who handed respondents papers, and prohibited the volunteers' individualized information forms. After Ehrman told a family that they had a constitutional right to remain silent, ICE agents immediately told him he could not speak with the family, could not remain in the hallway, and had to be inside a courtroom or leave; an agent later briefly blocked his path. Ehrman Decl. ¶¶ 11–15, ECF No. 65; see Am. Compl. ¶¶ 2, 17–18, 107–12, 125–30.

The next day, after Ehrman again advised a respondent of the right to remain silent, ICE agents raised their voices, told him he could not speak or remain in the waiting room, surrounded him, physically directed him to the elevators, and ensured that he left the floor. On another occasion, an ICE agent seized a handwritten information note exchanged between a volunteer and respondent and characterized the exchange as solicitation. ICE personnel also purported to enforce a no-phone rule against respondents in the waiting area. Ehrman Decl. ¶¶ 16–22; see Am. Compl. ¶¶ 107–18, 125–30.

Vásquez likewise states that ICE agents were among the personnel who ordered observers from waiting rooms, prohibited them from speaking with respondents, and prohibited distribution of know-your-rights material. A female ICE agent accused Vásquez of photographing agents merely because she was holding a phone, yelled at her, and expelled her. On another occasion the same agent followed directly behind Vásquez while yelling and insulting her and placed a hand on

her until Vásquez objected. Vásquez Decl. ¶¶ 2–5, ECF No. 71; see Am. Compl. ¶¶ 2, 17–18, 92–93, 107–18, 125–30.

Bender identifies ICE or other federal law-enforcement agents who told observers they could not speak with respondents, distribute papers, remain in designated waiting rooms, or remain in hallways. Agents entered waiting rooms to terminate conversations, took blank information cards from volunteers, and caused volunteers to conceal completed cards to prevent confiscation. Bender was expelled from public waiting areas or hallways approximately three or four times and was sometimes blocked from courtrooms and ordered to leave the building. Bender Decl. ¶¶ 3–13, ECF No. 68; see Am. Compl. ¶¶ 2, 17–18, 92, 107–18, 125–30.

At 201 Varick Street, Sigman observed armed personnel in police-style uniforms with apparent ICE markings aggressively confront a co-volunteer over a know-your-rights flyer she was only holding, order her to leave, and falsely claim that surveillance video showed distribution. The personnel then entered a courtroom, removed the person who was actually carrying flyers—reported to Sigman as a lawyer—and escorted her from the building. Sigman Decl. ¶¶ 4–6, ECF No. 69; see Am. Compl. ¶¶ 2, 17–18, 110–18, 125–30.

Glacel identifies ICE among the personnel who treated handwritten or typed notes, texting, collection of contact information or A-numbers, photography, passing written information, and speaking with respondents as prohibited or suspicious. The commands were accompanied by threats of removal from the courtroom or floor, expulsion from the building, permanent exclusion, or trespass treatment. Because Glacel identifies several categories of personnel, her declaration establishes ICE participation in the pattern without assigning every individual command exclusively to ICE. Glacel Decl. ¶¶ 10–15, ECF No. 54; see Am. Compl. ¶¶ 2, 17–18, 107–18, 125–30.

**B. ICE agents physically interrupted accompaniment and protected association.**

Vásquez was accompanying a young woman out of court when ICE approached. Agents ordered Vásquez to leave the woman, and an ICE agent grabbed Vásquez's arm, causing the accompaniment to end. Vásquez Decl. ¶ 8; see Am. Compl. ¶¶ 9–11, 17–19, 85–96, 113–18, 125–30. Bender describes agents allowing a respondent to proceed while blocking Bender, forcing a visibly frightened respondent to continue alone. Bender Decl. ¶¶ 9–11; see Am. Compl. ¶¶ 9–11, 17–19, 107–18, 125–30.

Conwesser was accompanying a respondent and the respondent's older brother when ERO-marked and plainclothes agents approached from behind and grabbed the brother, who had already received asylum and had no hearing that day. When Conwesser stated that he had asylum, an agent told her, in substance, to be quiet because the agents were not speaking to her. The agents questioned the man while holding a photograph and released him without explanation. Conwesser Decl. ¶¶ 5–15; see Am. Compl. ¶¶ 9–11, 17–19, 107–18, 125–30.

Schulman commonly encountered groups of masked ICE agents in hallways, waiting rooms, and elevator banks. On one occasion agents followed a person he was accompanying away from the court area, pushed or shoved that person, and pushed Schulman as well. Schulman Decl. ¶¶ 8–15, ECF No. 57; see Am. Compl. ¶¶ 17–19, 113–18, 125–30. Bowen was personally pushed by an ICE officer in a narrow corridor at 290 Broadway after she had been sitting with a respondent; she states that she was near the agents but was not interfering. Bowen Decl. ¶¶ 19–23; see Am. Compl. ¶¶ 17–19, 94, 113–18, 125–30.

Mun describes ICE personnel challenging volunteers' ordinary movement through hallways, including telling her that she was not supposed to be in a hallway while she was walking to a restroom. She was also speaking with and accompanying a nervous Jamaican respondent toward the restroom before the respondent's hearing when ICE took the woman, ending the

communication and preventing the woman from reaching the scheduled hearing. Mun Decl. ¶¶ 10–13, ECF No. 70; see Am. Compl. ¶¶ 9–11, 17–19, 85–96, 107–18, 125–30.

**C. ICE personnel exercised or purported to exercise access control in court-adjacent spaces.**

The witness evidence contradicts ICE's categorical assertion that its officers neither control public access nor expel persons for speaking or sharing information. Harrington Decl. ¶¶ 7–9. McCallum attributes repeated waiting-room, hallway, communication, and reentry restrictions jointly to ICE and building security. McCallum Decl. ¶¶ 4–10; see Am. Compl. ¶¶ 84–98, 103–18. Bender describes agents entering waiting rooms to end conversations, blocking courtroom entry, and ordering observers from the building. Bender Decl. ¶¶ 6–13; see Am. Compl. ¶¶ 103–18. Sigman describes apparent ICE personnel blocking a respondent in a courtroom doorway, demanding identification and court documents, rejecting the explanation that the judge had released her, and following the group to the restroom. Sigman Decl. ¶¶ 6–9; see Am. Compl. ¶¶ 85–96, 103–18.

Vásquez further states that security personnel told her ICE supervisors decided who could enter and that security enforced those decisions. After she obtained access by entering with Congressman Dan Goldman, the same ICE agent later invoked that intervention while expelling her again. Vásquez Decl. ¶¶ 12–14; see Am. Compl. ¶¶ 85–96, 103–18, 125–30. Even if discovery ultimately shows that ICE lacked formal authority to set building-wide rules, a federal officer who actually orders a person out, physically prevents entry, or directs security to enforce an exclusion causes the resulting injury for Article III purposes. Lujan, 504 U.S. at 560–61.

Kelly also records reports that ICE blocked a principal waiting-room entrance until Congressman Goldman intervened, rounded up members of the public and escorted them out on another date, and jammed elevator doors open to keep people on a court floor. Kelly expressly

identifies those accounts as reported information for which he sought corroboration. They therefore are not offered as an independent basis for standing, but they are consistent with the personally observed evidence of ICE participation in access control. Kelly Second Decl. ¶¶ 47, 53; see Am. Compl. ¶¶ 85–96, 103–18.

## V. THE SAME RECORD PLAUSIBLY ALLEGES FIRST AMENDMENT RETALIATION AND AN OBJECTIVELY COERCIVE INJURY.
### A. Several incidents expressly connect adverse action to protected activity.

Ehrman's encounter contains an express causal link. After Ehrman repeatedly advised respondents of the right to remain silent, an ICE agent told an EOIR supervisor that "he's going to keep doing this." Three masked ICE agents then surrounded Ehrman, physically escorted him toward the elevators, blocked his return, mocked his education and volunteer work, and ensured that he left the floor. Ehrman thereafter substantially stopped attending because the agents knew his face and he feared that his presence would draw ICE attention to respondents. Ehrman Decl. ¶¶ 16–20; see Am. Compl. ¶¶ 17–18, 107–18, 125–30. The sequence, the agent's words, the immediate escalation, and the resulting chill plausibly allege protected activity, adverse action, and retaliatory causation. Walker, 130 F.4th at 298–99; Posr, 180 F.3d at 418.

Vásquez's evidence is similarly direct. After she regained waiting-room access by entering with Congressman Goldman, the same ICE agent expelled her approximately six weeks later and stated, "Go get your fucking little congressman Goldman to help you." Vásquez understood the statement as evidence that the agent remembered the earlier intervention and held a grudge. Vásquez Decl. ¶¶ 12–14; see Am. Compl. ¶¶ 17–18, 93–98, 113–18, 125–30. The officer's express reference to the protected effort to obtain governmental assistance permits a reasonable inference of retaliatory motive. Posr, 180 F.3d at 418.

Sigman likewise heard a masked, armed agent threaten arrest for anyone who remained in the hallway and add, "These fucking advocates." The statement expressly linked the threatened

- 15 -

arrest to the observers' identity and accompaniment activity; Sigman and her co-volunteer were forced to abandon the respondent they had come to accompany. Sigman Decl. ¶¶ 10–11; see Am. Compl. ¶¶ 17–19, 85–96, 113–18, 125–30. A threat of arrest directed at "advocates" would deter a person of ordinary firmness from continuing accompaniment. Walker, 130 F.4th at 298–99.

Vásquez's phone incidents provide additional circumstantial evidence. A female ICE agent yelled at her for holding a phone, accused her of photographing agents, expelled her, and on another occasion followed directly behind her while yelling, insulting, and touching her. Vásquez Decl. ¶¶ 3–5; see Am. Compl. ¶¶ 17–18, 93–98, 113–18, 125–30. Personalized insults, unnecessary physical proximity, repeated targeting by the same officer, and physical contact permit an inference that the response was intended to deter documentation and observation rather than neutrally enforce a general rule. Posr, 180 F.3d at 418.

**B. The broader record establishes recurrence and objective deterrence, while preserving the distinction between intimidation and lawful enforcement.**

Glacel observed several ICE or ERO agents march into an active courtroom, move toward the front, turn, and visibly scan particular people. After being directed out, they remained nearby and made statements including words to the effect of "He's definitely in there" or "We've got him." One agent raised both hands in a rifle-like aiming gesture and referred to having someone "in our sights" or being able to "tag him out." Glacel Decl. ¶¶ 15–23; see Am. Compl. ¶¶ 12–19, 113–18, 125–30. After that display, a respondent turned pale and refused to leave the courtroom, another abandoned a trip to the restroom, and respondents hurried or ran through the hallways. Agents also leaned toward Glacel and a seventh-grade child as they passed, making ordinary movement frightening. Glacel Decl. ¶¶ 16, 24–31; see Am. Compl. ¶¶ 26, 113–18.

Halabi repeatedly observed groups of ICE agents enter waiting rooms, sit among immigrants with their feet up, joke for twenty to forty minutes, and leave without taking anyone.

On other occasions, agents publicly examined posted docket names and again left without an arrest. Halabi perceived the apparent purpose and effect as intimidation because everyone waiting was terrified and did not know whom ICE might target. Halabi Decl. ¶¶ 4–6, ECF No. 72; see Am. Compl. ¶¶ 12–19, 26, 113–18. Plaintiffs do not contend that ICE's mere presence is unlawful. The relevance is that repeated, nonoperational occupation of the precise spaces used for court participation supports recurrence, purpose, and the ordinary-firmness element when combined with direct threats, expulsions, and physical interference.

Bowen repeatedly observed approximately ten to twelve ICE officers, often almost completely masked and without visible badges, standing in forbidding clusters outside courtrooms and carrying photographs or identifying papers. She saw a woman rush to a restroom to vomit from fear and another woman collapse in her arms. One respondent refused to leave a courtroom because ICE officers were waiting immediately outside; after the courtroom was cleared, the man was detained. Bowen also observed people grabbed and pushed and was herself shoved despite noninterference. Bowen Decl. ¶¶ 5–25; see Am. Compl. ¶¶ 12–19, 26, 94, 113–18, 125–30.

Bender describes masked, armed agents gathering in groups, crowding hallways, and forcing immigrants and observers to pass single file while being questioned. Respondents visibly shook. Bender also observed agents stop people leaving court and say, almost jokingly, "Let me see your papers," before allowing them to pass, even when no arrest appeared to follow. Bender Decl. ¶¶ 5, 9–13; see Am. Compl. ¶¶ 12–19, 26, 85–96, 113–18. These facts are relevant not because every document request is independently unconstitutional, but because the arbitrary use of apparent authority in the immediate path of protected observation and accompaniment makes the direct threats and exclusions objectively deterrent.

Conwesser observed plainclothes and ERO-marked agents scan a packed waiting room, watch faces, gather near the elevator route, and then grab a person who was not the respondent and

had already received asylum. They questioned him while holding a photograph and released him without explanation or apology. Conwesser Decl. ¶¶ 5–15; see Am. Compl. ¶¶ 12–19, 26, 113–18. She separately observed a federal employee identified in reporting as ICE scream at Father Arias in a packed waiting room over alleged photography while several agents occupied the area. Conwesser Decl. ¶ 3; see Am. Compl. ¶¶ 22–39, 113–18. The latter identification is reporting-based and is offered with that limitation.

Sigman describes apparent ICE personnel aggressively rushing volunteers over a flyer, yelling at close range, falsely invoking surveillance video, and enclosing the volunteers on four sides in a small space. She also describes approximately ten to twelve armed agents ostentatiously handling sheets with names and photographs, blocking a respondent in a courtroom doorway, rejecting the judge's release as irrelevant, and following the group to the restroom. On another occasion, a mother and two young children had to pass through a hallway lined with large, armed, masked agents and cameras; volunteers shielded a child's face, the child clung to a stuffed animal, and the mother cried after reaching the elevator. Sigman Decl. ¶¶ 4–11; see Am. Compl. ¶¶ 12–19, 26, 85–96, 113–18.

Mun observed ICE and other federally marked police wearing masks and reflective sunglasses indoors, hovering over volunteers and immigrants, and sometimes lining a hallway in a group of approximately twelve. She describes the conduct as menacing and reports that the environment caused volunteers to experience panic attacks before entering the building. Mun Decl. ¶¶ 10, 14–15; see Am. Compl. ¶¶ 12–19, 26, 113–18. Mun also observed ICE take a nervous respondent en route to the restroom before the scheduled hearing, demonstrating how the enforcement environment can terminate communication and court participation at the moment of compliance. Mun Decl. ¶¶ 12–13; see Am. Compl. ¶¶ 17–19, 113–18.

Breyer and other clergy encountered four or five masked ICE officers positioned on both sides of the only route to a closed courtroom door at 26 Federal Plaza. The observers later watched respondents emerge and be taken by masked ICE personnel through the waiting area while observers were excluded from following. Breyer Decl. ¶¶ 7–13, ECF No. 53; see Am. Compl. ¶¶ 9–19, 22–39, 103–18. The exclusion itself was not attributed to ICE, but the ICE deployment is relevant to the practical and emotional consequences of being separated from persons who requested accompaniment.

McCallum observed ICE agents stationed immediately outside courtroom thresholds, monitoring people as they exited, demanding identification without explanation, and issuing abrupt commands that frightened immigrants and volunteers. She also observed an ICE agent push a volunteer at 290 Broadway and ICE agents forcefully grab a journalist in an elevator, causing another person to fall. McCallum Decl. ¶¶ 8–10; see Am. Compl. ¶¶ 86–98, 113–18. Harrington disputes the precise mechanics of the September 30 incident, but admits that ICE officers grabbed a reporter's shoulders and arms to remove him from the elevator during the same operation. Harrington Decl. ¶¶ 10–11; compare Am. Compl. ¶¶ 19, 36, 43, 94.

Schulman repeatedly encountered groups of approximately three to seven ICE agents in hallways, waiting rooms, and elevator banks, many wearing masks or sunglasses, and experienced agents following and pushing an accompanied person and pushing Schulman. Schulman Decl. ¶¶ 8–15; see Am. Compl. ¶¶ 12–19, 26, 113–18. Arias describes federal officers regularly patrolling ministry spaces in tactical or paramilitary gear, sometimes carrying military-style weapons, frightening the people he serves and causing him direct distress rooted in his experience of authoritarian abuse. Arias Aff. ¶¶ 3–7; see Am. Compl. ¶¶ 22–39, 113–18.

Ruiz's January 6 incident likewise occurred in front of children. The masked ICE officer violently pushed Ruiz aside while holding mugshots and yelling a name; the children and mother

cried; and agents threatened Ruiz with arrest as he attempted to explain that they had the wrong person. Ruiz Aff. ¶ 25; see Am. Compl. ¶¶ 9–19, 113–18. Vásquez describes ten to fifteen ICE agents lining exit routes while volunteers accompanied a pregnant mother, a father carrying a sleeping child, and their family. Agents stood on both sides of the hallway and made comments including "Are you proud?" and references to criminals; the family and observers cried after reaching the subway. Vásquez Decl. ¶¶ 9–11; see Am. Compl. ¶¶ 12–19, 26, 113–18.

Phillips observed a respondent emerge and be immediately detained by ICE while Phillips and other observers were being kept from the hearing by court personnel; the respondent's friend had also been denied entry. Am. Compl. ¶¶ 66–74. Plaintiffs do not attribute the exclusion to ICE on that basis, and they do not contend that the visible detention alone establishes standing against ICE. The incident is relevant only to the environment in which the inability to observe and accompany becomes immediately consequential. See Am. Compl. ¶¶ 12–19, 66–81, 113–18.

Kelly records additional reports that an agent called a volunteer working with children a "pedophile," that an agent rebuffed Arias with unusual hostility, and that agents made public homophobic comments about Plaintiffs in this litigation. Kelly expressly labels these matters as reported rather than personally observed information. Plaintiffs therefore offer the reports only as corroboration of fear and retaliatory context, not as an independent basis for Article III standing. Kelly Second Decl. ¶¶ 47–51, ECF No. 56; see Am. Compl. ¶¶ 17–19, 40–44, 113–18, 125–30.

## VI. THE ICE-SPECIFIC INJURIES ARE FAIRLY TRACEABLE TO ICE AND REDRESSABLE BY NARROW PROSPECTIVE RELIEF.

Traceability is straightforward where an ICE officer personally orders silence, seizes an informational exchange, directs a speaker to the elevator, grabs an accompanier's arm, pushes an observer, blocks entry, threatens arrest, or causes security personnel to enforce an ICE-directed

exclusion. Those acts directly produce the loss of speech, association, observation, accompaniment, movement, or participation alleged. Lujan, 504 U.S. at 560. The fact that EOIR, FPS, GSA, or contract security may control other aspects of the same building does not sever causation for conduct ICE personnel themselves undertake. See Am. Compl. ¶¶ 12–19, 96, 107–18, 125–30.

Harrington's declaration states that ICE officers do not set court-security or access rules and do not prohibit public speech or materials. Harrington Decl. ¶¶ 7–9. That merits denial cannot control a facial standing challenge where the proposed pleading alleges specific contrary acts and the declarations identify the actors, conduct, locations, and protected activities. Carter, 822 F.3d at 56–57; Whole Foods, 858 F.3d at 736. The conflict presents a factual issue for discovery and merits adjudication, not a basis to disregard well-pleaded ICE-specific allegations.

Redressability is equally direct. An injunction binds the agency, its officers, agents, servants, employees, and attorneys who receive actual notice. Fed. R. Civ. P. 65(d)(2)(A)–(B). Relief prohibiting ICE personnel from imposing or directing categorical speech and access restrictions, physically separating nonobstructive accompaniers because of protected activity, seizing individualized informational exchanges, threatening arrest because a person is observing or advocating, or retaliating against persons who seek help from elected officials would prevent repetition of the identified injuries. A favorable decision need not eliminate every source of harm; it is enough that it would meaningfully reduce the injury attributable to ICE. See Lujan, 504 U.S. at 561; Massachusetts v. EPA, 549 U.S. 497, 525–26 (2007).

Relief against EOIR, FPS, or GSA cannot fully redress actions taken by ICE officers acting under ICE command. EOIR may control courtroom decorum, FPS may control entrance security, and GSA may manage the building, but none can substitute for an order binding ICE personnel who personally interrupt speech, seize papers, grab accompaniers, issue threats, or direct

- 21 -

exclusions. The existence of overlapping agency responsibility therefore strengthens, rather than defeats, defendant-specific redressability. See Order at 8–11, 33–35; Am. Compl. ¶¶ 12–19, 96, 99–102, 107–18, 125–30.

