UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FR. FABIÁN ARIAS, et al.,

*Plaintiffs*,

-v-

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, et al.,

*Defendants.*

**Case No. 1:26-cv-02130 (CM)**

**SECOND AMENDED COMPLAINT**

*Redline to ECF No. 40: additions underlined; deletions struck through.*

**SECOND AMENDED COMPLAINT**

~~STEPHEN KELLY, LAURA MCCALLUM, DEBBIE NATHAN, DR. ZOEY PHILLIPS,~~

~~v.~~

~~and TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, 500 12th St. SW, Washington, D.C. 20536,~~

~~U.S. DEPARTMENT OF HOMELAND SECURITY, and KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security, 2707 Martin Luther King Jr. Ave SE, Washington, D.C. 20528,~~

~~U.S. DEPARTMENT OF JUSTICE, and PAMELA BONDI, in her official capacity as U.S. Attorney General, 950 Pennsylvania Ave., NW, Washington, DC 20530,~~

~~GENERAL SERVICES ADMINISTRATION, and EDWARD FORST, in his official capacity as Administrator of General Services, 1800 F Street NW, Washington, DC 20405,~~

~~**INTRODUCTION**~~

1. This is a case about the government using force on people who disagree with them with words, inside a courthouse, and brought by New Yorkers on their own behalf. Defendants have implemented policies and practices including violent detention operations, arbitrary and degrading access rituals, targeted harassment of members of the public, and systematic interference with the ability to speak with supportive individuals. Taken together it functions to deter a person of ordinary firmness from attending, observing, or participating in judicial proceedings, and from engaging in protected speech and association in and around the courthouse. What emerges is not a series of disconnected incidents, but a coherent pattern of coercive conduct that chills speech, fractures association, and undermines access to the courts carried out in plain view as a continuous feature of this court's operations.

2. This action challenges a pattern and practice by Defendants that directly restricts core First Amendment activity in and around federal immigration courts. Defendants have (i) locked courtrooms during proceedings that are required to be open to the public, (ii) prohibited members of the public from speaking with respondents, (iii) ejected individuals for distributing "know your rights" materials, and (iv) engaged in harassment in publicly accessible areas such that protected activity is effectively impossible, (v) engaged in conduct that would deter a person of ordinary firmness from appearing in court, conducting necessary business before the court, using the services of the clerk of the court, or participating in judicial proceedings.

3. Plaintiffs seek declaratory and injunctive relief to halt these ongoing constitutional violations and to ensure that immigration court proceedings and their surrounding public spaces remain open to lawful expression, observation, and association.

~~**NATURE OF ACTION**~~

~~119. Plaintiffs bring this action under the First Amendment and move this Court for an Order certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2).~~

~~120. Plaintiffs seek certification of the following class: "All persons who are or will be subjected to Defendants' enforcement within the court's jurisdiction."~~

~~121. Pursuant to Rule 23(g), Plaintiffs request appointment of Plaintiff Stephen Kelly as Class Counsel. As explained in the attached motion, since approximately April 2025, he has regularly attended Manhattan immigration courts, documenting alleged constitutional violations, interviewing affected individuals, and developing an evidentiary record sufficient to support this litigation. Despite sustained efforts to secure representation by experienced class or impact litigation counsel, no attorney or organization has agreed to take on this matter.~~

**NATURE OF THE ACTION**

1. Plaintiffs are clergy, an artist and educator, a journalist, and a psychologist who attend the immigration courts at 26 Federal Plaza and 290 Broadway in Manhattan. They observe public hearings and, except for Nathan's reporting activities, accompany and communicate with people who request their assistance. They seek prospective relief from the restrictions on their own access, speech, and association described below.

2. Court personnel have excluded Plaintiffs from otherwise open hearings because they were observers, clergy, or other nonparties. Court and building-security personnel have ordered Plaintiffs to stop quiet conversations with willing listeners, separated them from people they were assisting, or removed them after they engaged in those conversations. ICE

personnel have also directed Ruiz to leave and threatened him while he was providing pastoral accompaniment, including at times when no arrest was underway.

3. The relief sought concerns access to hearings that have not been lawfully closed or limited, necessary public access routes, and quiet, consensual, noncommercial communication in areas made available for public use. Plaintiffs also challenge the particular entry-barricade practice at 26 Federal Plaza described below. They seek no restriction on genuine, viewpoint-neutral security measures, or lawful courtroom closures.

~~122. The Court has subject-matter jurisdiction under federal law, including 28 U.S.C. § 1331 et seq. and the Administrative Procedure Act, 5 U.S.C. 702 et seq.~~

~~123. Venue is proper pursuant to 28 U.S.C § 1391 as the claims occurred in this district.~~

**JURISDICTION AND VENUE**

4. This action arises under the First Amendment to the United States Constitution. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331. Plaintiffs seek equitable relief against federal agencies and officials acting in their official capacities; 5 U.S.C. § 702 waives sovereign immunity for the relief other than money damages requested here.

5. Declaratory relief is authorized by 28 U.S.C. §§ 2201–2202. Venue is proper under 28 U.S.C. § 1391(e)(1)(B) because the events and practices at issue occurred in this District.

~~**PLAINTIFFS**~~

~~20. Plaintiffs in this action are representative of the clergy, legal observers, social services providers, community volunteers, and journalists that constitute the typical public presence at the immigration courts. Their experience of these courts varies from less than a year to decades, and all have experienced consistent constitutional injury in the past year connected~~

with their First Amendment activities in this forum. Perry v. Sindermann, 408 U.S. 593, 597 (1972).

21. The experiences of the named plaintiffs described below offer only a snapshot; they do not and cannot capture the scale, pervasiveness, or psychological toll of the government's administration of these courts. While the full scope of the constitutional injuries attributable to immigration court authorities beginning in 2025 cannot be fully known, their consistency and overwhelming pervasiveness is well documented.

**DEFENDANTS**

99. United States Immigration and Customs Enforcement and Todd Lyons in his official capacity.

100. United States Department of Justice and Pamela Bondi in her official capacity.

101. United States Department of Homeland Security and Kristi Noem in her official capacity.

102. United States General Services Administration and Edward Forst in his official capacity.

**PARTIES AND RESPONSIBILITIES**

6. Plaintiff Fr. Fabián Arias is a Lutheran priest at Saint Peter's Church in Manhattan. Since 2004, he has regularly accompanied immigrants and their families to court, observed their hearings, and provided pastoral assistance.

7. Plaintiff Laura McCallum is an artist and educator residing in Brooklyn. Since March 2025, she has visited immigration courts weekly as a volunteer to observe hearings and accompany and assist respondents.

8. Plaintiff Debbie Nathan is a journalist with approximately forty-five years of reporting experience. She has reported on immigration since the late 1980s and seeks to observe immigration proceedings firsthand for her reporting.

9. Plaintiff Dr. Zoey Phillips is a New York-licensed psychologist who works with children, young adults, and families affected by trauma. She speaks Spanish and attends immigration court to observe hearings and provide accompaniment and support.

10. Plaintiff Rev. Juan Carlos Ruiz is an ordained minister and a pastor in Bay Ridge, Brooklyn. Since approximately 2007, he has regularly accompanied immigrants to court as part of his ministry, sometimes visiting immigration facilities as often as four times per week. His work includes the courts at 26 Federal Plaza and 290 Broadway.

11. Defendant U.S. Department of Justice, through the Executive Office for Immigration Review (EOIR), operates the immigration courts at 26 Federal Plaza and 290 Broadway. The Attorney General is sued in official capacity as the head of that Department. DOJ and its responsible EOIR officials control courtroom access, court staff, and court waiting-area practices challenged here.

12. Defendant U.S. Department of Homeland Security includes the Federal Protective Service (FPS), which is responsible for building security and access control at both buildings. FPS employs and oversees contract Protective Security Officers (PSOs) who staff security posts and enforce entry and facility-access requirements. The Secretary of Homeland Security is sued in official capacity.