## VII. THE REQUESTED RELIEF CAN EXPRESSLY PRESERVE LAWFUL ENFORCEMENT OPERATIONS.

Plaintiffs do not seek to enjoin constitutional detention, transportation, removal, or legitimate steps reasonably necessary to secure those operations. Order at 34–35, 95. The challenged conduct is collateral: silencing a pastor who is quietly counseling; terminating a completed legal explanation by a nonobstructive attorney; confiscating a one-to-one information note; expelling an observer for rights advice; grabbing an accompanier's arm after ordering her to abandon a respondent; threatening "advocates" with arrest merely for remaining in a hallway; or retaliating because an observer obtained assistance from a Member of Congress. Ruiz Aff. ¶¶ 24–26; Kelly Second Decl. ¶¶ 37–39; Ehrman Decl. ¶¶ 11–22; Vásquez Decl. ¶¶ 8, 12–14; Sigman Decl. ¶¶ 10–11; see Am. Compl. ¶¶ 17–19, 107–18, 125–30.

A tailored injunction can permit restrictions reasonably necessary to address actual obstruction, disruption, congestion, safety, confidentiality, capacity, or the secure execution of a particular lawful operation, while prohibiting restrictions imposed because of protected observation, reporting, ministry, accompaniment, rights advice, or individualized noncommercial communication. That formulation follows the Court's own instruction to distinguish unconstitutional interference from lawful law-enforcement activity and to preserve legitimate operational needs. Order at 34–35, 95; see Am. Compl. ¶¶ 1–3, 17–19, 124–30.

The Court's prior dismissal identified a curable attribution problem, not an absence of injury or an immunity for ICE conduct in court-adjacent spaces. The expanded allegations identify ICE or ERO personnel, identify named plaintiffs and protected activities, describe direct and

retaliatory acts collateral to lawful enforcement, establish repeated return to the same facilities, and explain how an order binding ICE would prevent recurrence. Existing named plaintiffs—most clearly McCallum, and independently Kelly under the reasonable inference supported by ICE's own description of its operations—therefore have Article III standing to seek appropriately tailored prospective relief against ICE. If Ruiz is properly added through an operative pleading, his January 6 allegations provide an additional, express ICE-specific basis for the same relief. Lujan, 504 U.S. at 560–61; Carter, 822 F.3d at 56–57; Walker, 130 F.4th at 298–99; Order at 33–35; see Am. Compl. ¶¶ 1–3, 9–19, 40–44, 82–98, 103–18, 124–30.

**THE EXTERIOR ACCESS AREAS, EOIR WAITING ROOMS, AND CONNECTING HALLWAYS ARE DESIGNATED PUBLIC FORA FOR QUIET, CONSENSUAL, NONCOMMERCIAL, COURT-RELATED SPEECH**

This Court found in its June 22 Opinion and Order that these spaces are nonpublic fora. We Respectfully disagree. *See* Opinion and Order at 61–62. Plaintiffs do not seek a forum for rallies, amplified speech, commerce, obstruction, or interference with screening or lawful enforcement; they seek the longstanding use of exterior access areas, EOIR waiting rooms, and connecting hallways for observation, accompaniment, information exchange, and requested pastoral support. *See* Ruiz Aff. ¶¶ 8–11, 23–24; Kelly Second Decl. ¶¶ 18–19, 60.

Those activities are quiet, individualized, consensual, noncommercial, and fully compatible with neutral rules governing safety, capacity, confidentiality, noise, decorum, and orderly movement. *See* Ruiz Aff. ¶¶ 11, 23–24; Schulman Decl. ¶¶ 3–4.

The Supplemental Declaration of former Immigration Judge and BIA Chair Paul Wickham Schmidt establishes that public use of those spaces was institutionally encouraged, generally available, operationally beneficial, and materially different from access to a jail or detention facility. *See* Schmidt Supp. Decl. ¶¶ 4–18.

**I. The forum must be defined as the particular court-access and communication system at issue**

Forum analysis focuses on the particular property or channel to which access is sought, rather than treating the largest government building containing that property as the relevant forum. *Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. 788, 800–02 (1985).

A designated public forum arises when the Government purposefully makes nontraditional property generally available to the public or to a defined class of speakers, while speaker-by-speaker permission indicates merely selective access. *Arkansas Educational Television Commission v. Forbes*, 523 U.S. 666, 677–80 (1998).

Governmental intent is determined objectively from policy, historical practice, the nature of the property, and the compatibility of the proposed speech with the property's function. *Cornelius*, 473 U.S. at 802–04; *Paulsen v. County of Nassau*, 925 F.2d 65, 69–70 (2d Cir. 1991).

The inquiry is holistic and gives substantial weight to the Government's actual course of conduct and the degree to which it has shaped or controlled private expression. *Shurtleff v. City of Boston*, 596 U.S. 243, 252–58 (2022).

A designated forum may be limited to particular speakers, subjects, or forms of expression without becoming a forum for every conceivable expressive activity. *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46 & n.7 (1983); *Hotel Employees & Restaurant Employees Union, Local 100 v. City of New York Department of Parks & Recreation*, 311 F.3d 534, 545–52 (2d Cir. 2002).

Once the Government opens property for a defined category of use, however, it may not exclude speakers whose proposed activity falls within the same category without a constitutionally

sufficient justification. *Forbes*, 523 U.S. at 677–80; *Travis v. Owego-Apalachin School District*, 927 F.2d 688, 692–93 (2d Cir. 1991).

The relevant forum here is therefore the exterior approaches, public waiting rooms, and hallways through which respondents, counsel, interpreters, relatives, journalists, observers, clergy, and volunteers reach, await, understand, and leave presumptively open immigration hearings. *See* EOIR Fact Sheet; Schmidt Supp. Decl. ¶¶ 6–9.

The forum excludes judges' chambers, secure offices, staff-only corridors, holding areas, detention facilities, and other spaces that have not been opened for public court access or communication. *See* Schmidt Supp. Decl. ¶ 17; Proposed PI provisions summarized in the Omnibus Motion.

**II. EOIR's own rules establish general access to the court-adjacent forum**

EOIR's governing regulation begins with a presumption of public access: all hearings other than exclusion hearings are open unless a specified closure, confidentiality, capacity, or protective exception applies. *See* 8 C.F.R. §§ 1003.27, 1240.10(b).

EOIR's public guidance states that members of the public need not notify the court before visiting and ordinarily need not obtain permission or check in with court personnel before entering a courtroom to observe. *See* EOIR Fact Sheet.

The same guidance expressly states that access to observe hearings necessarily entails access to EOIR-controlled courtrooms, interior entrances, exits, corridors, conference rooms, and waiting areas used in EOIR's daily operations. *See* EOIR Fact Sheet.

The Government's own declarations state that Broadway's waiting areas contain seating for parties, media representatives, and observers; are generally accessible to visitors and observers; and are subject to capacity and safety limits rather than categorical exclusion. *See* Taylor Decl. ¶¶ 5, 8, as summarized in the Opinion.

EOIR further represents that it does not prohibit members of the public from speaking with respondents or providing informational materials in those waiting areas, while retaining authority to address actual congestion, noise, and interference with orderly movement. *See* Taylor Decl. ¶ 8; Burns May 11 Email.

The Government also describes the hallways and elevator banks as publicly accessible circulation areas, although subject to neutral building-security and access rules. *See* Opinion and Order at 10–11.

These are general access rules applicable to classes of participants, not individualized invitations requiring each observer, cleric, journalist, volunteer, or relative to obtain discretionary permission. *See* Schmidt Supp. Decl. ¶ 11; *Forbes*, 523 U.S. at 679–80.

The Government's express opening of the spaces for observers, media, families, and other court visitors is therefore evidence of designation, even though that designation remains limited to court-related use. *Perry*, 460 U.S. at 45–47; *Travis*, 927 F.2d at 692–93.

**III. The Supplemental Schmidt Declaration confirms purposeful designation by institutional policy and practice**

Judge Schmidt served for approximately thirteen years as an Immigration Judge at a non-detained immigration court, presided over thousands of hours of hearings, and became familiar with the policies and practices governing visitors and observers. *See* Schmidt Supp. Decl. ¶¶ 2–3.

He states that, across administrations of both parties, EOIR management regarded public observation as beneficial and affirmatively encouraged and facilitated it. *See* Schmidt Supp. Decl. ¶ 4.

Court personnel did not regard the public as adverse or inherently disruptive, and administrators generally viewed public participation as helpful to court operations. *See* Schmidt Supp. Decl. ¶ 5.

The public opening necessarily extended beyond the courtroom because journalists, advocates, legal observers, students, researchers, volunteers, friends, relatives, Congressional staff, and government officials routinely waited in common areas, spoke quietly with respondents and counsel, observed operations, and moved through publicly accessible areas without incident. *See* Schmidt Supp. Decl. ¶ 6.

Waiting rooms, hallways, and other common areas were routinely used to coordinate attendance, exchange information, prepare for proceedings, locate courtrooms, understand schedules, arrange interpretation, and discuss what had occurred and what would happen next. *See* Schmidt Supp. Decl. ¶ 7.

Use was not confined to litigants, lawyers, and court employees because relatives, volunteers, faith leaders, students, legal observers, and other supporters routinely assisted respondents before and after hearings. *See* Schmidt Supp. Decl. ¶ 8.

No professional credential, relationship to a pending case, or institutional status was ordinarily required to observe or remain in the publicly accessible spaces associated with proceedings. *See* Schmidt Supp. Decl. ¶ 11.

That absence of individualized selection is the defining distinction between a designated forum generally available to a class and the selective-access forum addressed in *Forbes*. *Forbes*, 523 U.S. at 679–80.

The activity was also operationally compatible because public presence rarely caused problems, and the few necessary interventions ordinarily consisted of reminding observers to remain silent while a hearing was underway. *See* Schmidt Supp. Decl. ¶ 12.

The physical spaces were sufficiently large and accessible to accommodate observers, supporters, students, journalists, and other members of the public. *See* Schmidt Supp. Decl. ¶ 15.

Restrictions historically addressed individualized confidentiality concerns, including asylum and VAWA matters, rather than imposing general bans on public presence or expression throughout common areas. *See* Schmidt Supp. Decl. ¶ 16.

Public observation improved professionalism, preparation, civility, accountability, transparency, and public confidence, thereby advancing rather than frustrating the adjudicative function. *See* Schmidt Supp. Decl. ¶ 13.

Judge Schmidt characterizes observation and accompaniment as longstanding and institutionally familiar practices reflecting an established culture of public access and engagement. *See* Schmidt Supp. Decl. ¶ 14.

He expressly distinguishes non-detained immigration courts from jails and detention centers, where access may depend on custodial security and staffing considerations not present in ordinary public court facilities. *See* Schmidt Supp. Decl. ¶ 17.

The Supplemental Declaration thus supplies direct institutional evidence of policy, practice, general access, physical compatibility, and beneficial use—the precise objective factors governing designated-forum analysis. *Cornelius*, 473 U.S. at 802–04; *Paulsen*, 925 F.2d at 69–70.

**IV. Rev. Ruiz's affidavit establishes that exterior and interior access spaces form one necessary communicative forum**

Rev. Juan Carlos Ruiz has engaged in immigration-court accompaniment since approximately 2007, and that practice developed because immigrant families told sanctuary organizations that they needed community members and clergy to accompany them to court. *See* Ruiz Aff. ¶¶ 6–7.

His accompaniment begins before the hearing and includes entering the building, passing through security, using elevators, waiting in hallways and waiting rooms, answering basic

questions, locating resources, praying when requested, explaining what occurred, and leaving safely after court. *See* Ruiz Aff. ¶ 8.

The exterior sidewalk or entrance area is a recurring part of that process because it is where respondents and supporters meet and prepare before entering the court environment. *See* Ruiz Aff. ¶ 9.

If the exterior area is an ordinary municipal sidewalk, it is a traditional public forum notwithstanding its proximity to a courthouse. *United States v. Grace*, 461 U.S. 171, 177–80 (1983).

If an exterior approach, plaza, setback, or entrance area is federal rather than municipal property, its general use by the public to reach open proceedings and its longstanding use for court-related accompaniment support classification as a designated forum limited to those uses. *Cornelius*, 473 U.S. at 802–04; *Paulsen*, 925 F.2d at 69–70; Ruiz Aff. ¶¶ 8–10.

Rev. Ruiz's speech is quiet, individual, consensual, noncommercial, and intended to help willing respondents identify lawful legal, community, and church resources. *See* Ruiz Aff. ¶ 11.

He does not block doors, disrupt hearings, encourage nonappearance, or physically interfere with lawful arrests. *See* Ruiz Aff. ¶ 11.

He seeks only the ability to accompany willing persons, speak quietly in public waiting rooms and hallways, provide individualized noncommercial information, and pray when requested, unless a lawful and specific reason requires restriction. *See* Ruiz Aff. ¶ 23.

He accepts lawful closures, confidentiality, capacity limits, courtroom order, building security, and legitimate law-enforcement activity. *See* Ruiz Aff. ¶ 24.

That evidence makes Rev. Ruiz's affidavit central to the forum inquiry because it identifies the speakers, listeners, locations, subject matter, peaceful manner, and longstanding court-related function of the exterior and interior spaces. *See* Ruiz Aff. ¶¶ 8–12, 23–24.

**V. The proximity of the forum to judicial proceedings supports neutral manner rules, not categorical suppression**

The Government may impose content-neutral time, place, and manner rules in a designated forum when those rules are narrowly tailored to significant interests and preserve meaningful communication. *Perry*, 460 U.S. at 45–46; *Ward v. Rock Against Racism*, 491 U.S. 781, 791–803 (1989).

Proximity to courtrooms therefore justifies rules requiring quiet voices, clear doors and elevators, compliance with screening, respect for capacity, protection of confidentiality, and noninterference with hearings or lawful enforcement activity. *Ward*, 491 U.S. at 791–803; Ruiz Aff. ¶ 24.

Proximity does not justify forbidding all conversations, all note-taking, all individualized information exchange, or all accompaniment regardless of actual noise, obstruction, congestion, or security risk. *Grace*, 461 U.S. at 180–83; *McCullen v. Coakley*, 573 U.S. 464, 487–97 (2014).

The distinction is between regulating disruptive conduct and suppressing the category of peaceful expression for which the forum has been opened. *Ward*, 491 U.S. at 791–803; *Travis*, 927 F.2d at 692–93.

That distinction aligns Plaintiffs' interests with those of the court because Plaintiffs affirmatively seek safe circulation, orderly proceedings, informed respondents, accurate compliance, and calm communication. *See* Ruiz Aff. ¶¶ 11, 23–24; Kelly Second Decl. ¶¶ 18–19, 59–60.

Supporters help respondents appear for hearings, understand what judges have said, complete forms, obtain counsel, locate courtrooms, understand schedules, and arrange interpretation. *See* Schmidt Supp. Decl. ¶¶ 7–9.

Rev. Breyer likewise explains that trained accompaniers follow courthouse rules, avoid interfering with hearings or law enforcement, help respondents navigate the court, and reduce fear and confusion while promoting transparency and orderly administration. *See* Breyer Decl. ¶¶ 3–4.

The court's institutional interest is also served because public observation improves preparation, civility, professionalism, accountability, transparency, and confidence in the adjudicative process. *See* Schmidt Supp. Decl. ¶ 13.

A limited designated forum governed by neutral conduct rules therefore advances the court's operational interests more effectively than shifting, categorical commands that confuse visitors and leave no lawful place to wait, speak, or assist. *See* Glacel Decl. ¶¶ 6–14; Schulman Decl. ¶¶ 9, 15–17.

### VI. No alternative forum can perform the same function

The history of accompaniment treats the immigration-court proceeding as beginning with arrival and screening and continuing through locating the courtroom, waiting, communicating with supporters, attending the hearing, leaving, and complying with resulting requirements. *See* Block Decl. ¶ 6.

Waiting rooms, hallways, entrances, and elevator banks are therefore central sites of the practice rather than interchangeable conveniences. *See* Block Decl. ¶¶ 7–8.

Rev. Ruiz states that excluding an accompanier from any necessary part of that route breaks the accompaniment precisely when the respondent most needs support. *See* Ruiz Aff. ¶¶ 9, 18, 22.

A pastor cannot recreate prayer or comfort after the moment of fear has passed, a deadline has expired, or officers have taken the person away. *See* Ruiz Aff. ¶¶ 18, 26.

A hallway conversation may be the only opportunity to explain a ruling because the relevant information does not exist before the hearing and the respondent may be detained before reaching an exterior location. *See* Kelly Second Decl. ¶¶ 38–39.

The Supreme Court has rejected the notion that distant visibility or audibility is an adequate substitute when speakers seek calm, close, consensual, one-to-one communication with willing listeners. *McCullen*, 573 U.S. at 487–97.

The absence of a functionally equivalent alternative channel distinguishes a restriction that merely regulates manner from one that extinguishes the communication itself. *Ward*, 491 U.S. at 791, 802–03; *City of Ladue v. Gilleo*, 512 U.S. 43, 54–57 (1994).

**VII. The principal negative precedents do not govern the supplemented record**

*Make the Road by Walking, Inc. v. Turner* involved welfare-office waiting rooms governed by a written official-business policy and a record lacking evidence that the agency had generally opened those rooms to private speakers for expressive use. 378 F.3d 133, 144–47 (2d Cir. 2004).

EOIR's policy is the opposite because it generally admits observers and visitors, treats access to corridors and waiting rooms as necessary to public observation, and states that speech with respondents and informational materials are not categorically prohibited. *See* EOIR Fact Sheet; Burns May 11 Email.

The Supplemental Schmidt Declaration further establishes that the relevant speech was not incidental conversation merely tolerated in an agency office, but a normal, expected, institutionally accepted component of immigration-court operations. *See* Schmidt Supp. Decl. ¶¶ 6–14.

The communication is also itself court-related business because it enables respondents to locate proceedings, understand schedules and rulings, obtain interpretation or counsel, and comply with resulting obligations. *See* Schmidt Supp. Decl. ¶¶ 7–9.

*Huminski v. Corsones* concerned independent expressive protest against judges and court officials, rather than a generally admitted class engaging in the longstanding court-integrated activities shown here. 396 F.3d 53, 90–93 (2d Cir. 2005).

Even *Huminski* held that nonpublic-forum status did not validate an effectively complete, person-specific prohibition on protected expression throughout courthouse property. 396 F.3d at 92–93.

*Hotel Employees* concerned labor speech falling outside the artistic category for which Lincoln Center Plaza had been opened, and the court relied in part on nearby parks and sidewalks that permitted the union to reach the same audience. 311 F.3d at 545–55.

Here the proposed speech falls squarely within the court-related category historically admitted in the spaces, and no nearby location permits contemporaneous observation, explanation of a newly issued ruling, requested pastoral presence, or preservation of information before a respondent leaves or is detained. *See* Schmidt Supp. Decl. ¶¶ 6–9; Ruiz Aff. ¶¶ 8–9, 18; Kelly Second Decl. ¶¶ 38–39.

The earlier nonpublic-forum analysis rested on general courthouse precedents and the analogy to *Make the Road*, but the Supplemental Schmidt Declaration now adds direct evidence specific to non-detained immigration courts concerning institutional intent, general access, actual practice, physical compatibility, and operational benefit. *See* Opinion and Order at 61–62; Schmidt Supp. Decl. ¶¶ 4–18.

The supplemented record supports classification of exterior court-access areas, EOIR waiting rooms, and connecting hallways as designated public fora limited to safe, quiet, consensual, noncommercial, court-related observation, communication, accompaniment, education, and support. *See* Schmidt Supp. Decl. ¶¶ 4–19; Ruiz Aff. ¶¶ 8–12, 23–24; *Forbes*, 523 U.S. at 677–80; *Travis*, 927 F.2d at 692–93.

That designation preserves the Government's authority to enforce neutral limits addressing actual noise, obstruction, capacity, confidentiality, screening, decorum, and safety. *Perry*, 460 U.S. at 45–46; *Ward*, 491 U.S. at 791–803; Ruiz Aff. ¶ 24.

It does not permit categorical or selectively enforced bans on the peaceful activity that EOIR invited, historically accommodated, and relied upon as part of an open, intelligible, orderly, and accountable immigration-court system. *See* Schmidt Supp. Decl. ¶¶ 5–14, 18–19; Breyer Decl. ¶¶ 3–5, 13; *Shurtleff,* 596 U.S. at 252–59.

### EOIR'S WEBEX REVERSAL DEMONSTRATES BAD FAITH AND CONFIRMS THE NEED FOR ENFORCEABLE RELIEF

The record supports a precise formulation that neither overstates the historical uniformity of Webex access nor understates EOIR's subsequent restriction: before June 2026, Webex observation was inconsistently administered but regularly available; beginning in June 2026, EOIR converted that established means of observation into a presumptive categorical prohibition whenever any judge, respondent, or counsel appeared in a physical courtroom, while implementation remained uneven among individual judges. Silver Decl. ¶¶ 3–5, 10–15.