13. Defendant General Services Administration manages the two federal buildings and the building-management rules and arrangements governing their use. The Administrator of General Services is sued in official capacity. The GSA claims concern its building-management responsibilities, including the access and use restrictions enforced through building-security personnel.

14. Defendant U.S. Immigration and Customs Enforcement (ICE) is a component of DHS whose personnel operate at the facilities. The official performing the duties of ICE Director is sued in official capacity. The claims against ICE and that official concern ICE personnel's direct restrictions and threats against the Plaintiffs, as specifically alleged below.

15. The official-capacity defendants have authority, through their respective agencies, to direct the personnel and practices attributed to those agencies in this complaint. No official is sued in an individual capacity, and Plaintiffs seek no damages.

~~**BACKGROUND**~~

~~4. The immigration court is an administrative court within the Executive Office of Immigration Review ("EOIR"), a component of the United States Department of Justice. Immigration court hearings are generally open to the public except in limited circumstances prescribed by regulation. 8 C.F.R. § 1003.27 (2025); Executive Office for Immigration Review, Immigration Court Practice Manual § 4.9 (2024). Courts have long recognized that adjudicative proceedings are presumptively open to the public under the First Amendment. Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980); Press-Enterprise Co. v. Superior Court, 464 U.S. 501 (1984).~~

~~5. Much of the work of the immigration courts involves adjudicating removal proceedings for individuals seeking asylum. Although removal proceedings are civil in nature, they must comport with the requirements of due process under the Fifth Amendment. Reno v. Flores, 507 U.S. 292, 306 (1993); Bridges v. Wixon, 326 U.S. 135, 154 (1945); Yamataya v. Fisher, 189 U.S. 86 (1903). These proceedings therefore carry the openness and~~

transparency associated with adjudicative proceedings whose doors are open to the public. Richmond Newspapers, Inc v. Virginia, 448 U.S. at 580–81.

6. Federal precedent identifies only one relevant distinction between removal proceedings and criminal prosecutions: respondents are not entitled to government-appointed counsel. Rather, proceedings consist of the respondent, usually advocating for themselves pro se, an EOIR Immigration Judge, and an attorney from the U.S. Department of Homeland Security. 8 U.S.C. § 1362. The latter two roles are under the control of the executive, and there is no meaningful structural oversight outside of executive agencies.

7. The immigration courts are among the most consequential of the federal administrative courts. They decide whether an individual will be deported, often after a period of years and sometimes decades in this country. They decide whether individuals will remain with their families or be separated, whether they will be permitted to stay or compelled to leave, often to places where they face immediate and concrete danger.

8. At the same time, the asylum process operates through an extraordinarily complex bureaucratic framework. The governing law draws from an intricate combination of federal statutes, administrative regulations, immigration precedent, international refugee law, and federal court decisions. Navigating this framework is difficult even for experienced practitioners. Respondents, the overwhelming majority of whom are unrepresented, must attempt to understand and participate in these proceedings while confronting fear, uncertainty, and sometimes continuing personal threats via social media.

9. Many people who learn about the circumstances of immigration court respondents find that it deeply implicates their personal civil, moral, and religious values. As a result, over time, a distinct civic culture has developed around supporting immigration court respondents. One

~~aspect of this is what is commonly called "accompaniment," which is the practice of attending court with a respondent to provide logistical, informational, and emotional support. The accompanying individual may be a member of a local congregation, a community volunteer, or a personal friend. On the day of a hearing, the volunteer typically travels with the respondent to the courthouse, waits with them until the case is called, and sits in the gallery during the proceeding. The latter role is particularly important as respondents frequently retain little of what occurs during their hearings. Moreover, immigration court proceedings do not provide respondents with transcripts or accessible recordings. In this setting, the presence of a supportive observer able to take notes, understand procedural directives, and recall next steps is crucial.~~

~~10. Another aspect is maintaining a presence in public waiting areas to share information about legal and social services, observe open proceedings, and offer compassionate support, all of which are longstanding practices in this forum. These activities reflect core First Amendment principles of speech, association, and public observation, and there is no meaningful alternative venue in which these forms of expression can occur.~~

~~11. Apart from activities supporting respondents, access to the immigration courts is necessary for accurate reporting, study by legal practitioners and students, and for the accurate observation and data compilation undertaken by legal organizations, non-profits, advocacy organizations, and academic institutions. Defendants' actions are an impermissible attack on government accountability and public confidence in the administration of justice. Globe Newspaper Co. v. Superior Court, 457 U.S. 596 (1982); Hartford Courant Co. v. Pellegrino, 380 F.3d 83 (2d Cir. 2004).~~

12. During the past year, the authorities responsible for operating the immigration courts in New York City have applied a vast array of policies and procedures to discourage, restrict, or entirely block public attendance. These policies and procedures are wholly contrary to law, to all applicable federal precedent, and to the immigration courts' own procedural manual. Executive Office for Immigration Review, Immigration Court Practice Manual § 4.9 (2024); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980).

13. Government opposition to protected activities has permeated all aspects of the daily operations of the immigration courts, starting before a visitor even enters the building: security guards stationed behind barricades outside prevent individuals from approaching or entering, even though the building houses numerous other public offices, and an individual who questions the asserted identification policy may be required to produce additional forms of identification or documentation, even though this does not reflect any written policy. This practice has resulted in visitors, respondents with scheduled hearings, and even attorneys being denied entry for failing to satisfy an entrance requirement that has no basis in any published rule. See Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150–51 (1969) (invalidating permit scheme granting officials unfettered discretion over expressive activity); City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 757 (1988) (holding licensing schemes allowing officials to grant or deny access to expressive channels without objective standards violate the First Amendment).

14. When members of the public are able to gain access to the building, they are subjected to severe harassment and physical danger by security guards and federal police, and are prevented from observing public proceedings by court employees. This has become a daily occurrence. Individuals who attempt to remain to carry out their protected activities in

~~public areas may be expelled at the discretion of security officers, federal police, or court staff for doing so. Individuals have been expelled from the building for conduct such as quietly speaking with a respondent in a public waiting room or, in one case, writing down the name of a church that provides services and showing it to an immigrant.~~

~~15. Those who manage to remain in public areas around the immigration court despite these obstacles find that nearly every active courtroom is locked against public entry, typically with a court employee stationed inside to admit only respondents. If a member of the public does gain entry, a federal employee will question their presence and remove them before the proceedings begin. This applies equally to remote presence on Webex, and to individuals accompanying a respondent at their own request. These practices are not set forth in any public policy, depart from decades of established practice, and are contrary to governing precedent. See Detroit Free Press v. Ashcroft, 303 F.3d 681 (6th Cir. 2002); Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 581 (1980); Press-Enterprise Co. v. Superior Court ("Press-Enterprise I"), 464 U.S. 501, 510 (1984); Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 606–07 (1982); United States v. Alcantara, 396 F.3d 189, 196–200 (2d Cir. 2005). They do not reflect the court's published procedures, which explicitly require proceedings be open, and do not allow access to be restricted, except that if there is insufficient room in the gallery, reporters should be given preference as a matter of public policy. 8 C.F.R. § 1003.27(a); Executive Office for Immigration Review, Immigration Court Practice Manual § 4.9(b) (2024).~~

~~16. Courts have consistently held that once the government opens a forum for expressive activity, it may not discriminate based on viewpoint. See, e.g., United States v. Grace, 461 U.S. 171, 177 (1983); Widmar v. Vincent, 454 U.S. 263, 267–69 (1981); Good News Club~~

~~v. Milford Central School, 533 U.S. 98, 107 (2001). Mere presence in public areas around the immigration court itself constitutes an easily understood expression of support for immigrants and refugees in American society. People familiar with the variety of works done in this venue are unaware of even a single example of a member of the public being there for any reason unrelated to supporting immigrants and refugees, or for studying or reporting on their access to justice. This message is only amplified when a hostile administration attempts to prevent such presence.~~

~~17. Were there any ambiguity about the content neutrality of the new practices individuals have encountered in the past year, these have been dispelled by the federal authorities themselves, who have repeatedly, directly, and explicitly banned and prevented the sharing of information or materials advising immigrants of their rights, or making them aware of available services. Defendants' actions to block public access effectively destroys entire channels of communication and expressive activity. See City of Ladue v. Gilleo, 512 U.S. 43, 55–56 (1994); Schneider v. State (Town of Irvington), 308 U.S. 147, 163 (1939); City of Madison Joint School District v. Wisconsin Employment Relations Commission, 429 U.S. 167, 175–76 (1976). Plaintiffs to this suit have experienced and witnessed countless examples of federal employees and contractors explicitly prohibiting the sharing of content that could help a refugee. Federal agents have confiscated such materials based solely on their content and have ejected people from the building explicitly for disobeying an unlawful verbal instruction from a government agent not to engage in speech about legal or social services for immigrants. The First Amendment forbids licensing or access regimes that grant officials unbridled discretion or require prior permission to engage in protected speech. See City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 757 (1988);~~

Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150–51 (1969); Forsyth County v. Nationalist Movement, 505 U.S. 123, 133 (1992); Watchtower Bible & Tract Society v. Village of Stratton, 536 U.S. 150, 165–66 (2002). Plaintiffs have all experienced this first-hand, and have documented this common practice.