That change directly contradicts Defendants' sworn representations to this Court. Acting Assistant Chief Immigration Judge John Burns declared, in support of Defendants' motion to dismiss and opposition to preliminary relief, that public access was governed principally by 8 C.F.R. §§ 1003.27, 1240.10(b), and 1240.11(c)(3)(i), and that, "[s]ubject to the same regulations, the general public can also observe hearings conducted remotely by joining the remote hearing." Burns Decl. ¶ 7, Dkt. No. 45. Burns further represented that each immigration judge's internet-based hearing link was posted on EOIR's public website. Id. Assistant Chief Immigration Judge Khalilah Taylor made the same representation: "[s]ubject to the same regulations, the general public can also observe hearings conducted remotely by joining the remote hearing," using links posted on EOIR's public website. Taylor Decl. ¶ 6, Dkt. No. 46. Neither declarant identified any

categorical exception for a remotely conducted or hybrid hearing merely because the judge, respondent, or counsel occupied a physical courtroom.

Those statements were not isolated descriptions by line employees. Burns and Taylor each declared that their supervisory responsibilities included ensuring that EOIR policies, procedures, and guidance were followed by immigration judges and court personnel. Burns Decl. ¶ 3; Taylor Decl. ¶ 4. Their sworn descriptions therefore represented EOIR's operative understanding of public access at the two immigration courts at issue.

EOIR's contemporaneous operational instructions were even more explicit. On April 29, 2026, while expressly acknowledging the "pending lawsuit regarding public access," EOIR Court Administrator Rafael Fernandez instructed all Federal Plaza judges and support staff that, "[f]or any hearing conducted by Webex," they must keep the Webex session "open and unlocked unless the respondent has requested a closed hearing," because "[a]n unlocked Webex permits public observation throughout the hearing." Dkt. No. 45-4 at 1. Thus, while opposing judicial relief, EOIR represented both to the Court and to its own personnel that the governing closure standards applied to remote observation and that a Webex session should remain publicly accessible unless the particular hearing was lawfully closed.

EOIR then adopted the opposite rule. The June 2026 Fact Sheet continued to state that immigration hearings are generally open and identified specific, case-dependent grounds for closure, including proceedings involving abused children or spouses, sealed or classified information, a respondent's request to close an asylum hearing, and an immigration judge's determination that closure was necessary to protect witnesses, parties, or the public interest. June 2026 Fact Sheet at 1–2. It nevertheless added an entirely different, categorical restriction: whenever the immigration judge, respondent, or counsel appears in a physical courtroom, visitors "must observe in person," "Webex visitors will not be admitted," and publicly posted Webex links

are reserved for remotely appearing parties unless "no physical courtroom is available." Id. at 2. That physical-presence trigger does not depend on any individualized closure determination, confidentiality interest, misconduct, disruption, or limitation recognized in the Fact Sheet's own list of lawful exceptions.

The July 15, 2026 policy memorandum did not correct the contradiction; it ratified it. PM 26-06 announces that its purpose is to "reemphasize the open nature" of immigration hearings, states that EOIR is "fully committed" to lawful public access, provides that visitors need no permission to observe an open hearing, and asserts that hearings should generally remain open "regardless of whether the hearing is in-person or internet-based." PM 26-06 at 1–2. Yet the same memorandum provides that an observer of any hearing designated as in-person must be physically present and that "[w]ebex visitors will not be admitted," even where parties have been authorized to appear remotely through the publicly posted link. Id. at 3. EOIR thus invokes the vocabulary of openness while imposing a format-based exclusion that is independent of the lawful, case-specific closure exceptions it identifies elsewhere in the same memorandum.

Silver's firsthand observations establish that this was an actual change in access, not a clarification of an unchanged practice. Silver is a retired attorney who began regularly observing immigration proceedings through Webex no later than September 2025, generally observing approximately twice per week and sometimes three times per week. Silver Decl. ¶¶ 1–4. Before June 2026, access varied substantially: some judges regularly admitted observers, others did not, and the quality of the video and audio was inconsistent. Id. ¶¶ 5–9. That evidence does not establish that Webex access had always been uniformly administered; it establishes that Webex was a regularly used and recognized channel of public observation before EOIR imposed the new categorical rule.

Beginning in approximately June 2026, a judge who had previously afforded broad Webex access announced in open court that two directives dated June 29 had been issued and that Webex observers could not be admitted whenever anyone was physically present in the courtroom. Silver Decl. ¶ 10. Although that judge had previously permitted extensive Webex observation and appeared unhappy about the restriction, the judge required Silver to leave because persons were physically present. Id. ¶ 11. A second judge subsequently told Silver, in an apologetic manner, that observers were no longer permitted to attend through Webex and could attend only in person, again identifying an order or directive as the basis. Id. ¶ 12. These statements by judges implementing the rule confirm that EOIR personnel themselves understood the directive as a material departure from prior practice.

Implementation nevertheless remained arbitrary. During the same period, Silver observed attorneys and clients appearing through Webex in some courtrooms, and another judge permitted her to remain after she agreed not to record and the ICE attorney stated that there was no objection. Silver Decl. ¶ 13. The operative condition therefore was not the technical feasibility of remote observation, a demonstrated disruption, or an actual threat of recording. The platform was already operating, parties were already appearing remotely, and individual judges could still admit observers; the new guidance instead directed judges to exclude the public based solely on the presence of any person in a physical courtroom.

The practical result is the near-elimination of remote court observation in ordinary cases. Silver explains that unrepresented respondents are generally required to appear physically and that she has also observed judges requiring represented respondents and their attorneys to appear in person. Silver Decl. ¶ 15. At the same time, the number of active judges, large master-calendar proceedings, and required in-person appearances has increased, creating crowded proceedings in which little or no physical space may remain for public observers. Id. ¶ 16. EOIR's memorandum

itself acknowledges that waiting areas are subject to capacity limits and that respondents, attorneys, and witnesses receive priority when space is inadequate. PM 26-06 at 2. EOIR therefore directs observers to rely exclusively on physical access while simultaneously acknowledging conditions under which physical access will predictably be unavailable.

This sequence supports a direct inference of bad faith. If the categorical physical-presence rule was already EOIR policy when Burns and Taylor filed their declarations, their statements that the public could observe remote hearings "[s]ubject to the same regulations" were materially incomplete. If the categorical rule did not yet exist, EOIR changed the operative policy after relying on the prior, more permissive regime to oppose enforceable judicial relief. Either possibility defeats any claim that Defendants' declarations, internal reminders, or subsequently issued guidance provide an adequate assurance of future compliance. The change was not semantic: EOIR replaced a regime in which Webex observation was regularly available subject to uneven administration and the ordinary lawful-closure rules with a presumptive prohibition triggered solely by the hearing's physical format.

The Court therefore should not treat PM 26-06 as a remedial measure that obviates injunctive relief. The memorandum cancels no prior directive and expressly provides that it "may not be relied upon to create any right or benefit" enforceable against the Government. PM 26-06 at 1, 5. Enforceable relief must reach Webex observation itself and prohibit categorical exclusion based merely on the physical presence of a judge, party, or counsel, subject to the same lawful and individualized closure rules that govern the underlying hearing. Because admission alone can be rendered meaningless through restricted video or incomplete audio, that relief should also require a view and audio feed reasonably sufficient to permit actual observation whenever EOIR provides public access through Webex. Silver Decl. ¶¶ 7–9, 17.

**EOIR Has Eliminated Remote Observation While Artificially Creating Conditions That Foreclose In-Person Observation**

EOIR's rollback of Webex access coincides with a fundamental alteration of its in-person calendaring practices. EOIR has begun employing new "mega master" calendars that aggregate scores—and, in at least one documented instance, 140 cases—before a single immigration judge in the same time block and courtroom. On June 25, 2026, Laura Conwesser accompanied a respondent to a 9:00 a.m. appearance at 290 Broadway on a new mega-master day when the assigned judge had 140 cases on her docket. Although Conwesser and the respondent arrived shortly after 8:00 a.m., the line already extended around one block and halfway down another, and they did not enter the courthouse until approximately 9:30 a.m.—after the scheduled appearance time. Conwesser Decl. ¶ 4.

The resulting scarcity of observation space is neither speculative nor attributable solely to fixed architectural limitations. Silver observed that the number of judges appearing on a typical calendar increased from approximately four to six when she began observing to approximately fifteen on July 22, 2026. She further observed increasing numbers of large calendar proceedings and in-person appearances and explained that crowded master calendars may leave little or no physical room for public observers. Silver Decl. ¶¶ 15–16. Conwesser likewise described the waiting area on the 140-case mega-master day as "packed," with respondents and supporters waiting for hours. Conwesser Decl. ¶¶ 5–8.

Defendants' own evidence establishes what happens when EOIR creates that overcrowding. Assistant Chief Immigration Judge Taylor declared that when the number of people exceeds what the courtroom and waiting areas can safely accommodate, EOIR gives priority to respondents, attorneys, interpreters, and witnesses over observers and other members of the public. Taylor Decl. ¶ 9. PM 26-06 adopts the same hierarchy, stating that overcrowded waiting areas must

prioritize respondents, attorneys, and witnesses and that physical-facility limitations may restrict the number of observers admitted. PM 26-06 at 2. Thus, once EOIR places scores of respondents, their counsel, witnesses, interpreters, and family members into the same courtroom and waiting area at the same time, exclusion of ordinary public observers is not merely foreseeable; it is the operation of EOIR's announced priority rule.

Any short, accelerated, or belated notice of placement on such a calendar compounds the problem. Respondents, counsel, family members, and supporters must converge at the agency-selected time with little practical ability to stagger their attendance, while observers cannot anticipate which courtroom will have usable capacity. Even timely notice does not solve the access failure: Conwesser's experience demonstrates that persons who arrived nearly an hour before a scheduled hearing could remain outside the building until thirty minutes after the stated appearance time because EOIR had concentrated 140 matters into the same calendar. Conwesser Decl. ¶ 4.

At the same time, EOIR has foreclosed the alternative that would ordinarily mitigate those self-created physical constraints. PM 26-06 directs that an observer of an in-person hearing must be physically present in the courtroom and that "Webex visitors will not be admitted," even where a Webex link exists and parties have been authorized to appear remotely. PM 26-06 at 3. Silver explains that this physical-presence rule effectively eliminates remote observation in nearly all ordinary cases because unrepresented respondents are generally required to appear in person and some judges also require represented respondents and counsel to appear physically. Silver Decl. ¶ 15.

EOIR therefore cannot characterize the resulting exclusion as a neutral consequence of unavoidable "space limitations." The relevant scarcity is substantially produced by EOIR's own operational choices: it aggregates extraordinary numbers of cases into a single simultaneous calendar; requires or induces large numbers of respondents and counsel to appear physically; gives

those participants categorical priority over observers once the predictable overcrowding occurs; and then prohibits those excluded observers from using the already-operational Webex session. EOIR may not manufacture the capacity problem and then invoke that same problem as the justification for extinguishing public access.

The combined policies operate as a practical closure. When observers cannot enter because EOIR has filled the courtroom and waiting areas through mega-master scheduling, and cannot observe remotely because anyone is physically present, no meaningful means of observation remains. An injunction that addresses only nominal openness of the physical courtroom, while leaving the categorical Webex prohibition intact, would therefore permit EOIR to defeat public access simply by calendaring more respondents than the available public space can accommodate.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court accept the proposed Second Amended Complaint, permit Reverend Juan Carlos Ruiz to be added as a named plaintiff, and grant appropriate declaratory and injunctive relief, and any other relief the Court deems appropriate. The amended allegations identify the conduct attributable to each Defendant, address the standing and pleading deficiencies identified by the Court, and allege continuing constitutional injuries requiring prospective relief.

Respectfully submitted,

/s/ Stephen Kelly
Counsel for the Plaintiffs
Dated: July 22, 2026
32 Court Street, 904
Brooklyn, NY 11201
929-270-9905
stephen@philanthropy-law.com

- 41 -

## APPENDIX A: REDLINED SECOND AMENDED COMPLAINT

| | |
|---|---|
| **UNITED STATES DISTRICT COURT**<br>**SOUTHERN DISTRICT OF NEW YORK** | **1:26-cv-02130 (CM)** |
| FR. FABIÁN ARIAS,*et al.*<br>~~STEPHEN KELLY,~~<br>~~LAURA MCCALLUM,~~<br>~~DEBBIE NATHAN,~~<br>~~DR. ZOEY PHILLIPS,~~<br>Plaintiffs,<br><br>v.<br><br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.,*<br>~~and TODD LYONS, in his official capacity as Acting~~<br>~~Director of U.S. Immigration and Customs Enforcement,~~<br>~~500 12th St. SW, Washington, D.C. 20536,~~<br><br>~~U.S. DEPARTMENT OF HOMELAND SECURITY, and~~<br>~~KRISTI NOEM, in her official capacity as Secretary of the~~<br>~~U.S. Department of Homeland Security,~~<br>~~2707 Martin Luther King Jr. Ave SE, Washington, D.C.~~<br>~~20528,~~<br><br>~~U.S. DEPARTMENT OF JUSTICE, and PAMELA BONDI,~~<br>~~in her official capacity as U.S. Attorney General,~~<br>~~950 Pennsylvania Ave., NW, Washington, DC 20530,~~<br><br>~~GENERAL SERVICES ADMINISTRATION, and~~<br>~~EDWARD FORST, in his official capacity as Administrator~~<br>~~of General Services,~~<br>~~1800 F Street NW, Washington, DC 20405,~~<br>Defendants. | **SECOND AMENDED**<br>**COMPLAINT** |

**SECOND AMENDED COMPLAINT**

## INTRODUCTION

1. ~~This is a case about the government using force on people who disagree with them with words, inside a courthouse, and brought by New Yorkers on their own behalf. Defendants have implemented policies and practices including violent detention operations, arbitrary and degrading access rituals, targeted harassment of members of the public, and systematic interference with the ability to speak with supportive individuals. Taken together it functions to deter a person of ordinary firmness from attending, observing, or participating in judicial proceedings, and from engaging in protected speech and association in and around the~~

courthouse. What emerges is not a series of disconnected incidents, but a coherent pattern of coercive conduct that chills speech, fractures association, and undermines access to the courts carried out in plain view as a continuous feature of this court's operations.

2.    This action challenges a pattern and practice by Defendants that directly restricts core First Amendment activity in and around federal immigration courts. Defendants have (i) locked courtrooms during proceedings that are required to be open to the public, (ii) prohibited members of the public from speaking with respondents, (iii) ejected individuals for distributing "know your rights" materials, and (iv) engaged in harassment in publicly accessible areas such that protected activity is effectively impossible, (v) engaged in conduct that would deter a person of ordinary firmness from appearing in court, conducting necessary business before the court, using the services of the clerk of the court, or participating in judicial proceedings.

3.    Plaintiffs seek declaratory and injunctive relief to halt these ongoing constitutional violations and to ensure that immigration court proceedings and their surrounding public spaces remain open to lawful expression, observation, and association.

1.   Plaintiffs submit this proposed Second Amended Complaint pursuant to the Court's June 22 and July 20, 2026 Orders. It cures the pleading deficiencies identified by the Court, incorporates factual allegations concerning subsequently issued agency guidance, and, pursuant to Federal Rule of Civil Procedure 15 and Local Civil Rule 15.1, seeks to add Reverend Juan Carlos Ruiz as a named plaintiff. (ECF No. 62, at 96–97; ECF No. 86, at 2–3, 7–8.)

2.   For ease of use, a redlined version showing all changes from the prior Amended Complaint is appended below as Appendix A.

**BACKGROUND**

4.      The immigration court is an administrative court within the Executive Office of Immigration Review ("EOIR"), a component of the United States Department of Justice. Immigration court hearings are generally open to the public except in limited circumstances prescribed by regulation. 8 C.F.R. § 1003.27 (2025); Executive Office for Immigration Review, Immigration Court Practice Manual § 4.9 (2024). Courts have long recognized that adjudicative proceedings are presumptively open to the public under the First Amendment. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980); *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984).

5.      Much of the work of the immigration courts involves adjudicating removal proceedings for individuals seeking asylum. Although removal proceedings are civil in nature, they must comport with the requirements of due process under the Fifth Amendment. *Reno v. Flores*, 507 U.S. 292, 306 (1993); *Bridges v. Wixon*, 326 U.S. 135, 154 (1945); *Yamataya v. Fisher*, 189 U.S. 86 (1903). These proceedings therefore carry the openness and transparency associated with adjudicative proceedings whose doors are open to the public. *Richmond Newspapers, Inc v. Virginia*, 448 U.S. at 580–81.

6.      Federal precedent identifies only one relevant distinction between removal proceedings and criminal prosecutions: respondents are not entitled to government-appointed counsel. Rather, proceedings consist of the respondent, usually advocating for themselves *pro se*, an EOIR Immigration Judge, and an attorney from the U.S. Department of Homeland Security. 8 U.S.C. § 1362. The latter two roles are under the control of the executive, and there is no meaningful structural oversight outside of executive agencies.

7.      The immigration courts are among the most consequential of the federal administrative courts. They decide whether an individual will be deported, often after a period of

years and sometimes decades in this country. They decide whether individuals will remain with their families or be separated, whether they will be permitted to stay or compelled to leave, often to places where they face immediate and concrete danger.

8.      At the same time, the asylum process operates through an extraordinarily complex bureaucratic framework. The governing law draws from an intricate combination of federal statutes, administrative regulations, immigration precedent, international refugee law, and federal court decisions. Navigating this framework is difficult even for experienced practitioners. Respondents, the overwhelming majority of whom are unrepresented, must attempt to understand and participate in these proceedings while confronting fear, uncertainty, and sometimes continuing personal threats via social media.

9.      Many people who learn about the circumstances of immigration court respondents find that it deeply implicates their personal civil, moral, and religious values. As a result, over time, a distinct civic culture has developed around supporting immigration court respondents. One aspect of this is what is commonly called "accompaniment," which is the practice of attending court with a respondent to provide logistical, informational, and emotional support. The accompanying individual may be a member of a local congregation, a community volunteer, or a personal friend. On the day of a hearing, the volunteer typically travels with the respondent to the courthouse, waits with them until the case is called, and sits in the gallery during the proceeding. The latter role is particularly important as respondents frequently retain little of what occurs during their hearings. Moreover, immigration court proceedings do not provide respondents with transcripts or accessible recordings. In this setting, the presence of a supportive observer able to take notes, understand procedural directives, and recall next steps is crucial.

10.     Another aspect is maintaining a presence in public waiting areas to share information about legal and social services, observe open proceedings, and offer compassionate

support, all of which are longstanding practices in this forum. These activities reflect core First Amendment principles of speech, association, and public observation, and there is no meaningful alternative venue in which these forms of expression can occur.

11.    Apart from activities supporting respondents, access to the immigration courts is necessary for accurate reporting, study by legal practitioners and students, and for the accurate observation and data compilation undertaken by legal organizations, non-profits, advocacy organizations, and academic institutions. Defendants' actions are an impermissible attack on government accountability and public confidence in the administration of justice. *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982); *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83 (2d Cir. 2004).

12.    During the past year, the authorities responsible for operating the immigration courts in New York City have applied a vast array of policies and procedures to discourage, restrict, or entirely block public attendance. These policies and procedures are wholly contrary to law, to all applicable federal precedent, and to the immigration courts' own procedural manual. Executive Office for Immigration Review, Immigration Court Practice Manual § 4.9 (2024); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980).

13.    Government opposition to protected activities has permeated all aspects of the daily operations of the immigration courts, starting before a visitor even enters the building: security guards stationed behind barricades outside prevent individuals from approaching or entering, even though the building houses numerous other public offices, and an individual who questions the asserted identification policy may be required to produce additional forms of identification or documentation, even though this does not reflect any written policy. This practice has resulted in visitors, respondents with scheduled hearings, and even attorneys being denied entry for failing to satisfy an entrance requirement that has no basis in any published rule. See

*Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969) (invalidating permit scheme granting officials unfettered discretion over expressive activity); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988) (holding licensing schemes allowing officials to grant or deny access to expressive channels without objective standards violate the First Amendment).

14. When members of the public are able to gain access to the building, they are subjected to severe harassment and physical danger by security guards and federal police, and are prevented from observing public proceedings by court employees. This has become a daily occurrence. Individuals who attempt to remain to carry out their protected activities in public areas may be expelled at the discretion of security officers, federal police, or court staff for doing so. Individuals have been expelled from the building for conduct such as quietly speaking with a respondent in a public waiting room or, in one case, writing down the name of a church that provides services and showing it to an immigrant.