18. Visitors to the immigration courts are also subjected to inconsistent and discretionary directives, with no purpose other than show dominance in the face of any situational rationale, called "degradation rituals" in the language of sociology. Security personnel and federal officers frequently issue rapid and repeated commands governing where individuals may stand in public waiting rooms, restrooms, hallways, and elevator areas surrounding the immigration courts. These directives are at times internally contradictory or impossible to follow. They often result in groups of individuals being crowded into narrow corridors opposite large numbers of armed federal agents preparing to carry out detention operations against immigration court respondents.

19. Government action constitutes retaliation if it would deter a person of ordinary firmness from exercising First Amendment rights, and the physical risk to members of the public at immigration court is very real. Index Newspapers LLC v. United States Marshals Serv., 977 F.3d 817 (9th Cir. 2020). Defendants' practices have resulted in multiple incidents where visitors have been severely injured by federal agents carrying out detention operations. Plaintiffs in this action were present during an incident in which an observer was knocked to the ground with sufficient force that the sound of the individual's head striking the floor was audible throughout the building. The individual was ultimately removed unconscious on a gurney. There have been at least two incidents with that degree of severity, with many more examples of unprovoked, unnecessary violent physical contact directed at observers

by federal agents, including against plaintiffs to this action, including one involving Plaintiff Stephen Kelly, which did not result in similar head injuries only as a matter of chance.

**ALLEGATIONS**

**A. Locking of Public Courtrooms**

103. Immigration court proceedings are presumptively open to the public.

104. Defendants have repeatedly locked courtroom doors during active proceedings, preventing members of the public from entering.

105. Individuals seeking to observe proceedings have been denied access without lawful justification.

106. These actions eliminate public observation and suppress the expressive and oversight functions associated with open judicial proceedings.

**B. Prohibition on Speaking with Respondents**

107. In publicly accessible areas of immigration court facilities, including hallways and waiting areas, Defendants have prevented Plaintiffs and others from speaking with respondents.

108. These prohibitions are enforced categorically, without regard to time, place, or manner considerations.

109. The barred speech includes brief, consensual conversations concerning legal rights, court procedures, and access to counsel.

**C. Ejection for Sharing Know Your Rights Materials**

110. Plaintiffs and similarly situated individuals distribute printed informational materials concerning legal rights and court processes.

~~111. Defendants have ordered individuals to cease such distribution and have ejected them from public areas when they do not comply.~~

~~112. These actions suppress protected expressive activity and target specific content related to legal rights.~~

~~**D. Harassment in Public Areas**~~

~~113. In areas surrounding immigration courtrooms that are open to the public, Defendants have engaged in repeated harassment, including intimidation, close monitoring, and threats of removal.~~

~~114. This conduct is sufficiently pervasive and coercive that individuals are effectively unable to remain in these areas while engaging in protected activity.~~

~~115. As a result, Plaintiffs and others have curtailed or ceased their activities.~~

~~**E. Deterrence of Court Participation**~~

~~116. Defendants have engaged in conduct that would deter a person of ordinary firmness from appearing in court, conducting necessary business before the court, using the services of the clerk of the court, or otherwise participating in judicial proceedings.~~

~~117. This conduct is sufficiently coercive and intimidating that individuals are effectively dissuaded from attending court or carrying out essential functions related to their cases.~~

~~118. As a result, Plaintiffs and others have curtailed or forgone court attendance and participation in judicial proceedings.~~

## FACTUAL ALLEGATIONS

### The two courts and the practices at issue

16. The immigration courts at 26 Federal Plaza and 290 Broadway conduct hearings attended by respondents, counsel, witnesses, family members, observers, journalists, clergy, and other

visitors. Members of the public ordinarily reach the courtrooms through the buildings' visitor entrances, security screening, elevators, corridors, and court waiting areas.

17. Plaintiffs' work requires them to be present when hearings take place and when the people they accompany need assistance. A missed hearing cannot later be observed firsthand, and a requested conversation or prayer before or after a proceeding cannot be recreated by directing the participants to communicate elsewhere at another time.

18. Plaintiffs have encountered repeated access restrictions, which continue to the present: locked or blocked courtroom doors during hearings, orders excluding observers despite available seats, and diverse measures designed to separate respondents from their support during hearings. The specific incidents affecting each Plaintiff are described below.

19. Court and security personnel have also prohibited quiet, consensual conversations and individualized exchanges of legal, community, or church information in waiting areas and common areas used to reach the courts. Personnel have identified the visitor's status as clergy or a nonrelative, the content of the communication, or an asserted general prohibition on speaking as the reason for exclusion.

20. The recurring practices described here have deprived Plaintiffs of particular opportunities to observe, report, learn, communicate, and accompany. They have also placed Plaintiffs at risk of exclusion on future visits. Each Plaintiff intends to continue the activities described in this complaint.

~~**A. Father Fabián Arias**~~

~~22. Fabián Arias was born in Buenos Aires, Argentina, in 1963. He began studying for the priesthood in 1982 and completed his theological studies in 1989. He moved to New York~~

in 2002 and was ordained as a Lutheran minister in 2004. He currently serves as a priest at St. Peter's Church on Lexington Avenue in Manhattan.

23. Many of the individuals Father Arias serves are immigrants, and immigration-related pastoral care is a central and indispensable component of his ministry. His religious vocation requires him to accompany members of his congregation, and any others who come to him for his moral support, during moments of fear, vulnerability, or crisis, including when they are summoned before government authorities. This duty extends specifically to respondents appearing before the Immigration Courts and to their family members.

24. Since 2004, accompaniment has been one of the most important and consistent components of Father Arias's ministry. He has accompanied thousands of individuals to immigration hearings, helped them understand court procedures, comforted them during proceedings, and assisted them afterward in understanding judicial rulings and any resulting obligations or deadlines. This accompaniment constitutes an explicit exercise of his religious faith, his speech, and his associative commitments as a priest.

25. For nearly twenty years, Father Arias has been physically present in New York City's immigration courts two to three times per week.

26. In his recent experience, conditions inside these courts have changed dramatically. The environment has become increasingly hostile, intimidating, and militarized. Federal agents and building security personnel now regularly patrol the hallways and waiting areas. Over the past year he has had to accomplish his ministry under the eyes of federal officers, who typically appear in tactical or paramilitary gear, sometimes carrying military-style weapons.

27. This display is deeply frightening to the individuals Father Arias serves. The harassment and intimidation have been carried out by federal agents and building security personnel acting

in coordination. On multiple occasions, these officers have explicitly ordered Father Arias not to speak with members of his ministry, even when those individuals requested his presence or support, and even when they were standing in public hallways or waiting areas of the building.

28. Father Arias has been forcibly removed from the building for what these officers perceive as insufficient compliance with these unwritten, ad hoc rules. This has included simply being present to comfort members of his congregation and community in public spaces inside the courthouse.