15. Those who manage to remain in public areas around the immigration court despite these obstacles find that nearly every active courtroom is locked against public entry, typically with a court employee stationed inside to admit only respondents. If a member of the public does gain entry, a federal employee will question their presence and remove them before the proceedings begin. This applies equally to remote presence on Webex, and to individuals accompanying a respondent at their own request. These practices are not set forth in any public policy, depart from decades of established practice, and are contrary to governing precedent. See *Detroit Free Press v. Ashcroft*, 303 F.3d 681 (6th Cir. 2002); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 581 (1980); *Press-Enterprise Co. v. Superior Court* ("Press-Enterprise I"), 464 U.S. 501, 510 (1984); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606–07 (1982); *United States v. Alcantara*, 396 F.3d 189, 196–200 (2d Cir. 2005). They do not reflect the court's published procedures, which explicitly require proceedings be open, and do not allow access to be restricted, except that if there

- 47 -

is insufficient room in the gallery, reporters should be given preference as a matter of public policy. 8 C.F.R. § 1003.27(a); Executive Office for Immigration Review, Immigration Court Practice Manual § 4.9(b) (2024).

16.    Courts have consistently held that once the government opens a forum for expressive activity, it may not discriminate based on viewpoint. See, e.g., *United States v. Grace*, 461 U.S. 171, 177 (1983); *Widmar v. Vincent*, 454 U.S. 263, 267–69 (1981); *Good News Club v. Milford Central School*, 533 U.S. 98, 107 (2001). Mere presence in public areas around the immigration court itself constitutes an easily understood expression of support for immigrants and refugees in American society. People familiar with the variety of works done in this venue are unaware of even a single example of a member of the public being there for any reason unrelated to supporting immigrants and refugees, or for studying or reporting on their access to justice. This message is only amplified when a hostile administration attempts to prevent such presence.

17.    Were there any ambiguity about the content neutrality of the new practices individuals have encountered in the past year, these have been dispelled by the federal authorities themselves, who have repeatedly, directly, and explicitly banned and prevented the sharing of information or materials advising immigrants of their rights, or making them aware of available services. Defendants' actions to block public access effectively destroys entire channels of communication and expressive activity. See *City of Ladue v. Gilleo*, 512 U.S. 43, 55–56 (1994); *Schneider v. State (Town of Irvington)*, 308 U.S. 147, 163 (1939); *City of Madison Joint School District v. Wisconsin Employment Relations Commission*, 429 U.S. 167, 175–76 (1976). Plaintiffs to this suit have experienced and witnessed countless examples of federal employees and contractors *explicitly* prohibiting the sharing of content that could help a refugee. Federal agents have confiscated such materials based solely on their content and have ejected people from the building explicitly for disobeying an unlawful verbal instruction from a government agent not to

engage in speech about legal or social services for immigrants. The First Amendment forbids licensing or access regimes that grant officials unbridled discretion or require prior permission to engage in protected speech. See *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757 (1988); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969); *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 133 (1992); *Watchtower Bible & Tract Society v. Village of Stratton*, 536 U.S. 150, 165–66 (2002). Plaintiffs have all experienced this first-hand, and have documented this common practice.

18.    Visitors to the immigration courts are also subjected to inconsistent and discretionary directives, with no purpose other than show dominance in the face of any situational rationale, called "degradation rituals" in the language of sociology. Security personnel and federal officers frequently issue rapid and repeated commands governing where individuals may stand in public waiting rooms, restrooms, hallways, and elevator areas surrounding the immigration courts. These directives are at times internally contradictory or impossible to follow. They often result in groups of individuals being crowded into narrow corridors opposite large numbers of armed federal agents preparing to carry out detention operations against immigration court respondents.

19.    Government action constitutes retaliation if it would deter a person of ordinary firmness from exercising First Amendment rights, and the physical risk to members of the public at immigration court is very real. *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817 (9th Cir. 2020). Defendants' practices have resulted in multiple incidents where visitors have been severely injured by federal agents carrying out detention operations. Plaintiffs in this action were present during an incident in which an observer was knocked to the ground with sufficient force that the sound of the individual's head striking the floor was audible throughout the building. The individual was ultimately removed unconscious on a gurney. There have been at least two incidents with that degree of severity, with many more examples of unprovoked, unnecessary

violent physical contact directed at observers by federal agents, including against plaintiffs to this action, including one involving Plaintiff Stephen Kelly, which did not result in similar head injuries only as a matter of chance.

### PLAINTIFFS

20.    Plaintiffs in this action are representative of the clergy, legal observers, social services providers, community volunteers, and journalists that constitute the typical public presence at the immigration courts. Their experience of these courts varies from less than a year to decades, and all have experienced consistent constitutional injury in the past year connected with their First Amendment activities in this forum. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

21.    The experiences of the named plaintiffs described below offer only a snapshot; they do not and cannot capture the scale, pervasiveness, or psychological toll of the government's administration of these courts. While the full scope of the constitutional injuries attributable to immigration court authorities beginning in 2025 cannot be fully known, their consistency and overwhelming pervasiveness is well documented.

**A. Father Fabián Arias**

22.    Fabián Arias was born in Buenos Aires, Argentina, in 1963. He began studying for the priesthood in 1982 and completed his theological studies in 1989. He moved to New York in 2002 and was ordained as a Lutheran minister in 2004. He currently serves as a priest at St. Peter's Church on Lexington Avenue in Manhattan.

23.    Many of the individuals Father Arias serves are immigrants, and immigration-related pastoral care is a central and indispensable component of his ministry. His religious vocation requires him to accompany members of his congregation, and any others who come to him for his moral support, during moments of fear, vulnerability, or crisis, including when they are

summoned before government authorities. This duty extends specifically to respondents appearing before the Immigration Courts and to their family members.

24.    Since 2004, accompaniment has been one of the most important and consistent components of Father Arias's ministry. He has accompanied thousands of individuals to immigration hearings, helped them understand court procedures, comforted them during proceedings, and assisted them afterward in understanding judicial rulings and any resulting obligations or deadlines. This accompaniment constitutes an explicit exercise of his religious faith, his speech, and his associative commitments as a priest.

25.    For nearly twenty years, Father Arias has been physically present in New York City's immigration courts two to three times per week.

26.    In his recent experience, conditions inside these courts have changed dramatically. The environment has become increasingly hostile, intimidating, and militarized. Federal agents and building security personnel now regularly patrol the hallways and waiting areas. Over the past year he has had to accomplish his ministry under the eyes of federal officers, who typically appear in tactical or paramilitary gear, sometimes carrying military-style weapons.

27.    This display is deeply frightening to the individuals Father Arias serves. The harassment and intimidation have been carried out by federal agents and building security personnel acting in coordination. On multiple occasions, these officers have explicitly ordered Father Arias not to speak with members of his ministry, even when those individuals requested his presence or support, and even when they were standing in public hallways or waiting areas of the building.

28.    Father Arias has been forcibly removed from the building for what these officers perceive as insufficient compliance with these unwritten, ad hoc rules. This has included simply

being present to comfort members of his congregation and community in public spaces inside the courthouse.

29. On numerous occasions, he has been ordered to leave courtrooms, hallways, or the building entirely without explanation, posted rule, or lawful justification. The imposition of these restrictions is wholly unpredictable.

30. He estimates that while performing his ministry he has been turned away from courtroom doors dozens of times, and ordered out of ordinary proceedings approximately twenty times, as of the filing of the original complaint in March of 2026, and these attacks of his ministry have continued unabated, and perhaps intensified, since.

31. These exclusions were imposed by federal agents and building security personnel acting under federal authority. They were not based on courtroom capacity, judicial orders, or any individualized conduct on his part. No regulation or lawful basis was cited.

32. As a direct result of these actions, Father Arias has been prevented from carrying out his religious and pastoral duties at the precise moments when they are most essential. Members of his ministry who rely on his knowledge, guidance, and spiritual presence are left alone inside an intimidating and confusing legal process. Immigrants who depend on his accompaniment are deprived of support not because they rejected it, but because he was forcibly excluded.

33. Father Arias's ministry serves many individuals who come from extremely rural areas of Latin America, who may not read or write, may not speak Spanish fluently, and often have no prior experience with courts or government institutions. Many are terrified simply to be present in the building.

34. When Father Arias is excluded, they are unable to understand what is occurring in their proceedings, what the judge has ordered, or what obligations they must meet. His exclusion directly undermines their ability to participate meaningfully in their own cases.

35.    Father Arias was raised in Argentina during periods marked by authoritarian rule and state abuse. The militarized presence, arbitrary commands, and intimidation tactics now present in the immigration courts echo conditions of repression he experienced earlier in his life. The familiarity of the fear tactics causes him great personal distress.

36.    Father Arias was present on September 30, 2025, when a journalist was forcibly taken to the ground, causing his head to strike the marble floor with an impact audible throughout the building.

37.    For Father Arias to unhesitatingly carry on this work under these conditions, and then to have his ministerial duties interrupted by a wholly unlawful order from the defendants is a cruel assault on both his and the respondent's First Amendment rights. He is repeatedly forced to abandon members of his flock at their greatest moment of need.

38.    The arbitrary restrictions being imposed on Father Arias directly and substantially burden his religious exercise, his speech, and his right to associate with members of his congregation and community.

39.    Even under these conditions Father Arias continues to accompany immigrants and their families. Because the practices described above are ongoing and routinely enforced at New York City immigration court locations, he faces a credible and continuing threat of repeated exclusion, intimidation, and removal in the future.

**B. Stephen Kelly**

40.    Stephen Kelly is an attorney registered in the State of New York. In June of 2025, he registered to practice before the Executive Office for Immigration Review, a two-step process requiring electronic submission of personal information followed by in-person identity verification. On several occasions, court clerks refused to complete the verification, citing computer problems, including while actively using their computer. On a later visit, a clerk stated

that "they weren't supposed to let in any more attorneys." After this remark, another clerk who had previously declined to process his request allowed him to complete the verification. However, as a New York attorney, he has an ethical obligation to represent clients only if he can do so competently, which requires the ability to observe the tribunal in which he may practice, particularly where the government advances novel legal theories.

41.    Like other plaintiffs, he has been denied entry without justification to virtually every courtroom he has attempted to enter when visiting the court on average once a week, for the past year. Even when accompanying a respondent at the respondent's request. Long-time practitioners in this court system have informed him that the presence of even a single observer significantly influences courtroom conduct, raising concerns about proceedings conducted without public oversight. He continues to attend immigration court to provide support where possible, though these efforts are substantially impeded by the challenged practices.

42.    On or around June 23, 2025, while accompanying an individual to court, Mr. Kelly was present in the gallery during that individual's hearing. After the hearing concluded, Mr. Kelly, the respondent, and the respondent's priest exited the courtroom at an appropriate moment. The respondent had been represented remotely by counsel, and the proceedings were conducted in English, which neither the respondent nor the priest speaks. In the hallway outside the courtroom, Mr. Kelly spent several minutes explaining the favorable outcome of the hearing to them. At the conclusion of that conversation, the three began to proceed toward the elevator. At that point, a group of government agents, attired in military-style weapons and armor and who had been standing nearby without indicating any attention to the group, suddenly and without warning rushed them. Mr. Kelly was forcibly thrown away from the group, and the respondent was seized and dragged away in handcuffs. This conduct, occurring immediately following participation in a judicial proceeding and in a public courthouse space, would deter a person of ordinary firmness

from attending court, conducting business before the court, or engaging in other activities that can only take place within the courthouse environment.

43.    Mr. Kelly was present on September 30, 2025, when a journalist was forcibly taken to the ground, causing his head to strike the marble floor with an impact audible throughout the building.

44.    Defendants' practices have directly interfered with Mr. Kelly's ability to observe immigration proceedings, to accompany respondents who have requested his presence, and to fulfill his responsibilities as an attorney. Although immigration court proceedings are presumptively open to the public, Mr. Kelly has repeatedly been excluded from courtrooms, prevented from completing required attorney verification, and denied access to public spaces without lawful justification. These barriers have impeded his efforts to document court operations, support respondents, and assess the functioning of a tribunal before which he is authorized to practice. Because these exclusions arise from a recurring pattern of restrictions rather than isolated incidents, declaratory and injunctive relief is necessary to restore lawful public access and to prevent further interference with Mr. Kelly's ability to observe and participate in immigration court proceedings.

C. Debbie Nathan

45.    Debbie Nathan is an author and has been a journalist for forty-five years. She has worked as a staff writer for publications including *El Paso Times*, *City Limits*, and *The Appeal*, and as a freelancer for outlets including *The Nation*, *The Intercept*, *The New York Times*, *The Atlantic*, *Ms.*, *Los Angeles Times Magazine*, *New York Magazine*, and *The Guardian*. She has reported extensively on immigration and the immigration court system since the late 1980s.

46.    Through the summer of 2025, Ms. Nathan's experience in immigration courts was consistent with EOIR's written rules and practice manuals. Respondents had priority for seating,

and remaining seats were made available to members of the public, including journalists. During that period, Ms. Nathan was routinely able to observe proceedings, take notes, and gather information necessary to report accurately on how immigration courts functioned.

47.    She has reported on how, since mid-summer 2025, conditions in the New York City immigration courts have changed drastically. Access restrictions have significantly impeded Ms. Nathan's ability to gather information and to perform her work as a journalist.

48.    In a representative incident, on November 14, 2025, Ms. Nathan went to the immigration courts at 26 Federal Plaza, on the fourteenth floor, to observe hearings for a story she was actively reporting. She was accompanied by a colleague who is also a writer.

49.    She initially wasn't able to find any courtroom with an open door, despite having researched the day's docket. When she eventually found one, Ms. Nathan observed approximately four people in the gallery, who appeared to be respondents. There was ample additional seating available for public observers.

50.    As Ms. Nathan and her colleague prepared to enter the courtroom, they were approached by an individual she recognized as a court employee from her previous visits to the court. The official told them they could not enter the courtroom because "it's too small" and that "the judge never allows the public in the courtroom." When Ms. Nathan replied that she had attended proceedings in that courtroom in the past, the court employee replied that the judge had permanently banned the public from her courtroom, and further that all judges in that section permanently ban public observers, except for a single Immigration Judge.

51.    Ms. Nathan questioned this explanation in light of both the EOIR Practice Manual, and a recently issued EOIR "Fact Sheet," dated November 2025, which state that court hearings are generally open to the public, subject to limited exceptions. She also reminded the

official that he himself had allowed her into courtrooms earlier in the year. He responded, "Things have changed since then."

52.    Ms. Nathan was not permitted to observe any of the other courts, despite visible available seating and the absence of any posted closure orders or capacity determinations.

53.    On another occasion, when attempting to enter a courtroom, she was denied access by a court employee. When she joined the proceeding via Webex from her phone instead, she was told by the judge that only in-person attendance was allowed. She explained that she had just been turned away from the courtroom, and the judge told her to return in person. She was briefly admitted, and then expelled during proceedings, with the judge claiming that some unspecified conduct disqualified her from attending proceedings. Ms. Nathan's behavior in the course of her reporting is always scrupulously appropriate.

54.    As a direct result of these actions, Ms. Nathan was prevented from observing proceedings she had specifically sought to cover for reporting purposes.

55.    She was unable to gather first-hand information about how multiple judges were conducting master calendar hearings, how respondents were being treated, and how proceedings were being managed.

56.    This resulted in the loss of information necessary for accurate and responsible reporting on the immigration court system.

57.    Because these access restrictions have become routine and categorical, Ms. Nathan has been forced to abandon specific reporting efforts to cover immigration court proceedings in New York. Attempting to observe hearings under these conditions has become futile, as she reasonably expects to be excluded regardless of available seating or the public nature of the proceedings.

58. These restrictions have caused distinct and concrete professional harm, interfering with her ability to pursue stories, gather facts, and earn a living as a journalist.

59. Ms. Nathan would continue attending immigration court proceedings if permitted to do so. Observing hearings firsthand is essential to her reporting career and to her ability to inform the public accurately about how the immigration court system operates.

60. Based on her personal experiences and statements made by court officials, she faces a credible risk of permanent or ongoing exclusion from large portions of the New York City immigration courts.

61. The restrictions she encountered are not isolated incidents but reflect a broader and continuing practice that has substantially curtailed public and press access.

**D. Dr. Zoey Phillips**

62. Dr. Zoey Phillips is a New York-licensed psychologist working in the treatment of youth and families, with a particular focus on individuals who have experienced trauma. She regularly counsels youth, families, and adults who have personal or family histories of immigration to the United States in New York hospitals, schools, group practices, and private practice.

63. Dr. Phillips is a Spanish-speaker, with a background in the psychological toll of court proceedings in immigrant communities. As part of this specialization she must diligently remain aware of the firsthand experience of immigration court proceedings on individuals and families. This is necessary to her ability to treat issues informed by fear, confusion, isolation, and re-traumatization that refugees experience.

64. Dr. Phillips is a practicing Christian, who considers it an integral part of her faith and religious practice to also be present for people experiencing hardship, fear, and displacement. Being physically present, offering companionship, and providing prayer when asked are core

expressions of her religious duty. These commitments have been central to her personal, professional, social, and religious life throughout her career.

65.    Consistent with these commitments, Dr. Phillips regularly volunteers to accompany individuals to their court dates, and to provide meaningful support before and after hearings. She has been consistently stymied in this on virtually every visit she has attempted to make to Immigration Court in the past year.

66.    In a representative example, on October 21, 2025, Dr. Phillips attempted to observe an open immigration hearing. Earlier that morning, a court clerk had informed people in the waiting room that the gallery would be opened at approximately 10 a.m.

67.    When Dr. Phillips returned at approximately 9:55 a.m., the court clerk stated that observers were not permitted to enter and instructed them to return in ten to fifteen minutes. Dr. Phillips requested permission to wait in the public waiting room to ensure timely access. The clerk refused and ordered the observers to leave the almost empty waiting room.

68.    Later that morning Dr. Phillips and two others were permitted to enter. After the hearing, a respondent expressed concern about her ability to secure legal representation before her next court date. Dr. Phillips walked with her into the waiting room and spoke quietly with her in Spanish. Dr. Phillips wrote down the name and address of St. Peter's Church and the time of services on a small piece of paper. The woman expressed gratitude and asked if someone could accompany her to the lobby, which Dr. Phillips did.

69.    While Dr. Phillips was speaking quietly with the woman in the waiting room, the court clerk observed the interaction and stated, "After this, you're done." Dr. Phillips explained that she had only shared the name of a church. The clerk responded, "Yeah, whatever. After this, you're done," and raised his hand in a gesture blocking her return to the courtroom. She was not permitted to re-enter.

70.     She then entered another courtroom connected to the same waiting room, whose door was open during a recess, and sat in the gallery to wait. Other individuals, apparently attorneys, were milling around the area separating the gallery from the court. As proceedings were just about to commence, the judge noticed her and asked if she was an attorney. When she replied in the negative, she was told she must leave "because they were about to have an individual hearing." The relevant law explicitly states that individual hearings are open to the public. 8 C.F.R. § 1003.27 (2025).

71.     Dr. Phillips had complied with all building rules and security procedures. No courtroom closure order, capacity determination, or other recognized justification was provided, despite her request. Many seats, including the seat she had previously occupied, were visibly unoccupied. No overflow or alternative access was offered.

72.     The October 21, 2025 incident was not isolated. On numerous other occasions at New York City immigration courts, court clerks and security officers have ordered Dr. Phillips to leave waiting rooms, hallways, and courtrooms, both when she was alone and when she was with others. On multiple occasions, she was told she could not wait in public waiting rooms or hallways and was given no lawful alternative that would allow her to observe hearings.

73.     On at least one occasion, despite arriving at approximately 7 a.m., Dr. Phillips was prevented by security officers from entering the building until 8:30 a.m., pursuant to a new policy that made it virtually impossible for observers to make it to a courtroom before staff had the opportunity to lock it from the inside.

74.     On other occasions, clerks explicitly told Dr. Phillips that she was not permitted to speak with or exchange information with individuals awaiting their hearings, even in public areas, and that she would have been allowed entry only if she had met those individuals outside the building.

75. These practices make it practically impossible for Dr. Phillips to pursue her protected activities as a court observer, volunteer, mental-health professional, and person of faith.

76. The actions described above have caused Dr. Phillips direct and personal harm. She has been prevented from observing public immigration court proceedings, excluded from public spaces without lawful justification, and barred from re-entering courtrooms after lawful exits.

77. She has been forced to abandon individuals at moments of acute vulnerability, including people experiencing fear, confusion, and psychological distress.