29. On numerous occasions, he has been ordered to leave courtrooms, hallways, or the building entirely without explanation, posted rule, or lawful justification. The imposition of these restrictions is wholly unpredictable.

30. He estimates that while performing his ministry he has been turned away from courtroom doors dozens of times, and ordered out of ordinary proceedings approximately twenty times, as of the filing of the original complaint in March of 2026, and these attacks of his ministry have continued unabated, and perhaps intensified, since.

31. These exclusions were imposed by federal agents and building security personnel acting under federal authority. They were not based on courtroom capacity, judicial orders, or any individualized conduct on his part. No regulation or lawful basis was cited.

32. As a direct result of these actions, Father Arias has been prevented from carrying out his religious and pastoral duties at the precise moments when they are most essential. Members of his ministry who rely on his knowledge, guidance, and spiritual presence are left alone inside an intimidating and confusing legal process. Immigrants who depend on his

accompaniment are deprived of support not because they rejected it, but because he was forcibly excluded.

33. Father Arias's ministry serves many individuals who come from extremely rural areas of Latin America, who may not read or write, may not speak Spanish fluently, and often have no prior experience with courts or government institutions. Many are terrified simply to be present in the building.

34. When Father Arias is excluded, they are unable to understand what is occurring in their proceedings, what the judge has ordered, or what obligations they must meet. His exclusion directly undermines their ability to participate meaningfully in their own cases.

35. Father Arias was raised in Argentina during periods marked by authoritarian rule and state abuse. The militarized presence, arbitrary commands, and intimidation tactics now present in the immigration courts echo conditions of repression he experienced earlier in his life. The familiarity of the fear tactics causes him great personal distress.

36. Father Arias was present on September 30, 2025, when a journalist was forcibly taken to the ground, causing his head to strike the marble floor with an impact audible throughout the building.

37. For Father Arias to unhesitatingly carry on this work under these conditions, and then to have his ministerial duties interrupted by a wholly unlawful order from the defendants is a cruel assault on both his and the respondent's First Amendment rights. He is repeatedly forced to abandon members of his flock at their greatest moment of need.

38. The arbitrary restrictions being imposed on Father Arias directly and substantially burden his religious exercise, his speech, and his right to associate with members of his congregation and community.

~~39. Even under these conditions Father Arias continues to accompany immigrants and their families. Because the practices described above are ongoing and routinely enforced at New York City immigration court locations, he faces a credible and continuing threat of repeated exclusion, intimidation, and removal in the future.~~

**Arias's access and pastoral communication**

21. For nearly twenty years, Arias regularly accompanied immigrants to their hearings two or three times a week. His work included remaining with families in public waiting areas, speaking with them, and attending their proceedings.

22. During the year preceding this action, Arias repeatedly was ordered not to speak with people who requested his assistance in public hallways and waiting areas. He was directed to leave courtrooms, hallways, or the building while providing pastoral accompaniment by ICE agents and other federal employees and contractors.

23. By March 2026, Arias had been denied courtroom entry dozens of times and ordered out of hearings approximately twenty times. He encountered these restrictions while attempting to observe proceedings and accompany the people who requested his presence.

24. Arias was not given an individualized explanation that these exclusions resulted from his disruption, a lack of seats, or a lawful closure applicable to the particular hearing. The exclusions and speaking prohibitions prevented him from providing support at the time and place it was requested.

25. Arias intends to continue attending these courts and providing pastoral accompaniment. The repeated restrictions require him to choose between curtailing that work and returning with the risk of another exclusion or order to stop communicating.

~~**B. Stephen Kelly**~~

40. Stephen Kelly is an attorney registered in the State of New York. In June of 2025, he registered to practice before the Executive Office for Immigration Review, a two-step process requiring electronic submission of personal information followed by in-person identity verification. On several occasions, court clerks refused to complete the verification, citing computer problems, including while actively using their computer. On a later visit, a clerk stated that "they weren't supposed to let in any more attorneys." After this remark, another clerk who had previously declined to process his request allowed him to complete the verification. However, as a New York attorney, he has an ethical obligation to represent clients only if he can do so competently, which requires the ability to observe the tribunal in which he may practice, particularly where the government advances novel legal theories.

41. Like other plaintiffs, he has been denied entry without justification to virtually every courtroom he has attempted to enter when visiting the court on average once a week, for the past year. Even when accompanying a respondent at the respondent's request. Long-time practitioners in this court system have informed him that the presence of even a single observer significantly influences courtroom conduct, raising concerns about proceedings conducted without public oversight. He continues to attend immigration court to provide support where possible, though these efforts are substantially impeded by the challenged practices.

42. On or around June 23, 2025, while accompanying an individual to court, Mr. Kelly was present in the gallery during that individual's hearing. After the hearing concluded, Mr. Kelly, the respondent, and the respondent's priest exited the courtroom at an appropriate moment. The respondent had been represented remotely by counsel, and the proceedings were conducted in English, which neither the respondent nor the priest speaks. In the

~~hallway outside the courtroom, Mr. Kelly spent several minutes explaining the favorable outcome of the hearing to them. At the conclusion of that conversation, the three began to proceed toward the elevator. At that point, a group of government agents, attired in military-style weapons and armor and who had been standing nearby without indicating any attention to the group, suddenly and without warning rushed them. Mr. Kelly was forcibly thrown away from the group, and the respondent was seized and dragged away in handcuffs. This conduct, occurring immediately following participation in a judicial proceeding and in a public courthouse space, would deter a person of ordinary firmness from attending court, conducting business before the court, or engaging in other activities that can only take place within the courthouse environment.~~

~~43. Mr. Kelly was present on September 30, 2025, when a journalist was forcibly taken to the ground, causing his head to strike the marble floor with an impact audible throughout the building.~~

~~44. Defendants' practices have directly interfered with Mr. Kelly's ability to observe immigration proceedings, to accompany respondents who have requested his presence, and to fulfill his responsibilities as an attorney. Although immigration court proceedings are presumptively open to the public, Mr. Kelly has repeatedly been excluded from courtrooms, prevented from completing required attorney verification, and denied access to public spaces without lawful justification. These barriers have impeded his efforts to document court operations, support respondents, and assess the functioning of a tribunal before which he is authorized to practice. Because these exclusions arise from a recurring pattern of restrictions rather than isolated incidents, declaratory and injunctive relief is necessary to~~

~~restore lawful public access and to prevent further interference with Mr. Kelly's ability to observe and participate in immigration court proceedings.~~

**~~C. Debbie Nathan~~**

~~45. Debbie Nathan is an author and has been a journalist for forty-five years. She has worked as a staff writer for publications including El Paso Times, City Limits, and The Appeal, and as a freelancer for outlets including The Nation, The Intercept, The New York Times, The Atlantic, Ms., Los Angeles Times Magazine, New York Magazine, and The Guardian. She has reported extensively on immigration and the immigration court system since the late 1980s.~~

~~46. Through the summer of 2025, Ms. Nathan's experience in immigration courts was consistent with EOIR's written rules and practice manuals. Respondents had priority for seating, and remaining seats were made available to members of the public, including journalists. During that period, Ms. Nathan was routinely able to observe proceedings, take notes, and gather information necessary to report accurately on how immigration courts functioned.~~

~~47. She has reported on how, since mid-summer 2025, conditions in the New York City immigration courts have changed drastically. Access restrictions have significantly impeded Ms. Nathan's ability to gather information and to perform her work as a journalist.~~

~~48. In a representative incident, on November 14, 2025, Ms. Nathan went to the immigration courts at 26 Federal Plaza, on the fourteenth floor, to observe hearings for a story she was actively reporting. She was accompanied by a colleague who is also a writer.~~

~~49. She initially wasn't able to find any courtroom with an open door, despite having researched the day's docket. When she eventually found one, Ms. Nathan observed approximately four~~

~~people in the gallery, who appeared to be respondents. There was ample additional seating available for public observers.~~