78. These exclusions interfere directly with her professional responsibilities as a psychologist specializing in trauma, her ability to understand the court environment affecting her clients, and her religious duty to provide presence, compassion, and support.

79. Dr. Phillips' research and professional experience make her particularly aware of the ways in which human connection, companionship, and, often, faith can buffer the effects of traumatic experiences and promote resilience. Being prevented from offering this support causes both personal and professional injury. She is equally aware of the psychological impact of a government worker in a threatening environment arbitrarily curtailing such support.

80. These practices create an ongoing and concrete barrier to Dr. Phillips's ability to carry out her professional, civic, and religious obligations. Despite immigration proceedings being presumptively open to the public under federal law, Defendants' repeated exclusion of Dr. Phillips from courtrooms, waiting areas, and other public spaces—without lawful justification—prevents her from observing proceedings, accompanying vulnerable individuals, and offering the support that her professional training and religious commitments compel her to provide. The restrictions described above are not isolated incidents but part of a broader pattern that effectively forecloses meaningful public access to immigration court proceedings in New York.

81.    Declaratory and injunctive relief is therefore necessary to restore lawful public access, to prevent further arbitrary exclusion of observers such as Dr. Phillips, and to ensure that she may engage in her protected professional, expressive, and religious activities without unlawful interference.

**E. Laura McCallum**

82.    Laura McCallum is an artist and educator and has lived in Brooklyn, New York, for approximately forty-five years.

83.    Ms. McCallum has regularly volunteered as a court observer and accompanier at the federal immigration courts in New York City. Ms. McCallum attends immigration court approximately once per week. Her purpose in attending is to observe public immigration court proceedings, to provide non-legal information to individuals navigating the asylum process, and to accompany immigrants to and from their hearings so that they are not forced to face an intimidating legal process alone.

84.    From March through late May 2025, public-access conditions in New York City's immigration courts were consistent with Ms. McCallum's prior experience volunteering in courthouses. During this period, court observers were able to enter the buildings, wait in public waiting rooms, speak quietly with immigrants, distribute written information describing legal rights, accompany individuals into courtrooms when space permitted, and exit the building with them after hearings. Throughout her previous experience, court staff and security personnel did not restrict observers' movement through public hallways, did not prohibit access to waiting rooms, and did not interfere with observation of hearings.

85.    Beginning in early June 2025, access conditions changed sharply and dramatically. This change coincided with the regular presence of federal agents inside and immediately outside immigration courtrooms.

86. Since that time, Ms. McCallum has repeatedly attempted to observe public immigration court proceedings and to accompany individuals attending hearings. She has repeatedly been prevented from doing so by federal agents and building security personnel acting under federal authority.

87. Since June 2025, Ms. McCallum has been denied entry into public waiting rooms, prohibited from standing or walking in hallways ordinarily open to the public, separated from immigrants by security directives preventing communication, forced to wait outside court buildings in extreme weather conditions to gain entry, and barred from re-entering courtrooms after briefly leaving to use the restroom or accompany an individual.

88. On multiple occasions at New York's Immigration Courts, Ms. McCallum has been told by federal agents or building security personnel that hallways were "private" or off-limits, despite those hallways being necessary to access public restrooms or courtrooms.

89. Since June 2025, Ms. McCallum has personally been turned away at courtroom doors between fifteen and twenty-five times. She estimates that she has been ordered to leave courtrooms approximately fifteen times and has been prohibited from entering courtrooms at least twenty times.

90. These exclusions were not accompanied by any courtroom closure order, capacity determination, or case-specific justification. No federal agent, security officer, or court staff member cited any regulation, court order, or lawful basis for denying access.

91. As a direct result of these actions, Ms. McCallum has been prevented from observing hearings she intended to attend and was lawfully entitled to observe as a member of the public. She has also been prevented from monitoring how immigration conducted proceedings, how ICE agents interacted with respondents and family members, and whether hearings were conducted in a fair, orderly, and lawful manner.

92.     On several occasions, Ms. McCallum was prohibited from distributing written materials explaining immigrants' legal rights by security personnel, who characterized this activity as "solicitation," a term whose definition in any relevant statute, code, or regulation has no application to her activities or reason for being present at immigration court. She both explained this, and demonstrated this fact with the court's own materials. She was told that the prohibition reflected new policy.

93.     She has witnessed federal agents demand identification without explanation and issue abrupt commands that frightened immigrants and volunteers.

94.     She was present on September 30, 2025, when a journalist was forcibly taken to the ground, causing his head to strike the marble floor with an impact audible throughout the building. Ms. McCallum has personal experience of friends with permanent cognitive impairment from this type of injury, and witnessing this conduct heightened Ms. McCallum's fear of retaliation and reinforced the chilling effect of the access restrictions described above.

95.     The conduct described above has directly interfered with Ms. McCallum's ability to observe public immigration court proceedings, to engage in lawful court observation, and to accompany individuals during and after hearings.

96.     These actions have denied her meaningful access to proceedings that are presumptively open to the public and have chilled her continued participation as a court observer. Because these practices are ongoing and appear to be enforced uniformly by ICE agents and building security personnel, Ms. McCallum faces a credible and continuing threat of repeated exclusion each time she attempts to observe immigration court proceedings in the future.

97.     Based on her repeated observations at two separate immigration courthouses, the restrictions she experienced are not isolated incidents but reflect a systemic practice applied generally to court observers and members of the public.

98.    The harms caused by these practices are ongoing and can be remedied only through declaratory and injunctive relief requiring defendants to cease unlawful restrictions and to restore lawful public access to immigration court proceedings.

## DEFENDANTS

99.    United States Immigration and Customs Enforcement and Todd Lyons in his official capacity.

100.    United States Department of Justice and Pamela Bondi in her official capacity.

101.    United States Department of Homeland Security and Kristi Noem in her official capacity.

102.    United States General Services Administration and Edward Forst in his official capacity.

## ALLEGATIONS

### A. Locking of Public Courtrooms

103.    Immigration court proceedings are presumptively open to the public.

104.    Defendants have repeatedly locked courtroom doors during active proceedings, preventing members of the public from entering.

105.    Individuals seeking to observe proceedings have been denied access without lawful justification.

106.    These actions eliminate public observation and suppress the expressive and oversight functions associated with open judicial proceedings.

### B. Prohibition on Speaking with Respondents

107.    In publicly accessible areas of immigration court facilities, including hallways and waiting areas, Defendants have prevented Plaintiffs and others from speaking with respondents.

108. These prohibitions are enforced categorically, without regard to time, place, or manner considerations.

109. The barred speech includes brief, consensual conversations concerning legal rights, court procedures, and access to counsel.

**C. Ejection for Sharing Know Your Rights Materials**

110. Plaintiffs and similarly situated individuals distribute printed informational materials concerning legal rights and court processes.

111. Defendants have ordered individuals to cease such distribution and have ejected them from public areas when they do not comply.

112. These actions suppress protected expressive activity and target specific content related to legal rights.

**D. Harassment in Public Areas**

113. In areas surrounding immigration courtrooms that are open to the public, Defendants have engaged in repeated harassment, including intimidation, close monitoring, and threats of removal.

114. This conduct is sufficiently pervasive and coercive that individuals are effectively unable to remain in these areas while engaging in protected activity.

115. As a result, Plaintiffs and others have curtailed or ceased their activities.

**E. Deterrence of Court Participation**

116. Defendants have engaged in conduct that would deter a person of ordinary firmness from appearing in court, conducting necessary business before the court, using the services of the clerk of the court, or otherwise participating in judicial proceedings.

117. This conduct is sufficiently coercive and intimidating that individuals are effectively dissuaded from attending court or carrying out essential functions related to their cases.

118. As a result, Plaintiffs and others have curtailed or forgone court attendance and participation in judicial proceedings.

## NATURE OF ACTION

119. Plaintiffs bring this action under the First Amendment and move this Court for an Order certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2).

120. Plaintiffs seek certification of the following class: "All persons who are or will be subjected to Defendants' enforcement within the court's jurisdiction."

121. Pursuant to Rule 23(g), Plaintiffs request appointment of Plaintiff Stephen Kelly as Class Counsel. As explained in the attached motion, since approximately April 2025, he has regularly attended Manhattan immigration courts, documenting alleged constitutional violations, interviewing affected individuals, and developing an evidentiary record sufficient to support this litigation. Despite sustained efforts to secure representation by experienced class or impact litigation counsel, no attorney or organization has agreed to take on this matter.

## JURISDICTION AND VENUE

122. The Court has subject-matter jurisdiction under federal law, including 28 U.S.C. § 1331 *et seq.* and the Administrative Procedure Act, 5 U.S.C. 702 *et seq.*

123. Venue is proper pursuant to 28 U.S.C § 1391 as the claims occurred in this district.

## CLAIM FOR RELIEF

### Count I – Violation of the First Amendment

124. Plaintiffs incorporate by reference the foregoing paragraphs.

125. Plaintiffs' activities, including observing court proceedings, engaging in consensual conversation, and distributing informational materials, are protected by the First Amendment.

126. The courtroom closures, speech prohibitions, ejections, and harassment described above constitute direct restrictions on protected speech and access.

127. These restrictions are not reasonable time, place, or manner regulations. They are not narrowly tailored to serve a significant governmental interest and do not leave open ample alternative channels for communication.

128. Defendants' actions are not viewpoint neutral and disproportionately burden speech concerning legal rights and access to the courts.

129. Defendants have violated the First Amendment by imposing adverse actions that chill and deter protected activity, including the rights to petition the government for redress of grievances and to access the courts. This conduct lacks adequate justification, is not narrowly tailored to any legitimate governmental interest, and has caused, and will continue to cause, irreparable harm absent injunctive relief.

130. Defendants' conduct has caused and continues to cause irreparable injury.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request this Court:

(1) Assume jurisdiction over this matter;

(2) Issue a declaratory judgment that the Defendants' policies violate the First Amendment to the United States Constitution, federal common law, various acts, and public policy;

(3) Issue preliminary and permanent injunctions enjoining Defendants, their officers, agents, employees, and all persons acting in concert with them from enforcing or maintaining policies or

practices that restrict public access to immigration court proceedings except as permitted by law, or retaliating against persons who engage in protected activities;

(4)    Prohibit Defendants from engaging in retaliatory conduct that burdens, penalizes, or deters respondents from attending or participating in their own judicial proceedings, including conduct that would dissuade a person of ordinary firmness from exercising such rights;

(5)    Award the Plaintiffs attorneys' fees and costs; and

(6)    Grant any other relief the Court deems appropriate.

## PLAINTIFFS HAVE ARTICLE III STANDING TO SEEK PROSPECTIVE RELIEF AGAINST ICE

3.    The Court dismissed the claims against U.S. Immigration and Customs Enforcement ("ICE") and its senior official without prejudice for a narrow, defendant-specific pleading deficiency. The Amended Complaint referred collectively to federal agents, federal police, security personnel, and Defendants, but did not allege a specific instance in which an identified ICE officer, apart from carrying out or securing an arrest, detention, transport, or other enforcement operation, prohibited a named plaintiff from observing a hearing, communicating with a respondent, distributing information, or remaining in a publicly accessible area. The Court expressly authorized amendment if Plaintiffs could allege a real and immediate threatened injury to a named plaintiff that is fairly traceable to ICE and redressable by prospective relief against ICE, while distinguishing unconstitutional interference with protected activity from lawful enforcement operations. Order at 33–35, ECF No. 62; see Am. Compl. ¶¶ 14, 17–19, 26–31, 40–44, 82–98, 103–18, 124–30, ECF No. 40.

4.    The expanded allegations cure that precise deficiency. Named Plaintiff Laura McCallum identifies ICE agents as participants in repeated restrictions on her observation, movement,

- 69 -

communication, and accompaniment, and she alleges a concrete intention to return to the same facilities. Named Plaintiff Stephen Kelly alleges that agents conducting an immigration seizure physically terminated his quiet explanation of a completed hearing even though he was neither obstructing nor interfering; the nature of the operation, ICE's own description of ERO's functions, and the surrounding record support the reasonable inference that the agents were ICE or ERO personnel. Reverend Juan Carlos Ruiz, if properly joined through an operative pleading, provides an additional and unusually explicit ICE-specific incident: officers wearing ICE-marked vests violently displaced him, threatened him with arrest, and prevented ongoing pastoral counseling while he was not obstructing any arrest. McCallum Decl. ¶¶ 1–10; Kelly Second Decl. ¶¶ 4–6, 37–41, 63–67, ECF No. 56; Ruiz Aff. ¶¶ 21–26; Harrington Decl. ¶¶ 1, 6–10, ECF No. 50; see Am. Compl. ¶¶ 1–3, 9–19, 40–44, 82–98, 107–18, 124–30.

5.    The remaining declarations do not substitute nonparties' injuries for named-plaintiff standing. They corroborate who imposed the challenged restrictions, how ICE and ERO personnel are identified in the court environment, whether the conduct is recurring rather than accidental, whether the challenged actions were collateral to rather than necessary for lawful enforcement, and whether the conduct would deter a person of ordinary firmness from protected activity. That corroborating evidence directly answers the Court's concerns about agency attribution, recurrence, and the distinction between lawful enforcement and unconstitutional interference. See Order at 33–35, 66–69; Am. Compl. ¶¶ 1–3, 12–19, 96, 107–18, 124–30.

### I. THE GOVERNING ARTICLE III STANDARD IS SATISFIED.

6.    Article III requires injury in fact, fair traceability, and likely redressability. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992). Because Defendants' jurisdictional objection is

facial, Plaintiffs bear no evidentiary burden at the pleading stage; the Court accepts all material allegations as true, draws reasonable inferences in Plaintiffs' favor, and asks only whether the pleading affirmatively and plausibly suggests standing. Carter v. HealthPort Techs., LLC, 822 F.3d 47, 56–57 (2d Cir. 2016); John v. Whole Foods Mkt. Grp., Inc., 858 F.3d 732, 736 (2d Cir. 2017). General factual allegations may suffice because courts presume that they embrace the specific facts necessary to support the claim. Lujan, 504 U.S. at 561; Order at 26–27.

7.    For prospective relief, a plaintiff must allege a real and immediate threat of similar future injury, not merely a completed past wrong. City of Los Angeles v. Lyons, 461 U.S. 95, 102, 105–06 (1983); Nicosia v. Amazon.com, Inc., 834 F.3d 220, 239 (2d Cir. 2016). Repeated past injuries are nevertheless evidence of likely recurrence, particularly where the plaintiff regularly returns to the same place, performs the same activity, and confronts the same asserted practice. O'Shea v. Littleton, 414 U.S. 488, 495–96 (1974); Order at 27–33. Standing must exist for each claim and form of relief and must be established against each defendant. Davis v. Fed. Election Comm'n, 554 U.S. 724, 734 (2008); Summers v. Earth Island Inst., 555 U.S. 488, 499 (2009).

8.    The retaliation theory supplies an independently cognizable injury. Official reprisal for protected expression violates the First Amendment because it threatens to inhibit exercise of the protected right. Hartman v. Moore, 547 U.S. 250, 256 (2006). A plaintiff plausibly pleads retaliation by alleging protected activity, adverse action that would deter a similarly situated person of ordinary firmness, and a causal connection between the two. Walker v. Senecal, 130 F.4th 291, 298–99 (2d Cir. 2025). Retaliatory intent may be inferred from temporal proximity, statements linking the official response to protected activity, or other

circumstantial facts; it need not be proved in the pleading. Posr v. Ct. Officer Shield No. 207, 180 F.3d 409, 418 (2d Cir. 1999); Order at 66–69.

## II. THE RECORD IDENTIFIES ICE AND ERO PERSONNEL WITH SUFFICIENT SPECIFICITY.

9.   The absence of a visible personal name or badge number does not make the responsible agency unknowable. ICE's own supervisory declarant states that Enforcement and Removal Operations ("ERO") is an ICE component, that ERO deportation officers make immigration arrests, and that the New York City Field Office is located at 26 Federal Plaza. Harrington Decl. ¶¶ 1–2, 6, ECF No. 50. Thus, a witness who personally observes "ERO" markings has identified ICE, not an indeterminate federal entity. Glacel personally observed officers with ICE badges or ERO markings in the relevant court spaces, including the ERO-marked personnel who entered a courtroom and engaged in the simulated-rifle display described below. Glacel Decl. ¶¶ 10–18, ECF No. 54; see Am. Compl. ¶¶ 12–19, 26, 96, 113–18, 124–30.

10. Other declarants identify ICE through express vest or agency markings, repeated observation in the same court environment, the officers' own words and conduct, or a careful limitation to "ICE or other federal law-enforcement" personnel when agency identity was less certain. Ruiz saw the word "ICE" printed on the officers' vests. Ruiz Aff. ¶ 25. Bowen repeatedly observed ICE personnel outside immigration courtrooms and was personally pushed by an ICE officer. Bowen Decl. ¶¶ 5–9, 19–25, ECF No. 66. Conwesser distinguished ERO-marked agents from other plainclothes personnel. Conwesser Decl. ¶¶ 5–7, ECF No. 67. Sigman described police-style uniforms and apparent ICE markings, while expressly presenting that identification as apparent rather than certain. Sigman Decl. ¶¶ 4–6, ECF No. 69. Bender likewise identified ICE or other federal law-enforcement agents and did not

overstate which category applied to every encounter. Bender Decl. ¶¶ 5–13, ECF No. 68; see Am. Compl. ¶¶ 14, 17–19, 26, 85–96, 113–18.

11. The practical difficulty of recording individual names is itself documented. Agents frequently wear masks, tactical clothing, sunglasses, or other gear that obscures identity, and they do not consistently provide names or badge numbers when challenged. Kelly Second Decl. ¶ 41, ECF No. 56; Bowen Decl. ¶¶ 5–9, 24–25; Schulman Decl. ¶¶ 8–15, ECF No. 57. At the pleading stage, Plaintiffs need not identify every individual officer by name where the allegations identify the agency, describe the actor, date, location, protected activity, and challenged act with sufficient specificity to render ICE causation plausible. Carter, 822 F.3d at 56–57; Whole Foods, 858 F.3d at 736; see Am. Compl. ¶¶ 12–19, 96, 103–18.

## III. NAMED PLAINTIFFS ALLEGE CONCRETE, RECURRING, ICE-SPECIFIC INJURIES.

### A. McCallum alleges repeated interference by ICE and a concrete intent to return.

12. McCallum attends immigration court approximately once per week to observe proceedings, provide nonlegal information, and accompany respondents, and she intends to continue. She states that, beginning in June 2025, she was repeatedly prevented from observing and accompanying by ICE agents and building-security personnel acting under federal authority. The restrictions included exclusion from public waiting rooms, prohibitions on standing or walking in public hallways, directives separating observers from immigrants and preventing communication, unequal restrictions on phone use, and denial of courtroom reentry. On multiple occasions, ICE agents or security personnel told her that necessary hallways were private or off limits. McCallum Decl. ¶¶ 1–7; see Am. Compl. ¶¶ 82–93, 95–98.

13. McCallum was turned away at courtroom doors between approximately fifteen and twenty-five times and removed from courtrooms approximately fifteen times, without a cited closure

order, capacity determination, or case-specific safety basis. She also personally observed ICE agents stationed at courtroom thresholds, demanding identification without explanation, issuing abrupt commands, pushing a volunteer, and forcefully grabbing a journalist in an elevator, causing another person to fall and strike the floor. Those experiences heightened her fear of retaliation and chilled her continued observation. She alleges that the practices remain ongoing and that declaratory and injunctive relief would allow her to resume observation and accompaniment without ICE interference. McCallum Decl. ¶¶ 8–10; see Am. Compl. ¶¶ 84–98, 103–18, 124–30.

14.  These allegations satisfy injury, imminence, traceability, and redressability as to McCallum. Her injuries are personal rather than ideological; they recur in the same two facilities during the same weekly activity; she expressly identifies ICE among the personnel imposing the restrictions; and an injunction directed to ICE would prevent ICE personnel from repeating their portion of that conduct. Lujan, 504 U.S. at 560–61; Nicosia, 834 F.3d at 239; see Am. Compl. ¶¶ 82–98, 125–30.

**B. Kelly alleges physical termination of protected communication during an ICE-type enforcement operation.**

15.  Kelly attends the immigration courts approximately once per week as an observer, attorney, organizer, and accompanier and intends to continue. Kelly Second Decl. ¶¶ 4–6, ECF No. 56; Am. Compl. ¶¶ 40–44. On June 23, 2025, after a completed hearing with a favorable result, Kelly spent several minutes in the hallway explaining that result to a respondent and priest who did not understand English. When the group began walking toward the elevator, military-equipped government agents suddenly rushed them, forcibly separated Kelly, seized the respondent, and removed him in handcuffs. Kelly states that he was not blocking the

corridor, obstructing the agents, or interfering with an arrest; he was explaining the completed proceeding. Kelly Second Decl. ¶¶ 37–39; Am. Compl. ¶ 42.