~~50. As Ms. Nathan and her colleague prepared to enter the courtroom, they were approached by an individual she recognized as a court employee from her previous visits to the court. The official told them they could not enter the courtroom because "it's too small" and that "the judge never allows the public in the courtroom." When Ms. Nathan replied that she had attended proceedings in that courtroom in the past, the court employee replied that the judge had permanently banned the public from her courtroom, and further that all judges in that section permanently ban public observers, except for a single Immigration Judge.~~

~~51. Ms. Nathan questioned this explanation in light of both the EOIR Practice Manual, and a recently issued EOIR "Fact Sheet," dated November 2025, which state that court hearings are generally open to the public, subject to limited exceptions. She also reminded the official that he himself had allowed her into courtrooms earlier in the year. He responded, "Things have changed since then."~~

~~52. Ms. Nathan was not permitted to observe any of the other courts, despite visible available seating and the absence of any posted closure orders or capacity determinations.~~

~~53. On another occasion, when attempting to enter a courtroom, she was denied access by a court employee. When she joined the proceeding via Webex from her phone instead, she was told by the judge that only in-person attendance was allowed. She explained that she had just been turned away from the courtroom, and the judge told her to return in person. She was briefly admitted, and then expelled during proceedings, with the judge claiming that some unspecified conduct disqualified her from attending proceedings. Ms. Nathan's behavior in the course of her reporting is always scrupulously appropriate.~~

54. As a direct result of these actions, Ms. Nathan was prevented from observing proceedings she had specifically sought to cover for reporting purposes.

55. She was unable to gather first-hand information about how multiple judges were conducting master calendar hearings, how respondents were being treated, and how proceedings were being managed.

56. This resulted in the loss of information necessary for accurate and responsible reporting on the immigration court system.

57. Because these access restrictions have become routine and categorical, Ms. Nathan has been forced to abandon specific reporting efforts to cover immigration court proceedings in New York. Attempting to observe hearings under these conditions has become futile, as she reasonably expects to be excluded regardless of available seating or the public nature of the proceedings.

58. These restrictions have caused distinct and concrete professional harm, interfering with her ability to pursue stories, gather facts, and earn a living as a journalist.

59. Ms. Nathan would continue attending immigration court proceedings if permitted to do so. Observing hearings firsthand is essential to her reporting career and to her ability to inform the public accurately about how the immigration court system operates.

60. Based on her personal experiences and statements made by court officials, she faces a credible risk of permanent or ongoing exclusion from large portions of the New York City immigration courts.

61. The restrictions she encountered are not isolated incidents but reflect a broader and continuing practice that has substantially curtailed public and press access.

**Nathan's ability to professionally report**

26. On November 14, 2025, Nathan attempted to observe immigration hearings on the fourteenth floor of 26 Federal Plaza. Despite available seating, a court employee refused her entry, stating that the judge never allowed the public into the courtroom. On June 25, 2026, ICE agents aggressively confronted Ms. Nathan after Ms. Nathan photographed a public hallway while reporting on immigration court. Officers from another DHS component intervened and physically positioned themselves between Ms. Nathan and the ICE agents.

27. Attorney Stephen Kelly arrived at approximately the same time. A supervisory non-ICE federal law-enforcement officer acknowledged that the hallway was public and that Ms. Nathan had every right to take pictures there, but strongly advised her not to, so as not to antagonize the ICE agents.

28. During this conversation, Mr. Kelly observed the agents unnecessarily follow and position themselves in Ms. Nathan's immediate vicinity while posturing threateningly, while the non-ICE officers positioned themselves to stand between them. The supervisor's warning appeared to reflect genuine concern.

29. Plaintiffs do not challenge lawful enforcement. They challenge unnecessary force, threats, speech commands, access commands, and retaliation directed at nonobstructive protected activity.

30. The Defendants' actions deprived Nathan of firsthand information and caused her to abandon reporting she otherwise would have pursued. She intends to return to observe and report on proceedings for the public good if she can obtain safe access.

~~**D. Dr. Zoey Phillips**~~

62. Dr. Zoey Phillips is a New York-licensed psychologist working in the treatment of youth and families, with a particular focus on individuals who have experienced trauma. She regularly counsels youth, families, and adults who have personal or family histories of immigration to the United States in New York hospitals, schools, group practices, and private practice.

63. Dr. Phillips is a Spanish-speaker, with a background in the psychological toll of court proceedings in immigrant communities. As part of this specialization she must diligently remain aware of the firsthand experience of immigration court proceedings on individuals and families. This is necessary to her ability to treat issues informed by fear, confusion, isolation, and re- traumatization that refugees experience.

64. Dr. Phillips is a practicing Christian, who considers it an integral part of her faith and religious practice to also be present for people experiencing hardship, fear, and displacement. Being physically present, offering companionship, and providing prayer when asked are core expressions of her religious duty. These commitments have been central to her personal, professional, social, and religious life throughout her career.

65. Consistent with these commitments, Dr. Phillips regularly volunteers to accompany individuals to their court dates, and to provide meaningful support before and after hearings. She has been consistently stymied in this on virtually every visit she has attempted to make to Immigration Court in the past year.

66. In a representative example, on October 21, 2025, Dr. Phillips attempted to observe an open immigration hearing. Earlier that morning, a court clerk had informed people in the waiting room that the gallery would be opened at approximately 10 a.m.

67. When Dr. Phillips returned at approximately 9:55 a.m., the court clerk stated that observers were not permitted to enter and instructed them to return in ten to fifteen minutes. Dr.

Phillips requested permission to wait in the public waiting room to ensure timely access. The clerk refused and ordered the observers to leave the almost empty waiting room.

68. Later that morning Dr. Phillips and two others were permitted to enter. After the hearing, a respondent expressed concern about her ability to secure legal representation before her next court date. Dr. Phillips walked with her into the waiting room and spoke quietly with her in Spanish. Dr. Phillips wrote down the name and address of St. Peter's Church and the time of services on a small piece of paper. The woman expressed gratitude and asked if someone could accompany her to the lobby, which Dr. Phillips did.

69. While Dr. Phillips was speaking quietly with the woman in the waiting room, the court clerk observed the interaction and stated, "After this, you're done." Dr. Phillips explained that she had only shared the name of a church. The clerk responded, "Yeah, whatever. After this, you're done," and raised his hand in a gesture blocking her return to the courtroom. She was not permitted to re-enter.

70. She then entered another courtroom connected to the same waiting room, whose door was open during a recess, and sat in the gallery to wait. Other individuals, apparently attorneys, were milling around the area separating the gallery from the court. As proceedings were just about to commence, the judge noticed her and asked if she was an attorney. When she replied in the negative, she was told she must leave "because they were about to have an individual hearing." The relevant law explicitly states that individual hearings are open to the public. 8 C.F.R. § 1003.27 (2025).

71. Dr. Phillips had complied with all building rules and security procedures. No courtroom closure order, capacity determination, or other recognized justification was provided,

despite her request. Many seats, including the seat she had previously occupied, were visibly unoccupied. No overflow or alternative access was offered.

72. The October 21, 2025 incident was not isolated. On numerous other occasions at New York City immigration courts, court clerks and security officers have ordered Dr. Phillips to leave waiting rooms, hallways, and courtrooms, both when she was alone and when she was with others. On multiple occasions, she was told she could not wait in public waiting rooms or hallways and was given no lawful alternative that would allow her to observe hearings.

73. On at least one occasion, despite arriving at approximately 7 a.m., Dr. Phillips was prevented by security officers from entering the building until 8:30 a.m., pursuant to a new policy that made it virtually impossible for observers to make it to a courtroom before staff had the opportunity to lock it from the inside.

74. On other occasions, clerks explicitly told Dr. Phillips that she was not permitted to speak with or exchange information with individuals awaiting their hearings, even in public areas, and that she would have been allowed entry only if she had met those individuals outside the building.

75. These practices make it practically impossible for Dr. Phillips to pursue her protected activities as a court observer, volunteer, mental-health professional, and person of faith.

76. The actions described above have caused Dr. Phillips direct and personal harm. She has been prevented from observing public immigration court proceedings, excluded from public spaces without lawful justification, and barred from re-entering courtrooms after lawful exits.