16.   The agency inference is plausible and specific. The agents were carrying out a post-hearing immigration seizure at 26 Federal Plaza. ICE's own supervisory declarant identifies ERO as ICE's immigration-arrest component, states that ICE's New York City Field Office is located at 26 Federal Plaza, and acknowledges that ICE officers conduct post-hearing arrests and use the elevators for processing. Harrington Decl. ¶¶ 1–2, 6, 9–10. Taken together with the pleaded allegation and the Court's obligation to draw reasonable inferences in Plaintiffs' favor, those facts plausibly attribute the separation to ICE or ERO personnel. Whole Foods, 858 F.3d at 736; see Am. Compl. ¶¶ 19, 36, 42–44, 94, 113–18.

17.   The constitutional injury is not the fact that ICE arrested or transported another person. It is the unnecessary physical termination of Kelly's protected explanation and association when he was not obstructing the operation. An injunction requiring ICE personnel to refrain from physically separating or silencing a nonobstructive speaker except where reasonably necessary to carry out a lawful operation would directly redress that injury while leaving arrest, detention, transport, and removal authority intact. Order at 34–35, 95; see Am. Compl. ¶¶ 17–19, 42–44, 113–18, 125–30.

**C. Arias alleges repeated injury and a continuing obligation to return; the additional record supplies the ICE attribution.**

18.   Father Arias has accompanied immigrants to immigration court multiple times each week for nearly twenty years because accompaniment is a religious duty. He has repeatedly been ordered not to speak with persons requesting his help, removed from courtrooms, hallways, and the building, and subjected to a militarized federal-law-enforcement environment that directly impairs his ministry and causes personal distress. He continues to return and faces the

real possibility of being excluded, silenced, or expelled again. Arias Aff. ¶¶ 1–7; see Am. Compl. ¶¶ 22–39, 107–18, 124–30.

19.   Arias's affidavit uses the broader term "federal agents" and should not be overstated as independently identifying every actor as ICE. But Conwesser separately observed a federal employee identified in contemporaneous reporting as ICE scream at Arias in a packed waiting area over alleged photography while several agents occupied the waiting room and hall. Conwesser Decl. ¶ 3, ECF No. 67. Kelly also records reported hostility directed toward Arias and alleged public comments about Plaintiffs, expressly labeling that information as reported rather than personally observed. Kelly Second Decl. ¶¶ 47–51. These facts corroborate ICE-specific targeting, but Arias's standing need not depend on the reported incidents because McCallum and Kelly independently allege ICE-traceable injury. See Am. Compl. ¶¶ 22–39, 113–18, 125–30.

**D. Ruiz, if joined through an operative pleading, independently alleges direct ICE interference.**

20.   The Court has not yet made Ruiz a party; it denied the prior joinder motion without prejudice because Plaintiffs did not attach clean and redlined proposed pleadings as required by Local Civil Rule 15.1. July 20 Order at 2–3, ECF No. 86. Accordingly, Plaintiffs do not rely on Ruiz as a substitute for the standing of existing named plaintiffs. If properly joined, however, Ruiz independently satisfies every element of ICE-specific prospective standing.

21.   Ruiz has accompanied immigrants to immigration court and ICE appointments regularly since approximately 2007 and will continue because his faith and ministry require it. Accompaniment includes walking through the building, waiting, quiet counseling, prayer, explanation, and leaving safely after court. Ruiz Aff. ¶¶ 5–12, 21–24. On January 6, 2026, officers wearing vests printed with the word "ICE" approached a family Ruiz was counseling

after a master-calendar hearing. A masked agent violently pushed Ruiz aside while holding mugshots and yelling a name; the children and mother cried; the officers moved the group toward an elevator and threatened Ruiz with arrest. Ruiz states that he was walking and counseling, was not obstructing or blocking any arrest, and was prevented from continuing accompaniment. Because he continues to return, he reasonably expects the same conduct again. Ruiz Aff. ¶¶ 21–26; see Am. Compl. ¶¶ 1–3, 9–19, 107–18, 124–30.

22.   Ruiz's allegations track exactly the distinction required by the Court: the requested relief would not prohibit ICE from making a lawful arrest, but would prohibit ICE personnel from using unnecessary force or threats to terminate quiet pastoral communication and accompaniment by a nonobstructive minister. Order at 34–35, 95; Ruiz Aff. ¶¶ 24–26; see Am. Compl. ¶¶ 17–19, 113–18, 125–30.

## IV. ICE EXERCISES DE FACTO OPERATIONAL CONTROL OVER COURT-ACCESS RESTRICTIONS

23.   Defendants' own declarations state that EOIR controls its courtrooms and waiting rooms, GSA manages the buildings, and FPS and its contract security officers enforce federal-building access and visitor-conduct rules. *See* Welsh Decl. ¶¶ 4–5, 7–8, 12–16 (ECF No. 47); Steichen Decl. ¶¶ 4–8 (ECF No. 48). ICE separately disclaims any role in regulating access, security, speech, written materials, hallways, waiting rooms, or elevator banks. Harrington Decl. ¶¶ 7–8 (ECF No. 50).

24.   The record shows otherwise in practice. ICE agents began announcing and enforcing purported "EOIR rules," including restrictions on speaking with respondents, distributing papers, using phones, and remaining in waiting rooms or hallways. Ehrman Decl. ¶¶ 12–14, 21–22 (ECF No. 65). Although an EOIR supervisor confirmed that EOIR controlled courtrooms and waiting rooms and GSA controlled hallways, ICE agents physically removed

Ehrman from an EOIR waiting room, blocked his return, and ensured that he entered an elevator; GSA personnel thereafter provided no meaningful intervention. *Id.* ¶¶ 15–19.

25. ICE agents likewise issued speech and access restrictions to Vasquez, summoned security to enforce their commands, and personally expelled her. Vásquez Decl. ¶¶ 2–4 (ECF No. 71). Security personnel told Vasquez that ICE supervisors decided who could remain in hallways or courtrooms and that security enforced those decisions. *Id.* ¶ 12. Other witnesses similarly describe ICE or ICE-associated agents confiscating materials, excluding observers from waiting rooms and hallways, obstructing courtroom access, threatening arrest, and physically removing or separating accompaniers. *See* Bender Decl. ¶¶ 5–10, 13 (ECF No. 68); Sigman Decl. ¶¶ 5–6, 10–11 (ECF No. 69); Kelly Decl. ¶¶ 12, 19–20 (ECF No. 41).

26. ICE also entered an immigration courtroom and scanned respondents until an EOIR clerk ordered the agents out, and in another incident pressed an immigration judge to surrender a respondent who remained inside the courtroom. Glacel Decl. ¶¶ 17–23 (ECF No. 54); Bowen Decl. ¶¶ 13–17 (ECF No. 66).

27. The record therefore supports the inference that, although EOIR, GSA, and FPS retain nominal authority, ICE repeatedly exercises the immediate operational power that determines whether observers may speak, distribute information, remain in court-adjacent spaces, accompany respondents, or continue observing proceedings. *See, e.g.*, Ehrman Decl. ¶¶ 12–22 (ECF No. 65); Vásquez Decl. ¶¶ 2–4, 12–14 (ECF No. 71); Bender Decl. ¶¶ 5–10, 13 (ECF No. 68).

**IV. THE DECLARATIONS DOCUMENT DIRECT ICE INTERFERENCE WITH SPEECH, INFORMATION-SHARING, ACCOMPANIMENT, AND MOVEMENT.**

**A. ICE agents prohibited rights advice and individualized information-sharing.**

28.  Ehrman's declaration provides the clearest direct evidence. ICE agents began announcing "no soliciting," singled out volunteers who handed respondents papers, and prohibited the volunteers' individualized information forms. After Ehrman told a family that they had a constitutional right to remain silent, ICE agents immediately told him he could not speak with the family, could not remain in the hallway, and had to be inside a courtroom or leave; an agent later briefly blocked his path. Ehrman Decl. ¶¶ 11–15, ECF No. 65; see Am. Compl. ¶¶ 2, 17–18, 107–12, 125–30.

29.  The next day, after Ehrman again advised a respondent of the right to remain silent, ICE agents raised their voices, told him he could not speak or remain in the waiting room, surrounded him, physically directed him to the elevators, and ensured that he left the floor. On another occasion, an ICE agent seized a handwritten information note exchanged between a volunteer and respondent and characterized the exchange as solicitation. ICE personnel also purported to enforce a no-phone rule against respondents in the waiting area. Ehrman Decl. ¶¶ 16–22; see Am. Compl. ¶¶ 107–18, 125–30.

30.  Vásquez likewise states that ICE agents were among the personnel who ordered observers from waiting rooms, prohibited them from speaking with respondents, and prohibited distribution of know-your-rights material. A female ICE agent accused Vásquez of photographing agents merely because she was holding a phone, yelled at her, and expelled her. On another occasion the same agent followed directly behind Vásquez while yelling and insulting her and placed a hand on her until Vásquez objected. Vásquez Decl. ¶¶ 2–5, ECF No. 71; see Am. Compl. ¶¶ 2, 17–18, 92–93, 107–18, 125–30.

31.   Bender identifies ICE or other federal law-enforcement agents who told observers they could not speak with respondents, distribute papers, remain in designated waiting rooms, or remain in hallways. Agents entered waiting rooms to terminate conversations, took blank information cards from volunteers, and caused volunteers to conceal completed cards to prevent confiscation. Bender was expelled from public waiting areas or hallways approximately three or four times and was sometimes blocked from courtrooms and ordered to leave the building. Bender Decl. ¶¶ 3–13, ECF No. 68; see Am. Compl. ¶¶ 2, 17–18, 92, 107–18, 125–30.

32.   At 201 Varick Street, Sigman observed armed personnel in police-style uniforms with apparent ICE markings aggressively confront a co-volunteer over a know-your-rights flyer she was only holding, order her to leave, and falsely claim that surveillance video showed distribution. The personnel then entered a courtroom, removed the person who was actually carrying flyers—reported to Sigman as a lawyer—and escorted her from the building. Sigman Decl. ¶¶ 4–6, ECF No. 69; see Am. Compl. ¶¶ 2, 17–18, 110–18, 125–30.

33.   Glacel identifies ICE among the personnel who treated handwritten or typed notes, texting, collection of contact information or A-numbers, photography, passing written information, and speaking with respondents as prohibited or suspicious. The commands were accompanied by threats of removal from the courtroom or floor, expulsion from the building, permanent exclusion, or trespass treatment. Because Glacel identifies several categories of personnel, her declaration establishes ICE participation in the pattern without assigning every individual command exclusively to ICE. Glacel Decl. ¶¶ 10–15, ECF No. 54; see Am. Compl. ¶¶ 2, 17–18, 107–18, 125–30.

**B. ICE agents physically interrupted accompaniment and protected association.**

34.   Vásquez was accompanying a young woman out of court when ICE approached. Agents ordered Vásquez to leave the woman, and an ICE agent grabbed Vásquez's arm, causing the accompaniment to end. Vásquez Decl. ¶ 8; see Am. Compl. ¶¶ 9–11, 17–19, 85–96, 113–18, 125–30. Bender describes agents allowing a respondent to proceed while blocking Bender, forcing a visibly frightened respondent to continue alone. Bender Decl. ¶¶ 9–11; see Am. Compl. ¶¶ 9–11, 17–19, 107–18, 125–30.

35.   Conwesser was accompanying a respondent and the respondent's older brother when ERO-marked and plainclothes agents approached from behind and grabbed the brother, who had already received asylum and had no hearing that day. When Conwesser stated that he had asylum, an agent told her, in substance, to be quiet because the agents were not speaking to her. The agents questioned the man while holding a photograph and released him without explanation. Conwesser Decl. ¶¶ 5–15; see Am. Compl. ¶¶ 9–11, 17–19, 107–18, 125–30.

36.   Schulman commonly encountered groups of masked ICE agents in hallways, waiting rooms, and elevator banks. On one occasion agents followed a person he was accompanying away from the court area, pushed or shoved that person, and pushed Schulman as well. Schulman Decl. ¶¶ 8–15, ECF No. 57; see Am. Compl. ¶¶ 17–19, 113–18, 125–30. Bowen was personally pushed by an ICE officer in a narrow corridor at 290 Broadway after she had been sitting with a respondent; she states that she was near the agents but was not interfering. Bowen Decl. ¶¶ 19–23; see Am. Compl. ¶¶ 17–19, 94, 113–18, 125–30.

37.   Mun describes ICE personnel challenging volunteers' ordinary movement through hallways, including telling her that she was not supposed to be in a hallway while she was walking to a restroom. She was also speaking with and accompanying a nervous Jamaican respondent toward the restroom before the respondent's hearing when ICE took the woman,

ending the communication and preventing the woman from reaching the scheduled hearing. Mun Decl. ¶¶ 10–13, ECF No. 70; see Am. Compl. ¶¶ 9–11, 17–19, 85–96, 107–18, 125–30.

**C. ICE personnel exercised or purported to exercise access control in court-adjacent spaces.**

38.   The witness evidence contradicts ICE's categorical assertion that its officers neither control public access nor expel persons for speaking or sharing information. Harrington Decl. ¶¶ 7–9. McCallum attributes repeated waiting-room, hallway, communication, and reentry restrictions jointly to ICE and building security. McCallum Decl. ¶¶ 4–10; see Am. Compl. ¶¶ 84–98, 103–18. Bender describes agents entering waiting rooms to end conversations, blocking courtroom entry, and ordering observers from the building. Bender Decl. ¶¶ 6–13; see Am. Compl. ¶¶ 103–18. Sigman describes apparent ICE personnel blocking a respondent in a courtroom doorway, demanding identification and court documents, rejecting the explanation that the judge had released her, and following the group to the restroom. Sigman Decl. ¶¶ 6–9; see Am. Compl. ¶¶ 85–96, 103–18.

39.   Vásquez further states that security personnel told her ICE supervisors decided who could enter and that security enforced those decisions. After she obtained access by entering with Congressman Dan Goldman, the same ICE agent later invoked that intervention while expelling her again. Vásquez Decl. ¶¶ 12–14; see Am. Compl. ¶¶ 85–96, 103–18, 125–30. Even if discovery ultimately shows that ICE lacked formal authority to set building-wide rules, a federal officer who actually orders a person out, physically prevents entry, or directs security to enforce an exclusion causes the resulting injury for Article III purposes. Lujan, 504 U.S. at 560–61.

40.   Kelly also records reports that ICE blocked a principal waiting-room entrance until Congressman Goldman intervened, rounded up members of the public and escorted them out

on another date, and jammed elevator doors open to keep people on a court floor. Kelly expressly identifies those accounts as reported information for which he sought corroboration. They therefore are not offered as an independent basis for standing, but they are consistent with the personally observed evidence of ICE participation in access control. Kelly Second Decl. ¶¶ 47, 53; see Am. Compl. ¶¶ 85–96, 103–18.

## V. THE SAME RECORD PLAUSIBLY ALLEGES FIRST AMENDMENT RETALIATION AND AN OBJECTIVELY COERCIVE INJURY.

### A. Several incidents expressly connect adverse action to protected activity.

41.  Ehrman's encounter contains an express causal link. After Ehrman repeatedly advised respondents of the right to remain silent, an ICE agent told an EOIR supervisor that "he's going to keep doing this." Three masked ICE agents then surrounded Ehrman, physically escorted him toward the elevators, blocked his return, mocked his education and volunteer work, and ensured that he left the floor. Ehrman thereafter substantially stopped attending because the agents knew his face and he feared that his presence would draw ICE attention to respondents. Ehrman Decl. ¶¶ 16–20; see Am. Compl. ¶¶ 17–18, 107–18, 125–30. The sequence, the agent's words, the immediate escalation, and the resulting chill plausibly allege protected activity, adverse action, and retaliatory causation. Walker, 130 F.4th at 298–99; Posr, 180 F.3d at 418.

42.  Vásquez's evidence is similarly direct. After she regained waiting-room access by entering with Congressman Goldman, the same ICE agent expelled her approximately six weeks later and stated, "Go get your fucking little congressman Goldman to help you." Vásquez understood the statement as evidence that the agent remembered the earlier intervention and held a grudge. Vásquez Decl. ¶¶ 12–14; see Am. Compl. ¶¶ 17–18, 93–98, 113–18, 125–30.

The officer's express reference to the protected effort to obtain governmental assistance permits a reasonable inference of retaliatory motive. Posr, 180 F.3d at 418.

43.  Sigman likewise heard a masked, armed agent threaten arrest for anyone who remained in the hallway and add, "These fucking advocates." The statement expressly linked the threatened arrest to the observers' identity and accompaniment activity; Sigman and her co-volunteer were forced to abandon the respondent they had come to accompany. Sigman Decl. ¶¶ 10–11; see Am. Compl. ¶¶ 17–19, 85–96, 113–18, 125–30. A threat of arrest directed at "advocates" would deter a person of ordinary firmness from continuing accompaniment. Walker, 130 F.4th at 298–99.

44.  Vásquez's phone incidents provide additional circumstantial evidence. A female ICE agent yelled at her for holding a phone, accused her of photographing agents, expelled her, and on another occasion followed directly behind her while yelling, insulting, and touching her. Vásquez Decl. ¶¶ 3–5; see Am. Compl. ¶¶ 17–18, 93–98, 113–18, 125–30. Personalized insults, unnecessary physical proximity, repeated targeting by the same officer, and physical contact permit an inference that the response was intended to deter documentation and observation rather than neutrally enforce a general rule. Posr, 180 F.3d at 418.

**B. The broader record establishes recurrence and objective deterrence, while preserving the distinction between intimidation and lawful enforcement.**

45.  Glacel observed several ICE or ERO agents march into an active courtroom, move toward the front, turn, and visibly scan particular people. After being directed out, they remained nearby and made statements including words to the effect of "He's definitely in there" or "We've got him." One agent raised both hands in a rifle-like aiming gesture and referred to having someone "in our sights" or being able to "tag him out." Glacel Decl. ¶¶ 15–23; see Am. Compl. ¶¶ 12–19, 113–18, 125–30. After that display, a respondent turned pale and refused to

leave the courtroom, another abandoned a trip to the restroom, and respondents hurried or ran through the hallways. Agents also leaned toward Glacel and a seventh-grade child as they passed, making ordinary movement frightening. Glacel Decl. ¶¶ 16, 24–31; see Am. Compl. ¶¶ 26, 113–18.

46.  Halabi repeatedly observed groups of ICE agents enter waiting rooms, sit among immigrants with their feet up, joke for twenty to forty minutes, and leave without taking anyone. On other occasions, agents publicly examined posted docket names and again left without an arrest. Halabi perceived the apparent purpose and effect as intimidation because everyone waiting was terrified and did not know whom ICE might target. Halabi Decl. ¶¶ 4–6, ECF No. 72; see Am. Compl. ¶¶ 12–19, 26, 113–18. Plaintiffs do not contend that ICE's mere presence is unlawful. The relevance is that repeated, nonoperational occupation of the precise spaces used for court participation supports recurrence, purpose, and the ordinary-firmness element when combined with direct threats, expulsions, and physical interference.

47.  Bowen repeatedly observed approximately ten to twelve ICE officers, often almost completely masked and without visible badges, standing in forbidding clusters outside courtrooms and carrying photographs or identifying papers. She saw a woman rush to a restroom to vomit from fear and another woman collapse in her arms. One respondent refused to leave a courtroom because ICE officers were waiting immediately outside; after the courtroom was cleared, the man was detained. Bowen also observed people grabbed and pushed and was herself shoved despite noninterference. Bowen Decl. ¶¶ 5–25; see Am. Compl. ¶¶ 12–19, 26, 94, 113–18, 125–30.

48.  Bender describes masked, armed agents gathering in groups, crowding hallways, and forcing immigrants and observers to pass single file while being questioned. Respondents visibly shook. Bender also observed agents stop people leaving court and say, almost

jokingly, "Let me see your papers," before allowing them to pass, even when no arrest appeared to follow. Bender Decl. ¶¶ 5, 9–13; see Am. Compl. ¶¶ 12–19, 26, 85–96, 113–18. These facts are relevant not because every document request is independently unconstitutional, but because the arbitrary use of apparent authority in the immediate path of protected observation and accompaniment makes the direct threats and exclusions objectively deterrent.