77. She has been forced to abandon individuals at moments of acute vulnerability, including people experiencing fear, confusion, and psychological distress.

78. These exclusions interfere directly with her professional responsibilities as a psychologist specializing in trauma, her ability to understand the court environment affecting her clients, and her religious duty to provide presence, compassion, and support.

79. Dr. Phillips' research and professional experience make her particularly aware of the ways in which human connection, companionship, and, often, faith can buffer the effects of traumatic experiences and promote resilience. Being prevented from offering this support causes both personal and professional injury. She is equally aware of the psychological impact of a government worker in a threatening environment arbitrarily curtailing such support.

80. These practices create an ongoing and concrete barrier to Dr. Phillips's ability to carry out her professional, civic, and religious obligations. Despite immigration proceedings being presumptively open to the public under federal law, Defendants' repeated exclusion of Dr. Phillips from courtrooms, waiting areas, and other public spaces—without lawful justification— prevents her from observing proceedings, accompanying vulnerable individuals, and offering the support that her professional training and religious commitments compel her to provide. The restrictions described above are not isolated incidents but part of a broader pattern that effectively forecloses meaningful public access to immigration court proceedings in New York.

81. Declaratory and injunctive relief is therefore necessary to restore lawful public access, to prevent further arbitrary exclusion of observers such as Dr. Phillips, and to ensure that she

~~may engage in her protected professional, expressive, and religious activities without unlawful interference.~~

**Phillips's access, conversation, and exclusion**

31. Phillips regularly attends immigration court to observe proceedings and provide accompaniment. On October 21, 2025, a clerk told her she could enter a hearing at 10:00 a.m. When she returned at approximately 9:55 a.m., she was told to return ten to fifteen minutes later and was ordered out of an almost empty waiting room.

32. After a hearing Phillips was permitted to observe, a respondent expressed concern about obtaining a lawyer. Phillips walked with the respondent into the waiting room, spoke quietly with her in Spanish, and wrote down the name, address, and service times of Saint Peter's Church.

33. A clerk who saw the exchange told Phillips, "After this, you're done." Phillips explained that she was providing church information. The clerk responded, "Yeah, whatever. After this, you're done," and used a hand to block Phillips from reentering.

34. At another courtroom during a recess, a judge asked Phillips whether she was an attorney. When she said she was not, she was told to leave because an individual hearing was about to begin. Seats were available, and no further explanation of a closure was given to her.

35. On other visits, clerks and security personnel directed Phillips out of waiting areas, hallways, or courtrooms, and expressly told her not to speak with respondents or exchange information there. She was told she could do so only if she met them outside.

36. These restrictions interrupted Phillips's own conversations and accompaniment, as well as her observation of hearings. She intends to continue attending the courts and providing support and faces the prospect of the same restrictions on future visits.

**E. Laura McCallum**

82. Laura McCallum is an artist and educator and has lived in Brooklyn, New York, for approximately forty-five years.

83. Ms. McCallum has regularly volunteered as a court observer and accompanier at the federal immigration courts in New York City. Ms. McCallum attends immigration court approximately once per week. Her purpose in attending is to observe public immigration court proceedings, to provide non-legal information to individuals navigating the asylum process, and to accompany immigrants to and from their hearings so that they are not forced to face an intimidating legal process alone.

84. From March through late May 2025, public-access conditions in New York City's immigration courts were consistent with Ms. McCallum's prior experience volunteering in courthouses. During this period, court observers were able to enter the buildings, wait in public waiting rooms, speak quietly with immigrants, distribute written information describing legal rights, accompany individuals into courtrooms when space permitted, and exit the building with them after hearings. Throughout her previous experience, court staff and security personnel did not restrict observers' movement through public hallways, did not prohibit access to waiting rooms, and did not interfere with observation of hearings.

85. Beginning in early June 2025, access conditions changed sharply and dramatically. This change coincided with the regular presence of federal agents inside and immediately outside immigration courtrooms.

86. Since that time, Ms. McCallum has repeatedly attempted to observe public immigration court proceedings and to accompany individuals attending hearings. She has repeatedly been

~~prevented from doing so by federal agents and building security personnel acting under federal authority.~~

~~87. Since June 2025, Ms. McCallum has been denied entry into public waiting rooms, prohibited from standing or walking in hallways ordinarily open to the public, separated from immigrants by security directives preventing communication, forced to wait outside court buildings in extreme weather conditions to gain entry, and barred from re-entering courtrooms after briefly leaving to use the restroom or accompany an individual.~~

~~88. On multiple occasions at New York's Immigration Courts, Ms. McCallum has been told by federal agents or building security personnel that hallways were "private" or off-limits, despite those hallways being necessary to access public restrooms or courtrooms.~~

~~89. Since June 2025, Ms. McCallum has personally been turned away at courtroom doors between fifteen and twenty-five times. She estimates that she has been ordered to leave courtrooms approximately fifteen times and has been prohibited from entering courtrooms at least twenty times.~~

~~90. These exclusions were not accompanied by any courtroom closure order, capacity determination, or case-specific justification. No federal agent, security officer, or court staff member cited any regulation, court order, or lawful basis for denying access.~~

~~91. As a direct result of these actions, Ms. McCallum has been prevented from observing hearings she intended to attend and was lawfully entitled to observe as a member of the public. She has also been prevented from monitoring how immigration conducted proceedings, how ICE agents interacted with respondents and family members, and whether hearings were conducted in a fair, orderly, and lawful manner.~~

92. On several occasions, Ms. McCallum was prohibited from distributing written materials explaining immigrants' legal rights by security personnel, who characterized this activity as "solicitation," a term whose definition in any relevant statute, code, or regulation has no application to her activities or reason for being present at immigration court. She both explained this, and demonstrated this fact with the court's own materials. She was told that the prohibition reflected new policy.

93. She has witnessed federal agents demand identification without explanation and issue abrupt commands that frightened immigrants and volunteers.

94. She was present on September 30, 2025, when a journalist was forcibly taken to the ground, causing his head to strike the marble floor with an impact audible throughout the building. Ms. McCallum has personal experience of friends with permanent cognitive impairment from this type of injury, and witnessing this conduct heightened Ms. McCallum's fear of retaliation and reinforced the chilling effect of the access restrictions described above.

95. The conduct described above has directly interfered with Ms. McCallum's ability to observe public immigration court proceedings, to engage in lawful court observation, and to accompany individuals during and after hearings.

96. These actions have denied her meaningful access to proceedings that are presumptively open to the public and have chilled her continued participation as a court observer. Because these practices are ongoing and appear to be enforced uniformly by ICE agents and building security personnel, Ms. McCallum faces a credible and continuing threat of repeated exclusion each time she attempts to observe immigration court proceedings in the future.

~~97. Based on her repeated observations at two separate immigration courthouses, the restrictions she experienced are not isolated incidents but reflect a systemic practice applied generally to court observers and members of the public.~~

~~98. The harms caused by these practices are ongoing and can be remedied only through declaratory and injunctive relief requiring defendants to cease unlawful restrictions and to restore lawful public access to immigration court proceedings.~~

**McCallum's access, legal information, and accompaniment**

37. McCallum has attended immigration court weekly since March 2025. Before June 2025, she generally could enter waiting areas, speak with respondents who wanted assistance, and observe hearings.

38. Beginning in June 2025, McCallum repeatedly was denied access to waiting areas and hallways, separated from people she was accompanying, and barred from reentering courtrooms after briefly leaving to use a restroom or accompany a respondent.

39. Personnel, understood by McCallum to belong to ICE, based on her familiarity with the environment, described hallways as "private" even though visitors needed to pass through them to reach courtrooms, exits, or public restrooms. Those restrictions interrupted McCallum's access to the court and her ability to remain with people requesting her help.

40. By the time of the First Amended Complaint, McCallum estimated that she had been denied entry at courtroom doors fifteen to twenty-five times and had been ordered out of hearings approximately fifteen times. She was not given a particularized closure or capacity explanation for these recurring exclusions.