49. Conwesser observed plainclothes and ERO-marked agents scan a packed waiting room, watch faces, gather near the elevator route, and then grab a person who was not the respondent and had already received asylum. They questioned him while holding a photograph and released him without explanation or apology. Conwesser Decl. ¶¶ 5–15; see Am. Compl. ¶¶ 12–19, 26, 113–18. She separately observed a federal employee identified in reporting as ICE scream at Father Arias in a packed waiting room over alleged photography while several agents occupied the area. Conwesser Decl. ¶ 3; see Am. Compl. ¶¶ 22–39, 113–18. The latter identification is reporting-based and is offered with that limitation.

50. Sigman describes apparent ICE personnel aggressively rushing volunteers over a flyer, yelling at close range, falsely invoking surveillance video, and enclosing the volunteers on four sides in a small space. She also describes approximately ten to twelve armed agents ostentatiously handling sheets with names and photographs, blocking a respondent in a courtroom doorway, rejecting the judge's release as irrelevant, and following the group to the restroom. On another occasion, a mother and two young children had to pass through a hallway lined with large, armed, masked agents and cameras; volunteers shielded a child's face, the child clung to a stuffed animal, and the mother cried after reaching the elevator. Sigman Decl. ¶¶ 4–11; see Am. Compl. ¶¶ 12–19, 26, 85–96, 113–18.

51. Mun observed ICE and other federally marked police wearing masks and reflective sunglasses indoors, hovering over volunteers and immigrants, and sometimes lining a hallway in a group of approximately twelve. She describes the conduct as menacing and reports that the environment caused volunteers to experience panic attacks before entering the building. Mun Decl. ¶¶ 10, 14–15; see Am. Compl. ¶¶ 12–19, 26, 113–18. Mun also observed ICE take a nervous respondent en route to the restroom before the scheduled hearing, demonstrating how the enforcement environment can terminate communication and court participation at the moment of compliance. Mun Decl. ¶¶ 12–13; see Am. Compl. ¶¶ 17–19, 113–18.

52. Breyer and other clergy encountered four or five masked ICE officers positioned on both sides of the only route to a closed courtroom door at 26 Federal Plaza. The observers later watched respondents emerge and be taken by masked ICE personnel through the waiting area while observers were excluded from following. Breyer Decl. ¶¶ 7–13, ECF No. 53; see Am. Compl. ¶¶ 9–19, 22–39, 103–18. The exclusion itself was not attributed to ICE, but the ICE deployment is relevant to the practical and emotional consequences of being separated from persons who requested accompaniment.

53. McCallum observed ICE agents stationed immediately outside courtroom thresholds, monitoring people as they exited, demanding identification without explanation, and issuing abrupt commands that frightened immigrants and volunteers. She also observed an ICE agent push a volunteer at 290 Broadway and ICE agents forcefully grab a journalist in an elevator, causing another person to fall. McCallum Decl. ¶¶ 8–10; see Am. Compl. ¶¶ 86–98, 113–18. Harrington disputes the precise mechanics of the September 30 incident, but admits that ICE officers grabbed a reporter's shoulders and arms to remove him from the elevator during the same operation. Harrington Decl. ¶¶ 10–11; compare Am. Compl. ¶¶ 19, 36, 43, 94.

54. Schulman repeatedly encountered groups of approximately three to seven ICE agents in hallways, waiting rooms, and elevator banks, many wearing masks or sunglasses, and experienced agents following and pushing an accompanied person and pushing Schulman. Schulman Decl. ¶¶ 8–15; see Am. Compl. ¶¶ 12–19, 26, 113–18. Arias describes federal officers regularly patrolling ministry spaces in tactical or paramilitary gear, sometimes carrying military-style weapons, frightening the people he serves and causing him direct distress rooted in his experience of authoritarian abuse. Arias Aff. ¶¶ 3–7; see Am. Compl. ¶¶ 22–39, 113–18.

55. Ruiz's January 6 incident likewise occurred in front of children. The masked ICE officer violently pushed Ruiz aside while holding mugshots and yelling a name; the children and mother cried; and agents threatened Ruiz with arrest as he attempted to explain that they had the wrong person. Ruiz Aff. ¶ 25; see Am. Compl. ¶¶ 9–19, 113–18. Vásquez describes ten to fifteen ICE agents lining exit routes while volunteers accompanied a pregnant mother, a father carrying a sleeping child, and their family. Agents stood on both sides of the hallway and made comments including "Are you proud?" and references to criminals; the family and observers cried after reaching the subway. Vásquez Decl. ¶¶ 9–11; see Am. Compl. ¶¶ 12–19, 26, 113–18.

56. Phillips observed a respondent emerge and be immediately detained by ICE while Phillips and other observers were being kept from the hearing by court personnel; the respondent's friend had also been denied entry. Am. Compl. ¶¶ 66–74. Plaintiffs do not attribute the exclusion to ICE on that basis, and they do not contend that the visible detention alone establishes standing against ICE. The incident is relevant only to the environment in which the inability to observe and accompany becomes immediately consequential. See Am. Compl. ¶¶ 12–19, 66–81, 113–18.

57. Kelly records additional reports that an agent called a volunteer working with children a "pedophile," that an agent rebuffed Arias with unusual hostility, and that agents made public homophobic comments about Plaintiffs in this litigation. Kelly expressly labels these matters as reported rather than personally observed information. Plaintiffs therefore offer the reports only as corroboration of fear and retaliatory context, not as an independent basis for Article III standing. Kelly Second Decl. ¶¶ 47–51, ECF No. 56; see Am. Compl. ¶¶ 17–19, 40–44, 113–18, 125–30.

## VI. THE ICE-SPECIFIC INJURIES ARE FAIRLY TRACEABLE TO ICE AND REDRESSABLE BY NARROW PROSPECTIVE RELIEF.

58. Traceability is straightforward where an ICE officer personally orders silence, seizes an informational exchange, directs a speaker to the elevator, grabs an accompanier's arm, pushes an observer, blocks entry, threatens arrest, or causes security personnel to enforce an ICE-directed exclusion. Those acts directly produce the loss of speech, association, observation, accompaniment, movement, or participation alleged. Lujan, 504 U.S. at 560. The fact that EOIR, FPS, GSA, or contract security may control other aspects of the same building does not sever causation for conduct ICE personnel themselves undertake. See Am. Compl. ¶¶ 12–19, 96, 107–18, 125–30.

59. Harrington's declaration states that ICE officers do not set court-security or access rules and do not prohibit public speech or materials. Harrington Decl. ¶¶ 7–9. That merits denial cannot control a facial standing challenge where the proposed pleading alleges specific contrary acts and the declarations identify the actors, conduct, locations, and protected activities. Carter, 822 F.3d at 56–57; Whole Foods, 858 F.3d at 736. The conflict presents a factual issue for discovery and merits adjudication, not a basis to disregard well-pleaded ICE-specific allegations.

60.   Redressability is equally direct. An injunction binds the agency, its officers, agents, servants, employees, and attorneys who receive actual notice. Fed. R. Civ. P. 65(d)(2)(A)– (B). Relief prohibiting ICE personnel from imposing or directing categorical speech and access restrictions, physically separating nonobstructive accompaniers because of protected activity, seizing individualized informational exchanges, threatening arrest because a person is observing or advocating, or retaliating against persons who seek help from elected officials would prevent repetition of the identified injuries. A favorable decision need not eliminate every source of harm; it is enough that it would meaningfully reduce the injury attributable to ICE. See Lujan, 504 U.S. at 561; Massachusetts v. EPA, 549 U.S. 497, 525–26 (2007).

61.   Relief against EOIR, FPS, or GSA cannot fully redress actions taken by ICE officers acting under ICE command. EOIR may control courtroom decorum, FPS may control entrance security, and GSA may manage the building, but none can substitute for an order binding ICE personnel who personally interrupt speech, seize papers, grab accompaniers, issue threats, or direct exclusions. The existence of overlapping agency responsibility therefore strengthens, rather than defeats, defendant-specific redressability. See Order at 8–11, 33–35; Am. Compl. ¶¶ 12–19, 96, 99–102, 107–18, 125–30.

## VII. THE REQUESTED RELIEF CAN EXPRESSLY PRESERVE LAWFUL ENFORCEMENT OPERATIONS.

62.   Plaintiffs do not seek to enjoin constitutional detention, transportation, removal, or legitimate steps reasonably necessary to secure those operations. Order at 34–35, 95. The challenged conduct is collateral: silencing a pastor who is quietly counseling; terminating a completed legal explanation by a nonobstructive attorney; confiscating a one-to-one information note; expelling an observer for rights advice; grabbing an accompanier's arm after ordering her to abandon a respondent; threatening "advocates" with arrest merely for

remaining in a hallway; or retaliating because an observer obtained assistance from a Member of Congress. Ruiz Aff. ¶¶ 24–26; Kelly Second Decl. ¶¶ 37–39; Ehrman Decl. ¶¶ 11–22; Vásquez Decl. ¶¶ 8, 12–14; Sigman Decl. ¶¶ 10–11; see Am. Compl. ¶¶ 17–19, 107–18, 125–30.

63. A tailored injunction can permit restrictions reasonably necessary to address actual obstruction, disruption, congestion, safety, confidentiality, capacity, or the secure execution of a particular lawful operation, while prohibiting restrictions imposed because of protected observation, reporting, ministry, accompaniment, rights advice, or individualized noncommercial communication. That formulation follows the Court's own instruction to distinguish unconstitutional interference from lawful law-enforcement activity and to preserve legitimate operational needs. Order at 34–35, 95; see Am. Compl. ¶¶ 1–3, 17–19, 124–30.

64. The Court's prior dismissal identified a curable attribution problem, not an absence of injury or an immunity for ICE conduct in court-adjacent spaces. The expanded allegations identify ICE or ERO personnel, identify named plaintiffs and protected activities, describe direct and retaliatory acts collateral to lawful enforcement, establish repeated return to the same facilities, and explain how an order binding ICE would prevent recurrence. Existing named plaintiffs—most clearly McCallum, and independently Kelly under the reasonable inference supported by ICE's own description of its operations—therefore have Article III standing to seek appropriately tailored prospective relief against ICE. If Ruiz is properly added through an operative pleading, his January 6 allegations provide an additional, express ICE-specific basis for the same relief. Lujan, 504 U.S. at 560–61; Carter, 822 F.3d at 56–57; Walker, 130 F.4th at 298–99; Order at 33–35; see Am. Compl. ¶¶ 1–3, 9–19, 40–44, 82–98, 103–18, 124–30.

**THE EXTERIOR ACCESS AREAS, EOIR WAITING ROOMS, AND CONNECTING HALLWAYS ARE DESIGNATED PUBLIC FORA FOR QUIET, CONSENSUAL, NONCOMMERCIAL, COURT-RELATED SPEECH**

65. This Court found in its June 22 Opinion and Order that these spaces are nonpublic fora. We Respectfully disagree. *See* Opinion and Order at 61–62. Plaintiffs do not seek a forum for rallies, amplified speech, commerce, obstruction, or interference with screening or lawful enforcement; they seek the longstanding use of exterior access areas, EOIR waiting rooms, and connecting hallways for observation, accompaniment, information exchange, and requested pastoral support. *See* Ruiz Aff. ¶¶ 8–11, 23–24; Kelly Second Decl. ¶¶ 18–19, 60.

66. Those activities are quiet, individualized, consensual, noncommercial, and fully compatible with neutral rules governing safety, capacity, confidentiality, noise, decorum, and orderly movement. *See* Ruiz Aff. ¶¶ 11, 23–24; Schulman Decl. ¶¶ 3–4.

67. The Supplemental Declaration of former Immigration Judge and BIA Chair Paul Wickham Schmidt establishes that public use of those spaces was institutionally encouraged, generally available, operationally beneficial, and materially different from access to a jail or detention facility. *See* Schmidt Supp. Decl. ¶¶ 4–18.

68. **I. The forum must be defined as the particular court-access and communication system at issue**

69. Forum analysis focuses on the particular property or channel to which access is sought, rather than treating the largest government building containing that property as the relevant forum. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800–02 (1985).

70. A designated public forum arises when the Government purposefully makes nontraditional property generally available to the public or to a defined class of speakers, while speaker-by-

speaker permission indicates merely selective access. *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677–80 (1998).

71.  Governmental intent is determined objectively from policy, historical practice, the nature of the property, and the compatibility of the proposed speech with the property's function. *Cornelius*, 473 U.S. at 802–04; *Paulsen v. County of Nassau*, 925 F.2d 65, 69–70 (2d Cir. 1991).

72.  The inquiry is holistic and gives substantial weight to the Government's actual course of conduct and the degree to which it has shaped or controlled private expression. *Shurtleff v. City of Boston*, 596 U.S. 243, 252–58 (2022).

73.  A designated forum may be limited to particular speakers, subjects, or forms of expression without becoming a forum for every conceivable expressive activity. *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45–46 & n.7 (1983); *Hotel Employees & Restaurant Employees Union, Local 100 v. City of New York Department of Parks & Recreation*, 311 F.3d 534, 545–52 (2d Cir. 2002).

74.  Once the Government opens property for a defined category of use, however, it may not exclude speakers whose proposed activity falls within the same category without a constitutionally sufficient justification. *Forbes*, 523 U.S. at 677–80; *Travis v. Owego-Apalachin School District*, 927 F.2d 688, 692–93 (2d Cir. 1991).

75.  The relevant forum here is therefore the exterior approaches, public waiting rooms, and hallways through which respondents, counsel, interpreters, relatives, journalists, observers, clergy, and volunteers reach, await, understand, and leave presumptively open immigration hearings. *See* EOIR Fact Sheet; Schmidt Supp. Decl. ¶¶ 6–9.

76.  The forum excludes judges' chambers, secure offices, staff-only corridors, holding areas, detention facilities, and other spaces that have not been opened for public court access or

communication. *See* Schmidt Supp. Decl. ¶ 17; Proposed PI provisions summarized in the Omnibus Motion.

77. **II. EOIR's own rules establish general access to the court-adjacent forum**

78. EOIR's governing regulation begins with a presumption of public access: all hearings other than exclusion hearings are open unless a specified closure, confidentiality, capacity, or protective exception applies. *See* 8 C.F.R. §§ 1003.27, 1240.10(b).

79. EOIR's public guidance states that members of the public need not notify the court before visiting and ordinarily need not obtain permission or check in with court personnel before entering a courtroom to observe. *See* EOIR Fact Sheet.

80. The same guidance expressly states that access to observe hearings necessarily entails access to EOIR-controlled courtrooms, interior entrances, exits, corridors, conference rooms, and waiting areas used in EOIR's daily operations. *See* EOIR Fact Sheet.

81. The Government's own declarations state that Broadway's waiting areas contain seating for parties, media representatives, and observers; are generally accessible to visitors and observers; and are subject to capacity and safety limits rather than categorical exclusion. *See* Taylor Decl. ¶¶ 5, 8, as summarized in the Opinion.

82. EOIR further represents that it does not prohibit members of the public from speaking with respondents or providing informational materials in those waiting areas, while retaining authority to address actual congestion, noise, and interference with orderly movement. *See* Taylor Decl. ¶ 8; Burns May 11 Email.

83. The Government also describes the hallways and elevator banks as publicly accessible circulation areas, although subject to neutral building-security and access rules. *See* Opinion and Order at 10–11.

84. These are general access rules applicable to classes of participants, not individualized invitations requiring each observer, cleric, journalist, volunteer, or relative to obtain discretionary permission. *See* Schmidt Supp. Decl. ¶ 11; *Forbes*, 523 U.S. at 679–80.

85. The Government's express opening of the spaces for observers, media, families, and other court visitors is therefore evidence of designation, even though that designation remains limited to court-related use. *Perry*, 460 U.S. at 45–47; *Travis*, 927 F.2d at 692–93.

**86. III. The Supplemental Schmidt Declaration confirms purposeful designation by institutional policy and practice**

87. Judge Schmidt served for approximately thirteen years as an Immigration Judge at a non-detained immigration court, presided over thousands of hours of hearings, and became familiar with the policies and practices governing visitors and observers. *See* Schmidt Supp. Decl. ¶¶ 2–3.

88. He states that, across administrations of both parties, EOIR management regarded public observation as beneficial and affirmatively encouraged and facilitated it. *See* Schmidt Supp. Decl. ¶ 4.

89. Court personnel did not regard the public as adverse or inherently disruptive, and administrators generally viewed public participation as helpful to court operations. *See* Schmidt Supp. Decl. ¶ 5.

90. The public opening necessarily extended beyond the courtroom because journalists, advocates, legal observers, students, researchers, volunteers, friends, relatives, Congressional staff, and government officials routinely waited in common areas, spoke quietly with respondents and counsel, observed operations, and moved through publicly accessible areas without incident. *See* Schmidt Supp. Decl. ¶ 6.

91. Waiting rooms, hallways, and other common areas were routinely used to coordinate attendance, exchange information, prepare for proceedings, locate courtrooms, understand schedules, arrange interpretation, and discuss what had occurred and what would happen next. *See* Schmidt Supp. Decl. ¶ 7.

92. Use was not confined to litigants, lawyers, and court employees because relatives, volunteers, faith leaders, students, legal observers, and other supporters routinely assisted respondents before and after hearings. *See* Schmidt Supp. Decl. ¶ 8.

93. No professional credential, relationship to a pending case, or institutional status was ordinarily required to observe or remain in the publicly accessible spaces associated with proceedings. *See* Schmidt Supp. Decl. ¶ 11.

94. That absence of individualized selection is the defining distinction between a designated forum generally available to a class and the selective-access forum addressed in *Forbes*. *Forbes*, 523 U.S. at 679–80.

95. The activity was also operationally compatible because public presence rarely caused problems, and the few necessary interventions ordinarily consisted of reminding observers to remain silent while a hearing was underway. *See* Schmidt Supp. Decl. ¶ 12.

96. The physical spaces were sufficiently large and accessible to accommodate observers, supporters, students, journalists, and other members of the public. *See* Schmidt Supp. Decl. ¶ 15.

97. Restrictions historically addressed individualized confidentiality concerns, including asylum and VAWA matters, rather than imposing general bans on public presence or expression throughout common areas. *See* Schmidt Supp. Decl. ¶ 16.

98. Public observation improved professionalism, preparation, civility, accountability, transparency, and public confidence, thereby advancing rather than frustrating the adjudicative function. *See* Schmidt Supp. Decl. ¶ 13.

99. Judge Schmidt characterizes observation and accompaniment as longstanding and institutionally familiar practices reflecting an established culture of public access and engagement. *See* Schmidt Supp. Decl. ¶ 14.

100. He expressly distinguishes non-detained immigration courts from jails and detention centers, where access may depend on custodial security and staffing considerations not present in ordinary public court facilities. *See* Schmidt Supp. Decl. ¶ 17.

101. The Supplemental Declaration thus supplies direct institutional evidence of policy, practice, general access, physical compatibility, and beneficial use—the precise objective factors governing designated-forum analysis. *Cornelius*, 473 U.S. at 802–04; *Paulsen*, 925 F.2d at 69–70.

**102. IV. Rev. Ruiz's affidavit establishes that exterior and interior access spaces form one necessary communicative forum**

103. Rev. Juan Carlos Ruiz has engaged in immigration-court accompaniment since approximately 2007, and that practice developed because immigrant families told sanctuary organizations that they needed community members and clergy to accompany them to court. *See* Ruiz Aff. ¶¶ 6–7.

104. His accompaniment begins before the hearing and includes entering the building, passing through security, using elevators, waiting in hallways and waiting rooms, answering basic questions, locating resources, praying when requested, explaining what occurred, and leaving safely after court. *See* Ruiz Aff. ¶ 8.

105. The exterior sidewalk or entrance area is a recurring part of that process because it is where respondents and supporters meet and prepare before entering the court environment. *See* Ruiz Aff. ¶ 9.

106. If the exterior area is an ordinary municipal sidewalk, it is a traditional public forum notwithstanding its proximity to a courthouse. *United States v. Grace*, 461 U.S. 171, 177–80 (1983).

107. If an exterior approach, plaza, setback, or entrance area is federal rather than municipal property, its general use by the public to reach open proceedings and its longstanding use for court-related accompaniment support classification as a designated forum limited to those uses. *Cornelius*, 473 U.S. at 802–04; *Paulsen*, 925 F.2d at 69–70; Ruiz Aff. ¶¶ 8–10.

108. Rev. Ruiz's speech is quiet, individual, consensual, noncommercial, and intended to help willing respondents identify lawful legal, community, and church resources. *See* Ruiz Aff. ¶ 11.

109. He does not block doors, disrupt hearings, encourage nonappearance, or physically interfere with lawful arrests. *See* Ruiz Aff. ¶ 11.