41. Security personnel prohibited McCallum from providing written legal-rights information to respondents, characterizing it as “solicitation” or a “new policy.” The exchanges were noncommercial and part of her assistance to people seeking help.

42. The restrictions have prevented McCallum from observing proceedings, communicating with willing listeners, and accompanying respondents. She intends to continue her weekly visits and that work.

**Ruiz’s hearing access and pastoral communication**

43. Ruiz’s accompaniment ordinarily includes entering with the person who requested his presence, passing through security, using the elevators, waiting together, answering questions quietly, praying when requested, observing a hearing, and leaving with the person afterward.

44. At 26 Federal Plaza and 290 Broadway, Ruiz repeatedly has been ordered not to speak with people requesting his pastoral assistance, even when the conversations were quiet, consensual, and noncommercial and he was not obstructing movement or interfering with a proceeding.

45. On June 25, 2026, Ruiz accompanied a family at 26 Federal Plaza, wore his clerical collar, and sat in the courtroom gallery. He took notes and offered support. He did not disrupt the proceeding, speak loudly, or block movement.

46. A court employee asked Ruiz who he was. He identified himself as the family’s priest and was ordered to leave. He left and spoke with the family outside the courtroom.

47. On other occasions, clerks asked Ruiz whether he was a relative of the person he accompanied and denied him entry when he explained that he was the person’s priest. At

other times he was admitted as clergy. He was not given a stable written rule explaining that difference.

48. Uniformed building-security personnel have removed Ruiz from public areas while he was engaged in quiet, consensual pastoral communication. Those removals separated him from the people he was assisting and stopped the requested communication.

49. On July 20, 2026, building security removed Ruiz twice while he was speaking with people in connection with his pastoral work. During one encounter, he was told, in substance, "I thought you were a relative, not a priest. Get out."

50. These restrictions deprive Ruiz of his own opportunities to observe proceedings, speak, pray, and remain with people who requested his presence. His ministry requires that accompaniment at the time and place of the proceeding. He intends to continue regularly visiting the courts and providing that support.

**ICE personnel's direct restrictions and threats against Ruiz**

51. On January 6, 2026, Ruiz accompanied a family in the twelfth-floor hallway at 26 Federal Plaza after a hearing. Officers wearing ICE-marked vests approached the family during an arrest operation. One officer pushed Ruiz aside with an arm as officers separated a man from the family and moved him toward an elevator.

52. Ruiz told the officers that they had the wrong person. He was threatened with arrest. He was not blocking the officers' path, using force, or refusing a lawful order. This encounter interrupted his accompaniment of the family.

53. Ruiz also has received repeated warnings from ICE personnel that he would not be permitted to continue if he persisted in his "behavior," had to leave, or would be arrested if he

interfered. These warnings followed his continuing to accompany, question, or remain near a person who had requested his pastoral presence.

54. Ruiz explained that he was providing pastoral assistance, was not aggressive or violent, and was accompanying a person who requested his presence. When he asked what conduct was improper, he received no explanation.

55. The warnings occurred not only when an arrest was already underway, but also during ICE personnel's control of hallways and waiting areas. ICE personnel approached Ruiz directly, directed him to leave, separated him from the person he was accompanying, or threatened arrest.

56. The threatened loss of access affects Ruiz's own conduct. He weighs whether to ask a question, pray, or remain with a person against the risk that he will be excluded or prevented from assisting people on later visits. He intends to continue his accompaniment and expects to encounter those restrictions again.

57. Ruiz's claim concerns restrictions imposed because of his quiet, consensual pastoral speech, association, or questions, when he is not obstructing a proceeding or lawful enforcement activity. It does not seek to prevent officers from separating people as reasonably necessary to carry out an arrest or other lawful enforcement operation.

**The outermost entry barricades at 26 Federal Plaza**

58. The exterior location challenged here is the outermost staffed barricade used to control passage into the visitor-entry route at 26 Federal Plaza. The guards stationed there decide whether visitors may proceed toward the building entrance. The claim concerns that entrance-control function, rather than every sidewalk or plaza surrounding the building.

59. Ruiz has repeatedly encountered guards at that barricade stopping people who stated that they were respondents with scheduled immigration-court business. The guards demanded identification, hearing notices, or other papers and refused passage when those people could not produce them. No such building access requirement has been promulgated to respondents, nor does it appear in any regulation. As a result respondents have received in absentia Final Removal Orders due to not being allowed in the building. This has also occurred to respondents who were turned away from their courtroom door. By the time these people make it to an immigration clinic, few options remain to them.

60. On several of those occasions, Ruiz was there specifically to accompany the respondents. Even after he identified himself as their priest, the guards did not allow the respondents to proceed. The resulting separation prevented Ruiz from providing the requested accompaniment.

61. On information and belief, the guards controlling this building-entry post were FPS personnel or FPS-supervised contract PSOs. That identification is based on their operation of the federal-building entrance-control post and FPS's responsibility for staffing and supervising those posts.

62. FPS has stated that visitors to 26 Federal Plaza and 290 Broadway are not required to present identification, appointment letters, or other proof of appointments to gain access. It also has stated that court respondents and their accompaniers at 26 Federal Plaza use the visitor line separate from the line for people reporting to ICE. Yet the practice continues, and, like building access, is mirrored in practices at the courtroom door with policies that cause respondents to be separated from their support, even when space is available. This practice is ongoing.

63. Ruiz's exterior claim challenges the denial of the requested accompaniment through document demands of the kind described above, rather than screening for weapons or dangerous items. He intends to return regularly to 26 Federal Plaza with people who request his assistance and expects to encounter the same entrance-control practice.

**Recurring injury and prospective relief**

64. The events described above include restrictions imposed on different Plaintiffs by different employees over repeated visits. Statements that the public was never admitted, that nonrelatives or priests could not enter, that conversations were prohibited, or that a "new policy" barred legal information communicated general access or communication practices rather than a response to a particular disruption.

65. The agencies can direct their own court staff, building-security personnel, and other responsible personnel concerning access and communication. ICE-specific relief would permit Plaintiffs to safely observe eligible hearings and carry out the quiet communication and accompaniment described here without the challenged exclusions, prohibitions, and threats.

66. Ruiz has encountered greater flexibility from some clerks and less visible ICE activity on some visits. The varying treatment has not supplied him with a reliable ability to perform his regular accompaniment without the restrictions described above. The restrictions on any given day are completely arbitrary, unwritten, inconsistent, and appear to be devised on the spot.

67. The Court has entered preliminary relief concerning hearing access, necessary public access routes, and communication at these two courts. Plaintiffs seek final adjudication and permanent relief on the claims pleaded here. Their repeated use of the facilities and plans to

return expose them to renewed loss of observation, reporting, conversation, and accompaniment when the challenged practices are applied. While some of the most visible forms of the suppression of First Amendment rights have receded since this Court's July 21 Preliminary Injunction, the situation remains substantially unchanged. Respondents, many of whom appear *pro se* and have little familiarity with formal administrative systems, are expected to navigate complex legal proceedings without counsel or reliable assistance. Defendants' policies not only destroy transparency, but physically separate these respondents from any means of personal or community support prior to their hearing. The listening ear in the gallery that they may have relied upon is separated from them at the last moment before their hearing.

68. Under the accompanying motions, Plaintiffs seek to represent one class under Federal Rules of Civil Procedure 23(a) and 23(b)(2). Plaintiffs' claims arise from their repeated encounters with those practices while observing, reporting, communicating, or accompanying at the facilities. They seek prospective changes to the practices, rather than individualized grants. Their claims therefore present the same access and communication questions for others subjected to the same practices.

69. The proposed class includes a changing population of present and future court users and other visitors. New proceedings bring new respondents, families, witnesses, and observers to the facilities. The identities of future users cannot all be determined in advance, and joining each present and future person subject to the challenged practices is impracticable. Plaintiffs seek to protect the class's common interest in lawful access and protected communication in defined areas.