110. He seeks only the ability to accompany willing persons, speak quietly in public waiting rooms and hallways, provide individualized noncommercial information, and pray when requested, unless a lawful and specific reason requires restriction. *See* Ruiz Aff. ¶ 23.

111. He accepts lawful closures, confidentiality, capacity limits, courtroom order, building security, and legitimate law-enforcement activity. *See* Ruiz Aff. ¶ 24.

112. That evidence makes Rev. Ruiz's affidavit central to the forum inquiry because it identifies the speakers, listeners, locations, subject matter, peaceful manner, and longstanding court-related function of the exterior and interior spaces. *See* Ruiz Aff. ¶¶ 8–12, 23–24.

**113. V. The proximity of the forum to judicial proceedings supports neutral manner rules, not categorical suppression**

114. The Government may impose content-neutral time, place, and manner rules in a designated forum when those rules are narrowly tailored to significant interests and preserve meaningful communication. *Perry*, 460 U.S. at 45–46; *Ward v. Rock Against Racism*, 491 U.S. 781, 791–803 (1989).

115. Proximity to courtrooms therefore justifies rules requiring quiet voices, clear doors and elevators, compliance with screening, respect for capacity, protection of confidentiality, and noninterference with hearings or lawful enforcement activity. *Ward*, 491 U.S. at 791–803; Ruiz Aff. ¶ 24.

116. Proximity does not justify forbidding all conversations, all note-taking, all individualized information exchange, or all accompaniment regardless of actual noise, obstruction, congestion, or security risk. *Grace*, 461 U.S. at 180–83; *McCullen v. Coakley*, 573 U.S. 464, 487–97 (2014).

117. The distinction is between regulating disruptive conduct and suppressing the category of peaceful expression for which the forum has been opened. *Ward*, 491 U.S. at 791–803; *Travis*, 927 F.2d at 692–93.

118. That distinction aligns Plaintiffs' interests with those of the court because Plaintiffs affirmatively seek safe circulation, orderly proceedings, informed respondents, accurate compliance, and calm communication. *See* Ruiz Aff. ¶¶ 11, 23–24; Kelly Second Decl. ¶¶ 18–19, 59–60.

119. Supporters help respondents appear for hearings, understand what judges have said, complete forms, obtain counsel, locate courtrooms, understand schedules, and arrange interpretation. *See* Schmidt Supp. Decl. ¶¶ 7–9.

120. Rev. Breyer likewise explains that trained accompaniers follow courthouse rules, avoid interfering with hearings or law enforcement, help respondents navigate the court, and reduce fear and confusion while promoting transparency and orderly administration. *See* Breyer Decl. ¶¶ 3–4.

121. The court's institutional interest is also served because public observation improves preparation, civility, professionalism, accountability, transparency, and confidence in the adjudicative process. *See* Schmidt Supp. Decl. ¶ 13.

122. A limited designated forum governed by neutral conduct rules therefore advances the court's operational interests more effectively than shifting, categorical commands that confuse visitors and leave no lawful place to wait, speak, or assist. *See* Glacel Decl. ¶¶ 6–14; Schulman Decl. ¶¶ 9, 15–17.

**123. VI. No alternative forum can perform the same function**

124. The history of accompaniment treats the immigration-court proceeding as beginning with arrival and screening and continuing through locating the courtroom, waiting, communicating with supporters, attending the hearing, leaving, and complying with resulting requirements. *See* Block Decl. ¶ 6.

125. Waiting rooms, hallways, entrances, and elevator banks are therefore central sites of the practice rather than interchangeable conveniences. *See* Block Decl. ¶¶ 7–8.

126. Rev. Ruiz states that excluding an accompanier from any necessary part of that route breaks the accompaniment precisely when the respondent most needs support. *See* Ruiz Aff. ¶¶ 9, 18, 22.

127. A pastor cannot recreate prayer or comfort after the moment of fear has passed, a deadline has expired, or officers have taken the person away. *See* Ruiz Aff. ¶¶ 18, 26.

128. A hallway conversation may be the only opportunity to explain a ruling because the relevant information does not exist before the hearing and the respondent may be detained before reaching an exterior location. *See* Kelly Second Decl. ¶¶ 38–39.

129. The Supreme Court has rejected the notion that distant visibility or audibility is an adequate substitute when speakers seek calm, close, consensual, one-to-one communication with willing listeners. *McCullen*, 573 U.S. at 487–97.

130. The absence of a functionally equivalent alternative channel distinguishes a restriction that merely regulates manner from one that extinguishes the communication itself. *Ward*, 491 U.S. at 791, 802–03; *City of Ladue v. Gilleo*, 512 U.S. 43, 54–57 (1994).

131. **VII. The principal negative precedents do not govern the supplemented record**

132. *Make the Road by Walking, Inc. v. Turner* involved welfare-office waiting rooms governed by a written official-business policy and a record lacking evidence that the agency had generally opened those rooms to private speakers for expressive use. 378 F.3d 133, 144–47 (2d Cir. 2004).

133. EOIR's policy is the opposite because it generally admits observers and visitors, treats access to corridors and waiting rooms as necessary to public observation, and states that speech with respondents and informational materials are not categorically prohibited. *See* EOIR Fact Sheet; Burns May 11 Email.

134. The Supplemental Schmidt Declaration further establishes that the relevant speech was not incidental conversation merely tolerated in an agency office, but a normal, expected, institutionally accepted component of immigration-court operations. *See* Schmidt Supp. Decl. ¶¶ 6–14.

135. The communication is also itself court-related business because it enables respondents to locate proceedings, understand schedules and rulings, obtain interpretation or counsel, and comply with resulting obligations. *See* Schmidt Supp. Decl. ¶¶ 7–9.

136. *Huminski v. Corsones* concerned independent expressive protest against judges and court officials, rather than a generally admitted class engaging in the longstanding court-integrated activities shown here. 396 F.3d 53, 90–93 (2d Cir. 2005).

137. Even *Huminski* held that nonpublic-forum status did not validate an effectively complete, person-specific prohibition on protected expression throughout courthouse property. 396 F.3d at 92–93.

138. *Hotel Employees* concerned labor speech falling outside the artistic category for which Lincoln Center Plaza had been opened, and the court relied in part on nearby parks and sidewalks that permitted the union to reach the same audience. 311 F.3d at 545–55.

139. Here the proposed speech falls squarely within the court-related category historically admitted in the spaces, and no nearby location permits contemporaneous observation, explanation of a newly issued ruling, requested pastoral presence, or preservation of information before a respondent leaves or is detained. *See* Schmidt Supp. Decl. ¶¶ 6–9; Ruiz Aff. ¶¶ 8–9, 18; Kelly Second Decl. ¶¶ 38–39.

140. The earlier nonpublic-forum analysis rested on general courthouse precedents and the analogy to *Make the Road*, but the Supplemental Schmidt Declaration now adds direct evidence specific to non-detained immigration courts concerning institutional intent, general access, actual practice, physical compatibility, and operational benefit. *See* Opinion and Order at 61–62; Schmidt Supp. Decl. ¶¶ 4–18.

141. The supplemented record supports classification of exterior court-access areas, EOIR waiting rooms, and connecting hallways as designated public fora limited to safe, quiet,

consensual, noncommercial, court-related observation, communication, accompaniment, education, and support. *See* Schmidt Supp. Decl. ¶¶ 4–19; Ruiz Aff. ¶¶ 8–12, 23–24; *Forbes*, 523 U.S. at 677–80; *Travis*, 927 F.2d at 692–93.

142. That designation preserves the Government's authority to enforce neutral limits addressing actual noise, obstruction, capacity, confidentiality, screening, decorum, and safety. *Perry*, 460 U.S. at 45–46; *Ward*, 491 U.S. at 791–803; Ruiz Aff. ¶ 24.

143. It does not permit categorical or selectively enforced bans on the peaceful activity that EOIR invited, historically accommodated, and relied upon as part of an open, intelligible, orderly, and accountable immigration-court system. *See* Schmidt Supp. Decl. ¶¶ 5–14, 18–19; Breyer Decl. ¶¶ 3–5, 13; *Shurtleff*, 596 U.S. at 252–59.

**EOIR'S WEBEX REVERSAL DEMONSTRATES BAD FAITH AND CONFIRMS THE NEED FOR ENFORCEABLE RELIEF**

144. The record supports a precise formulation that neither overstates the historical uniformity of Webex access nor understates EOIR's subsequent restriction: before June 2026, Webex observation was inconsistently administered but regularly available; beginning in June 2026, EOIR converted that established means of observation into a presumptive categorical prohibition whenever any judge, respondent, or counsel appeared in a physical courtroom, while implementation remained uneven among individual judges. Silver Decl. ¶¶ 3–5, 10–15.

145. That change directly contradicts Defendants' sworn representations to this Court. Acting Assistant Chief Immigration Judge John Burns declared, in support of Defendants' motion to dismiss and opposition to preliminary relief, that public access was governed principally by 8 C.F.R. §§ 1003.27, 1240.10(b), and 1240.11(c)(3)(i), and that, "[s]ubject to the same regulations, the general public can also observe hearings conducted remotely by joining the remote hearing." Burns Decl. ¶ 7, Dkt. No. 45. Burns further represented that each

immigration judge's internet-based hearing link was posted on EOIR's public website. Id. Assistant Chief Immigration Judge Khalilah Taylor made the same representation: "[s]ubject to the same regulations, the general public can also observe hearings conducted remotely by joining the remote hearing," using links posted on EOIR's public website. Taylor Decl. ¶ 6, Dkt. No. 46. Neither declarant identified any categorical exception for a remotely conducted or hybrid hearing merely because the judge, respondent, or counsel occupied a physical courtroom.

146. Those statements were not isolated descriptions by line employees. Burns and Taylor each declared that their supervisory responsibilities included ensuring that EOIR policies, procedures, and guidance were followed by immigration judges and court personnel. Burns Decl. ¶ 3; Taylor Decl. ¶ 4. Their sworn descriptions therefore represented EOIR's operative understanding of public access at the two immigration courts at issue.

147. EOIR's contemporaneous operational instructions were even more explicit. On April 29, 2026, while expressly acknowledging the "pending lawsuit regarding public access," EOIR Court Administrator Rafael Fernandez instructed all Federal Plaza judges and support staff that, "[f]or any hearing conducted by Webex," they must keep the Webex session "open and unlocked unless the respondent has requested a closed hearing," because "[a]n unlocked Webex permits public observation throughout the hearing." Dkt. No. 45-4 at 1. Thus, while opposing judicial relief, EOIR represented both to the Court and to its own personnel that the governing closure standards applied to remote observation and that a Webex session should remain publicly accessible unless the particular hearing was lawfully closed.

148. EOIR then adopted the opposite rule. The June 2026 Fact Sheet continued to state that immigration hearings are generally open and identified specific, case-dependent grounds for closure, including proceedings involving abused children or spouses, sealed or classified

information, a respondent's request to close an asylum hearing, and an immigration judge's determination that closure was necessary to protect witnesses, parties, or the public interest. June 2026 Fact Sheet at 1–2. It nevertheless added an entirely different, categorical restriction: whenever the immigration judge, respondent, or counsel appears in a physical courtroom, visitors "must observe in person," "Webex visitors will not be admitted," and publicly posted Webex links are reserved for remotely appearing parties unless "no physical courtroom is available." Id. at 2. That physical-presence trigger does not depend on any individualized closure determination, confidentiality interest, misconduct, disruption, or limitation recognized in the Fact Sheet's own list of lawful exceptions.

149. The July 15, 2026 policy memorandum did not correct the contradiction; it ratified it. PM 26-06 announces that its purpose is to "reemphasize the open nature" of immigration hearings, states that EOIR is "fully committed" to lawful public access, provides that visitors need no permission to observe an open hearing, and asserts that hearings should generally remain open "regardless of whether the hearing is in-person or internet-based." PM 26-06 at 1–2. Yet the same memorandum provides that an observer of any hearing designated as in-person must be physically present and that "[w]ebex visitors will not be admitted," even where parties have been authorized to appear remotely through the publicly posted link. Id. at 3. EOIR thus invokes the vocabulary of openness while imposing a format-based exclusion that is independent of the lawful, case-specific closure exceptions it identifies elsewhere in the same memorandum.

150. Silver's firsthand observations establish that this was an actual change in access, not a clarification of an unchanged practice. Silver is a retired attorney who began regularly observing immigration proceedings through Webex no later than September 2025, generally observing approximately twice per week and sometimes three times per week. Silver Decl. ¶¶

1–4. Before June 2026, access varied substantially: some judges regularly admitted observers, others did not, and the quality of the video and audio was inconsistent. Id. ¶¶ 5–9. That evidence does not establish that Webex access had always been uniformly administered; it establishes that Webex was a regularly used and recognized channel of public observation before EOIR imposed the new categorical rule.

151. Beginning in approximately June 2026, a judge who had previously afforded broad Webex access announced in open court that two directives dated June 29 had been issued and that Webex observers could not be admitted whenever anyone was physically present in the courtroom. Silver Decl. ¶ 10. Although that judge had previously permitted extensive Webex observation and appeared unhappy about the restriction, the judge required Silver to leave because persons were physically present. Id. ¶ 11. A second judge subsequently told Silver, in an apologetic manner, that observers were no longer permitted to attend through Webex and could attend only in person, again identifying an order or directive as the basis. Id. ¶ 12. These statements by judges implementing the rule confirm that EOIR personnel themselves understood the directive as a material departure from prior practice.

152. Implementation nevertheless remained arbitrary. During the same period, Silver observed attorneys and clients appearing through Webex in some courtrooms, and another judge permitted her to remain after she agreed not to record and the ICE attorney stated that there was no objection. Silver Decl. ¶ 13. The operative condition therefore was not the technical feasibility of remote observation, a demonstrated disruption, or an actual threat of recording. The platform was already operating, parties were already appearing remotely, and individual judges could still admit observers; the new guidance instead directed judges to exclude the public based solely on the presence of any person in a physical courtroom.

153. The practical result is the near-elimination of remote court observation in ordinary cases. Silver explains that unrepresented respondents are generally required to appear physically and that she has also observed judges requiring represented respondents and their attorneys to appear in person. Silver Decl. ¶ 15. At the same time, the number of active judges, large master-calendar proceedings, and required in-person appearances has increased, creating crowded proceedings in which little or no physical space may remain for public observers. Id. ¶ 16. EOIR's memorandum itself acknowledges that waiting areas are subject to capacity limits and that respondents, attorneys, and witnesses receive priority when space is inadequate. PM 26-06 at 2. EOIR therefore directs observers to rely exclusively on physical access while simultaneously acknowledging conditions under which physical access will predictably be unavailable.

154. This sequence supports a direct inference of bad faith. If the categorical physical-presence rule was already EOIR policy when Burns and Taylor filed their declarations, their statements that the public could observe remote hearings "[s]ubject to the same regulations" were materially incomplete. If the categorical rule did not yet exist, EOIR changed the operative policy after relying on the prior, more permissive regime to oppose enforceable judicial relief. Either possibility defeats any claim that Defendants' declarations, internal reminders, or subsequently issued guidance provide an adequate assurance of future compliance. The change was not semantic: EOIR replaced a regime in which Webex observation was regularly available subject to uneven administration and the ordinary lawful-closure rules with a presumptive prohibition triggered solely by the hearing's physical format.

155. The Court therefore should not treat PM 26-06 as a remedial measure that obviates injunctive relief. The memorandum cancels no prior directive and expressly provides that it "may not be relied upon to create any right or benefit" enforceable against the Government.

PM 26-06 at 1, 5. Enforceable relief must reach Webex observation itself and prohibit categorical exclusion based merely on the physical presence of a judge, party, or counsel, subject to the same lawful and individualized closure rules that govern the underlying hearing. Because admission alone can be rendered meaningless through restricted video or incomplete audio, that relief should also require a view and audio feed reasonably sufficient to permit actual observation whenever EOIR provides public access through Webex. Silver Decl. ¶¶ 7–9, 17.

**156. EOIR Has Eliminated Remote Observation While Artificially Creating Conditions That Foreclose In-Person Observation**

157. EOIR's rollback of Webex access coincides with a fundamental alteration of its in-person calendaring practices. EOIR has begun employing new "mega master" calendars that aggregate scores—and, in at least one documented instance, 140 cases—before a single immigration judge in the same time block and courtroom. On June 25, 2026, Laura Conwesser accompanied a respondent to a 9:00 a.m. appearance at 290 Broadway on a new mega-master day when the assigned judge had 140 cases on her docket. Although Conwesser and the respondent arrived shortly after 8:00 a.m., the line already extended around one block and halfway down another, and they did not enter the courthouse until approximately 9:30 a.m.—after the scheduled appearance time. Conwesser Decl. ¶ 4.

158. The resulting scarcity of observation space is neither speculative nor attributable solely to fixed architectural limitations. Silver observed that the number of judges appearing on a typical calendar increased from approximately four to six when she began observing to approximately fifteen on July 22, 2026. She further observed increasing numbers of large calendar proceedings and in-person appearances and explained that crowded master calendars may leave little or no physical room for public observers. Silver Decl. ¶¶ 15–16.

Conwesser likewise described the waiting area on the 140-case mega-master day as "packed," with respondents and supporters waiting for hours. Conwesser Decl. ¶¶ 5–8.

159. Defendants' own evidence establishes what happens when EOIR creates that overcrowding. Assistant Chief Immigration Judge Taylor declared that when the number of people exceeds what the courtroom and waiting areas can safely accommodate, EOIR gives priority to respondents, attorneys, interpreters, and witnesses over observers and other members of the public. Taylor Decl. ¶ 9. PM 26-06 adopts the same hierarchy, stating that overcrowded waiting areas must prioritize respondents, attorneys, and witnesses and that physical-facility limitations may restrict the number of observers admitted. PM 26-06 at 2. Thus, once EOIR places scores of respondents, their counsel, witnesses, interpreters, and family members into the same courtroom and waiting area at the same time, exclusion of ordinary public observers is not merely foreseeable; it is the operation of EOIR's announced priority rule.

160. Any short, accelerated, or belated notice of placement on such a calendar compounds the problem. Respondents, counsel, family members, and supporters must converge at the agency-selected time with little practical ability to stagger their attendance, while observers cannot anticipate which courtroom will have usable capacity. Even timely notice does not solve the access failure: Conwesser's experience demonstrates that persons who arrived nearly an hour before a scheduled hearing could remain outside the building until thirty minutes after the stated appearance time because EOIR had concentrated 140 matters into the same calendar. Conwesser Decl. ¶ 4.

161. At the same time, EOIR has foreclosed the alternative that would ordinarily mitigate those self-created physical constraints. PM 26-06 directs that an observer of an in-person hearing must be physically present in the courtroom and that "Webex visitors will not be admitted," even where a Webex link exists and parties have been authorized to appear remotely. PM 26-

06 at 3. Silver explains that this physical-presence rule effectively eliminates remote observation in nearly all ordinary cases because unrepresented respondents are generally required to appear in person and some judges also require represented respondents and counsel to appear physically. Silver Decl. ¶ 15.

162. EOIR therefore cannot characterize the resulting exclusion as a neutral consequence of unavoidable "space limitations." The relevant scarcity is substantially produced by EOIR's own operational choices: it aggregates extraordinary numbers of cases into a single simultaneous calendar; requires or induces large numbers of respondents and counsel to appear physically; gives those participants categorical priority over observers once the predictable overcrowding occurs; and then prohibits those excluded observers from using the already-operational Webex session. EOIR may not manufacture the capacity problem and then invoke that same problem as the justification for extinguishing public access.

163. The combined policies operate as a practical closure. When observers cannot enter because EOIR has filled the courtroom and waiting areas through mega-master scheduling, and cannot observe remotely because anyone is physically present, no meaningful means of observation remains. An injunction that addresses only nominal openness of the physical courtroom, while leaving the categorical Webex prohibition intact, would therefore permit EOIR to defeat public access simply by calendaring more respondents than the available public space can accommodate.

## CONCLUSION

164. For the foregoing reasons, Plaintiffs respectfully request that the Court accept the proposed Second Amended Complaint, permit Reverend Juan Carlos Ruiz to be added as a named plaintiff, and grant appropriate declaratory and injunctive relief, and any other relief the Court deems appropriate. The amended allegations identify the conduct attributable to each

- 111 -

Defendant, address the standing and pleading deficiencies identified by the Court, and allege continuing constitutional injuries requiring prospective relief.


Respectfully submitted,

/s/ Stephen Kelly
Counsel for the Plaintiffs
Dated: April 26, 2026, July 22, 2026
32 Court Street, 904
Brooklyn, NY 11201
929-270-9905
stephen@philanthropy-law.com