~~**CLAIM FOR RELIEF**~~

**Count I – Violation of the First Amendment**

124. Plaintiffs incorporate by reference the foregoing paragraphs.

125. Plaintiffs' activities, including observing court proceedings, engaging in consensual conversation, and distributing informational materials, are protected by the First Amendment.

126. The courtroom closures, speech prohibitions, ejections, and harassment described above constitute direct restrictions on protected speech and access.

127. These restrictions are not reasonable time, place, or manner regulations. They are not narrowly tailored to serve a significant governmental interest and do not leave open ample alternative channels for communication.

128. Defendants' actions are not viewpoint neutral and disproportionately burden speech concerning legal rights and access to the courts.

129. Defendants have violated the First Amendment by imposing adverse actions that chill and deter protected activity, including the rights to petition the government for redress of grievances and to access the courts. This conduct lacks adequate justification, is not narrowly tailored to any legitimate governmental interest, and has caused, and will continue to cause, irreparable harm absent injunctive relief.

130. Defendants' conduct has caused and continues to cause irreparable injury.

**CLAIMS FOR RELIEF**

**COUNT I — First Amendment access to otherwise open hearings**

70. Arias, McCallum, Nathan, Phillips, and Ruiz assert this count against DOJ and the Attorney General for courtroom and EOIR access practices, and against DHS and the Secretary through FPS and its PSOs, and GSA and its Administrator, for building-access and management practices that obstruct access to those hearings.

71. The particular exclusions alleged above prevented these Plaintiffs from observing hearings that were not identified as lawfully closed or subject to an applicable attendance limitation. Personnel excluded Plaintiffs because they were observers, clergy, nonrelatives, or nonattorneys, or through recurring access barriers, rather than an identified disruption, capacity limit, or other lawful ground applicable to the hearing.

72. Those practices violate Plaintiffs' qualified First Amendment right to observe otherwise open immigration hearings. Each Plaintiff intends to return and seeks declaratory and injunctive relief against recurrence.

**COUNT II — First Amendment speech and association**

73. Arias, McCallum, Phillips, Nathan, and Ruiz assert this count against DOJ and the Attorney General for EOIR communication and accompaniment restrictions, and against DHS and the Secretary through FPS and its PSOs, and GSA and its Administrator, for the building-access and use restrictions attributed to those agencies. Plaintiffs also assert this count against ICE and its Director, and DHS and the Secretary through ICE, for ICE personnel's direct restrictions described above.

74. Plaintiffs were involved in gathering information and reporting as a journalist. Others spoke quietly with willing listeners, provided individualized noncommercial information or gave requested pastoral assistance, or remained with people who requested their presence, and were repeatedly targeted for intimidation, unnecessarily placed in harm's way, or threatened with arbitrary restrictions for engaging in protected speech and association by the Defendants in this action, including ICE agents. The restrictions described above barred those activities in public waiting areas or excluded Plaintiffs from areas they needed to use,

without an explanation that their actual conduct disrupted a proceeding, blocked movement, or created a security problem.

75. The stated reasons for some exclusions expressly turned on the visitor's being a priest rather than a relative or an attorney, the giving of church or legal information, or a prohibition on speaking with respondents. As applied to the quiet, consensual activities alleged here, the restrictions were unreasonable in light of the use of the affected areas and, where imposed because of the pastoral or legal-rights message, were not viewpoint neutral.

76. Ruiz's claim concerning the outermost entry barricades at 26 Federal Plaza is asserted against DHS and the Secretary through FPS and its PSOs, and GSA and its Administrator to the extent of their control of the entry practice. The document demands and denials described above prevented his requested accompaniment in the route designated for court visitors, notwithstanding FPS's stated policy that those documents are not required for entry.

77. Ruiz's claim against ICE concerns restrictions and threats directed at his own pastoral speech and accompaniment, including the repeated warnings irrespective of any concurrent lawful law enforcement activities. He seeks relief only to the extent those restrictions are imposed because of protected activity rather than an actual obstruction or a reasonable need to conduct lawful enforcement.

78. These practices burden Plaintiffs' own speech and association. Their recurring attendance and intended continuation of these activities expose them to renewed interruption, separation, and exclusion, for which they seek declaratory and injunctive relief.

**COUNT III — First Amendment retaliation**

79. Plaintiffs assert this count against the DOJ, DHS, ICE and GSA defendants responsible for the retaliatory exclusions and communication restrictions described above.

80. These Plaintiffs engaged in protected activity by observing otherwise open hearings, gathering information and reporting as a journalist, speaking quietly with willing listeners, providing noncommercial information, offering requested pastoral support, and asking questions without obstructing proceedings or lawful enforcement.

81. Personnel responded to that activity with threatened or actual exclusion, orders to stop communicating, physical separation, or threats of arrest. The stated reasons and sequence of events—including Phillips's exclusion immediately after providing church information, the exclusions identifying Ruiz as a priest rather than a relative, and the warnings to Ruiz about continuing his pastoral "behavior"—connect those adverse actions to the protected activity.

82. The challenged actions curtailed Plaintiffs' activities and would deter a person of ordinary firmness from continuing them. Plaintiffs nevertheless intend to return. They seek prospective protection against adverse action imposed because of their protected activity, subject to lawful access, security, and enforcement measures.

**PRAYER FOR RELIEF**

~~WHEREFORE, Plaintiffs request this Court:~~

~~(1) Assume jurisdiction over this matter;~~

~~(2) Issue a declaratory judgment that the Defendants' policies violate the First Amendment to the United States Constitution, federal common law, various acts, and public policy;~~

~~(3) Issue preliminary and permanent injunctions enjoining Defendants, their officers, agents, employees, and all persons acting in concert with them from enforcing or maintaining policies or~~

practices that restrict public access to immigration court proceedings except as permitted by law, or retaliating against persons who engage in protected activities;

(4) Prohibit Defendants from engaging in retaliatory conduct that burdens, penalizes, or deters respondents from attending or participating in their own judicial proceedings, including conduct that would dissuade a person of ordinary firmness from exercising such rights;

(5) Award the Plaintiffs attorneys' fees and costs; and

(6) Grant any other relief the Court deems appropriate.

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Declare that the practices proved under Counts I–III violate Plaintiffs' First Amendment rights to the extent described in those counts;

B. Enter a permanent injunction directing DOJ and the Attorney General, through responsible EOIR personnel, to permit observation of otherwise open hearings at 26 Federal Plaza and 290 Broadway, subject to lawful closure and attendance limitations, and to refrain from the unconstitutional communication restrictions and retaliatory exclusions established in this action;

C. Direct DHS and the Secretary, through FPS and responsible PSOs, and GSA and its Administrator, within their respective authority, to provide the access necessary to reach those hearings and public waiting areas and to refrain from unconstitutional entry, movement, communication, or retaliation practices established in this action, including any unlawful application of the particular 26 Federal Plaza entrance-document practice alleged above;

D. Direct ICE and its Director, and DHS and the Secretary through ICE, to refrain from restricting Plaintiffs' protected speech and association or retaliating against them for that

activity to the extent established under Counts II and III, while preserving reasonable measures necessary for lawful security;

E. Upon a properly supported motion, certify the proposed class under Rule 23(b)(2), appoint appropriate class representatives and class counsel, and extend the relief to the class to the extent supported by the certified claims;

F. Award costs and reasonable attorneys' fees to the extent authorized by applicable law; and

G. Grant such further relief consistent with the pleaded claims as the Court deems just and proper.

The requested relief excludes nonpublic offices, staff-only routes, detention and holding areas, lawfully closed proceedings, and conduct reasonably necessary for lawful enforcement or genuine security. No monetary damages are requested.

~~Counsel for the Plaintiffs~~

~~Dated: April 26, 2026~~

~~32 Court Street, 904~~

~~Brooklyn, NY 11201~~

~~929-270-9905~~

Executed on October 26, 2026 in Brooklyn, New York

Respectfully submitted,

/s/ Stephen Kelly

Stephen Kelly
Counsel for Plaintiffs
32 Court Street, Suite 904
Brooklyn, New York 11201
(929) 270-9905
stephen@philanthropy-law.com